ANDREW R. MUEHLBAUER
Nevada Bar No. 10161
SEAN P. CONNELL
Nevada Bar No. 7311
**MUEHLBAUER LAW OFFICE, LTD.**
7915 West Sahara Avenue, Suite 104
Las Vegas, Nevada 89117
Telephone: 702-330-4505
Fax: 702-825-0141
Email: andrew@mlolegal.com
sean@mlolegal.com

*Lead Counsel for Lead Plaintiff*

[*Additional Counsel on Signature Page*]

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| CHRISTIAN A. FELIPE, individually as administrator of the CHRISTIAN A. FELIPE CONTRIBUTORY IRA, and on behalf of all those similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>PLAYSTUDIOS, INC. *et al.*,<br><br>Defendants. | Case No. 2:22-cv-01159-RFB-NJK<br><br>Hon. Richard F. Boulware, II<br><br>CLASS ACTION<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

The Phoenix Insurance Company Ltd. and The Phoenix Provident Pension Fund Ltd. (collectively referred to herein as the "Lead Plaintiff"), individually and on behalf of all other persons similarly situated, through their undersigned attorneys, for their Amended Class Action Complaint (the "Amended Complaint") against Defendants (as defined below), allege the following based upon personal knowledge as to those allegations concerning themselves and, as to all other matters, the investigation conducted by and through their attorneys, including, among other things, a review of the Defendants' public statements and filings made with the United States Securities and Exchange Commission (the "SEC"), wire and press releases issued by or regarding Playstudios, Inc. ("Playstudios" or the "Company") and Acies Acquisition Corp. ("Acies"), analysts' reports and advisories about the Company, information obtained from interviews with knowledgeable former employees of the Company, and other information readily available on the Internet. Lead Plaintiff believes that substantial evidentiary support exists for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of the following three classes:

a. Securities Act Class: a class consisting of all persons who purchased or otherwise acquired public shares in Playstudios (including by way of exchange of publicly-listed Acies shares) pursuant to or traceable to the defective proxy/registration statement that Defendants filed with the SEC on Form S-4 on February 16, 2021, and amended on Forms S-4/A on March 26, 2021, May 10, 2021, May 18, 2021, and May 20, 2021, and the body of which was incorporated into the final prospectus on Form 424(b)(3) filed on May 25, 2021 (hereafter the "Defective

Proxy/Registration Statement"). The Securities Act Class asserts claims under Sections 11 and 15 of the Securities Act. These claims arise from Defendants' negligence, and do not assert that Defendants acted with scienter.

b. <u>14(a) Class</u>: a class consisting of all persons who were solicited to approve the merger and who exchanged publicly-listed Acies shares for Playstudios' Class A Ordinary Shares rather than redeeming the same pursuant to the Defective Proxy/Registration Statement. The 14(a) Class asserts claims pursuant to Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). These claims arise from Defendants' negligence, and do not assert that Defendants acted with scienter.

c. <u>10(b) Class</u>: a class consisting of all persons who purchased or otherwise acquired Playstudios' Class A Ordinary Shares or other public Playstudios' securities between August 11, 2021 and May 5, 2022, both dates inclusive (the "10(b) Class Period"). The 10(b) Class asserts claims under Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.

Excluded from all Classes are: (a) Defendants and their immediate families; (b) current and former directors or officers of Playstudios or Acies; (c) any entity that has entered into a stockholder agreement or co-venture agreement with Playstudios, or was a Private Investment in Public Equities ("PIPE") investor in Playstudios; and (d) any entity controlled, majority-owned or wholly owned, or affiliated with any of the above.

2. Playstudios went public on June 22, 2021, via a billion dollar merger with Acies,

a special purpose acquisition company ("SPAC"). It is one of the worst performing companies that chose to go public in this manner since June 2021, and its stock price has plummeted by nearly 70% since the merger, which was effected through a defective and negligently prepared proxy and registration statement registered with the SEC pursuant to the Securities Act on Form S-4.

3. Structurally, every public shareholder of the Acies SPAC was impacted by the Defective Proxy/Registration Statement in three ways:

a. Redemption: public shareholders were provided the right to redeem Acies shares for $10 pursuant to the Defective Proxy/Registration Statement if they preferred to receive their money back rather than obtain Playstudios' shares in the merger.

b. Merger Vote: regardless of whether a shareholder redeemed shares, the Defective Proxy/Registration Statement called for Acies public shareholders to vote to approve or reject the merger between Acies and Playstudios.

c. Replacement Share Issuance: Acies shareholders who did not redeem shares had their Acies shares cancelled in exchange for the right to receive Class A Ordinary Shares of Playstudios pursuant to a predetermined formula. These shares comprised the entire public market for Playstudios' Class A Ordinary Shares after the merger, as all other shareholders (as admitted in the Defective Proxy/Registration Statement) were subject to a 12 month lock up period during which their shares could not be sold, and a very limited quantity of shares were allowed to be sold by those

shareholders subject to the lock up only after 6 months from the date that the merger closed. For this reason, and because of the redemption and merger vote, all Playstudios' Class A Ordinary Shares publicly traded on or after June 22, 2021 are traceable to the Defective Proxy/Registration Statement.

4. Founded in 2011, Playstudios is a mobile gaming company that principally develops and markets casino games for mobile devices and personal computers, including slots, blackjack, and bingo. While the Company had no experience in the far more lucrative market for role-playing games (hereafter "RPGs"), before going public via the merger, it entered into an agreement with Boss Fight Entertainment, Inc. ("Boss Fight") to develop and commercialize a significant new RPG known as Kingdom Boss. RPGs are games in which players assume the roles of certain characters in a defined setting and act on those roles within the game's narrative. Examples of prominent mobile RPGs include games related to the Star Wars and Final Fantasy franchises and Minecraft. Smooth gameplay free of glitches and bugs is critical to keep users engaged and dedicated to an RPG.

5. To pitch the merger to investors and pull off a vital capital raise, the Defective Proxy/Registration Statement repeatedly claimed that Kingdom Boss would launch in the second half of 2021, and its sales would cause the Company's full year revenues to skyrocket from $269.8 million in 2020 to $435.2 in 2022. These statements were tethered to the baseless predicate assumption that Kingdom Boss would launch in 2021 and generate $60 million in revenues for the Company by 2022.

6. However, significant problems existed with Kingdom Boss and were known to Defendants at the time of the Defective Proxy/Registration Statement. At least seven months

before the merger was consummated, hundreds of players with personal knowledge and experience confirmed that Kingdom Boss suffered from intractable technical defects including glitches, inordinate lags, and constant crashes that rendered the game completely inoperable. As a result of these insurmountable problems, Playstudios never had a game that could be launched commercially or reasonably be assumed to be a source of revenue, let alone $60 million per year in revenue.

7. These severe defects persisted even after the merger despite numerous software updates and became chronic as the year 2021 progressed into the year 2022. Aware of these severe defects before the merger, Defendants edited a draft of the Defective Proxy/Registration Statement that earlier claimed that the game would launch in mid-2021 to claim that the game would launch in the second half of 2021. Defendants did not, however, disclose the significant and persistent technical defects they had known about for months or that these problems caused the delay. Nor did Defendants disclose that these serious technical defects had already become an adverse trend before the Company went public and caused great uncertainty about both whether the game could be launched on the timeline represented or launched at all.

8. It was vital for investors to be accurately informed about Kingdom Boss's intractable technical defects before the merger so that investors could accurately weigh their redemption options and merger votes. Accurate disclosure was also affirmatively required by SEC regulations. Without the benefit of accurate disclosure in the Defective Proxy/Registration Statement, Acies investors overwhelmingly approved the merger with Playstudios, and most of them did not redeem their shares instead. On June 17, 2021, the merger closed, effecting Playstudios' initial public offering via a large SPAC transaction.

9. Because the Defective Proxy/Registration Statement was negligently prepared, it

did not accurately inform investors of critical information. Only days after the Company's common stock and warrants began to trade on the stock exchange, Defendants completed the second quarter of 2021, the results of which confirmed what they had known for months: that the commercial launch of Kingdom Boss was in peril and threatened the inaccurate revenue projections they had just included in the Defective Proxy/Registration Statement. Defendants admitted these facts when they announced in mid-2021 that the game's launch would be delayed further, and the deterioration in revenues was principally caused by that delay. Despite repeatedly assuring investors that the Company would launch and commercialize the game before the end of 2021, in February 2022, the Company abandoned the game completely, and blamed the failure on amorphous "metrics" and vague "performance" issues. Still, Defendants never disclosed the specific, intractable technical defects that arose before the merger and lasted until the game was abandoned and went offline.

10. Playstudios and its Chief Executive Officer ("CEO") also made additional misleading statements regarding Kingdom Boss in violation of Section 10(b) throughout the 10(b) Class Period.

11. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiff and other Class members have suffered significant losses and damages.

**JURISDICTION AND VENUE**

12. The claims asserted herein arise under and pursuant to §§11 and 15 of the Securities Act (15 U.S.C. §§77k, 77l and 77o) and §§10(b), 14(a) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b), 78n and 78t(a)) and Rules 10b-5 and 14a-9 promulgated thereunder by the SEC (17 C.F.R. §§240.10b-5, 240.14a-9).

13. This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. §1331, §22 of the Securities Act, and §27 of the Exchange Act.

14. Venue is proper in this Judicial District pursuant to §22 of the Securities Act, (15 U.S.C. §77v), §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b). Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District since Playstudios' principal place of business is in Las Vegas, Nevada.

15. In connection with the acts, conduct and other wrongs alleged in this Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications and the facilities of a national securities exchange.

## PARTIES

16. Lead Plaintiff purchased or otherwise acquired Playstudios' securities traceable to the Defective Proxy/Registration Statement, elected to exchange rather than redeem shares pursuant to the Defective Proxy/Registration Statement, and/or purchased or otherwise acquired Playstudios' common stock during the 10(b) Class Period, as described in the Certification previously filed with this Court (ECF No. 24-4), and suffered damages as a result of the federal securities laws violations alleged herein.

17. Defendant Playstudios is incorporated under the laws of Delaware with its principal executive offices located in Las Vegas, Nevada. Since June 22, 2021, Playstudios' Class A common stock has traded on the NASDAQ exchange under the symbol "MYPS," and its warrants have traded under the symbol "MYPSW." Playstudios went public in late June 2021

via a merger with Acies. Before the merger, Acies existed as a blank check SPAC and traded on the NASDAQ under the symbol "ACAC."

18. Defendant Edward King ("King") was the Co-CEO and Principal Executive Officer of Acies. King signed the Defective Proxy/Registration Statement.

19. Defendant Daniel Fetters ("Fetters") was the Co-CEO and Principal Financial and Accounting Officer of Acies. Fetters signed the Defective Proxy/Registration Statement.

20. Defendant James Murren ("Murren") was the Chairman of Acies' Board of Directors. Murren signed the Defective Proxy/Registration Statement. Murren also gave consent to be listed in the Defective Proxy/Registration Statement as a Director of the merged Company.

21. Defendant Zach Leonsis ("Leonsis") was a Director of Acies. Leonsis signed the Defective Proxy/Registration Statement.

22. Defendant Brisa Carleton f/k/a Trinchero ("Carleton") was a Director of Acies. Carleton signed the Defective Proxy/Registration Statement.

23. Defendant Andrew Zobler ("Zobler") was a Director of Acies. Zobler signed the Defective Proxy/Registration Statement.

24. Defendant Sam Kennedy ("Kennedy") was a Director of Acies. Kennedy signed the Defective Proxy/Registration Statement.

25. Defendant Christopher Grove ("Grove") was a Director of Acies, and served as Executive Vice President of Acquisitions. Grove consented to being listed as a Director in the Defective Proxy/Registration Statement.

26. Defendant Andrew Pascal ("Pascal") was a co-founder and shareholder of Acies, and is a co-founder, Chairman and CEO of Playstudios. Pascal was also identified as the Chairman of Playstudios' Board of Directors in the Defective Proxy/Registration Statement, and

he made misleading statements in Forms 425s that were incorporated into the Defective Proxy/Registration Statement.

27. Defendant William J. Hornbuckle ("Hornbuckle") was a Director of Playstudios at the time of the merger and served as Director until December 20, 2021. He gave consent to be listed in the Defective Proxy/Registration Statement as a Director of the merged Company.

28. Defendant Joe Horowitz ("Horowitz") is a Director of Playstudios. He gave consent to be listed in the Defective Proxy/Registration Statement as a Director of the merged Company.

29. Defendant Jason Krikorian ("Krikorian") is a Director of Playstudios. He gave consent to be listed in the Defective Proxy/Registration Statement as a Director of the merged Company.

30. Defendant Judy K. Mencher ("Mencher") is a Director of Playstudios. She gave consent to be listed in the Defective Proxy/Registration Statement as a Director of the merged Company.

31. The Defendants identified in Paragraphs 18 through 30 are sometimes referred to herein collectively as the "Individual Defendants."

32. Playstudios and the Individual Defendants are sometimes collectively referred to herein as the "Defendants."

33. The Individual Defendants possessed the power and authority to control the contents of Acies' and Playstudios' SEC filings, press releases, and other communications with investors. The Individual Defendants were provided with copies of Acies' and Playstudios' public communications alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because

of their positions at Acies and/or Playstudios, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from investors, and that the positive representations being made were then materially misleading. The Individual Defendants are liable for the misleading statements and omissions pleaded herein.

## FACTS COMMON TO ALL CLAIMS

### I. Acies Forms As A SPAC To Consummate A Merger With Playstudios

34. Acies was a blank check company incorporated on August 14, 2020, as a Cayman Islands exempted company for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization or similar business combination with one or more businesses or entities. From its earliest SEC filings, Acies described itself as a "blank check company." *See, e.g.*, Draft Registration Statement on Form S-1 filed with the SEC on September 21, 2020.

35. John Coates, speaking as Acting Director of the SEC's Division of Corporate Finance, has described the SPAC structure as follows:

> The basics of a typical SPAC are complex, but can be simplified as follows. A SPAC is a shell company with no operations. It proceeds in two stages. In the first stage, it registers the offer and sale of redeemable securities for cash through a conventional underwriting, sells them primarily to hedge funds and other institutions, and places the proceeds in a trust for a future acquisition of a private operating company. Initial investors also commonly obtain warrants to buy additional stock as at a fixed price, and sponsors of the SPAC obtain a "promote" – greater equity than their cash contribution or commitment would otherwise imply – and their promote is at risk. If the SPAC fails to find and acquire a target within a period of two years, the promote is forfeited and the SPAC liquidates. About ten percent of SPACs have liquidated between 2009 and now.
>
> But most SPACs since 2009 have gone on to identify acquisition candidates. In their second stage, SPACs complete a business combination transaction, in which the SPAC, the target (i.e., the private company to be acquired), or a new shell "holdco" issues equity to target owners, and sometimes to other investors. SPAC shareholders typically have a vote on the so-called "de-SPAC" transaction, and

> many investors who purchased securities in the first stage SPAC either sell on the secondary market or have their shares redeemed before or shortly after the de-SPAC. After the de-SPAC, the entity carries on its operations as a public company. In this way, SPACs offer private companies an alternative pathway to "go public" and obtain a stock exchange listing, a broader shareholder base, status as a public company with Exchange Act registered securities, and a liquid market for its shares.

John Coates, "SPACS, IPOs and Liability Risk Under Securities Laws," available at https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws (April 8, 2021) (footnotes omitted).

36. The SPAC structure creates manager incentives to pursue a target that may not be in investors' best interest, and to avoid disclosures that may dissuade investors from exchanging shares in the merger. If a merger is completed within the allocated time frame, founders and managers of the SPAC generally reap windfall profits from their ownership of SPAC securities they obtained cheaply prior to public offering, and enjoy considerable control such as the ability to nominate board members to the new company. However, if an acquisition is not effectuated within that time frame, then the SPAC is dissolved and the money in the trust is returned to investors, with no compensation paid to the founders and managers of the SPAC. Accordingly, the founders and management team of a SPAC are highly incentivized to complete an acquisition within their deadline, even if the transaction may be to the detriment of the public shareholders.

37. The SPAC structure does not require a shareholder to exchange pre-merger SPAC shares into shares of the merged company. Instead, after what is supposed to be full disclosure of material information, such holders are afforded the opportunity to redeem shares prior to exchange. The redemption of shares directly impacts the working capital of the merged company, and indirectly impacts the economic interests of SPAC sponsors. As a result, SPAC sponsors and merger targets are highly incentivized to minimize the number of redemptions by SPAC shareholders.

38. Companies seeking to go public have increasingly turned to SPAC structures in recent years. SPAC transactions are faster than traditional IPOs, the price is determined in advance instead of by the volatile market, and SPAC sponsors often have a network of contacts and management expertise they can offer to the new company. However, SPAC mergers also have the potential to be rife with inaccurate disclosures and serious conflicts of interest, as the process allows companies to sidestep traditional underwriting and regulatory scrutiny. SEC officials have also expressed concern over the recent surge in SPACs, in particular about the "baseless hype" by which many are sold. *See* John Coates, "SPACS, IPOs and Liability Risk Under Securities Laws," https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws (April 8, 2021). As SEC Chair Gary Gensler testified in front of Congress, the "surge of SPACs raises a number of policy questions. First and foremost, are SPAC investors being appropriately protected?" *See* https://www.sec.gov/news/testimony/gensler-2021-05-26.

39. Acies and Playstudios are Exhibits A and B of these underlying problems. From its earliest filings, Acies encouraged investors to set aside concerns about it being a "blank check company" by touting the business acumen of Acies' Board of Directors, and promising that it would focus on acquiring "disruptive business models with strong secular growth" in the mobile entertainment industry, including sectors that span live events, family entertainment, casino gaming, destination hospitality, sports, sports betting and iGaming, and social and casual mobile games. *See, e.g.*, Draft Registration Statement on Form S-1 filed with the SEC on September 21, 2020.

40. However, Acies' merger with Playstudios was a foregone conclusion as soon as it went public and raised over $215 million from public investors and $250 million from the PIPE. In the summer of 2020, before Acies raised public funds, Pascal considered using a SPAC as a

vehicle for Playstudios to go public. Pascal admitted this fact to the Las Vegas Review-Journal in February 2021. After Pascal hatched this plan, he founded Acies with Murren. Murren is the former CEO and Chairman of MGM Resorts International (hereafter "MGM"), and a friend, mentor, and neighbor of Pascal's. Murren and Pascal have known each other for over twenty-five years. Apart from their personal relationship, Murren and Pascal had common business interests in the casino industry when Pascal served as the President and Chief Operating Officer of Wynn Las Vegas from 2003 to 2010 at the insistence of his aunt, Elaine Wynn, the largest individual shareholder of Wynn Resorts, Ltd. Pascal and Murren also served together as advisors to the State of Nevada concerning its response to the Covid-19 pandemic.

41. In 2011, Pascal pitched the concept of Playstudios to Murren on a casual hiking trip. Murren and Hornbuckle, the current CEO of MGM and the Chief Marketing Officer of MGM at that time, agreed to help Pascal launch Playstudios and facilitated its critical business relationship with MGM. Pascal admitted to these facts in an interview with the Absolute Return Podcast on March 5, 2021. Today, MGM is one of Playstudios' largest shareholders and its most significant rewards partner. Hornbuckle was installed as a Director of the merged Company and served in that role until December 2021, and Murren continues to own the Company's shares, and serves as a Director of Playstudios.

42. According to a Special Report published by Reuters on May 11, 2022 entitled "How Wall Street banks made a killing on SPAC craze," hours after the IPO for Acies closed, bankers from J.P. Morgan Chase & Company ("J.P. Morgan") contacted managers at Acies to pitch them on merging with Playstudios. J.P. Morgan served both as the underwriter of the IPO for Acies as well as an advisor to Playstudios in connection with the merger.

43. Based on the specific facts particularized in Paragraphs 34 through 42, Lead

Plaintiff is informed and believes that Acies was formed by Pascal and Murren to raise funds for Playstudios, and the merger target was known at the time that Acies was formed in violation of the law. These facts were not disclosed in the Defective Proxy/Registration Statement.

**II. Acies Claims Extensive Due Diligence Confirmed Playstudios' Valuation**

44. On February 1, 2021, Acies announced that it had entered into a merger agreement with Playstudios. The merger was intended to and did affect an initial public offering of Playstudios, which was previously a private company. Upon approval and closing of the merger, Acies would cease to exist and Playstudios would become the surviving entity.

45. As is customary in SPAC transactions, the merger was contingent upon approval by Acies shareholders, and regardless of the vote, Acies shareholders would be permitted to redeem shares at $10/share if they did not want to hold shares in Playstudios post-closing.

46. In the Defective Proxy/Registration Statement, Defendants claimed to have conducted extensive due diligence of Playstudios. In particular, the Acies Board represented that it considered, among other things, whether Playstudios satisfied the following factors: (i) operating in a high-growth industry, (ii) having a unique and defensible business model, (iii) extraordinary user engagement, (iv) significant revenue and earnings growth potential, and (v) an experienced and motivated management team. The Acies Board also stated specifically that, on December 21, 2020, representatives of Acies and Playstudios met to perform diligence on Playstudios' existing games and, on December 22, 2020, ***met to perform diligence on Playstudios' new game launches***.

47. In the Defective Proxy/Registration Statement, Defendants represented that the results of their due diligence were based upon:

> extensive virtual meetings and calls with PLAYSTUDIOS' management team regarding its operations, projections and the proposed transaction; and review of

> materials related to PLAYSTUDIOS and its business, made available by PLAYSTUDIOS, including financial statements, material contracts, key metrics and performance indicators, benefit plans, employee compensation and labor matters, intellectual property matters, real property matters, information technology, privacy and personal data, litigation information, environmental matters and other regulatory and compliance matters, and other legal and business diligence.

48. Based upon their review of Playstudios' financial data and a comparison with its peers in the industry as well as their "due diligence," the Acies Board claimed that Playstudios warranted a valuation of $1.15 billion:

> Neither the Acies Board of Directors nor any committee thereof obtained a third-party valuation in connection with the Business Combination. In analyzing the Business Combination, the Acies Board of Directors and management conducted due diligence on PLAYSTUDIOS. The Acies Board of Directors reviewed comparisons of selected financial data of PLAYSTUDIOS with its peers in the industry and the financial terms set forth in the Merger Agreement, and concluded that the Business Combination was in the best interest of Acies' shareholders. Accordingly, investors will be relying solely on the judgment of the Acies Board of Directors and management in valuing PLAYSTUDIOS, and the Acies Board of Directors and management may not have properly valued such businesses.

49. As a result of this due diligence and what they told investors was "careful consideration," the Acies Board told investors in the Defective Proxy/Registration Statement that they concluded merging with Playstudios at a $1.15 billion valuation for Playstudios was "in the best interests" of Acies shareholders, and "unanimously recommend[ed]" that investors vote **"FOR"** the merger. *See* Defective Proxy/Registration Statement at xxv (emphasis in original).

50. The Defective Proxy/Registration Statement discouraged investors from doing their own due diligence, and instead expected investors to rely on the information provided or incorporated into that document: "Neither Acies nor PLAYSTUDIOS has authorized anyone to give any information or make any representation about the Business Combination or their companies that is different from, or in addition to, that contained in this proxy statement/prospectus."

**III. Playstudios Misrepresents Exponential Growth Potential**

51. Pascal founded Playstudios in July 2011 with substantial assistance from Murren, who helped the Company secure an important strategic investment from MGM. The Company develops casual, free-to-play video games for social platforms. For most of its existence, the Company has focused on social casino based mobile games such as slots, blackjack, and bingo. Over 99% of the Company's revenue has historically been generated from the sale of virtual currency that can be used to gamble in the mobile games.

52. The Company claims that its playAWARDS loyalty platform sets it apart from others in the gaming industry. The playAWARDS platform allows players to accumulate loyalty points that can be redeemed for real-world rewards including hotel stays, invitations to special events and access to other benefits at the Company's award partners that include MGM, Wolfgang Puck, Royal Caribbean Cruise Lines, Cirque du Soleil, and the House of Blues. In the Defective Proxy/Registration Statement, the Company stated that the playAWARDS program changed the lifecycle of a video game because it allowed Playstudios to scale quickly, drive deeper user engagement, and realize greater lifetime value from individual players.

53. Before the merger, the Company entered into a partnership with Boss Fight to develop a new RPG called Kingdom Boss. Boss Fight is a game development studio based in Allen, Texas that has produced RPGs for mobile devices, personal computers, and gaming consoles. RPGs are games where players assume the roles of characters in a fictional setting, and act on those roles within a defined narrative. RPGs are mobile gaming's biggest genre by revenue, with tens of billions of dollars generated in the last few years alone. Kingdom Boss was a purported RPG game that was supposed to allow players to build empires, forge alliances, command armies, and rescue subjects from exiled kingdoms.

54. While Boss Fight developed components of Kingdom Boss, Playstudios was the ultimate publisher and distributor of the game with responsibility to acquire users and generate revenues.

55. In the Defective Proxy/Registration Statement, Defendants repeatedly represented that Kingdom Boss was on track to launch in 2021, and would extend the Company's addressable market, thereby allowing the Company to reap enormous benefits from one of the fastest growing gaming segments with a large market size and year-over-year growth rates of 50%. The Defective Proxy/Registration Statement stated that Playstudios' revenues would grow from $269.8 in 2020 to $328 million in 2021, and to $435.2 million in 2022. The Defective Proxy/Registration Statement represented that these figures were prepared by Playstudios' management in good faith based on "reasonable" estimates and assumptions. One of these material assumptions was that Kingdom Boss would launch in second half of 2021. Before the merger, Pascal represented to investors that at least $60 million of additional post-merger revenue would be generated from Kingdom Boss.

**IV. Kingdom Boss Was Plagued With Technical Defects From The Start To The End**

56. Confidential Witness 1 ("CW1") was the Chief Creative Officer ("CCO") of Boss Fight from June 2013 until the spring of 2022. CW1 co-founded Boss Fight, and as CCO, headed the creative side of all game development at Boss Fight. CW1 also interacted and negotiated with senior management at Playstudios in connection with the development of Kingdom Boss. According to CW1, Kingdom Boss went live as early as November 2020, allowing those who downloaded the game to play it. CW1 states that Playstudios had an inadequate marketing budget that caused the game to fail to gain momentum. Specifically, CW1 states that Playstudios failed to properly invest in user acquisition growth. Pascal, in fact, corroborated this fact during a conference call held in August 2021 to announce the Company's financial results for the second

quarter of 2021. During that conference call, Pascal admitted that additional time was needed to assess "retention," "engagement," and "monetization" metrics to "optimize" and "adjust" the game to measure and see how it performs with new versions before investing tens of millions of dollars in "scaling" and "growing" the product. In late 2021, Pascal vaguely claimed that Kingdom Boss's launch was delayed because the Company needed more time for "refinement and performance optimizations," but he deliberately did not explain what that meant and instead concealed the scope and gravity of the fundamental technical defects of the game that existed before the merger, turned chronic as the Class Period progressed, and permanently persisted until the game was abandoned completely in the beginning of 2022 without advanced warning.

57. To investigate the claims raised in this Amended Complaint, Lead Plaintiff reviewed Kingdom Boss's Facebook page, and numerous forums and chatrooms dedicated to video games, including Similar Play, KruGame, Black Mod, Android Republic, PLATINMODS and Reddit. These were all sources that the Defective Proxy/Registration Statement directed investors to ignore. *See* Paragraph 50. In these forums and chatrooms, gamers vented about the game's fundamental defects based on their personal knowledge and experience as players of Kingdom Boss. Lead Plaintiff reviewed almost a hundred and fifty negative comments or reviews about crashes, bugs, frequent lagging, and major stability problems that were constant between, at least, November 2020 and February 2022. These negative comments and reviews corroborate each other and demonstrate that severe functionality and performance problems existed before the Defective Proxy/Registration Statement was filed and continued throughout the Class Period despite Boss Fight's apparent attempts to launch numerous software updates designed to rectify the defects. Defendants did not disclose these specific and adverse facts at any time. Nor were

these concealed facts expressly disclosed in or incorporated by reference into the Defective Proxy/Registration Statement.

58. The following examples are merely illustrative of the persistent performance and functionality problems that gamers identified (and made available to Defendants via forum posts) while playing Kingdom Boss both before and after the Defective/Proxy Registration Statement was filed. These problems were so serious that they effectively rendered the game inoperable from the start to the finish.

59. On November 8, 2020, Jovi Young wrote on Kingdom Boss's Facebook page that Kingdom Boss had "many bugs" and requested Boss Fight to rectify the issues. Two days later, Boss Fight acknowledged the issues in a Facebook post. Despite claims that a new update fixed the technical difficulties, gamers continued to advise about serious ongoing problems. On November 22, 2020, John Angelo Montes again complained about a "bug" and stated that "after arena it stops here. [T]hen you have to log in again your FB account over and over again..!" These complaints were corroborated by other users who posted on the Similar Play forum. On December 19, 2020, a participant on Similar Play wrote that "To[o] many bugs….Not recommend Update to fix bugs they said…But actually it become worst." On December 25, 2020, another participant on Similar Play wrote: "So many bugs, always crash." Throughout November 2020, December 2020 and January 2021, numerous participants on Similar Play complained with regularity about lagging and stability problems and explained that the game constantly crashed.

60. One participant on November 30, 2020, provided the following specifics:

> So buggy, a character looked like bounce out of combat, my unit can no longer kill it so i had to restart the game, lost me some arena tickets. Doing the world boss crashed the game, the castle feature sometimes glitches. You cant view characters yet to be unlocked. You have to upgrade buildings to gain equipment [sic] rather than gain from idle combat which is unique for its genre, but annoying because the materials it needs is very scarce.

61. These complaints were consistent across all the forums and chatrooms. For example, on November 6, 2020, a user known as Limper wrote on the Android Republic forum that: "Game has so many bug[s] lmao…"

62. Starting in the beginning of 2021, escalating problems were identified on Kingdom Boss's Facebook page and various gaming forums and chatrooms. On January 12, 2021, Julz Rely Piando wrote on Kingdom Boss's Facebook page: "Kingdom Boss fi[x] Facebook log in. Can't even secure progress if we can't connect." On March 11, 2021, Luis Modomo asked on Kingdom Boss's Facebook page: "will the boss Bash ever be fixed?" On March 19, 2021, Tami Temlett similarly complained that "[m]y game keeps crashing AND the support button is disabled." These complaints were corroborated with complaints from other forums. For example, on June 18, 2021, days before Playstudios went public, a user known as Tdttvd wrote on the Black Mod forum that Kingdom Boss had crashed and force closed.

63. The problems continued to mount after the Defective Proxy/Registration Statement was filed and the Company went public. Throughout the summer of 2021, while Pascal repeatedly publicized misleading statements about the Company's entry into the lucrative RPG market, gamers complained on the Similar Play forum of "constant crashes," and "laggy" performance. For instance, on July 23, 2021, a participant on Similar Play stated that "I can sum this game up in 2 words…..frustratingly laggy!!!!!! I don't even know if this could be a good game or not as it's so laggy!!" On July 31, 2021, another gamer on Similar Play provided the following specifics:

> Having played the game for many hours/days an error appeared on loading, it suggested that an update was available, playstore didn't have an update, only an option to play or uninstall. Regardless of what I did, the game wouldn't run, so I uninstalled and then reinstalled, several restarts later and the game loaded,

> unfortunately the game started from the beginning, all my progress was lost. Needless to say I uninstalled the game.

64. These fundamental defects remained despite the software updates released by Boss Fight. For example, on September 9, 2021, a user wrote on Similar Play: "[k]eeps crashing, can't progress past first stage." On September 13, 2021, another user on Similar Play wrote that "Game does not work, heats up phone and crashes within 40 seconds." The next day, another user on Similar Play summarized the deficiencies in this way:

> All these bug fixes aren't working. Still problems in the Arena. Summons diabolical!! Getting 9 1 star heroes and a 3 star isn't good enough, which happens all the time!! It's time you got your act together and get more Chapters loaded. The events, hasn't worked either. Plus deleting any negative comments in the chat room is just not on. I have paid out a lot of money on this game, so get this game fixed fast!!

65. These complaints were corroborated by other users in other forums. On September 4, 2021, a gamer known as Bozoz wrote on Black Mod: "force close, can't open."

66. CW1 states that Boss Fight handed over the game to Playstudios in the final quarter of 2021 and the game was soft launched in December 2021. In software, a soft launch is considered a "rehearsal" for an actual commercial launch, opening up a mature version of the software to certain users. *See* https://www.is.com/glossary/soft-launch/#:~:text=A%20soft%20launch%20refers%20to,world%20interactions%20with%20their%20app.

67. Yet, the problems persisted. On December 11, 2021, Dima Fedotov wrote the following in Russian (translated here in English) on Kingdom Boss's Facebook page: "the game is not loading." On December 14, 2021, the Kingdom Boss page on Facebook announced that a new update had been released that allegedly fixed several issues. Still, on December 25, 2021, Brad Steward provided the following feedback on Kingdom Boss's Facebook page: "Your update didn't fix anything I'm done good bye." Similar complaints were posted on Similar Play in

December 2021 and January 2022. A user there wrote on December 26, 2021 that "this game constantly crashes. It doesn't deserve even 1 star." Others there continued to complain about chronic lags, bugs, and slow performance that made it impossible to play the game. One user on Similar Play provided the following specifics on December 29, 2021:

> This game crashes so hard. Clicking on "claim" and then 10 min later you hear the claim go through while you're doing something completely different. Took 15 min to join a guild and after that everything freezes. Can't even get into the guild, the hour glass keeps freezing. Another game that refuses to test in house and relies on the players to test their product. It's a shame because the game was fun for about a day.

68. These complaints were rampant, corroborated and beyond reasonable dispute. Pascal admitted in late 2021 that the launch of Kingdom Boss was delayed because of additional time required for "refinement and performance optimizations," and Defendants ultimately abandoned Kingdom Boss in February 2022, conceding that further investment in the game was not worth the Company's time or resources. Problems identified by players are further corroborated by Confidential Witness 2's ("CW2") inside account. CW2 worked as a Quality Assurance lead at Playstudios from October 2016 to February 2022. In November 2021, CW2 spent four weeks play testing Kingdom Boss and was responsible for identifying issues that needed to be addressed before the game was marketed. CW2 confirms that Kingdom Boss was not ready to launch even then because of significant ***glitches*** and ***bugs***.

69. On February 24, 2022, the Company held a conference call to announce the financial results for the fourth quarter of 2022. During this conference call, Pascal disclosed that the Company would suspend the development of Kingdom Boss.

70. On April 7, 2022, Kingdom Boss's Facebook page posted an update that announced that the servers would be taken down and the game would not be playable beginning on May 6, 2022.

## FACTS ALLEGED WITH RESPECT TO COUNTS I, II and III

### I. Material Information Was Omitted In the Defective Proxy/Registration Statement

71. The Defective Proxy/Registration Statement contained numerous misleading statements and omitted to state material facts necessary to make the statements not misleading under the circumstances in which they were made. It referred to Kingdom Boss as the "soon to be released" RPG game, and under a sub-heading entitled "growth opportunities," the Company stated that "[w]e also expect to expand our portfolio as we enter the RPG category with our Kingdom Boss product in 2021." Under another sub-heading entitled "new game launches," the Defective Proxy/Registration Statement claimed that: "[w]e launched our myVEGAS Bingo game in March 2021 and intend to complete the development and launch of Kingdom Boss, our Idle RPG game, in the second half of 2021. These games represent an extension of our addressable market and growth opportunity." Under a different sub-heading entitled Kingdom Boss (coming soon), the Defective Proxy/Registration Statement similarly stated that: "[w]e expect to launch our first idle RPG game, Kingdom Boss, in the second half of 2021, moving beyond casino-style content and into another rapidly expanding game category." The Company also stated that it would integrate its loyalty program and cross-promote games as "[w]e expect to turn our attention to the massive RPG market in 2021, as we launch Kingdom Boss with the category's only real-world loyalty program." Defendants' claim that the Company would generate $435 million in revenues in 2022 was explicitly based on an unsubstantiated assumption contained in the Defective Proxy/Registration Statement: that "a new game, Kingdom Boss, which began development in 2020, will launch as expected in the second half of 2021."

72. The statements identified in Paragraph 71 were materially misleading when made because they omitted to disclose that: (a) Kingdom Boss was riddled with technical defects that

rendered the game inoperable, (b) these technical defects emerged at least seven months before these misleading statements were made and persisted despite software updates implemented by Boss Fight, (c) Defendants delayed Kingdom Boss's launch from mid-2021 to the second half of 2021 because of these technical defects, and as a result (d) the Defective Proxy/Registration Statement did not accurately disclose the Company's then-current financial situation or its business prospects because it omitted to disclose (i) a very high risk that the game would not commercially launch on schedule, if at all, and (ii) there was no reasonable basis to assume that the release would cause revenues to skyrocket.

73. Other statements which were filed with the SEC on Form 425 before the merger and which were incorporated into the Defective Proxy/Registration Statement were also materially misleading when made and omitted to disclose material facts to make the statements not misleading under the circumstances in which they were made. On February 2, 2021, Pascal, Murren, Fetters, and King participated in a conference call to discuss the merger. The transcript of this conference call was filed on Form 425 that same day and incorporated into the Defective Proxy/Registration Statement. During this conference call, Pascal made the following materially misleading statements about how the "maturity" of Kingdom Boss would drive the Company's growth in 2021 and 2022:

> ***And so here it is, if you look, you can see the growth and the bridge that takes us from the $270 million that we did in 2020 and how it is that we're going to get to the forecast of $435 million in 2022.*** What of it comes from our existing portfolio, versus the new products, versus the diversification of our model. And that does not take into account the dynamic growth that we think we're going to achieve as we go out and acquire and integrate these companies into our platform. ***So as we look to see how that plan translates into our financial performance, as I just talked about, we expect to see the maturity of these new games along with our existing portfolio, drive our growth through 2021 into 2022.*** And if you look at page 38, you can see how that translates to our EBITDA performance.
>
> (Emphasis added)

74. Pascal illustrated his point with the following misleading slides that he touted to investors during the conference call:






75. The statements identified in Paragraphs 73 and 74 were materially misleading when made because they omitted to disclose: (a) then-known risks to the "maturity" of Kingdom Boss and its ability to "drive" the Company's growth in 2021 and 2022 due to the fundamental technical defects that emerged before these statements were made and that had already caused Defendants to delay the game's launch, (b) the plan to achieve $435 million in revenues by 2022, $60 million of which would be derived from Kingdom Boss sales, was not "clear and actionable" because of the intractable technical defects, and (c) the path to "profitability" and "margin growth" was not "proven" or "clear" because of the intractable technical defects.

76. During the February 2, 2021 conference call to discuss the merger, Pascal also claimed that the Company would aggressively invest in scaling and growing new games, including Kingdom Boss, and would double its spending on user acquisition in a year:

> I would just highlight that in 2020, we were subsidizing both teams that are creating these new products, which compromised our margins a bit. We're going to carry those expenses just to the early part of this year. ***And then as we launch these new products, we're going to invest aggressively and in scaling and growing them, allowing them to achieve their scale and critical mass, which we expect will drive our performance as we roll into '22 and beyond. So you can see here in 2022, we're forecasting $90 million of EBITDA and margins that are north of 20%, but with a very clear path that gets us into the mid-twenties in 2023, and north of 30% as we get into 2025 and beyond. And so on page 39, you can see the expected path that gets us to that margin growth.*** What of it's going to come from the leverage we get out of our existing development capacity. What of it's going to come from the expansion in gross profits, from doing direct commerce with our players, or incorporating ad monetization. ***What of it's going to come from the efficiencies in our user acquisitions as the marketing spend starts to normalize and the relationship to revenues. So again, we feel very confident in the plan that we have that gets us to our normalized margins.*** And just to benchmark, you can see here how our forecast and growth and margins generally compares to the market and the companies that are more mature than we are, with a median in and around 32%.
>
> So all that translates to this summarized performance. ***I would just highlight a few things here on page 42, just to, again, illustrate how our model will mature. If you look, you can see the difference from '20 to '21 in the third line item, User***

***Acquisition, we expect it's going to grow from $50 million to $94 million in 2021 as we launch these two new products.***

(Emphasis added)

77. Pascal illustrated his point with the following misleading slides that he touted to investors during the conference call:



## FINANCIALS

Sustained and projected top and bottom-line growth.

30% Forecasted Margin 2025

| | 2017A | 2018A | 2019A | 2020E | 2021E | 2022E |
|---|---|---|---|---|---|---|
| Revenue | $161.8 M | $195.5 M | $239.4 M | $269.8 M | $328.0 M | $435.2 M |
| YOY% | | 20.8% | 22.5% | 12.7% | 21.6% | 32.7% |
| Cost of Sales | 53.4 M | 66.8 M | 80.3 M | 91.2 M | 102.2 M | 128.4 M |
| % of Revenue | 33.0% | 34.2% | 33.5% | 33.8% | 31.2% | 29.5% |
| User Acquisition | 46.2 M | 48.3 M | 53.8 M | 50.1 M | 94.3 M | 103.4 M |
| % of Revenue | 28.5% | 24.7% | 22.5% | 18.6% | 28.7% | 23.8% |
| All Other Expenses | 48.9 M | 64.0 M | 76.8 M | 96.0 M | 109.7 M | 113.5 M |
| % of Revenue | 30.2% | 32.7% | 32.1% | 35.6% | 33.5% | 26.1% |
| Adjusted EBITDA | $13.3 M | $16.5 M | $28.5 M | $32.4 M | $21.8 M | $89.9 M |
| Margin % | 8.2% | 8.4% | 11.9% | 12.0% | 6.7% | 20.7% |

42

78. The statements identified in Paragraphs 76 and 77 were materially misleading when made because they omitted to disclose that: (a) the path to grow EBITDA and margins was unclear because of the intractable technical defects of Kingdom Boss that had already caused Defendants to delay the launch from mid-2021 to the second half of 2022, and (b) the serious technical defects rendered infeasible the assumption that the Company could ramp "sustained and projected top and bottom-line growth" simply by doubling its marketing spend, which the Company effectively conceded by not making that additional spend, as Pascal later admitted and CW1 now confirms.

79. On April 7, 2021, Pascal participated in a video interview with Fantini Research that was subsequently posted on YouTube. The transcript of this interview was filed on Form 425 that same day and incorporated into the Defective Proxy/Registration Statement. During this interview, Pascal was asked about the potential for Kingdom Boss and the RPG market, and he made the following materially misleading statements:

Frank Fantini: Another kind of game that you mentioned as something that PLAYSTUDIOS will develop is RPG. What is RPG and what's its potential?

Andrew Pascal: Yeah. Sure. So role-playing games are a style of game where as a player, you have a collection of characters or heroes that engage in different activities during the overall cycle and narrative of the game experience. We have a game that we're developing in partnership with a really talented group out of Texas called Boss Fight Entertainment. And it's effectively a game where you collect heroes and you compose teams of those heroes that you then put into battle against other players that have composed their own teams of heroes, and as you engage in battle, you progress throughout the cycle of the game. And as you win more of these battles and accumulate different currencies and unlock more heroes to expand your roster, you're also building out your own village that you can then use to harvest all kinds of different currencies and attributes that you can ascribe or assigned to your heroes that make them more effective as they go into battle.

And it's fascinating, and there's a flavor of these RPG games, which is called Idle RPG, Idle being that you don't necessarily have to control the characters and the heroes that are engaging in these battles. You can actually let them play on their own and have a more limited interaction where you invoke their super powers at the right times, which makes the act of playing the game a lot more accessible and easier, but still offers all the excitement and thrill of progressing and completing different stages and advancing through the overall narrative of the game. The game will be called Kingdom Boss and like many of our games, I think that we found an opportunity within a category to elevate the creative execution and also then integrate our playAWARDS proposition, so that really for the first time, people that love and enjoy RPG games can now play hours and not only get this beautiful and really enriched and elevated experience, but they can amass loyalty benefits and go get some fun real world stuff. So yeah, we're very excited. ***We fully expect that we'll be launching that product at some point later on this summer.***

(Emphasis added).

80. The statements identified in Paragraph 79 were materially misleading when made for the same reasons identified in Paragraphs 72, 75 and 78. In addition, the statements identified in Paragraph 79 were materially misleading when made because Pascal omitted to disclose that: (a) the Company had already delayed Kingdom Boss's launch from mid-2021 to the second half of 2021 because of the intractable technical defects, and (b) a high risk of additional delays or abandonment remained because the intractable technical defects persisted despite Boss Fight's attempts to provide software updates before these misleading statements were made.

81. On May 11, 2021, Playstudios issued a press release that announced the financial results for the first quarter of 2021. The press release was filed on Form 425 on May 13, 2021, and incorporated into the Defective Proxy/Registration Statement. In this press release, the Company misstated that it "remain[ed] on schedule to launch Kingdom Boss" "during the second half of 2021," and Pascal made the following materially misleading statements:

> 2021 is off to a strong start. First quarter revenue growth of 27% has accelerated compared to last year's levels, driven by the performance of our core portfolio of games. ***Looking ahead, we expect the results for the rest of 2021 will reflect the combination of the current momentum in our existing portfolio with new game expansions into two of the fastest growing game categories—bingo and idle role-playing games, or RPG.***
>
> During March, we launched myVEGAS Bingo, a game that elevates classic bingo with enhanced social features and the opportunity to earn real-world rewards. While it remains early, initial results are going well. ***We are also on track to launch Kingdom Boss, our entry into the idle RPG category during the second half of 2021.*** The entry into these new and rapidly growing categories should allow us to leverage our loyalty mechanics and our player network and enable us to continue to attract, retain, and monetize a growing player base.
>
> (Emphasis added)

82. The statements identified in Paragraph 81 were materially misleading when made because they omitted to disclose that: (a) Kingdom Boss was not "on schedule" or "on track" but was instead mired in intractable technical defects that rendered the game inoperable and had already caused the Defendants to delay its launch, and as a result (b) any "momentum" in revenue growth in 2021 from new games was already threatened by further delays or abandonment of Kingdom Boss because of the intractable technical defects.

## II. The Defective Proxy/Registration Statement Violated SEC Regulation S-K

83. SEC Regulation S-K required Defendants to describe, in the Defective Proxy/Registration Statement as well as all investor communications incorporated into the Defective Proxy/Registration Statement, "any known trends or uncertainties that have had or that

the registrant reasonably expects will have a material impact . . . on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii) ("Item 303") (2017). "Disclosure is mandatory where there is a known trend or uncertainty that is reasonably likely to have a material effect on the registrant's financial condition or results of operations." SEC Release Nos. 33-8056; 34-45321; FR-61.

84. The SEC has emphasized that the disclosure requirements under Item 303 are "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company" and "a historical and prospective analysis of the registrant's financial condition . . . with particular emphasis on the registrant's prospects for the future." S.E.C. Release No. 6835, 1989 WL 1092885, at *3, *17. Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects." *See* Comm'n Guidance Regarding Mgmt.'s Discussion and Analysis of Fin. Condition and Results of Operations, S.E.C. Release No. 8350, 2003 WL 22996757, at *11 (December 19, 2003).

85. Item 105 also required the Defendants to include in the Registration Statement a "discussion of the most significant factors that make the offering speculative or risky." 17 C.F.R. § 229.503(c) (2011). Item 105's purpose is "to provide investors with a clear and concise summary of the material risks to an investment in the issuer's securities." Sec. Offering Reform, S.E.C. Release No. 8501, 2004 WL 2610458, at *86 (Nov. 3, 2004). The discussion of risk factors must be specific to the particular company and its operations, and must explain how the risk affects the company and/or the securities being offered. Generic or boilerplate attempts to disclose potential risks and shield oneself from liability do not tell investors how the specific risks

could affect their investment. *See* Statement of the Comm'n Regarding Disclosure of Year 2000 Issues and Consequences by Pub. Cos., Inv. Advisers, Inv. Cos., & Mun. Sec. Issuers, 1998 WL 425894, at *14 (July 29, 1998).

86. Put simply, Item 105 required Defendants to disclose the most significant risks that ***could*** adversely affect Playstudios' present or future business expectations and prohibited the Defendants from relying on generic risks that could apply to virtually any other gaming company in the industry.

87. Defendants omitted to disclose in the Defective Proxy/Registration Statement, as well as the Form 425s incorporated into it, that bugs and crashes associated with Kingdom Boss had already become a trend long before the merger and, at least, created serious uncertainty about whether the game would launch on time as expected, if at all, and would contribute to the Company's revenues and profits as Defendants repeatedly claimed that it would. Item 303 affirmatively required the Defendants to disclose the trends and uncertainties related to Kingdom Boss with a high degree of specificity to comply with Regulation S-K's rigorous disclosure requirements.

88. Defendants also violated their affirmative disclosure duties imposed by Item 105. Basic gameplay was never resolved with Kingdom Boss, as confirmed by the myriad of known technical difficulties that had already emerged before the Company went public, and was likely to adversely affect the Company's present or future business expectations, and, in fact, did have a negative impact on Playstudios' business, yet Defendants failed to disclose these specific risks in the Defective Proxy/Registration Statement.

## III. Playstudios Goes Public Via the Defective Proxy/Registration Statement

89. Having only available the materially inaccurate and misleading information contained in the Defective Proxy/Registration Statement, shareholders of Acies overwhelmingly approved the merger, thereby effecting the IPO of Playstudios.

90. Although all public shareholders of Acies had the right to redeem shares for $10 regardless of how they voted on the merger, as a result of the Defective Proxy/Registration Statement, a majority did not elect to redeem.

91. On August 11, 2021, the Company announced in a press release that it expected full year 2021 revenues to be in the range of $290 million to $300 million, or tens of millions of dollars below the figures identified in the Defective Proxy/Registration Statement. On a conference call held the same day, Pascal admitted that a "substantial amount o[r] majority of the adjustment" in revenues was because of the delayed launch of Kingdom Boss. On February 24, 2022, the Company announced that it expected full year 2022 revenues to be in the range of $305 million to $325 million, or $110 million below the figures published in the Defective Proxy/Registration Statement on the high end of the new range. On the same day, the Company held a conference call to announce the financial results for the fourth quarter of 2021, in which Pascal announced that the Company had abandoned Kingdom Boss. The Company's financial results continued to disappoint investors in May 2022 and later as the year progressed. The Defective Proxy/Registration Statement did not disclose the then-existing known impediments to commercial launch, in particular the severe and persistent technical difficulties identified before the merger.

## IV. The Safe Harbor Cannot Apply to the Defective/Proxy Registration Statement

92. None of the misleading statements and omissions in the Defective Proxy/Registration Statement can be protected by the safe harbor provisions of the Private

Securities Litigation Reform Act of 1995 ("PSLRA") because they fell outside the scope of the safe harbor provision.

93. Alternately, even if otherwise within the scope of the safe harbor provision, the misleading statements and omissions were subject to exceptions. According to the PSLRA, the safe harbor does not apply to statements made "in connection with an offering of securities by a blank check company," (*see* 15 U.S.C. §78u-5(b)(1)(B)) or to any statements "made in connection with an initial public offering," (*see* 15 U.S.C. §78u-5(b)(2)(D)). As the Defective Proxy/Prospectus admits, the issuer (Acies) was "a blank check company." Additionally, the statements were made in connection with the initial public offering of Playstudios, which was effected by the Form S-4 and de-SPAC transaction with Acies.

## ADDITIONAL FACTS ALLEGED ONLY WITH RESPECT TO COUNTS IV AND V

### I. Pascal Made Additional Misleading Statements After the Merger

94. Unlike Counts I, II, and III, which are premised only on negligence and/or strict liability, Counts IV and V allege that following the Defective Proxy/Registration Statement, Defendants Playstudios and Pascal ("Section 10(b) Defendants") made additional misstatements with scienter in violation of Section 10(b) and 20(a) of the Exchange Act.

95. Section 10(b) Defendants possessed the power and authority to control the contents of the Company's public communications with investors as well as the ability and opportunity to prevent their issuance or to cause them to be corrected.

96. On August 11, 2021, the Company issued a press release, which was subsequently filed on Form 8-K with the SEC, and which announced the financial results for the second quarter of 2021. In this press release, the Company stated that it had "[a]dvanced the development of

Kingdom Boss, the Company's entry into the fast-growing idle RPG category, which is expected to launch later this year."

97. The statements identified in Paragraph 96 were materially misleading when made because they omitted to disclose that: (a) the Company had not "advanced the development of Kingdom Boss," but was then struggling to cope with intractable technical defects that became only worse after the merger, and (b) these intractable technical defects that persisted despite numerous software updates to fix the glitches and bugs had, in fact, increased the risk of further delays or abandonment of the game before these misleading statements were made.

98. On August 11, 2021, the Company also held a conference call to discuss the financial results for the second quarter of 2021. During this conference call, Pascal admitted that the release of Kingdom Boss was delayed because of the time needed to "optimize the experience," claimed that the Company needed additional time to assess "retention," "engagement," and "monetization" metrics to "optimize" and "adjust" the game to measure and see how it performs with new versions before investing tens of millions of dollars in "scaling" and "growing" the product, but he continued to conceal the game's serious deficiencies, and repeatedly insisted that "we plan to introduce the product globally later this year," "expect to soon launch Kingdom Boss," and "we're going to get it launched before the year[']s out."

99. The statements identified in Paragraph 98 were materially misleading when made because they omitted to disclose that: (a) Kingdom Boss's limitations were not limited to engaging, retaining and monetizing players, but fundamentally derived from intractable technical defects that were identified more than half a year earlier and never resolved, (b) the game's performance issues were not limited to mere "optimization" of a developed product but extended

to basic functionality given the glitches and crashes players encountered, and as a result (c) there was no path to commercial launch by the end of 2021 as Pascal misled investors to believe.

100. On November 11, 2021, the Company held a conference call to discuss the financial results for the third quarter of 2021. During this conference call, Pascal told investors that the launch date for Kingdom Boss was shifted to the fourth quarter of 2021 "to allow for more refinement and performance optimizations," but that the game "will be ready to launch by the end of the year." In response to a specific analyst question about the specific cause of the delay, Pascal made the following materially misleading statements:

> Q - Greg Gibas:
>
> Great. Good afternoon, guys. Thanks for taking the questions. And likewise sentiment for me regarding the stock purchase plan. I guess regarding the delta in revenue, it sounds like most of it is coming from Kingdom Boss now expected to kind of the end of the year. I think previously it was maybe mid quarter, early quarter. ***I guess, just wondering kind of the reason for another slight delay their development kind of related, or just kind of perfecting it.*** Any color you can provide there?
>
> A – Andrew Pascal:
>
> ***Sure. More the latter. The game from a future perspective is complete. We are constantly expanding and refining it and really this is about finding its market and optimizing the metrics to a degree that really warrants and justifies are transitioning into a more formal launch.***
>
> With that said, I will tell you that just this week we opened up Canada. So it really is the first time that product is now going to be available to what is its primary target audience have been North America. We're doing it on a somewhat of a limited basis, ***but, so that we can acquire players that really fit the profile that we think is more ideally suited for that product.***
>
> ***So we'll continue to watch it very closely, and obviously provide more information as we further qualify what the potential is for that product. But to your point we as it hoped that it would launch earlier in this quarter we still expect that it's going to launch before the end of the year, that certainly every indication that we're getting from our partners, at Boss Fight and so we're looking forward to that.***

(Emphasis added).

101. The statements identified in Paragraph 100 were materially misleading when made because: (a) the game was not then "complete" let alone capable of expansion; and (b) Pascal omitted to disclose that: (i) the game's performance problems were not related to "perfecting it," but instead principally concerned fundamental defects that rendered it inoperable, (ii) the intractable technical defects could not be resolved by improving the "metrics" and "finding its market" or acquiring the right kind of players, and as a result (iii) the game could not be successfully commercialized and marketed by the end of 2021 as Pascal misled investors to believe.

## II. Section 10(b) Defendants Made Misleading Statements With Scienter

102. Pascal knew about the severe technical problems that rendered Kingdom Boss inoperable before the Defective Proxy/Registration Statement became effective. At the very least, these serious technical obstacles as fully described in Paragraphs 56 through 70 above would cause a delay in the anticipated launch of Kingdom Boss and Pascal knew this fact before the merger. This is supported by the fact that the earliest draft of the Defective Proxy/Registration Statement that was filed with the SEC on February 16, 2021, stated that Kingdom Boss would launch in "mid-2021." But this language was surreptitiously modified without explanation or a fulsome disclosure of the fundamental defects of the game fully described in Paragraphs 56 through 70 in an amended draft of the Defective Proxy/Registration Statement filed on March 26, 2021.

103. In that amended draft, the Company modified the language to claim that Kingdom Boss would launch in the "second half of 2021." This language was then finalized as is in the Defective Proxy/Registration Statement. This demonstrates that Pascal knew about the severe

technical deficiencies of the game before the Company went public and modified the timeline as a result. Indeed, Kingdom Boss had acknowledged the deficiencies on its Facebook page long before the draft was filed on February 16, 2021, and committed to fix them though the problems persisted as 2021 progressed into 2022. It is not conceivable that Boss Fight would not communicate these facts to Pascal given the importance of the game to Playstudios' bottom line since Pascal sold the merger to investors on the unsubstantiated assumption that Kingdom Boss would generate $60 million by 2022. Indeed, Pascal admitted to investors in late 2021 that ***he was working with Boss Fight*** to "optimize" the game.

104. On August 11, 2021, Pascal admitted during a conference call that a "substantial amount o[r] majority of the adjustment" in 2021 revenues was caused by the delayed launch of Kingdom Boss. The financial results for the second quarter of 2021 were finalized no later than June 30, 2021, or just over a week after the Company went public. Because of the time needed to review and finalize a company's financial statements, it is not conceivable that Pascal did not know about the deterioration in revenues or the delayed launch of Kingdom Boss before he made additional misleading statements starting in August 2021. In any event, the temporal proximity between the unreliable revenue figures touted during the merger and Defendants' subsequent August 2021 admission of delays due to performance issues related to the game is itself sufficient to enhance an inference of scienter.

105. Pascal's own statements to investors further support an inference of scienter. Before the merger, he discussed the Company's revenue projections, the RPG market, and the game play features of Kingdom Boss at length, demonstrating that he was extremely knowledgeable about the game. On August 11, 2021, he admitted that the game was delayed because of the time needed to "optimize the experience," but concealed the fundamental and

intractable technical defects, and further admitted that he would not invest the necessary resources to scale and grow the game without first seeing how it "performs." CW1 states that Playstudios refused to commit an adequate marketing budget, impairing momentum. CW1's account, together with Pascal's own admissions, shows that Pascal understood at least by August 11, 2021, that Playstudios could not scale and grow Kingdom Boss due to serious gameplay defects.

106. The critical importance of Kingdom Boss to the merger pitch and the Company's long-term prospects also supports that Pascal knew or recklessly disregarded the danger of misleading investors with his positive statements. The $435 million revenue figure for 2022 lacked a reasonable basis, assumed that $60 million would be reaped from Kingdom Boss sales, and Pascal admitted that the Company failed to hit this target because of the game's failure to launch.

107. Pascal also profited from his misconduct while investors suffered losses. Pascal told Christian A. Felipe ("Felipe"), the named plaintiff who initially brought this Action, that he exchanged the maximum eligible amount of his shares in old Playstudios for cash. Lead Plaintiff has confirmed this allegation with Felipe's counsel.

## III. The Truth Begins to Emerge

108. On February 24, 2022, the Company announced in a press release that its full fiscal year revenues for 2021 were $287.4 million, missing the low end of its previous estimates by millions of dollars. In this same press release, the Company announced that it expected full year 2022 revenues to be in the range of $305 million to $325 million, or $110 million below the figures published in the Defective Proxy/Registration Statement on the high end of the new range. On the same day, the Company held a conference call to announce the financial results for the fourth quarter of 2021. During this conference call, Pascal announced that the Company had

abandoned Kingdom Boss, and the Company's Chief Financial Officer, Scott Peterson, disclosed that Playstudios would take an $8 million write off associated with the game. Slide 17 of an investor presentation that Pascal and other executives used during this conference call admitted that a dramatic decline in AEBITDA in 2021 was "impacted by New Game Development."

109. On this news, the price of Playstudios' common stock declined from its previous day closing price of $5.10 on February 24, 2022 to close at $4.86 per share on February 25, 2022. The price of Playstudios' common stock declined again the next trading day on February 28, 2022 to close at $4.56 per share, and $3.90 on March 1, 2022.

110. On May 5, 2022, Playstudios announced revenues of $70.5 million for the first quarter of 2022 compared to $74.1 million for the first quarter of 2021, a further result of the concealed defects with Kingdom Boss. The revenues reported missed analyst estimates of Northland Capital Markets, Oppenheimer, and Craig-Hallum Capital Group LLC, for that specific quarter.

111. On this news, the price of Playstudios' common stock declined from its previous day closing price of $5.77 on May 5, 2022 to close at $4.77 per share on May 6, 2022. The price of Playstudios' common stock declined again the next trading day on May 9, 2022 to close at $4.20 per share, and $4.13 on May 10, 2022.

## LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS

112. Lead Plaintiff brings these claims individually and on behalf of three Classes:

a. Securities Act Class: all persons who purchased or otherwise acquired shares in Playstudios (including by way of exchange of Acies shares) pursuant to or traceable to the Defective Proxy/Registration Statement that Defendants filed with the SEC on Form S-4 on February 16, 2021, and amended on Forms S-4/A on

March 26, 2021, May 10, 2021, May 18, 2021, and May 20, 2021, and the body of which was incorporated into the final prospectus on Form 424(b)(3) filed on May 25, 2021. The Securities Act Class asserts claims under Sections 11 and 15 of the Securities Act. These claims arise from Defendants' negligence, and do not assert that Defendants acted with scienter.

b. 14(a) Class: all persons who were solicited to approve the merger and who exchanged Acies shares for Playstudios Class A Ordinary Shares rather than redeeming the same pursuant to the Defective Proxy/Registration Statement. The 14(a) Class asserts claims pursuant to Section 14(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder. These claims arise from Defendants' negligence, and do not assert that Defendants acted with scienter.

c. 10(b) Class: all persons who purchased or otherwise acquired Playstudios Class A Ordinary Shares between August 11, 2021 and May 5, 2022, both dates inclusive. The 10(b) Class asserts claims under Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.

Excluded from all Classes are: (a) Defendants and their immediate families; (b) current and former directors of Playstudios or Acies; (c) any entity that has entered into a stockholder's agreement or co-venture agreement with Playstudios or was a PIPE investor in Playstudios; and (d) any entity controlled, majority-owned or wholly owned, or affiliated with any of the above.

113. The members of the Classes are so numerous that joinder of all members is impracticable. The Company's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of

members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company, its transfer agent and brokers, and may be notified of the pendency of this Action by mail, using the form of notice similar to that customarily used in securities class actions.

114. Common questions of law and fact exist as to all members of each Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Classes are:

a. Whether Defendants made inaccurate statements and/or omitted material information to investors in the Defective Proxy/Registration Statement;

b. Whether Defendants' misrepresentations and omissions violated federal securities laws;

c. Whether Defendants' misrepresentations and omissions were material;

d. [For the 10(b) Class only] Whether Section 10(b) Defendants made additional misrepresentations and omissions to investors outside the Defective Proxy/ Registration Statement, and whether those misrepresentations and omissions were material;

e. [For the 10(b) Class only] Whether Section 10(b) Defendants acted with scienter;

f. [For the 10(b) Class only] Whether the prices of Playstudios' securities during the 10(b) Class Period were artificially inflated because of Section 10(b) Defendants' conduct complained of herein; and

g. [For the 10(b) Class only] Whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

115. Lead Plaintiff's claims are typical of the claims of the members of the Classes as

all members of each Class were similarly affected by Defendants' wrongful conduct in violation of federal law, and all assert the same legal claims arising out of the same conduct.

116. Lead Plaintiff will fairly and adequately protect the interests of the members of the Classes. Lead Plaintiff has no interests antagonistic to the Classes and has retained highly experienced counsel specializing in securities litigation.

117. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all claims is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Classes to individually redress the wrongs done to them. There will be no difficulty in the management of this Action as a class action.

118. [Alleged only with respect to the 10(b) Class] For the 10(b) Class, Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a. During the 10(b) Class Period, Defendants made public misrepresentations of material fact and failed to disclose material facts necessary to make the statements they publicly made during the 10(b) Class Period not misleading under the circumstances in which they were made;

b. Playstudios' shares traded in an efficient market;

c. Playstudios' shares were liquid and traded with heavy volume during the 10(b) Class Period;

d. Playstudios' shares traded on the NASDAQ, and the Company was covered by multiple analysts, journalists, and industry commentators;

e. the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

f. Lead Plaintiff and members of the 10(b) Class purchased, acquired and/or sold Playstudios' shares between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

g. Based upon the foregoing, Lead Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

119. [Alleged only with respect to the 10(b) Class] Alternatively, Lead Plaintiff and the members of the 10(b) Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**

**Violation of Section 11 of the Securities Act of 1933**
**Against the Company and Defendants King, Fetters, Murren, Leonsis, Carleton, Zobler, Kennedy, Pascal, Hornbuckle, Horowitz, Krikorian, Mencher, and Grove**

120. Lead Plaintiff restates and realleges Paragraphs 1 through 93 and 112 through 119 as though fully set forth herein.

121. This Count is based on negligence and strict liability and does not sound in fraud. Any allegations of fraud or fraudulent conduct and/or motive are expressly excluded from this Count.

122. This Count is asserted against the Company and each individual Defendant named herein for violations of Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of Lead

Plaintiff, who purchased and/or otherwise acquired Playstudios' securities traceable to the Defective Proxy/Registration Statement, and all members of the Class who purchased or otherwise acquired Playstudios' securities pursuant to, or traceable to, the Defective Proxy/Registration Statement.

123. The Company is the issuer of the stock issued via the Defective Proxy/Registration Statement. As such, the Company is strictly liable for each misleading statement contained therein, even for innocent misrepresentations.

124. Defendants King, Fetters, Murren, Leonsis, Carleton, Zobler, Kennedy, and Grove signed the Defective Proxy/Registration Statement and/or were directors or senior officers of Acies at the time the Defective Proxy/Registration Statement was effected and each consented to be identified as a director or senior officer of Acies in the Defective Proxy/Registration Statement. Therefore, each had a duty to make a reasonable investigation into the statements contained in the Defective Proxy/Registration Statement to ensure that said statements were true and that there was no omission to state any material fact required to be stated in order to make the statements contained therein not misleading. In the exercise of reasonable care, these Defendants should have known of the misleading statements and omissions contained in the Defective Proxy/Registration Statement. As such, each of these Defendants is liable to Lead Plaintiff and the Securities Act Class.

125. Defendants Pascal, Murren, Hornbuckle, Horowitz, Krikorian, and Mencher were named in the Defective Proxy/Registration Statement as persons who were about to become directors in the merged Company, and consented to being so named. Therefore, each of these Defendants had a duty to make a reasonable investigation into the statements contained in the Defective Proxy/Registration Statement to ensure that said statements were true and that there

was no omission to state any material fact required to be stated in order to make the statements contained therein not misleading. In the exercise of reasonable care, these Defendants should have known of the material misstatements and omissions contained in the Defective Proxy/Registration Statement. As such, each of these Defendants is liable to Lead Plaintiff and the Securities Act Class.

126. Defendants also made the statements in the Form 425s referenced in Paragraphs 73, 74, 76, 77, 79, and 81 and consented to those statements being incorporated thereby into the Defective Proxy/Registration Statement. Therefore, they had a duty to make a reasonable investigation into those statements to ensure they were true and that there was no omission to state any material fact required to be stated therein in order to make the statements not misleading. In the exercise of reasonable care, Defendants should have known that these statements contained misleading statements and omissions.

127. Lead Plaintiff and other members of the Securities Act Class acquired Playstudios' securities without knowledge of the untruths and/or omissions alleged herein. Lead Plaintiff and the other members of the Securities Act Class were thus damaged by Defendants' material misstatements and omissions.

128. This Action was brought within one year after the discovery of the untrue statements and omissions and within three years of the offering date.

## <u>COUNT II</u>

**Violation of Section 15 of the Securities Act of 1933**
**Against Defendant Pascal**

129. Lead Plaintiff restates and realleges Paragraphs 1 through 93, and 112 through 128, as though fully set forth herein.

130. This Count is asserted pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, against Defendant Pascal. Pascal, in addition to his own primary liability under the Securities Act, is also secondarily liable for the primary violations of Playstudios.

131. As the CEO of Playstudios, he was involved with the day-to-day operations of the Company prior to the merger and was involved in reviewing and providing the descriptions of Playstudios' operations in the Defective Proxy/Registration Statement. Pascal had the ability to control the contents thereof.

132. Lead Plaintiff and other members of the Securities Act Class acquired Playstudios' securities without knowledge of the untruths and/or omissions alleged herein. Lead Plaintiff and the other members of the Securities Act Class were thus damaged by the primary violations of the Company. By virtue of the conduct alleged herein, and Pascal's status as a control person of the Company, Pascal is secondarily liable to Lead Plaintiff and the Securities Act Class for the primary violations of Playstudios.

## COUNT III

### Violation of Section 14(a) of the Exchange Act of 1934 and Rule 14a-9 Against Playstudios and Defendants King, Fetters, Murren, Leonsis, Carleton, Zobler, Kennedy, and Grove

133. Lead Plaintiff restates and realleges Paragraphs 1 through 93 and 112 through 132 as though fully set forth herein.

134. This Count is asserted pursuant to Section 14(a) of the Exchange Act, 15 U.S.C. §78n, and Rule 14a-9 promulgated thereunder, against the Company and Defendants King, Fetters, Murren, Leonsis, Carleton, Zobler, Kennedy, and Grove and does not sound in fraud. Lead Plaintiff does not allege that these Defendants acted with scienter or fraudulent intent with respect to this Count as that intent is not an element of a Section 14(a) claim.

135. SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

136. These Defendants prepared, reviewed, and disseminated the Defective Proxy/Registration Statement, which as specified above made misleading statements, omitted material information that was required to be set forth therein, and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

137. By virtue of their positions within the pre-merger Company and their due diligence regarding Playstudios and the merger, these Defendants were aware of the undisclosed or misrepresented information and of their duty to disclose this information in the Defective Proxy/Registration Statement. The Defective Proxy/Registration Statement was prepared, reviewed, and/or disseminated by the Defendants named herein. It omitted material facts, as detailed above. These Defendants were at least negligent in filing the Defective Proxy/Registration Statement with these materially misleading statements.

138. As a direct result of these Defendants' negligent preparation, review and dissemination of the Defective Proxy/Registration Statement, members of the 14(a) Class were precluded from exercising their right to seek redemption of their Acies shares prior to the merger on a fully informed basis and were induced to vote their shares and accept inadequate

consideration in connection with the merger. The Defective Proxy/Registration Statement used to obtain shareholder approval of the merger deprived 14(a) Class members of their right to a fully informed shareholder vote in connection therewith, and deprived them of their right to the information necessary to make an informed redemption decision. At all times relevant to the dissemination of the Defective Proxy/Registration Statement, these Defendants were aware of and/or had access to the true facts concerning Playstudios. Thus, as a direct and proximate result of the dissemination of the Defective Proxy/Registration Statement that these Defendants used to obtain shareholder approval of and thereby consummate the merger, and to dissuade investors from redeeming Acies shares, the 14(a) Class suffered damages and actual economic losses in an amount to be determined at trial.

139. The misleading statements and omissions contained in the Defective Proxy/Registration Statement were material in that a reasonable stockholder would have considered them important in deciding how to vote on the merger. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to stockholders.

140. As stated herein, the Defective Proxy/Registration Statement contained misleading statements of material fact and omitted to state material facts necessary to make the statements made not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. It was an essential link in the consummation of the merger, and described itself as the sole source of information investors were to rely upon in making the merger vote and redemption decisions. These Defendants failed to correct the Defective Proxy/Registration Statement prior to the merger vote or redemption deadline, and the failure to

update and correct misleading statements is also a violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

141. By reason of the foregoing, these Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9(a) promulgated thereunder.

**COUNT IV**

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
**Against the Company and Pascal**

142. Lead Plaintiff restates and realleges each and every Paragraph above as though fully set forth herein.

143. During the 10(b) Class Period, the Company and Pascal, individually and in concert, directly or indirectly, (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for the Company's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

144. These Defendants acted with scienter in that they knew or deliberately disregarded that the public statements made during the 10(b) Class Period; knew that such statements would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements as primary violations of the securities laws. These Defendants, by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's materially misleading statements, and/or their associations with the Company, were privy to

confidential proprietary information concerning the Company and participated in the fraudulent scheme alleged herein.

145. Pascal spearheaded the merger on behalf of Playstudios and had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and during the 10(b) Class Period intended to be deceitful, or, in the alternative, acted with reckless disregard for the truth when he failed to ascertain and disclose the true facts in the statements made by him or other Company personnel.

146. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the 10(b) Class Period. Lead Plaintiff and the other members of the 10(b) Class relied on the statements described above and/or the integrity of the market price of Company securities during the 10(b) Class Period in purchasing Company securities at prices that were artificially inflated as a result of these Defendants' false and misleading statements.

147. Had Lead Plaintiff and the other members of the 10(b) Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Company securities at the artificially inflated prices that they did, or at all.

148. As a result of the wrongful conduct alleged herein, Lead Plaintiff and other members of the 10(b) Class have suffered damages in an amount to be established at trial.

149. By reason of the foregoing, these Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Lead Plaintiff and the other members of the 10(b) Class for substantial damages which they suffered in connection with their purchase of Company securities during the 10(b) Class Period.

## COUNT V

**Violation of Section 20(a) of the Exchange Act**
**Against Defendant Pascal**

150. Lead Plaintiff restates and realleges each and every Paragraph above as though fully set forth herein.

151. During the 10(b) Class Period, as the CEO of Playstudios, Pascal exercised control over the day-to-day activities of the Company, including the description to investors of Playstudios' operations, material trends, and operating environment. Because of his role and responsibilities at Playstudios, Pascal knew the adverse non-public information concealed by Playstudios. He exercised authority and capability to control the contents of the misleading statements made as alleged herein.

152. Accordingly, Pascal is secondarily liable as a control person for the primary §10(b) violations of Playstudios, as alleged herein. By reason of his senior management position and/or being a director of the Company, Pascal had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Pascal exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiff and the other members of the Class complain.

153. Pascal also made the misleading statements made to investors as alleged in Count IV. Because of his positions of control and authority as a senior officer, Pascal was able to, and did, control the contents of Playstudios' direct communications with investors, which the Company disseminated in the marketplace during the 10(b) Class Period concerning the Company's operations. Throughout the 10(b) Class Period, Pascal thus exercised his power and authority to cause the Company to engage in the wrongful acts complained of herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant Action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Lead Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Lead Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Lead Plaintiff hereby demands a trial by jury.

Dated: October 4, 2022

Respectfully submitted,

*/s/ Omar Jafri*

**POMERANTZ LLP**

Joshua B. Silverman (*admitted PHV*)
Omar Jafri (*admitted PHV*)
10 South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: jbsilverman@pomlaw.com
ojafri@pomlaw.com

*-and-*

Jeremy A. Lieberman (*admitted PHV*)

600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100[1]
Email: jalieberman@pomlaw.com

*-and-*

**MUEHLBAUER LAW OFFICE, LTD.**

ANDREW R. MUEHLBAUER, ESQ.
Nevada Bar No. 10161
SEAN P. CONNELL
Nevada Bar No. 7311
7915 West Sahara Avenue, Suite 104
Las Vegas, Nevada 89117
Telephone: 702-330-4505
Fax: 702-825-0141
Email: andrew@mlolegal.com
sean@mlolegal.com

*Attorneys for Lead Plaintiff*

[1] Orly Guy and Eitan Lavie, who are Of Counsel to Pomerantz LLP and admitted to practice in Israel, also provide advice to Lead Plaintiff in connection with this matter.