DEAN S. KRISTY *(admitted pro hac vice)*
dkristy@fenwick.com
JENNIFER C. BRETAN *(admitted pro hac vice)*
jbretan@fenwick.com
SOFIA RITALA *(admitted pro hac vice)*
sritala@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone: 415.875.2300
Facsimile: 415.281.1250

PATRICK G. BYRNE (Nevada Bar No. 7636)
pbyrne@swlaw.com
BRADLEY T. AUSTIN (Nevada Bar No. 13064)
baustin@swlaw.com
SNELL & WILMER L.L.P.
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
Telephone: 702.784.5200
Facsimile: 702.784.5252

*Attorneys for Defendants*
*PLAYSTUDIOS, Inc., Andrew Pascal, Edward King, Daniel Fetters, James Murren, Zach Leonsis, Brisa Carleton, Andrew Zobler, Sam Kennedy, Christopher Grove, William J. Hornbuckle, Joe Horowitz, Jason Krikorian, and Judy K. Mencher*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

CHRISTIAN A. FELIPE, individually as administrator of the CHRISTIAN A. FELIPE CONTRIBUTORY IRA, and on Behalf of Similarly Situated Persons,

Plaintiff,

v.

PLAYSTUDIOS, INC., *et al.*,

Defendants.

Case No.: 2:22-cv-01159-RFB-NJK

**DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT**

**ORAL ARGUMENT REQUESTED**

**TABLE OF CONTENTS**

**Page**


MOTION TO DISMISS .... viii

MEMORANDUM OF POINTS AND AUTHORITIES .... 1

I. INTRODUCTION .... 1

II. FACTUAL BACKGROUND .... 4

A. PLAYSTUDIOS And Its Business .... 4

B. The June 22, 2021 Merger Between Acies And Old PlayStudios .... 4

C. The Merger Is Consummated Following Robust Disclosures .... 5

D. PLAYSTUDIOS' Statements About *Kingdom Boss* After The Merger .... 8

E. This Lawsuit And The Untimely Inclusion Of New Defendants .... 10

III. THE CLAIMS ARE SUBJECT TO STRICT PLEADING REQUIREMENTS .... 10

IV. THE PSLRA SAFE HARBOR DISPOSES OF ALL CLAIMS .... 12

A. The Challenged Statements Regarding *Kingdom Boss* Are Forward-Looking .... 12

B. The Statements Are Protected Under the Safe Harbor .... 13

C. The Registration Statement Is Within The Safe Harbor .... 15

V. THE SECTION 10(b) CLAIM FAILS FOR ADDITIONAL REASONS .... 16

A. The AC Also Fails to Plead Any Actionable Statement In The Class Period .... 16

B. The Facts Do Not Give Rise To The Required Strong Inference Of Scienter .... 18

1. Mr. Pascal's Class Period Stock Purchases Negate Scienter .... 18

2. The CW Accounts Undermine Any Scienter Claim .... 19

3. The Remaining Scienter Theories Are Equally Unavailing .... 20

4. The Inference Of Good Faith Is Far More Compelling .... 21

C. Plaintiff Cannot Adequately Plead Loss Causation .... 22

VI. THE SECTION 11 CLAIM FAILS FOR ADDITIONAL REASONS .... 23

A. The AC Fails to Plead Any Actionable Statement .... 23

B. The Claim Against The Newly Added Defendants Is Time-Barred .... 25

C. Plaintiff Cannot Satisfy the Tracing Requirement .... 26

VII. THE SECTION 14(a) PROXY CLAIM ALSO FAILS ....................................................27

VIII. CONCLUSION..........................................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*3226701 Canada, Inc. v. Qualcomm, Inc.*, 2017 WL 4759021 (S.D. Cal. Oct. 20, 2017), *aff'd on other grounds*, 773 F. App'x 987 (9th Cir. 2019) ..... 15, 18, 25

*In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936 (N.D. Cal. 2010) ..... 20

*In re Allied Nevada Gold Corp. Sec. Litig.*, 2016 WL 4191017 (D. Nev. Aug. 8, 2016) ..... 24

*Allison v. Brooktree Corp.*, 999 F. Supp. 1342 (S.D. Cal. 1998) ..... 15, 25

*Bhatt v. Tech Data Corp.*, 2018 WL 6504375 (M.D. Fla. Dec. 11, 2018) ..... 17, 19

*Brodsky v. Yahoo! Inc.*, 592 F. Supp. 2d 1192 (N.D. Cal. 2008) ..... 20

*Brody v. Transitional Hosp. Corp.*, 280 F.3d 997 (9th Cir. 2002) ..... 11

*Browning v. Amyris, Inc.*, 2014 WL 1285175 (N.D. Cal. Mar. 24, 2014) ..... 21

*In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104 (9th Cir. 2013) ..... 26

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045 (N.D. Cal. 2012) ..... 25

*City of Sterling Heights Gen. Emps. Ret. Sys. v. Hospira, Inc.*, 2013 WL 566805 (N.D. Ill. Feb. 13, 2013) ..... 17

*Costanzo v. DXC Tech. Co.*, 2020 WL 4284838 (N.D. Cal. July 27, 2020) ..... 15

*In re Cutera Sec. Litig.*, 610 F.3d 1103 (9th Cir. 2010) ..... 11

*In re CytRx Corp. Sec. Litig.*, 2015 WL 5031232 (C.D. Cal. July 13, 2015) ..... 24

*Desaigoudar v. Meyercord*, 223 F.3d 1020 (9th Cir. 2000) ..... 12, 27, 28

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) ..... 22

*In re ECOtality, Inc. Sec. Litig.*,
2014 WL 4634280 (N.D. Cal. Sept. 16, 2014) .......... 21

*Fialkov v. Microsoft Corp.*,
72 F. Supp. 3d 1220 (W.D. Wash. 2014), *aff'd*, 692 F. App'x 491 (9th Cir. 2017) .......... 22

*Golub v. Gigamon Inc.*,
847 F. App'x 368 (9th Cir. 2021) .......... 14, 27

*Hertzberg v. Dignity Partners, Inc.*,
191 F.3d 1076 (9th Cir. 1999) .......... 26

*In re Infonet Servs. Corp. Sec. Litig.*,
310 F. Supp. 2d 1080 (C.D. Cal. 2003) .......... 16

*Jedrzejczyk v. Skillz Inc.*,
2022 WL 2441563 (N.D. Cal. July 5, 2022) .......... 13, 24

*Kelly v. Rambus, Inc.*,
2008 WL 5170598 (N.D. Cal. Dec. 9, 2008) .......... 28

*Knox v. Yingli Green Energy Holding Co.*,
2016 WL 6609210 (C.D. Cal. May 10, 2016) .......... 17

*Krupski v. Costa Crociere S.p.A.*,
560 U.S. 538 (2010) .......... 26

*Lane v. Page*,
649 F. Supp. 2d 1256 (D.N.M. 2009) .......... 25, 27

*Lawson v. Klondex Mines Ltd.*,
450 F. Supp. 3d 1057 (D. Nev. 2020) .......... 27

*In re Leapfrog Enter., Inc. Sec. Litig.*,
200 F. Supp. 3d 987 (N.D. Cal. 2016) .......... 13, 20

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016) .......... 22

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014) .......... 16, 22

*Lopes v. Fitbit, Inc.*,
2020 WL 1465932 (N.D. Cal. Mar. 23, 2020), *aff'd*, 848 F. App'x 278 (9th Cir. 2021) .......... 17, 18

*Matrixx Initiatives, Inc. v. Siracusano*,
131 S. Ct. 1309 (2011) .......... 11

*In re McKesson HBOC, Inc. Sec. Litig.*,
126 F. Supp. 2d 1248 (N.D. Cal. 2000) .......... 27

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008) .......... *passim*

*Miller v. Calvin*,
647 F. Supp. 199 (D. Colo. 1985) .......... 26

*Mineworkers' Pension Scheme v. First Solar, Inc.*,
881 F.3d 750 (9th Cir. 2018) .......... 22

*Moradpour v. Velodyne Lidar, Inc.*,
2022 WL 2391004 (N.D. Cal. July 1, 2022) .......... 15

*Mulligan v. Impax Labs, Inc.*,
36 F. Supp. 3d 942 (N.D. Cal. 2014) .......... 17

*New York Emps.' Ret. Sys. v. Jobs*,
593 F.3d 1018 (9th Cir. 2010), *overruled on other grounds by Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012) .......... 28

*Nguyen v. Endologix, Inc.*,
962 F.3d 405 (9th Cir. 2020) .......... 21

*Norfolk Cnty. Ter. Sys. v. Solazyme, Inc.*,
2018 WL 3126393 (N.D. Cal. June 26, 2018) .......... 24

*O'Sullivan v. Trident Microsys., Inc.*,
1994 WL 124453 (N.D. Cal. Jan. 31, 1994) .......... 23

*In re Obalon Therapeutics, Inc*,
2019 WL 4729461 (S.D. Cal. Sep. 25, 2019) .......... 25, 26

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
774 F.3d 598 (9th Cir. 2014) .......... 16, 22

*In re Oracle Corp. Sec. Litig.*,
627 F.3d 376 (9th Cir. 2010) .......... 23

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
2012 WL 1868874 (N.D. Cal. May 22, 2012), *aff'd*, 759 F.3d 1051 (9th Cir. 2014) .......... 20

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2010) .......... 11, 12, 14, 17

*Pomerantz v. Pac. Capital Bancorp*,
2009 WL 4911850 (C.D. Cal. Nov. 6, 2009) .......... 27

*In re Rigel Pharms., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012) .......... 11, 25, 27

*Rok v. Identiv, Inc.*,
2017 WL 35496 (N.D. Cal. Jan. 4, 2017), *aff'd*, 716 F. App'x 663 (9th Cir. 2018) .......... 23

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001) .......... 14, 15, 17

*Rubke v. Capitol Bancorp Ltd.*,
551 F.3d 1156 (9th Cir. 2003) .......... 12

*In re Siebel Sys., Inc. Sec. Litig.*,
2005 WL 3555718 (N.D. Cal. Dec. 28, 2005) ........ 15

*In re Silicon Graphics Inc. Sec. Litig.*,
183 F.3d 970 (9th Cir. 1999) ........ 22

*South Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) ........ 21

*Steckman v. Hart Brewing, Inc.*,
143 F.3d 1293 (9th Cir. 1998) ........ 25

*Szymborski v. Ormat Techs. Inc.*,
776 F. Supp. 2d 1191 (D. Nev. 2011) ........ 12, 14

*In re Talis Biomedical Corp. Sec. Litig.*,
2022 WL 17551984 (N.D. Cal. Dec. 9, 2022) ........ 12, 24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ........ 16, 18, 22

*In re Vantive Corp. Sec. Litig.*,
110 F. Supp. 2d 1209 (N.D. Cal. 2000), *aff'd*, 283 F.3d 1079 (9th Cir. 2002) ........ 16

*In re Verisign, Inc. Deriv. Litig.*,
531 F. Supp. 2d 1173 (N.D. Cal. 2007) ........ 27, 28

*In re Violin Memory Sec. Litig.*,
2014 WL 5525946 (N.D. Cal. Oct. 31, 2014) ........ 12

*Webb v. SolarCity Corp.*,
884 F.3d 844 (9th Cir. 2018) ........ 16, 18

*Welgus v. TriNet Grp., Inc.*,
2017 WL 167708 (N.D. Cal. Jan. 17, 2017) ........ 26

*Westley v. Oclaro, Inc.*,
897 F. Supp. 2d 902 (N.D. Cal. 2012) ........ 16

*Weston Fam. P'ship LLLP v. Twitter, Inc.*,
29 F.4th 611 (9th Cir. 2022) ........ 18, 21, 23

*Wochos v. Tesla, Inc.*,
985 F.3d 1180 (9th Cir. 2021) ........ *passim*

*In re Worlds of Wonder Sec. Litig.*,
35 F.3d 1407 (9th Cir. 1994) ........ 16

*Zack v. Allied Waste Indus., Inc.*,
2005 WL 3501414 (D. Ariz. Dec. 15, 2005), *aff'd*, 275 F. App'x 722 (9th Cir. 2008) ........ 18

*Zhou v. Faraday Future Intelligent Elec. Inc.*,
2022 WL 13800633 (C.D. Cal. Oct. 20, 2022) ........ 13, 14, 17, 24

*Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009) .......... 11, 16, 19, 22

**STATUTES AND RULES**

Securities Act of 1933, 15 U.S.C.
§ 77k.......... *passim*
§ 77k(a) .......... 23
§ 77m .......... 25
§77o.......... viii, 27
§ 77z-2(c)(1) .......... 13
§ 77z-2(i)(1) .......... 12

Securities Exchange Act of 1934 Act, 15 U.S.C.
§ 78j(b).......... *passim*
§ 78n(a) .......... *passim*
§ 78t(a) .......... viii, 23
§ 78u-4(b)(1)(B).......... 7, 11
§ 78u-4(b)(2)(A) .......... 27
§ 78u-5(c)(1) .......... 13, 14
§ 78u-5(c)(1)(A)(i).......... 11
§ 78u-5(i)(1).......... 12

Private Securities Litigation Reform Act of 1995 .......... *passim*

Code of Federal Regulations, 17 C.F.R.
§ 229.105.......... 25
§ 229.303.......... 25
§ 230.411(e) .......... 24
§ 230.419.......... 15
§ 240.3a51-1 .......... 15
§ 240.10b-5 .......... viii
§ 240.12b-23(e).......... 24
§ 240.14a-9 .......... viii

Federal Rules of Civil Procedure
Rule 9(b) .......... viii, 12, 16, 20
Rule 12(b)(6) .......... viii

**OTHER AUTHORITIES**

James Jian Hu et al., *2021: A Spectacular Year for SPACs,* Harv. L. Sch. F. Corp. Gov. (Feb. 17, 2022).......... 4

**MOTION TO DISMISS**

Defendants PLAYSTUDIOS, Inc. ("PLAYSTUDIOS" or the "Company"), Andrew Pascal, Edward King, Daniel Fetters, James Murren, Zach Leonsis, Brisa Carleton, Andrew Zobler, Sam Kennedy, Christopher Grove, William J. Hornbuckle, Joe Horowitz, Jason Krikorian, and Judy K. Mencher hereby move to dismiss the Amended Complaint (ECF No. 73, the "AC") filed by the lead plaintiff, The Phoenix Insurance Company Ltd. and The Phoenix Provident Pension Fund Ltd. ("plaintiff" or "Phoenix").[1] Defendants move pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6), and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), for failure to state a claim against any defendant. The alleged claims that fail as a matter of law purport to arise under the following provisions of the federal securities laws against the specified defendants:

(i) Section 11 of the Securities Act of 1933 (the "1933 Act"), 15 U.S.C. § 77k, against all defendants, and a related "control person" claim under Section 15 of the 1933 Act, 15 U.S.C. § 77o, against defendant Pascal (Counts I and II of the AC);

(ii) Section 14(a) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78n(a), and Rule 14a-9 thereunder (17 C.F.R. § 240.14a-9), against the Company and defendants King, Fetters, Murren, Leonsis, Carleton, Zobler, Kennedy and Grove (Count III of the AC); and

(iii) Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder (17 C.F.R. § 240.10b-5), against the Company and defendant Pascal, and a related "control person" claim under Section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a), against defendant Pascal (Counts IV and V of the AC).

/ / /

/ / /

/ / /

[1] Citations to "¶" are to the paragraphs of the AC.

This motion is based on the Memorandum of Points and Authorities below, defendants' Notice of Documents Incorporated by Reference and Request for Judicial Notice, the Declaration of Jennifer C. Bretan and accompanying Appendix of Exhibits,[2] the prior proceedings in this case, the arguments of counsel, and any other matters properly before the Court.

Dated: December 21, 2022

FENWICK & WEST LLP

By: *_/s/ Dean S. Kristy_*
Dean S. Kristy

Dean S. Kristy (admitted *pro hac vice*)
Jennifer C. Bretan (admitted *pro hac vice*)
Sofia Ritala (admitted *pro hac vice*)
FENWICK & WEST, LLP
555 California Street, 12th Floor
San Francisco, CA 94104

Patrick G. Byrne (Nevada Bar No. 7636)
Bradley T. Austin (Nevada Bar No. 13064)
SNELL & WILMER L.L.P.
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169

*Attorneys for Defendants PLAYSTUDIOS, Inc., Andrew Pascal, Edward King, Daniel Fetters, James Murren, Zach Leonsis, Brisa Carleton, Andrew Zobler, Sam Kennedy, Christopher Grove, William J. Hornbuckle, Joe Horowitz, Jason Krikorian, and Judy K. Mencher*

[2] Citations to "Ex." are to the exhibits referenced in the Declaration of Jennifer C. Bretan and attached to the accompanying Appendix of Exhibits. For ease of reference, exhibit pincites are to the serial page numbers provided in the Appendix. Unless otherwise indicated, italicized quotations from the AC or exhibits have emphasis added.

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

The central allegation in this case is extremely narrow and irredeemably flawed. Despite its many pages, the complaint focuses entirely on a handful of forward-looking statements about the anticipated launch of *Kingdom Boss*, a brand-new game. Slated to join PLAYSTUDIOS' lineup of award-winning mobile games, *Kingdom Boss* was to be the Company's first foray into the role-playing game ("RPG") genre.

The Company had a clearly stated strategy to diversify its business by introducing new games in new genres. In keeping with this strategy, the Company spent millions of dollars subsidizing the development of *Kingdom Boss*, a game created by a highly regarded outside gaming studio (Boss Fight Entertainment). But as with any new product, there is no "sure thing" when it comes to creating and bringing a new game to market. This is why, from the very outset, the Company warned in detail that: (i) its ability to develop and launch the game "on time or if at all" was subject to a host of specific risks; and (ii) there was no assurance that players would find the game sufficiently engaging to justify the substantial additional expense of a full-scale marketing campaign. Far from guaranteeing success, these meaningful disclosures highlighted the significant risks and uncertainties the Company faced in successfully introducing *Kingdom Boss*.

The risks ultimately came to pass. On February 24, 2022, the Company announced that it had made a difficult decision to suspend *Kingdom Boss*. As it explained, although Boss Fight "consistently assured us that, based on their experience, the product is on a constructive path," the "game has struggled to achieve all the criteria that were established for a full-scale launch even after making the game available in North America late in the fourth quarter." In the Company's view, the game was just not "in a place where we can really commit the tens of millions of dollars that would be required in order to really scale its audience and get it to perform and contribute at the levels . . . originally anticipated."

This case followed on the heels of that announcement. Working backwards from the decision to halt *Kingdom Boss* and ignoring the Company's thorough risk disclosures and cautionary language, plaintiff accuses the Company of making false and misleading statements

***every time*** it publicly discussed the "anticipated launch" of the game. In particular, plaintiff takes aim at the statement that the Company expects to release the game "in the second half of 2021" (in a May 25, 2021 Proxy/Prospectus (or Registration Statement), issued nine months earlier in connection with a merger) and later, on August 11 and November 11, 2021 when discussing delays in the anticipated release date during quarterly earnings calls. Plaintiff purports to assert securities fraud claims under Section 10(b) of the 1934 Act, as well as claims under Section 11 of the 1933 Act and Section 14(a) of the 1934 Act. These claims, which are subject to the rigorous pleading requirements of the PSLRA, fail as a matter of law for multiple reasons.

***The statements are protected by the safe harbor for forward-looking statements.*** *Kingdom Boss* launched globally in December 2021, just as the Company said it would, which is fatal to any claim that the Company misstated anything about the anticipated launch of the game. But even if the game had not launched (or proved not to be successful), all of the challenged statements – the projections, timelines, and estimates for the launch of a new game still in development – are quintessential forward-looking statements. Accompanied by meaningful cautionary language, they are within the safe harbor and thus inactionable as a matter of law. This alone disposes of ***all*** of plaintiff's claims. *See* Section IV, *infra.*

***The 10(b) claim also fails for lack of scienter and loss causation.*** The AC is devoid of necessary facts to create a strong inference of scienter – the intent to defraud – much less one that is as cogent and compelling as any competing inference, as the PSLRA requires. The Company was entering new territory with the launch of its very first RPG game and warned of an array of risks and uncertainties associated with that effort. Not every new game succeeds, and the securities laws do not punish companies simply because business opportunities do not pan out. Moreover, plaintiff's theory of fraud makes no sense. Far from taking advantage of any supposed "fraud," Mr. Pascal (the Company's CEO, and the only individual defendant sued under Section 10(b)) actually ***purchased*** 315,700 shares in the class period at prices (plaintiff contends) he knew were ***artificially high***. That eviscerates plaintiff's entire theory. In addition, plaintiff's inability to plead loss causation – that "revelation of fraudulently activity" (as opposed to a disappointing business development) caused a stock price decline – is an independent basis for dismissal. *See*

Sections V.A-C, *infra.*

***The Section 11 claim fails for additional reasons.*** Because the challenged statements in the Registration Statement are inactionable, plaintiff tries to expand its Section 11 claim to encompass matters ***outside*** the Registration Statement (relating to statements as early as February 2, 2021). This effort fails. Under SEC rules, the limited circumstances where materials outside a Registration Statement are deemed incorporated by reference have no application here. Even if the outside statements were considered, the claim would still fail. Each was forward-looking and so also within the safe harbor. Further, because its shares were not issued under or traceable to the Registration Statement, plaintiff also lacks Section 11 standing. *See* Section VI.A, C, *infra.*

***The Section 11 and Section 14(a) claims against newly added defendants are also time-barred.*** Equally ineffective is the *in terrorem* addition of 12 new defendants – not because they did anything wrong – but based solely on their status as directors of Acies Acquisition Corp. ("Acies") [3] at the time of the merger (discussed below in the Factual Background) or prospective directors of the post-merger Company.[4] That effort fails. Claims under Section 11 (against all 12 new defendants) and Section 14 (asserted only against the former Acies directors) carry a one-year statute of limitations. By plaintiff's own admission, it had notice of these claims by August 11, 2021, but failed to assert them for more than a year. The claims are not just substantively deficient, they are time-barred.[5] *See* Sections VI.B, VII, *infra.*

***The Section 14(a) claim fails for additional reasons.*** In addition to being untimely as to the new defendants and suffering from other deficiencies, plaintiff fails to plead specific facts giving rise to the required "strong inference" that each defendant acted culpably with the required

---

[3] Sued under Sections 11 and 14, these seven defendants are Acies' co-CEOs Dan Fetters (former Managing Director, Morgan Stanley's M&A Group) and Edward King (former Global Head of Gaming Investment Banking, Morgan Stanley), and five outside directors, James Murren (Chair, Nevada's COVID-19 Task Force and former CEO, MGM Resorts International), Zach Leonsis (Senior VP, Monumental Sports Network), Brisa Carleton (CEO, Princess Grace Foundation), Andrew Zobler (CEO, Sydell Group), and Sam Kennedy (CEO and President, Boston Red Sox).

[4] Sued under Section 11, these four defendants are Bill Hornbuckle (CEO and President, MGM Resorts International), Joe Horowitz (Managing General Partner, Icon Ventures), Jason Krikorian (General Partner, venture firm DCM) and Judy Mencher (CEO, Race Point Investors).

[5] Christopher Grove, a former Acies officer, was not listed as an Acies director or as a director of the Company (and never held such positions). He was apparently sued by mistake.

state of mind. Other than being identified as former Acies directors (as to Mr. Grove mistakenly so), the AC alleges nothing whatsoever about the Section 14(a) defendants, much less how each was aware of any supposed misstatement in the Proxy/Prospectus. Thus, whether sounding in fraud or negligence, the claim fails as a matter of law. *See* Section VII, *infra*.

*Kingdom Boss* did not turn out to be a blockbuster game, but that is not securities fraud. This case is fatally flawed and should be dismissed.

## II. FACTUAL BACKGROUND

### A. PLAYSTUDIOS And Its Business

PLAYSTUDIOS is a publisher and developer of free-to-play casual games. Its award-winning casino games are considered among the most innovative and successful in the world, and include *POP!Slots, myVegas Slots, myKONAMI Slots, myVegas Blackjack* and *myVegas Bingo*. The games are available for download on social and mobile-based platforms, including Apple's App Store, and on Google Play, Amazon, and Facebook.

Each game features the Company's proprietary *playAwards* program, allowing players to earn loyalty points through gameplay. Loyalty points can be exchanged for real-world rewards from over 95 partners, including MGM Resorts, Wolfgang Puck restaurants, and Norwegian Cruise Lines, representing hundreds of top-tier hospitality, entertainment, and leisure brands. The Company's primary revenue is from in-app sales of virtual coins or "chips", which users can buy to enhance and extend their playing experience (and earn further loyalty points). Based in Las Vegas, Nevada, the Company was co-founded in 2011 by its Chairman and CEO, Andrew Pascal.

### B. The June 22, 2021 Merger Between Acies And Old PlayStudios

Prior to June 22, 2021, PLAYSTUDIOS was a privately held Delaware corporation ("Old PlayStudios"). On February 1, 2021, Acies, a publicly traded special purpose acquisition company ("SPAC"), proposed to merge with Old PlayStudios.[6] In the merger: (i) Acies subsidiaries would merge with Old Playstudios; (ii) Acies would re-domesticate in Delaware (from the Cayman

[6] Acies went public in October 2020. Like other SPACs, it was formed for the purpose of effecting a merger or similar business combination. While the AC gratuitously takes aim at SPACs as if they are inherently suspect (*see* ¶¶ 35-38), investors view them as a highly efficient mechanism for capital formation. In 2021 alone, 679 SPACs raised in excess of $172 billion. *See* James Jian Hu et al., *2021: A Spectacular Year for SPACs,* Harv. L. Sch. F. Corp. Gov. (Feb. 17, 2022).

Islands) and change its name to PLAYSTUDIOS, and (iii) Acies stock would remain listed on Nasdaq and automatically convert to PLAYSTUDIOS stock "under the new ticker symbol 'MYPS.'" Ex. 12 at 190; *see* Ex. 1 at 2-4, 19. The deal, which valued the Company at about $1 billion, provided Old PlayStudios shareholders with stock (about 89.1 million shares), up to 15% of which ($150 million) could be taken as cash. Institutional buyers would invest $250 million in the Company at $10 per share (a private investment in public equity or "PIPE"). Ex. 1 at 2, 9.

If a deal was approved, Acies stockholders could elect to redeem their shares for $10 each; or shares would otherwise convert automatically to PLAYSTUDIOS common stock. At close, Old PlayStudios shareholders were expected to own 64% of the combined company, PIPE investors 18%, Acies stockholders 15%, and the Acies Sponsor (who formed the SPAC) 3%. Ex. 12 at 192.

### C. The Merger Is Consummated Following Robust Disclosures

On February 16, 2021, Acies filed a preliminary Form S-4 Registration Statement. The filing's central purpose was to register Acies shares to be issued to Old PlayStudios shareholders if the deal was approved. The Registration Statement was amended on March 26, May 10, May 18, and May 20, and effective as of May 25, 2021. A definitive Proxy Statement and Prospectus was then filed, which became part of the Registration Statement. Ex. 1.[7] The Proxy/Prospectus describes in detail the merger agreement; background leading to the merger; financial statements of each entity; the business, games, core strengths, strategy, and historical results of Old PlayStudios, and extensive risk factors affecting its future business prospects and outlook. *See* Ex. 1 at 2-7, 9-10, 14-15, 23-36, 54-72. It also explained Acies' rationale for the transaction, including its financial advisor's opinion that the merger was fair to Acies stockholders as a financial matter. *Id.* at 20-21, 36-48. Plaintiff does not challenge ***any*** of these disclosures.

***Disclosures Regarding Kingdom Boss.*** Instead, plaintiff focuses entirely on a handful of statements in the Proxy/Prospectus about the development and anticipated launch of a single game, *Kingdom Boss*. After noting *growth opportunities* for its existing portfolio of games, the Company stated that we "intend to complete the development and launch of *Kingdom Boss*, our Idle RPG

[7] For ease of reference, we refer to this filing as the "Proxy/Prospectus" unless the context requires a reference to the Registration Statement. The documents are substantively identical.

game, in the second half of 2021." Ex. 1 at 60*; see id.* at 66 ("[w]e expect to launch our first idle RPG game, *Kingdom Boss,* in the second half of 2021"), and 71 ("we expect to incur significant development costs associated with the expected launch of *Kingdom Boss* in the second half of 2021"). Far from a guarantee of success, the statements about the launch of a new game were made subject to considerable risks, uncertainties, and assumptions. *Id.* at 3, 20, 23-31. With specific respect to new game development, the Proxy/Prospectus expressly warned:

- risks and uncertainties ***"make it difficult to know whether we will succeed in continuing to develop successful games…and launch new games in accordance with our operating plan***" and that if it does not do so its financial performance will suffer (*id.* at 24);
- if games do not meet consumer expectations, ***or if new games are not brought to market in a timely and effective manner***, the Company's ability to grow revenue and financial performance will suffer (*id.* at 23);
- success will depend on its ability to ***"efficiently manage the development of new games without incurring excessive costs"*** (*id.* at 24);
- ***no assurance that it can "accurately forecast the timing and expense of our operations, including game and feature development,*** …customer adoption and revenue growth" (*id.*);
- due to consumer preferences . . . very few games actually succeed (*id.* at 25);
- where a third-party game development company is engaged (as here, with Boss Fight for *Kingdom Boss*), the Company has "***limited control over the work performed by the third-party development company and are therefore subject to additional risks," including "delaying their availability for launch and their performance once launched***, ***which could materially and adversely impact our ability to meet our forecasts***" (*id.* at 26-27);
- the development company will be responsible for "operat[ing] and maintain[ing] the game successfully and to develop and implement future game ***updates, patches and bug fixes***, and its failure to do so could adversely affect the game's performance and player satisfaction and our business may suffer as a result" (*id.* at 27);
- games "may contain errors, bugs, flaws…and other vulnerabilities, some of which may only become apparent after the launch, particularly as we launch new games…[and] our development and testing processes may not detect errors and vulnerabilities in our games prior to their release. Any such errors, flaws, defects and vulnerabilities may …adversely affect the game experience of our players, harm our reputation, cause our players to stop playing the game…any of which could result in harm to our business, financial condition or results of operations." (*Id.*).

In short, anyone reading the Proxy/Prospectus would understand that there were significant risks and uncertainties regarding when (if ever) *Kingdom Boss* would be released or if it would be a success. *See id.* at 40 (noting "risks associated with successful implementation" of plan and realizing the anticipated benefits "on the timeline expected or at all").

***Projections and Related Disclosures.*** The same is true of financial projections. As the Proxy/Prospectus made clear, the projections (estimated revenue of $269.8 million in 2020, increasing to $328 million in 2021, and $435.2 million in 2022) hinged on important assumptions, including that *Kingdom Boss* "will launch as expected in the second half of 2021." Ex. 1 at 48. As alleged, the projections assumed *Kingdom Boss* would grow to contribute $60 million in 2022 (about 14% of estimated revenue). ¶ 55. But as was plainly disclosed, the projections "are forward-looking statements that are inherently subject to significant uncertainties and contingencies…there can be no assurance that the projected results will be realized or that actual results will not" differ significantly. Ex.1 at 49; *id.* at 28 (projections "are subject to significant …risks and uncertainties and may not be achieved in full, within the projected timeframes or at all. Operating results are difficult to forecast because they generally depend on . . . future events which are uncertain, including levels of player engagement and the continued acceptance of our games"). It further warned that the projections were provided only because they were made available to Acies in its review of a possible deal, "***should not be viewed as public guidance***," and cautioned investors "***not to rely on the projections*** in making a decision regarding the transaction," as actual results may differ "materially," and the projections did not "take into account any circumstances or events occurring after the date on which they were finalized … November 13, 2020." *Id.* at 49.

***Related Party Disclosures.*** Mr. Pascal (the Company's CEO) surrendered substantial benefits in connection with the merger. Prior to the transaction, he had been an advisor to, and held an economic interest in, Acies (and its Sponsor), consisting of 522,843 shares and 449,129 warrants. Mr. Pascal agreed to forfeit these substantial interests (*i.e.*, he gave up a corresponding number of Company stock and warrants). Ex. 1 at 17, 22, 33-34, 36, 41, 78-80, 82. In addition, Mr. Pascal did not participate in any meetings of Acies' board in which potential business combinations were discussed, including with Old PlayStudios. *Id*. at 22, 34, 36.[8] Acies' Sponsor

[8] As the Proxy/Prospectus indicates, Acies considered 40 merger candidates and had discussions with 17 of them. *Id.* at 33. Old PlayStudios also engaged with other SPACs, even exchanging draft letters of intent. *Id.* at 34. Disregarding these disclosures, and Mr. Pascal's recusal, plaintiff makes the preposterous claim that "the merger target was known at the time Acies was formed" in 2020 "in violation of" some *unspecified* "law." ¶ 43. But tellingly, plaintiff does not attack any statement in the Proxy/Prospectus on this basis. 15 U.S.C. § 78u-4(b)(1)(B) (PSLRA requires plaintiff to "specify each statement alleged to have been misleading"). The AC also refers to

agreed not to redeem its Acies shares in the merger (and also gave up over 1.1 million shares that would otherwise have converted into PLAYSTUDIOS stock, and subjected receipt of a further 900,000 shares to future share-price performance triggers). *Id.* at 32, 78-81. Signaling confidence in the Company, Mr. Pascal and the Sponsor also agreed to lock up and not sell any shares for one year post-merger (and Mr. Pascal ***bought*** more shares after the merger closed). *Id.* at 92; Ex. 18.

***The Vote***. At a special meeting on June 17, 2021, Acies' stockholders overwhelmingly voted to approve the merger, with 16,093,891 shares in favor and just 513,645 opposed. Ex. 17 at 211. The majority of Acies stockholders chose to redeem their shares for cash (11,333,489 shares for about $113.4 million), rather than assume the risks associated with Company shares. *Id*. at 213. The merger closed June 21, 2021, with shares trading under the new symbol MYPS the next day.

### D. PLAYSTUDIOS' Statements About *Kingdom Boss* After The Merger

While *Kingdom Boss* development continued post-merger, the project encountered some of the challenges the Company had warned were inherent in new game development. On August 11, the Company announced results for Q2 2021. Discussing the ongoing *Kingdom Boss* development efforts by Boss Fight, the Company noted that the "timeline for its launch and resulting revenue contribution have shifted out" because "it's critical that we take the time needed to optimize the experience" for game players. Ex. 4 at 112, 114. As Mr. Pascal explained: "creating a great game is an organic and, at times, ***less predictable exercise***…and ***getting the core experience and play value right is less deterministic***. This was the case with some of our other products and is proving to be the case with *Kingdom Boss* as well." *Id.* at 112. That process is "complicated," and "we're learning, adjusting, optimizing and then releasing a new version to see how it performs. This is not atypical. Every product goes through this exercise. ***What is, as I shared, less predictable is when it ends***." *Id.* at 114. While "hopeful" that the game would still launch before year end and be a "modest contribution" to 2021, the impact for 2022 had yet to be determined. *Id.* at 113, 115. Taking the delay and other factors into account, 2021 revenue was now expected to be $290 million to 300 million.[9] The Company's stock price declined from $5.75 on August 11 to close at

disclosures concerning Acies' pre-merger due diligence (¶¶ 44-49), but likewise never alleges that the description is misstated in any way (nor could it).

[9] The earnings calls and earnings releases invoked the safe harbor for forward-looking statements

$5.09 the next day. Ex. 19.

Q3 2021 results were announced on November 11, 2021, reflecting momentum across most key metrics. Ex. 6 at 133-34; Ex. 7 at 139. On *Kingdom Boss*, the Company noted "there's still work to be done" but "our partners [are] now hopeful that the game will be ready to launch by the end of the year." Ex. 7 at 140. As Mr. Pascal explained, efforts to improve and refine the user experience, and optimize performance, continued, "this is about finding its market and optimizing the metrics to a degree that really warrants and justifies our transitioning into a more formal launch." *Id.* at 140, 144. Given that ongoing process, and the expected end-of-year launch timing, ***no revenue contribution*** from the game was expected in 2021, which the Company now estimated at $282.5 million to $287.5 million (which it would go on to achieve). Noting that he and other employees had interests aligned with stockholders, collectively owning about 40% of the Company, Mr. Pascal disclosed he would be buying additional shares in the open market (which he did by purchasing 315,700 shares during the alleged class period, at a cost of over $1.5 million). *Id.* at 141; Ex. 18.

The Company, in fact, went on to release *Kingdom Boss* globally in December 2021. Ex. 11 at 186. Two months later, on February 24, 2022, the Company reported Q4 2021 and full year results. Despite best efforts, the Company announced at that time that it had decided to suspend *Kingdom Boss* and halt further marketing and user engagement efforts. Although Boss Fight, the game developer, "consistently assured us that, based on their experience, the product is on a constructive path," the Company felt the "game has struggled to achieve all the criteria that were established for a full-scale launch even after making the game available in North America late in the fourth quarter." Ex. 10 at 167. Notwithstanding the substantial time and money on Boss Fight development, the game was not "in a place where we can really commit the tens of millions of dollars that would be required in order to really scale its audience and get it to perform and contribute at the levels . . . originally anticipated." *Id.* at 169-70. As a result, the Company would take an $8 million non-cash charge for the game in Q1 2022. *Id.* The Company's stock price

referred to in its Form 10-Q, which are largely the same as those in the Proxy/Prospectus concerning the Company's business. Ex. 3 at 108-09, Ex. 4 at 110, Ex. 5 at 121, 124-132.

declined from $5.10 to $4.86 following this announcement. Ex. 19 at 249.

Working back from the decision to suspend *Kingdom Boss*, and ignoring all of the detailed risk disclosures, plaintiff alleges the Company's statements on August 11 and November 11, 2021 were "fraudulent." While the alleged class period extends to May 5, 2022, the AC identifies no alleged misstatements after November 11, 2021 (much less after *Kingdom Boss* was discontinued).

### E. This Lawsuit And The Untimely Inclusion Of New Defendants

On April 5, 2022, just after the decision to suspend *Kingdom Boss*, this action was filed in the Northern District of California. The initial complaint alleged that the Company's statements about the anticipated launch of *Kingdom Boss* were false and misleading ***all along***, with the "truth" only beginning to emerge on August 11, 2021, when the timeline for launch was delayed. The suit purported to assert claims under Sections 10(b) and 14(a) of the 1934 Act and Section 11 of the 1933 Act and named ***only*** the Company and Mr. Pascal. A contested lead plaintiff process (required by the PSLRA) followed, in which Phoenix adopted the allegations, including that August 11, 2021 was a "corrective disclosure" and the "truth began to come to light" at that time. ECF No. 24 at 3, 6, 9. Phoenix was named lead plaintiff on July 12, 2022. ECF No. 44. The case was thereafter transferred to this Court.

The AC was filed on October 4, 2022. The core theory, that the Company's statements regarding *Kingdom Boss* in the Proxy/Prospectus and post-merger public statements were false and misleading, remains unchanged. Plaintiff asserts claims under Section 10(b) (on behalf of purchasers of Company stock between August 11, 2021 and May 5, 2022); Section 14(a) (on behalf of Acies stockholders who did not redeem their shares in the merger based on the allegedly misleading Proxy/Prospectus); and Section 11 (for purchasers of Company stock pursuant or traceable to the allegedly defective Registration Statement). Trying to raise the stakes (and take misplaced, gratuitous shots at SPACs), the AC adds untimely claims against 12 new defendants. All of plaintiff's claims fail as a matter of law and should be dismissed.

## III. THE CLAIMS ARE SUBJECT TO STRICT PLEADING REQUIREMENTS

Each of plaintiff's claims is subject to the PSLRA, which imposes "formidable pleading requirements to properly state a claim and avoid dismissal." *Metzler Inv. GMBH v. Corinthian*

*Colls., Inc*., 540 F.3d 1049, 1055 (9th Cir. 2008); *see Zucco Partners, LLC v. Digimarc Corp*., 552 F.3d 981, 990 (9th Cir. 2009). Among other things, this requires plaintiff to identify each allegedly misleading statement and the reasons "why [it] is misleading" (15 U.S.C. § 78u-4(b)(1)(B)). This requires ***specific*** contemporaneous facts at the time of the statement, and bars pleading by hindsight. *See Metzler*, 540 F.3d at 1071-72; *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012). An omitted fact is material only if "a *reasonable* investor" would have viewed it "as having *significantly* altered the 'total mix' of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1321-22 (2011). It must "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosp. Corp*., 280 F.3d 997, 1006 (9th Cir. 2002). A statement that is merely incomplete is not actionable. *Id.*

The PSLRA also includes a "safe harbor" that precludes liability for forward-looking statements if they are accompanied by meaningful cautionary language identifying important factors that could cause results to differ materially from what is projected. 15 U.S.C. § 78u-5(c)(1)(A)(i); *see Wochos v. Tesla, Inc.,* 985 F.3d 1180, 1189-92 (9th Cir. 2021); *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.,* 759 F.3d 1051, 1059 (9th Cir. 2010); *In re Cutera Sec. Litig.,* 610 F.3d 1103, 1112-13 (9th Cir. 2010). The safe harbor extends to "any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions underlying or related to any of these issues." *Intuitive Surgical,* 759 F.3d at 1058; *see Wochos,* 985 F.3d at 1191-92. Where they are accompanied by meaningful cautionary language, forward-looking statements are not actionable regardless of a defendant's state of mind. *Wochos,* 985 F.3d at 1190 (a plaintiff cannot overcome the safe harbor "merely by alleging, for example, that the company knew that the announced forward-looking objective was unlikely to be achieved"); *Cutera,* 610 F.3d at 1112. Even in the absence of cautionary language, to encourage companies to provide guidance, the PSLRA requires a plaintiff to plead specific facts showing that a speaker had *actual knowledge* that a forward-looking statement was false when made. *Id.* at 1108.

Application of these standards dooms plaintiff's entire case. In addition, certain claims are

subject to further pleading requirements. For example, the "fraud" claim under Section 10(b) of the 1934 Act is also subject to Rule 9(b) and requires not only a material misstatement, but a strong inference of scienter that is as cogent and compelling as any competing inference of non-fraudulent intent as well as loss causation. *See* Section V (regarding § 10(b), VI (§ 11), VII (§ 14(a)), *infra.* Where claims arising under Section 11 of the 1933 Act are alleged with a "unified course of fraudulent conduct," they too must meet the heightened pleading requirement of Rule 9(b). *Rubke v. Capitol Bancorp Ltd.,* 551 F.3d 1156, 1161 (9th Cir. 2003). "A typical example of th[e] situation is where a plaintiff alleges that the same course of conduct constitutes both securities fraud under Section 10 as well as a violation of Section 11." *In re Violin Memory Sec. Litig.,* 2014 WL 5525946, at *7 (N.D. Cal. Oct. 31, 2014); *see Desaigoudar v. Meyercord,* 223 F.3d 1020, 1022 (9th Cir. 2000) (applying Rule 9(b) to Section 14(a) claim). But, as shown below, whatever standard is applied, plaintiff's claims are irredeemably flawed.

## IV. THE PSLRA SAFE HARBOR DISPOSES OF ALL CLAIMS

### A. The Challenged Statements Regarding *Kingdom Boss* Are Forward-Looking

Every statement challenged (whether in the Proxy/Prospectus or otherwise) concerns one subject: the future launch of *Kingdom Boss*. *See, e.g.*, ¶¶ 71, 79, 81, 96 (that defendants "expect", "intend", "anticipate" or were "on track" to complete development and launch *Kingdom Boss* in a specific time frame); ¶ 71 (the description of *Kingdom Boss* as a "soon to be released" RPG game); ¶¶ 73, 74, 76, 77, 81 (attacking projections and assumptions related to the *Kingdom Boss* launch).

These statements – concerning projections, timelines, and estimates for the launch of a game ***still in development*** – are classic forward-looking statements under the safe harbor. *See* 15 U.S.C. § 77z-2(i)(1) (protecting, *inter alia*, projections, management plans and objectives, and underlying assumptions); 15 U.S.C. § 78u-5(i)(1) (same); *Wochos,* 985 F.3d at 1191-92 ("on track" to produce 5,000 vehicles per week by year-end was "unquestionably a 'forward-looking statement'"); *Intuitive*, 759 F.3d at 1058 ("growth and revenue projections…are forward-looking on their face"); *Szymborski v. Ormat Techs. Inc.,* 776 F. Supp. 2d 1191, 1197-98 (D. Nev. 2011) (projected completion dates of power plant "squarely" forward-looking); *In re Talis Biomedical Corp. Sec. Litig.*, 2022 WL 17551984, at *23-25 (N.D. Cal. Dec. 9, 2022) (that company was "on

track" and "expected" to scale automated lines to full capacity by end of 2021 is forward looking); *Zhou v. Faraday Future Intelligent Elec. Inc.*, 2022 WL 13800633, at *7 (C.D. Cal. Oct. 20, 2022) (that company "intend[ed] to" and was "positioned to" launch new vehicle is forward-looking); *Jedrzejczyk v. Skillz Inc*., 2022 WL 2441563, at *5 (N.D. Cal. July 5, 2022) (gaming company's launch schedule was forward-looking); *In re Leapfrog Enter., Inc. Sec. Litig.*, 200 F. Supp. 3d 987, 1010 (N.D. Cal. 2016) (launch date for a new product and related financial expectations are forward-looking).

### B. The Statements Are Protected Under the Safe Harbor

So long as a forward-looking statement is ***either*** "accompanied by meaningful cautionary language" or "made without actual knowledge" of falsity, it is protected. *See* 15 U.S.C. § 77z-2(c)(1); 15 U.S.C. § 78u-5(c)(1)*; Wochos,* 985 F.3d at 1189. Both prongs apply here.

***Meaningful cautionary language was provided.*** Every filing containing a challenged statement identified it as forward-looking, noted that numerous risks and uncertainties could cause actual results to materially differ, and directed investors to detailed risk disclosures. *See* Ex. 1 at 14, 23-31; Ex. 2 at 94, 98; 102; Ex. 3 at 108-09; Ex. 4 at 110; Ex. 5 at 121, 124-32; Ex. 6 at 136-37; Ex. 7 at 138; Ex. 8 at 150, 153-60; Ex. 9 at 165; Ex. 10 at 166; Ex. 11 at 174-75, 178-84; Ex. 12 at 193-94; Ex. 13 at 196-99; Ex. 14 at 201, 204; Ex. 15 at 207-08; Ex. 16 at 210.

The disclosures warned investors, in clear terms, of the risks alleged here – *i.e.*, that bugs, defects and delays could imperil the launch of *Kingdom Boss* and adversely impact the Company's financial projections. Among other things, investors were told: (i) the development and successful launch of new games are subject to ***multiple risks and uncertainties***, including the ability to "***maintain a quality gaming experience***" and to "minimize and quickly resolve bugs," and that failure to do so could harm its financial performance; (ii) that financial performance could suffer "***if new games are not brought to market in a timely and effective manner***"; (iii) that there could be ***no assurance that the Company could accurately forecast the timing and cost of game and feature development***; (iv) that there is less control when a third party development company is involved, ***increasing the risk that a launch would be delayed*** and that patches and bug fixes might not be timely implemented; and (v) that the Company's games "may contain errors, bugs, flaws …

and other vulnerabilities" which could result in harm to its "business, financial condition or results of operations" *See* Ex. 1 at 23-24, 26-30 (emphases added). *See also* Ex. 2 at 89, 94, 98, 102; Ex. 5 at 125-26, 129-30; Ex. 8 at 154-55, 157-58. The Company also warned that financial projections were "inherently subject to significant uncertainties and contingencies" and there could be "no assurance that the projected results will be realized or that actual results will not" differ significantly. Ex. 1 at 49. *See* Ex. 5 at 121; Ex. 8 at 150; *supra*, Sec. II.C. There simply were no guarantees that *Kingdom Boss* would launch on time, that development of the game would be problem-free, or that, once launched, players would find the game engaging.

The risk disclosures were meaningful and specific, bringing the *Kingdom Boss* statements directly within the safe harbor. *See Intuitive*, 759 F.3d at 1059 (cautionary language is meaningful where it "identif[ies] important factors that could cause actual results to differ materially from those in the forward-looking statement[s]"); *Faraday*, 2022 WL 13800633, at *9 (cautionary statements adequate where "specific, important risks that related directly to potential delay of the production schedule" identified, even absent reference to "the exact factors that ultimately delayed production"); *Ormat,* 776 F. Supp. 2d at 1198 (cautionary statements warning that equipment shortages and geological conditions could delay plant completion were effective even if "particular factor that ultimately cause[d] the forward-looking statement not to come true" not included).[10]

***There was no actual knowledge of a false or misleading statement.*** Even if defendants had not provided meaningful cautionary language (and they did), no specific contemporaneous facts show ***actual knowledge*** of falsity. *See Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001) (to be actionable, facts must show statement was knowingly false when made). The AC ***does not offer a single fact*** suggesting that defendants knew that their goal of launching *Kingdom Boss* in the second half of 2021 (or by year end) was not achievable. Nor could they: *Kingdom Boss* ***did in fact*** launch globally in December 2021. Ex. 11 at 186. The AC attempts to address this glaring deficiency with references to players making negative public comments on game performance (as

[10] To the extent plaintiff attempts to end run the safe harbor by recasting challenged statements as omissions, that also fails. *See* 15 U.S.C. § 78u-5(c)(1) (safe harbor applies to "omission of a material fact necessary to make the statement not misleading"); *Golub v. Gigamon Inc.*, 847 F. App'x 368, 373 (9th Cir. 2021) (omission also forward-looking and protected by the safe harbor).

"glitchy" or "laggy" or "bugs" or "log in" problems) while *Kingdom Boss* ***was still under development***. ¶¶ 56-68. But such problems are routine when designing a new game (that's why there are beta tests) and, under well-established law, do not render forward-looking goals unattainable or knowingly false. *See Ronconi*, 253 F.3d at 434 ("That [problems] exist does not make a lie out of any of the alleged false statements"); *Allison v. Brooktree Corp.*, 999 F. Supp. 1342, 1348 (S.D. Cal. 1998) ("In bringing any high-tech product to market, problems encountered in the early developmental stages are the norm, not the exception."); *In re Siebel Sys., Inc. Sec. Litig.*, 2005 WL 3555718, at *4 (N.D. Cal. Dec. 28, 2005) ("That a new program has kinks does not make a positive statement . . . false. If that were the case, the . . . securities laws would prevent . . . companies from making any positive statements about new software"); *3226701 Canada, Inc. v. Qualcomm, Inc.,* 2017 WL 4759021, at *18 (S.D. Cal. Oct. 20, 2017) (despite technical problems, no facts showed anticipated release date was impossible to achieve), *aff'd on other grounds*, 773 F. App'x 987 (9th Cir. 2019).

### C. The Registration Statement Is Within The Safe Harbor

In an effort to avoid the safe harbor for its Section 11 claim (but not others), plaintiff tries to recharacterize the merger to make an "alternative" allegation that the safe harbor does not apply. ¶ 93. That dodge, which would exclude the protections in every merger involving a SPAC, is baseless. The ***merger*** between a SPAC and an operating company is simply that – a merger and not an "initial public offering" for purposes of the safe harbor exceptions. *See, e.g.*, *Moradpour v. Velodyne Lidar, Inc.*, 2022 WL 2391004, at *15 n.5 (N.D. Cal. July 1, 2022) (merger of SPAC and private company not an IPO); *Costanzo v. DXC Tech. Co.,* 2020 WL 4284838, at *7 (N.D. Cal. July 27, 2020) (same). Nor was this an offering by a "blank check" company; the shares subject to the Registration Statement were for a merged operating company with substantial assets, not a "shell" company.[11]

But even if plaintiff could bend the law to its unprecedented assertion, the forward-looking statements here would still be inactionable under the bespeaks caution doctrine. That doctrine is

[11] Even ignoring these dispositive points, plaintiff's averment also fails because Acies' shares issued above the $4 threshold for penny-stocks and with over $5 million in shareholder equity, and thus did not fit the definition of a "blank check" company under SEC rules. *See* 17 C.F.R. §§ 230.419 (defining "blank check company" as one that issues "penny stock[s]") and 240.3a51-1 ("penny stock" defined by reference to share price and stockholder equity). *See also* Ex. 1 at 33.

an analog to the PSLRA safe harbor where "forward-looking representations contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud." *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1413 (9th Cir. 1994)*; see Westley v. Oclaro, Inc.,* 897 F. Supp. 2d 902, 917 (N.D. Cal. 2012) ("bespeaks caution doctrine provides for immunity in essentially the same circumstances as does the safe harbor provision"); *In re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1080, 1104 n.20 (C.D. Cal. 2003) (doctrine applies to IPO).

## V. THE SECTION 10(b) CLAIM FAILS FOR ADDITIONAL REASONS

Section 10(b) requires: (1) a material misstatement or omission; (2) made with scienter; (3) in connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 603 (9th Cir. 2014). Each element demands particularized facts satisfying Rule 9(b) and the "formidable" PSLRA standards. *Metzler*, 540 F.3d at 1055. Mere "fraud by hindsight" does not suffice. *In re Vantive Corp. Sec. Litig.*, 110 F. Supp. 2d 1209, 1215-16 (N.D. Cal. 2000), *aff'd*, 283 F.3d 1079 (9th Cir. 2002).

The standard is exacting. Not only must a claimed misstatement (or omission) be identified with particularity, plaintiff must plead a ***strong*** inference of scienter – the intent to defraud or deliberate recklessness tantamount to actual intent. *Webb v. SolarCity Corp.*, 884 F.3d 844, 850-51 (9th Cir. 2018); *Zucco*, 552 F.3d at 991-92. "More than merely plausible or reasonable," the inference "must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 309 (2007). Finally, plaintiff must show loss causation – that a "revelation of fraudulent activity" caused a stock price decline. *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014). If any one of these elements cannot be established, the Section 10(b) claims must be dismissed. *Metzler*, 540 F.3d at 1061-62.

### A. The AC Also Fails to Plead Any Actionable Statement In The Class Period

Nothing the Company said about *Kingdom Boss* on August 11, 2021 or November 11, 2021 was a misstatement. Far from it. No facts undermine statements, on August 11, that development had advanced and the game was "expected to launch later this year" (¶ 96), that we "expect to soon launch *Kingdom Boss*" and "we're going to get it launched before the year[']s out" (¶ 98),[12] nor is

[12] The quotes in ¶ 98 are selective, ignore warnings ***on the same call*** that game creation is a "less

there anything suspect in the statement that the Company was taking the time "needed to optimize the [*Kingdom Boss*] experience." *Id.* Likewise, no facts suggest that statements on November 11, about needing to assess the game's performance with test audiences to "qualify what the potential is for [*Kingdom Boss*]" (¶ 100); or that the Company "still expect[s] that it's going to launch before the end of the year" misstated anything. As noted, the game was released globally in December 2021 (Ex. 11 at 186), and so there is no basis in fact for the AC's misguided "failure to launch" assertions. Nor are any of the challenged statements, all of which concern ***future*** expectations for *Kingdom Boss* and related assumptions, and thus within the safe harbor, even actionable. *See Wochos*, 985 F.3d at 1191; *see supra*, Sec. IV.A-B.[13]

Plaintiff's challenge to these statements fails for further reasons. Favorable comments about the Company's expectations for a future launch (*see, e.g.*, ¶¶ 96, 98, 100) are classic corporate optimism. *See Intuitive*, 759 F.3d at 1060 ("vague statements of optimism . . . are not actionable"); *Lopes v. Fitbit, Inc.,* 2020 WL 1465932, at *6 (N.D. Cal. Mar. 23, 2020) (positive outlook for holiday season based on "compelling lineup of new products" was nonactionable), *aff'd*, 848 F. App'x 278 (9th Cir. 2021). Statements about "optimiz[ing] the experience" for players (¶ 98) or "expanding and refining" the game (¶ 100) in advance of the launch are inactionable for the same reason. *See Mulligan v. Impax Labs, Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014) (no misstatement based on "vague statements not capable of objective verification"); *see also Knox v. Yingli Green Energy Holding Co.*, 2016 WL 6609210, at *14 (C.D. Cal. May 10, 2016) (statement that company would "continue to optimize [its] customer portfolio and improve the profitability level of [its] sales in China" was nonactionable puffery); *City of Sterling Heights Gen. Emps. Ret. Sys. v. Hospira, Inc.*, 2013 WL 566805, at *24 (N.D. Ill. Feb. 13, 2013) (statements about "optimiz[ing]" operations and "refin[ing]" culture were nonactionable puffery).

Even disregarding those defects, plaintiff cannot show that any statement on August 11 or November 11 was false or misleading when made. *Ronconi*, 253 F.3d at 432. Instead, plaintiff

---

predictable exercise," "launch criteria [must be] satisfied," and omit critical caveats (*e.g.*, Mr. Pascal said "hopefully . . . we're going to get it launched"). *See* Ex. 4 at 112, 115.

[13] *See also Bhatt v. Tech Data Corp.*, 2018 WL 6504375, at *3 (M.D. Fla. Dec. 11, 2018) (efforts to "optimize" were "plans and objectives" within the definition of forward-looking statements).

relies on the same anecdotal comments of game players about performance problems during game development that, for the reasons noted above, are entirely insufficient. *See* IV.B, *supra*; *see also* *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 620 (9th Cir. 2022) (nondisclosure of software bugs in a program not misleading); *Fitbit*, 2020 WL 1465932, at *6 ("that a new program has kinks does not make a positive statement about the program false"); *Qualcomm*, 2017 WL 4759021, at *16 ("on track to have commercial devices available" in new year inactionable, despite technical issues, where no facts showed goal unachievable); *Wochos*, 985 F.3d at 1194 (rejecting forward-looking production goals as misstated due to manufacturing difficulties absent facts showing defendants "*knew* their year's end goal was *impossible* to achieve"). In fact, the goal was achieved (with the game's end-of-year global release) and, if anything, as set out below, CW1 (the game's developer at Boss Fight) underscores the absence of any alleged falsity.

### B. The Facts Do Not Give Rise To The Required Strong Inference Of Scienter

A company does not commit securities fraud merely because it did not meet a goal or objective. Developing a hit game is inherently uncertain. Here, the risks were amply disclosed, and despite high hopes and substantial effort, the Company made a business decision to suspend *Kingdom Boss* and avoid further expense. It then promptly told the market. Along the way, far from taking advantage of any supposed "fraud," Mr. Pascal ***bought*** hundreds of thousands of shares at prices (plaintiff contends) he knew were artificially high. This theory of fraud defies logic and common sense. Worse still, the entire case is built on little more than lawyer say-so; and the only "witnesses" offered do not bolster any claim, they undermine it. To establish a strong inference of scienter, what plaintiff needed were "compelling," "persuasive," and "powerful" contemporaneous facts. *See Tellabs*, 551 U.S. at 323. They had to reflect an intent to defraud or recklessness so egregious that it was tantamount to actual intent. *Webb*, 884 F.3d at 851. The facts here do not come close.

#### 1. Mr. Pascal's Class Period Stock Purchases Negate Scienter

Mr. Pascal purchased 315,700 shares during the class period, most prior to *Kingdom Boss* being halted (and sold no shares). *See* Ex. 18. No one would spend nearly $1.5 million on shares at prices knowing they were inflated. This eviscerates scienter. *Zack v. Allied Waste Indus., Inc.*,

2005 WL 3501414, at *14 (D. Ariz. Dec. 15, 2005) (purchases are "not actions demonstrating an intent to commit fraud, and instead gives rise to an inference of good faith"), *aff'd*, 275 F. App'x 722 (9th Cir. 2008). Plaintiff ignores this devastating fact. That Mr. Pascal – after ten years building a company, and like all Old PlayStudios shareholders – had a right to take a small portion of the merger consideration in cash (¶ 107) ***before*** the alleged class period began, raises no competing inference. *See* Ex. 1 at 2, 5. Indeed, if this had been about self-interest, Mr. Pascal would not have forfeited his interest in Acies for no consideration in the merger. *Id.* at 17, 22.

**2. The CW Accounts Undermine Any Scienter Claim**

Plaintiff's reliance on two CWs to raise an inference of scienter also backfires. If anything, CW1 (the Chief Creative Officer of Boss Fight, who allegedly headed *Kingdom Boss* development - ¶ 56) and CW2 (a quality assurance lead at the Company, tasked with identifying issues prior to game launch - ¶ 68) suggest the opposite. Anonymous "witnesses" must not only have personal knowledge of the alleged facts, the statements they offer must ***themselves*** be "indicative of scienter." *Zucco*, 552 F.3d at 995. CW1 and CW2 fail this basic test.

Presumably, if anyone was going to reveal that *Kingdom Boss* suffered from "intractable technical defects" (*see, e.g.*, ¶¶ 75, 78, 80, 82, 105) it would be CW1, the game's developer. But CW1 says ***nothing whatsoever*** supporting that claim, much less suggesting Mr. Pascal was told that the game had bugs or defects that could not be overcome (and believed so). To the contrary, CW1 states that the game was playable as early as November 2020 (well before the Proxy/Prospectus and class period) and attributes its failure, not to technical issues (which were Boss Fight's job to remedy), but to a lack of user momentum due to "inadequate marketing." ¶ 56. More critical still, CW1 ***admits*** that Boss Fight "handed over" the game to the Company in ***late*** 2021 and (as plaintiff portrays it) the game was "soft launched" by December 2021. ¶ 66.[14] Not only do these statements suggest there was a viable game (albeit one that users did not ultimately

[14] Plaintiff characterizes CW1 as describing December 2021 as a "soft" launch and cites an internet definition (not anything the Company said) ***to suggest*** that this means a mature game was not fully commercially released at that time. *Id.* Not so. The complete game was released (*i.e.*, made commercially available) to players worldwide in December 2021. Ex. 11 at 186. Plaintiff's preferred interpretation of CW1's comment is no substitute for actual allegations of a witness with personal knowledge. *See Zucco*, 552 F.3d at 995 (statements of the CW– not plaintiff – must be indicative of scienter).

embrace), they are fully consistent with the Company's August 11 and November 11 statements about the anticipated timeline for release. *See Leapfrog*, 200 F. Supp. 3d at 1005 (rejecting fraud theory contradicted by allegations in complaint). Put simply, CW1 does not corroborate plaintiff's theory of the case; CW1 ***eviscerates*** it.

Nothing CW2 has to say suggests otherwise. To start, CW2 did not have any exposure to *Kingdom Boss* prior to November 2021 (*see* ¶ 68), so cannot support a scienter inference at any earlier time. *See Brodsky v. Yahoo! Inc.*, 592 F. Supp. 2d 1192, 1201 (N.D. Cal. 2008) ("temporal mismatch between a CW's statement and a Defendant's statement results in a failure to plead with particularity 'the reason or reasons why the statement is misleading.'"). CW2 also had no direct communication with Mr. Pascal, so has ***no idea*** what he did or did not know or believe. *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 2012 WL 1868874, at *20 (N.D. Cal. May 22, 2012) (rejecting CWs who did not directly communicate with defendants), *aff'd*, 759 F.3d 1051 (9th Cir. 2014); *In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 949 (N.D. Cal. 2010) (absent interaction, "difficult to surmise how . . . the CWs could support a reasonable inference about what these individual [d]efendants knew . . . at the time [of] each of the challenged statements"). And while plaintiff reports that CW2, a game tester ferreting out gameplay issues *prior to* launch, said there were bugs as of November 2021 (¶ 68), he does not suggest that such problems could not be (or were not) overcome. Nor does he say the anticipated release date was misstated, or anything at all about the condition of the game when it was, in fact, launched globally in December 2021. In any event, CW2's account is not inconsistent with the Company's statements (which were about launch timing, not that the game would be completely glitch-free during development or even after release).

### 3. The Remaining Scienter Theories Are Equally Unavailing

As a last resort, plaintiff offers two other uncorroborated theories.

**Temporal proximity.** Plaintiff avers (¶ 104) that the "temporal proximity" of the merger to the August 11, 2021 disclosure that *Kingdom Boss* would shift later in 2021 somehow suggests fraud rather than changing or evolving circumstances. As the Ninth Circuit has squarely held, however, "temporal proximity alone does not satisfy the particularity requirement of Rule 9(b)."

*Twitter*, 29 F.4th at 622 (rejecting assertion that software bugs disclosed in August materialized earlier). As the Court explained, "it is simply not enough to assume or implausibly infer that the defendants must have known about these issues in July based on later facts or developments. Yet Plaintiffs repeatedly rely on future statements to leap to that conclusion." *Id.* at 621. The claim here suffers from the same flawed logic. *See Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020) (rejecting as implausible "supposition" that defendants would briefly inflate stock price only to reveal the truth and "then face the inevitable fallout").

**Core Operations.** Plaintiff fares no better with the "core operations" theory. ¶ 106. It applies only in the "exceedingly rare" case where it is absurd to suggest defendants did not know they were making a misstatement, at least where the defendant received specific contrary information. *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). The AC, however, never alleges that Mr. Pascal received specific information showing his statements about *Kingdom Boss* on August 11 and November 11 were false, much less that he knowingly lied. To the contrary, throughout, and to the end, Boss Fight was saying the game was on a constructive path. The AC cites nothing to show Mr. Pascal was informed any differently; and as the Company repeatedly disclosed, where a third-party developer is involved, it has less control and relies on the developer. Ex. 5 at 129; Ex. 8 at 157; Ex. 11 at 181. Generalized allegations that "due to [his] position[]" Mr. Pascal had "access to material information" (¶ 33), was "extremely knowledgeable about the game" (¶ 105), or that the game was of "critical importance" (¶ 106) are insufficient, standing alone. *See In re ECOtality, Inc. Sec. Litig.*, 2014 WL 4634280, at *11 n.3 (N.D. Cal. Sept. 16, 2014) (core operations ineffective where no facts show defendants "knew that the project was so beleaguered that it would be impossible to complete on time"); *Browning v. Amyris, Inc.*, 2014 WL 1285175, at *15 (N.D. Cal. Mar. 24, 2014) (rejecting core operations inference even where "signature product" involved).

### 4. The Inference Of Good Faith Is Far More Compelling

The competing inference of non-fraudulent conduct is vastly more compelling than the weak, nonsensical theory plaintiff offers. The PSLRA requires "holistic" review of all facts, including nonculpable explanations, to see whether, taken together, they raise a strong inference of

fraud. *Tellabs*, 551 U.S. at 314. The assessment is not even close. The Company was entering new territory with the launch of its very first role playing game and warned of a host of risks and uncertainties associated with that effort. It promptly disclosed when the launch date shifted out (hardly unusual in new product development), and later, the ultimate decision to halt the game after its release. No one stood to benefit from a short-term "fraud" either. Mr. Pascal bought more shares (and agreed not to sell any for a year post-merger). Those are not the actions of someone who knew the game would ***not*** launch or prove to be a hit with players. The PSLRA ended "the practice of pleading fraud by hindsight." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 988 (9th Cir. 1999). That is all that is alleged here. *See Fialkov v. Microsoft Corp.*, 72 F. Supp. 3d 1220, 1234 (W.D. Wash. 2014) (rejecting scienter allegations that "do not overcome the competing inference that Defendants simply miscalculated the demand for a new product"), *aff'd*, 692 F. App'x 491 (9th Cir. 2017); *see also Zucco*, 552 F.3d at 1007 (affirming dismissal where scienter "not as cogent or compelling as plausible alternative").

### C. Plaintiff Cannot Adequately Plead Loss Causation

Plaintiff's inability to plead loss causation – that "revelation of fraudulent activity" caused a stock price decline – is an independent basis for dismissal. *Loos*, 762 F.3d at 887. It must be pleaded with specificity. *Apollo Group,* 774 F.3d at 604-05. The requirement is meaningful. Myriad factors entirely unrelated to fraud – such as the fruition of a known or disclosed risk – can cause a stock price to decline; to meet its burden plaintiff needs specific facts showing a "causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342-43 (2005); *see Metzler*, 540 F.3d at 1062-63. It must trace a loss back to "the very facts about which the defendant lied." *Mineworkers' Pension Scheme v. First Solar, Inc.*, 881 F.3d 750, 753 (9th Cir. 2018); *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016).

The AC rests its loss causation theory on the February 24, 2022 announcement that the Company decided to suspend the game. ¶¶ 108-09. The Company explained why: following the December 2021 launch, the game "struggled to achieve all the criteria" that would support "a full-scale launch" (*i.e.*, the vast expense, "tens of millions of dollars…to totally scale its audience and get it to perform and contribute" at the levels originally anticipated). Thus, the Company made the

business decision to suspend *Kingdom Boss* even though Boss Fight "consistently assured us that, based on their experience, the [game] is on a constructive path." Ex. 10 at 167. The financial guidance for 2022 reflected this development. *Id*. at 169-70.

Plaintiff does not allege how the February 24 announcement revealed a fraud, as opposed to the wholly unremarkable proposition that investors were simply disappointed with this news (and thus the stock price declined from $5.10 to $4.86, accordingly). The disclosure can be read in vain for any suggestion that *Kingdom Boss* was discontinued due to the claimed "intractable technical defects" or "software bugs" on which plaintiff's claim hinges. Unable to point to any such disclosure, plaintiff focuses entirely on financial results and guidance. *See* ¶ 108. The problem is that "loss causation requires more" than missed earnings or disappointing guidance. *See, e.g.*, *In re Oracle Corp. Sec. Litig*., 627 F.3d 376, 392 (9th Cir. 2010). Likewise, referring to the May 5, 2022 earnings release as "corrective" makes no sense. ¶¶ 110-11. Nothing disclosed that day revealed "new" information about *Kingdom Bos*s, which had already been suspended by then. *See Rok v. Identiv, Inc.*, 2017 WL 35496, at *18 (N.D. Cal. Jan. 4, 2017) ("corrective disclosures must present facts to the market that are new, that is, publicly revealed for the first time"), *aff'd*, 716 F. App'x 663 (9th Cir. 2018).[15]

## VI. THE SECTION 11 CLAIM FAILS FOR ADDITIONAL REASONS

### A. The AC Fails to Plead Any Actionable Statement

As discussed above, all of the challenged statements in the Registration Statement about *Kingdom Boss* are inactionable. *See supra,* Sec. IV.[16] As a hedge, plaintiff tries to expand its Section 11 claim to encompass matters ***outside*** the Registration Statement (relating to statements as early as February 2, 2021, before the Registration Statement was filed much less effective). But Section 11 is limited to statements made ***in*** the Registration Statement. *See* 15 U.S.C. § 77k(a).

[15] Because the Section 10(b) claim fails, so does the "control person" claim against Mr. Pascal under Section 20(a). *See Twitter,* 29 F.4th at 623.

[16] Section 11 does not even apply to Mr. Grove, a newly added defendant, as he did not sign the Registration Statement, and was neither an Acies director nor identified as a prospective director of the Company. *See O'Sullivan v. Trident Microsys., Inc.,* 1994 WL 124453, at *10 (N.D. Cal. Jan. 31, 1994) ("nonsigning officers cannot be held liable under § 11); 15 U.S.C. § 77k(a). The § 14(a) claim fails for this reason too (in addition to having no role in preparing the Proxy/Prospectus).

Plaintiff's averment that other materials were "incorporated by reference" into the Registration Statement merely because they were filed with the SEC is unavailing. A document is deemed "incorporated by reference" ***only*** where the Registration Statement "[i]nclude[s] an express statement clearly describing the specific location of the information" and "identif[ies] the document where the information was originally filed or submitted and the location of the information within that document." 17 C.F.R. § 240.12b-23(e); 17 C.F.R § 230.411(e); *Faraday*, 2022 WL 13800633, at *14-15 (documents not incorporated by reference where the specific information required was absent); *In re CytRx Corp. Sec. Litig.*, 2015 WL 5031232, at *16 (C.D. Cal. July 13, 2015) (Section 11 has no application to statements outside of a registration statement). There are no such allegations here.[17]

That dispositive point aside, the Section 11 claim would fail even if these statements were considered part of the Registration Statement. As discussed in Section IV, each statement was forward-looking and covered by the safe harbor. *See* ¶¶ 73-81. And while plaintiff tries to suggest that a May 11, 2021 statement – that the Company was "on track to launch [*Kingdom Boss*] during the second half of 2021" – was a "mix" of current and forward-looking components, the Ninth Circuit disposed of that very argument in *Wochos.* 985 F.3d at 1191 (rejecting identical claim and holding company's statement that it is "on track" to meet a goal is "unquestionably" forward-looking and fully protected by the safe harbor); *see also Talis*, 2022 WL 17551984, at *25 (statements that company was "on track" and "expected" to scale automated lines to capacity by end of 2021 was forward-looking); *Skillz*, 2022 WL 2441563, at *5 ("on track" to launch in India was forward-looking). Even before *Wochos,* there was no shortage of cases confirming the point. *In re Allied Nevada Gold Corp. Sec. Litig.*, 2016 WL 4191017, at *7-10 (D. Nev. Aug. 8, 2016) ("on track to meet commissioning deadlines" and "on track to meet … production guidance" were forward-looking); *Norfolk Cnty. Ter. Sys. v. Solazyme, Inc.,* 2018 WL 3126393, at *3-4 (N.D. Cal.

[17] SEC regulations protect signatories from liability for unincorporated information outside the document. The Registration Statement thus contained a standard provision advising investors that neither Acies nor Old Playstudios "has authorized anyone to give any information or make any representations" outside the document. Ex. 1 at 83. Notwithstanding that the clear purpose of this admonition is to ensure that investors do not rely on ***positive*** information outside the document, the AC tries to turn this on its head to suggest that it somehow "discouraged investors from doing their own due diligence" (¶ 50). It did nothing of the kind.

June 26, 2018) ("on track to reach full nameplate capacity in the back half of 2015" was forward-looking); *Qualcomm,* 2017 WL 4759021, at *15-17 ("everything . . .remains on track and we expect commercial devices to be available in 1H2015" was forward-looking).

Moreover, the claim likewise fails because plaintiff has failed to plead facts showing falsity of these earlier statements. As discussed above, to allege falsity, plaintiff needed to plead facts showing that, at the time of the statements (in early 2021), there was no way the Company could meet its goal to launch the game in the second half of 2021. *See Rigel,* 697 F.3d at 881 ("still on track" not actionable as plaintiffs merely pleaded that defendants should have had different expectations, which is not falsity); *Qualcomm,* 2017 WL 4579021, at *18 ("on track" not actionable despite alleged technical problems because no facts showed goal was impossible to achieve); *Brooktree,* 999 F. Supp. at 1348 (on the "right track" to release product not actionable where no allegation that problems were insurmountable); *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.,* 880 F. Supp. 2d 1045, 1064 (N.D. Cal. 2012) (no facts showed that problems precluded projected growth rate). Plaintiff pleads ***no*** such facts – nor could they ever do so, given that the game did in fact launch by year end.[18]

**B. The Claim Against The Newly Added Defendants Is Time-Barred**

The limitations period for Section 11 is the earlier of one year after discovery of the alleged violation or three years from its occurrence. 15 U.S.C. § 77m. For the limitations period to begin running, a reasonably diligent plaintiff need not discover all of the facts underlying the complaint; instead, the period is triggered "when a prospective plaintiff … become[s] aware of warnings" that "there were either misleading statements or significant omissions involved." *Lane v. Page*, 649 F. Supp. 2d 1256, 1298 (D.N.M. 2009); *In re Obalon Therapeutics, Inc*, 2019 WL 4729461, at *12 (S.D. Cal. Sep. 25, 2019).

Here, in suing under Section 11, the original complaint alleged that the first "corrective" disclosure revealing supposed misstatements in the Registration Statement occurred on August 11,

[18] Equally fruitless are plaintiff's references to Items 105 (requiring disclosure of risks) and 303 (disclosure of "known trends and uncertainties") of Reg S-K. AC ¶¶ 87-88; 17 C.F.R. §§ 229.105, 229.303. The Registration Statement contained extensive discussion of risk factors and uncertainties concerning *Kingdom Boss*, which plaintiff never even tries to reconcile with these averments. *See Steckman v. Hart Brewing, Inc.,* 143 F.3d 1293, 1297 (9th Cir. 1998).

2021, when the Company announced that the *Kingdom Boss* launch would be delayed. Plaintiff took the same position when vying to be appointed lead plaintiff. ECF No. 24 at 3, 6, 9. The AC similarly alleges that a "substantial amount o[r] majority of the adjustment" in 2021 revenues was caused by the delay announced on August 11, and even now relies on the "temporal proximity" of that announcement to the merger to claim scienter. ¶ 104; *see also* ¶¶ 91, 105. Against this backdrop, plaintiff is hard pressed to deny it could not have reasonably discovered the facts constituting the alleged violation by August 11, 2021. *See Welgus v. TriNet Grp., Inc.*, 2017 WL 167708, at *20-22 (N.D. Cal. Jan. 17, 2017); *Obalon*, 2019 WL 4729461, at *12. Because the 12 new defendants were not named until more than a year later, on October 4, 2022, the claim as to them must be dismissed.[19]

### C. Plaintiff Cannot Satisfy the Tracing Requirement

Section 11 is narrowly construed so that standing is limited to those who purchased shares under the specific registration statement at issue – not some later or earlier registration statement. *Hertzberg v. Dignity Partners, Inc.,* 191 F.3d 1076, 1080 (9th Cir. 1999). Plaintiff must be able to "trace their shares back to the relevant offering." *In re Century Aluminum Co. Sec. Litig.,* 729 F.3d 1104, 1106 (9th Cir. 2013). It cannot do so here.

When the merger closed, Acies' common stock continued to trade on NASDAQ – just like the day before – but under Acies' new name, PLAYSTUDIOS and new symbol (MYPS). The shares plaintiff held were automatically converted into Company common stock, with no action on its part. Plaintiff did not "purchase" or pay anything for those shares (the merger consideration went to Old Playstudios shareholders, not Acies shareholders). While the Registration Statement referenced the total shares that would be outstanding after the merger (including newly issued shares to Old Playstudios shareholders and PIPE investors, none of whom are in the alleged class), the origin of plaintiff's shares is from Acies' IPO in 2020. It therefore lacks standing.[20]

---

[19] The "relation back" doctrine does not apply here, where the identities were known all along. *See Miller v. Calvin,* 647 F. Supp. 199, 202-03 (D. Colo. 1985) (relation back cannot salvage Section 11 claim against newly added director defendants); *see also Krupski v. Costa Crociere S.p.A.,* 560 U.S. 538, 549 (2010) (failure to sue known party not a "mistake" allowing for relation back).

[20] Absent a viable Section 11 claim, and with no facts to show that Mr. Pascal "controlled" Acies at the time of the Registration Statement, plaintiff's secondary liability claim against Mr. Pascal

## VII. THE SECTION 14(a) PROXY CLAIM ALSO FAILS

Section 14(a) governs proxy solicitations, here Acies' proposal to its stockholders to approve the merger. The claim is asserted against the Company and the seven newly added defendants who allegedly served on Acies' board at the time. It fails for multiple reasons.

***First,*** as with the other claims, plaintiff was required to allege specific facts showing that the proxy made a materially false or misleading statement. 15 U.S.C. § 78n(a). As shown above, the Proxy/Prospectus contained no such statements; nor is there any dispute that the safe harbor for forward-looking statements applies under Section 14(a). *See Golub*, 847 F. App'x at 372 (applying PSLRA safe harbor to Section 14(a) claim).

***Second,*** the claim against the former Acies directors is barred because, as with Section 11, it was not asserted until after the one-year limitations period had lapsed. *See In re Verisign, Inc. Deriv. Litig.,* 531 F. Supp. 2d 1173, 1212 (N.D. Cal. 2007); *Lane,* 649 F. Supp. 2d at 1298.

***Third,*** plaintiff fails to plead specific facts giving rise to a "strong inference" that each defendant "acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A); *see Desaigoudar*, 223 F.3d at 1022; *Lawson v. Klondex Mines Ltd.*, 450 F. Supp. 3d 1057, 1084 (D. Nev. 2020). Other than being identified as former Acies directors (as to Mr. Grove, mistakenly so), the AC alleges ***nothing whatsoever*** about the Section 14(a) defendants, much less how each (on a defendant-by-defendant basis) was aware of any supposed misstatement in the Proxy/Prospectus. Thus, the claim fails irrespective of whether it sounds in fraud or negligence. *See Desaigoudar,* 223 F.3d at 1022 n.5 (rejecting as "disingenuous" the assertion, also made here, that a negligence standard applies given fraud claims based on identical allegations); *In re McKesson HBOC, Inc. Sec. Litig.,* 126 F. Supp. 2d 1248, 1267 (N.D. Cal. 2000) (no inference of negligence where complaint "pleads no specific facts that would tend to show culpable conduct of any sort"); *Pomerantz v. Pac. Capital Bancorp,* 2009 WL 4911850, at *6 (C.D. Cal. Nov. 6, 2009) (no facts showing proxy was negligently prepared).

***Fourth,*** because Section 14(a) serves a specific purpose, plaintiff must allege the proxy statement itself, rather than the alleged defect, was an "essential link" that ***directly authorized*** the

---

under Section 15 of the Securities Act fails. *See Rigel*, 697 F.3d at 886.

loss-generating corporate action. *Desaigoudar*, 223 F.3d at 1022; *New York City Emps.' Ret. Sys. v. Jobs,* 593 F.3d 1018, 1022 (9th Cir. 2010), *overruled on other grounds by Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012); *Kelly v. Rambus, Inc.*, 2008 WL 5170598, at * 7 (N.D. Cal. Dec. 9, 2008). The AC does not meet this standard. Here, the sole purpose of the proxy was to seek the approval of Acies' shareholders for ***the merger***; it did not address or purport to advise them on the ***separate and independent decision*** as to whether to redeem their shares. *See* Ex. 1 at 5, 8-10, 16. Indeed, although Acies shareholders overwhelmingly approved the merger, the majority decided to redeem their shares, a matter that was not subject to any proxy solicitation or vote. Ex. 17 at 211, 213. Completely ignoring this critical distinction, plaintiff purports to assert the claim on behalf of shareholders who chose to hold their shares rather than redeem. ¶¶ 1a, 138. That decision was not "directly authorized" by the proxy, so the claim fails. *See Desaigoudar*, 223 F.3d at 1022; *Verisign*, 531 F. Supp. 2d at 1213 ("only when the votes for a specific corporate transaction requiring shareholder authorization …are obtained by a false proxy statement" is recovery available).

## VIII. CONCLUSION

Not every new product under development goes according to plan and is successfully introduced. The risk and uncertainties associated with the release of *Kingdom Boss* were repeatedly disclosed. While leave to amend is often granted, the safe harbor is an absolute bar to all the claims here, as is the statute of limitations for the newly added defendants. As there is no way around these flaws, further pleading cannot salvage this case. It should be dismissed with prejudice.

Dated: December 21, 2022

FENWICK & WEST LLP

By: */s/ Dean S. Kristy*
Dean S. Kristy

Dean S. Kristy (admitted *pro hac vice*)
Jennifer C. Bretan (admitted *pro hac vice*)
Sofia Ritala (admitted *pro hac vice*)
FENWICK & WEST, LLP
555 California Street, 12th Floor
San Francisco, CA 94104

Patrick G. Byrne (Nevada Bar No. 7636)
Bradley T. Austin (Nevada Bar No. 13064)
SNELL & WILMER L.L.P.
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169

*Attorneys for Defendants PLAYSTUDIOS, Inc., Andrew Pascal, Edward King, Daniel Fetters, James Murren, Zach Leonsis, Brisa Carleton, Andrew Zobler, Sam Kennedy, Christopher Grove, William J. Hornbuckle, Joe Horowitz, Jason Krikorian, and Judy K. Mencher*

**CERTIFICATE OF SERVICE**

Pursuant to F.R.C.P. 5(b) and Electronic Filing Procedure IV(B), I certify that on December 21, 2022, a true and correct copy of **DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT** was transmitted electronically through the Court's CM/ECF e-filing electronic notice system to all attorneys associated with the above-captioned case.

*/s/ Dean S. Kristy*
Dean S. Kristy
Fenwick & West LLP