# Exhibit 1

## Acies Acquisition Corp.'s Schedule 14A Proxy Statement and Prospectus (excerpted) (May 25, 2021)

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**SCHEDULE 14A**

**PROXY STATEMENT PURSUANT TO SECTION 14(a) OF**
**THE SECURITIES EXCHANGE ACT OF 1934**

Filed by the Registrant    ☒

Filed by a Party other than the Registrant    ☐

Check the appropriate box:
☐    Preliminary Proxy Statement
☐    Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))
☒    Definitive Proxy Statement
☐    Definitive Additional Materials
☐    Soliciting Material under § 240.14a-12

# ACIES ACQUISITION CORP.

(Name of Registrant as Specified in its Charter)

(Name of Person(s) Filing Proxy Statement, if Other Than the Registrant)

PAYMENT OF FILING FEE (CHECK THE APPROPRIATE BOX):

☒    No fee required.

☐    Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

(1)    Title of each class of securities to which transaction applies:

(2)    Aggregate number of securities to which transaction applies:

(3)    Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

(4)    Proposed maximum aggregate value of transaction:

(5)    Total fee paid:

☐    Fee paid previously with preliminary materials.

☐    Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1)    Amount Previously Paid:

(2)    Form, Schedule or Registration Statement No.:

(3)    Filing Party:

(4)    Date Filed:

001

**PROXY STATEMENT FOR EXTRAORDINARY GENERAL MEETING OF**
**ACIES ACQUISITION CORP.**
**(A CAYMAN ISLANDS EXEMPTED COMPANY)**
**PROSPECTUS FOR**
**107,054,411 SHARES OF CLASS A COMMON STOCK AND**
**7,175,000 SHARES OF CLASS A COMMON STOCK UNDERLYING WARRANTS**
**OF**
# ACIES ACQUISITION CORP.
**TO BE REDOMESTICATED AND RENAMED PLAYSTUDIOS, INC.**

On February 1, 2021, the board of directors of Acies Acquisition Corp., a Cayman Islands exempted company (" Acies"), approved:

- the domestication of Acies as a Delaware corporation (the " Domestication");

- the merger agreement (the "Merger Agreement") described in this proxy statement/prospectus, attached to this proxy statement/prospectus as Annex A, pursuant to which Acies and PlayStudios, Inc., a Delaware corporation ("PLAYSTUDIOS"), will become a new public company owned by the prior shareholders of Acies, the prior stockholders of PLAYSTUDIOS and the PIPE Investors described in this proxy statement/prospectus;

- concurrently with the consummation of the business combination, an issuance of Class A common stock of Acies to certain investors for a total aggregate purchase price of up to $250.0 million (the "PIPE Investment"); and

- the other transactions contemplated by the Merger Agreement and documents related thereto (the " Transactions" and, together with the Merger Agreement and the Domestication, the "Business Combination"). In connection with the Business Combination, Acies will change its name to "PLAYSTUDIOS, Inc." As used in this proxy statement/prospectus, "New PLAYSTUDIOS" refers to Acies after the Domestication, including after such change of name.

As a result of the Domestication, among other things,

- Acies will deregister as an exempted company in the Cayman Islands and continue as a corporation incorporated under the laws of the State of Delaware under the name "PLAYSTUDIOS, Inc." and, as a result, current Acies shareholders will receive shares in the Delaware corporation as described below, with materially different governing documents;

- each of the then issued and outstanding Class A and Class B ordinary shares of Acies (the " ordinary shares"), except for the forfeiture of certain ordinary shares held by Acies Acquisition LLC, a Delaware limited liability company (the "Sponsor"), will convert automatically, on a one-for-one basis, into a share of Class A common stock, par value $0.0001 per share, of New PLAYSTUDIOS (the "New PLAYSTUDIOS Class A common stock"),

- each then issued and outstanding redeemable warrant of Acies (the " Acies warrants") will convert automatically, on a one-for-one basis, into a warrant to acquire one share of New PLAYSTUDIOS Class A common stock (the "New PLAYSTUDIOS warrants"), on substantially the same terms and conditions of the Warrant Agreement dated October 22, 2020, between Acies and Continental Stock Transfer & Trust Company, as warrant agent, after giving effect to the forfeiture of certain warrants held by the Sponsor pursuant to the Sponsor Support Agreement, and

- each of the then issued and outstanding units of Acies that have not been previously separated into the underlying Acies Class A ordinary shares and one-third of an Acies warrant upon the request of the holder thereof (the "Acies units") will be cancelled and will entitle the holder thereof to one share of New PLAYSTUDIOS Class A common stock and one-third of a New PLAYSTUDIOS warrant, provided that no fractional New PLAYSTUDIOS warrants will be issued upon separation of the Acies units.

At the closing (the " Closing") of the Business Combination, among other things, all outstanding shares of PLAYSTUDIOS capital stock as of immediately prior to the Closing will be cancelled and, except for any dissenting shares, be exchanged for the right to receive the merger consideration described below. The merger consideration payable by Acies to PLAYSTUDIOS stockholders and vested optionholders will be:

- at the Closing, $1,041,000,000 in the form of shares of New PLAYSTUDIOS common stock, with each stockholder of PLAYSTUDIOS having the ability to elect up to 15% of their shares of New PLAYSTUDIOS common stock to be paid in cash at an assumed value of $10.00 per share of New PLAYSTUDIOS common stock, subject to proration if there is insufficient available cash, subject to certain conditions (holders of vested but unexercised options to purchase shares of PLAYSTUDIOS common stock will not receive shares at the Closing and will also not have a right to elect for cash consideration but their options will be converted to options to purchase shares of New PLAYSTUDIOS common stock as described below); and

- 15,000,000 shares of New PLAYSTUDIOS common stock in the form of earnout consideration, payable in two equal tranches if the closing price of the New PLAYSTUDIOS Class A common stock exceeds $12.50 and $15.00 per share, respectively, for any 20 trading days within any 30-trading day period commencing on or after the 150th day following the Closing and ending no later than the five-year anniversary of the Closing (the earnout consideration will also vest based on the price targets in connection with a sale of New PLAYSTUDIOS).

We estimate that holders of shares of PLAYSTUDIOS capital stock will receive approximately 0.235 shares of New PLAYSTUDIOS common stock per share of PLAYSTUDIOS capital stock (the "Exchange Ratio"), based on capitalization information of PLAYSTUDIOS as of March 31, 2021, subject to change as described in the Merger Agreement. Unexercised options to purchase shares of PLAYSTUDIOS common stock (whether vested or unvested) will be converted to options to purchase shares of New PLAYSTUDIOS common stock based on the Exchange Ratio. Unexercised warrants to purchase shares of PLAYSTUDIOS capital stock will be treated as if they were exercised and outstanding.

The amount of cash available to be paid to holders of PLAYSTUDIOS capital stock electing to receive cash consideration will be based on the amount of cash held by Acies after giving effect to (i) the PIPE Investment, (ii) redemptions by holders of Acies Class A ordinary shares, (iii) the payment of approximately $61.4 million in transaction expenses, (iv) the $200 million reserved for use by New PLAYSTUDIOS after the Closing and (v) the reservation of cash for any dissenting shares for which holders have timely demanded appraisal before the Closing. The aggregate amount of cash available to be paid to holders of PLAYSTUDIOS capital stock will not exceed $150 million. If there is not enough available cash to pay the full amount of elected cash consideration, the aggregate payment will be prorated. For further details, see

*"Summary of the Proxy Statement/Prospectus—Sources and Uses of Funds for the Business Combination"* and *"Business Combination Proposal—The Merger Agreement —Effects of the Merger Agreement—Aggregate Merger Consideration."*

The stock consideration to be issued (including at the Closing and in the form of earnout consideration) to:

- the then current holders of PLAYSTUDIOS stock and options and warrants to purchase PLAYSTUDIOS stock (other than to the Chief Executive Officer of PLAYSTUDIOS, Andrew Pascal, and certain affiliated entities) will be in the form of New PLAYSTUDIOS Class A common stock, and

- Mr. Pascal and certain affiliated entities will be in the form of shares of Class B common stock, par value $0.0001 per share, of New PLAYSTUDIOS (the "New PLAYSTUDIOS Class B common stock").

The New PLAYSTUDIOS Class B common stock will have the same economic terms as the New PLAYSTUDIOS Class A common stock, but the New PLAYSTUDIOS Class B common stock will be entitled to twenty (20) votes per share compared with one (1) vote per share for the New PLAYSTUDIOS Class A common stock. As a result, it is expected that Mr. Pascal and his affiliated entities will hold over 70% of the outstanding voting power of New PLAYSTUDIOS immediately following the closing of the Business Combination and New PLAYSTUDIOS will be a "controlled company" under the rules of the Nasdaq Stock Market LLC. The stock consideration will also be subject to certain restrictions on transfer for 12 months following the closing of the Business Combination, subject to certain exceptions, and after 180 days following the closing of the Business Combination, a release from such transfer restriction of the lesser of (A) 5% of the locked-up securities and (B) 50,000 of the locked-up securities, in each case, held by each holder. See the sections titled *"Summary of the Proxy Statement/Prospectus—Ownership of New PLAYSTUDIOS Following the Business Combination,* " *"Description of New PLAYSTUDIOS Securities"* and *"Description of New PLAYSTUDIOS Securities—Common Stock—Lock-up Restrictions.* "

**When you consider the recommendation of the Acies Board of Directors in favor of each of the Proposals discussed in this proxy statement/prospectus, you should keep in mind that Mr. Pascal is a co-founder and Chief Executive Officer of PLAYSTUDIOS, as well as a co-founder of Acies and an advisor to the Acies Board of Directors, and the proposed business combination is considered an affiliated transaction. Please see the section entitled "Questions and Answers for Shareholders of Acies—Is the Business Combination an affiliated transaction?"**

The issued and outstanding Acies units, Acies Class A ordinary shares and Acies warrants are currently listed on the Nasdaq Capital Market (" Nasdaq") under the symbols "ACACU," "ACAC" and "ACACW," respectively. Acies will apply for listing, to be effective at the time of the business combination New PLAYSTUDIOS common stock and New PLAYSTUDIOS warrants on Nasdaq under the proposed symbols, "MYPS" and "MYPSW," respectively. New PLAYSTUDIOS will not have units traded. It is a condition of the consummation of the Business Combination that Acies receives confirmation from Nasdaq that the securities have been approved for listing on Nasdaq, but there can be no assurance that Acies will obtain such confirmation from Nasdaq. If such confirmation is not obtained, the Business Combination will not be consummated unless the Nasdaq condition set forth in the Merger Agreement is waived by the applicable parties.

---

**This proxy statement/prospectus provides shareholders of Acies with detailed information about the proposed Business Combination and other matters to be considered at the Extraordinary General Meeting of Acies. We encourage you to read this entire document, including the Annexes and other documents referred to herein, carefully and in their entirety. You should also carefully consider the risk factors described in *"Risk Factors"* beginning on page 30 of this proxy statement/prospectus.**

**NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES REGULATORY AGENCY HAS APPROVED OR DISAPPROVED THE TRANSACTIONS DESCRIBED IN THIS PROXY STATEMENT/PROSPECTUS, PASSED UPON THE MERITS OR FAIRNESS OF THE BUSINESS COMBINATION OR RELATED TRANSACTIONS OR PASSED UPON THE ADEQUACY OR ACCURACY OF THE DISCLOSURE IN THIS PROXY STATEMENT/PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY CONSTITUTES A CRIMINAL OFFENSE.**

**This proxy statement/prospectus is dated May 25, 2021, and is first being mailed to Acies' shareholders on or about May 25, 2021.**

**ACIES ACQUISITION CORP.**

**A Cayman Islands Exempted Company**
**(Company Number 365197)**
**1219 Morningside Drive, Suite 110**
**Manhattan Beach, California 90266**

Dear Acies Acquisition Corp. Shareholders:

You are cordially invited to attend the Extraordinary General Meeting (the "Extraordinary General Meeting") of Acies Acquisition Corp., a Cayman Islands exempted company ("Acies" and, after the Domestication, as described below, "New PLAYSTUDIOS"), at 7:00 a.m., Pacific Time on June 17, 2021 at the offices of Latham & Watkins LLP located at 10250 Constellation Blvd., Suite 1100, Los Angeles, California 90067, and also virtually via live webcast at the following address: https://www.cstproxy.com/aciesacq/sm2021, or at such other time, on such other date and at such other place to which the meeting may be adjourned. Given the potential COVID-19 restrictions which may be in place at the time of the Extraordinary General Meeting, Acies would like to stress the importance of using other methods of attendance other than being physically in the same room, such as attending virtually or by proxy.

At the Extraordinary General Meeting, Acies shareholders will be asked to consider and vote upon a proposal, which is referred to herein as the "Business Combination Proposal," to approve and adopt the Agreement and Plan of Merger, dated as of February 1, 2021 (the "Merger Agreement"), by and among Acies, Catalyst Merger Sub I, Inc., a Delaware corporation and wholly owned subsidiary of Acies ("First Merger Sub"), Catalyst Merger Sub II, LLC, a Delaware limited liability company and wholly owned subsidiary of Acies ("Second Merger Sub") and PlayStudios, Inc., a Delaware corporation ("PLAYSTUDIOS"), a copy of which is attached to the accompanying proxy statement/prospectus as Annex A. The Merger Agreement provides for, among other things, following the Domestication of Acies to Delaware as described below, the merger of First Merger Sub with and into PLAYSTUDIOS (the "First Merger") with PLAYSTUDIOS surviving the merger as a wholly owned subsidiary of Acies (PLAYSTUDIOS, in its capacity as the surviving corporation of the First Merger, is referred to as the "Surviving Corporation"), and immediately following the First Merger, and as part of an integrated transaction with the First Merger, the merger of Surviving Corporation with and into Second Merger Sub (the "Second Merger" and, together with the First Merger, the "Mergers"), with Second Merger Sub being the surviving entity of the Second Merger (Second Merger Sub, in its capacity as the surviving entity of the Second Merger, the "Surviving Entity"); in accordance with the terms and subject to the conditions of the Merger Agreement as more fully described elsewhere in the accompanying proxy statement/prospectus.

As a condition to the consummation of the Mergers, the board of directors of Acies has unanimously approved a change of Acies' jurisdiction of incorporation by deregistering as an exempted company in the Cayman Islands and domesticating as a corporation incorporated under the laws of the State of Delaware (the "Domestication" and, together with the Merger Agreement and the other transactions contemplated by the Merger Agreement and documents related thereto, the "Business Combination"). As described in this proxy statement/prospectus, you will be asked to consider and vote upon a proposal, which is referred to herein as the "Domestication Proposal," to approve the Domestication. As used in the accompanying proxy statement/prospectus, "New PLAYSTUDIOS" refers to Acies after the Domestication, including after such change of name.

As a result of and upon the effective time of the Domestication, (1) each of the then issued and outstanding Class A ordinary shares, par value $0.0001 per share, of Acies (the "Acies Class A ordinary shares") will convert automatically, on a one-for-one basis, into a share of Class A common stock, par value $0.0001 per share, of New PLAYSTUDIOS (the "New PLAYSTUDIOS Class A common stock"), (2) each of the then issued and outstanding Class B ordinary shares, par value $0.0001 per share, of Acies (the "Acies Class B ordinary shares" and, together with the Acies Class A ordinary shares, the "ordinary shares"), will convert automatically, on a one-for-one basis, into a share of New PLAYSTUDIOS Class A common stock, after giving effect to the forfeiture of certain Acies Class B ordinary shares held by Acies Acquisition LLC, a Delaware limited liability company (the "Sponsor") pursuant to the Sponsor Support Agreement (as defined below), (3) each then issued and outstanding redeemable warrant of Acies (the "Acies warrants") will convert automatically, on a one-for-one basis, into a warrant to acquire one share of New

004

PLAYSTUDIOS Class A common stock (the "New PLAYSTUDIOS warrants") substantially on the same terms and conditions as the Warrant Agreement (the "Warrant Agreement"), dated October 22, 2020, between Acies and Continental Stock Transfer & Trust Company ("Continental"), as warrant agent, after giving effect to the forfeiture of certain warrants held by the Sponsor pursuant to the Sponsor Support Agreement (as defined below), and (4) each of the then issued and outstanding units of Acies that have not been previously separated into the underlying Acies Class A ordinary shares and one-third of an Acies warrant upon the request of the holder thereof (the "Acies units") will be cancelled and will entitle the holder thereof to one share of New PLAYSTUDIOS Class A common stock and one-third of a New PLAYSTUDIOS warrant, provided that no fractional New PLAYSTUDIOS warrants will be issued upon separation of the Acies units. As used herein, "public shares" shall mean the Acies Class A ordinary shares (including those that underlie the Acies units) that were registered pursuant to the Registration Statement on Form S-1 (333-249297) and the shares of New PLAYSTUDIOS Class A common stock issued as a matter of law upon the conversion thereof on the effective date of the Domestication. For further details, see "*Domestication Proposal*" in the accompanying proxy statement/prospectus.

You will also be asked to consider and vote upon (1) four separate proposals to approve material differences between Acies' Amended and Restated Memorandum and Articles of Association (as may be amended from time to time, the "Cayman Constitutional Documents") and the proposed certificate of incorporation and bylaws of New PLAYSTUDIOS, which are referred to herein as the "Organizational Documents Proposals," (2) a proposal to elect six directors who, upon consummation of the Business Combination, will be the directors of New PLAYSTUDIOS, which is referred to herein as the "Director Election Proposal," (3) a proposal to approve, for purposes of complying with the applicable provisions of Nasdaq Listing Rule 5635, the issuance of New PLAYSTUDIOS common stock to the PLAYSTUDIOS stockholders pursuant to the terms of the Merger Agreement, which is referred to herein as the "Merger Issuance Proposal," (4) a proposal to approve, for purposes of complying with the applicable provisions of Nasdaq Listing Rule 5635, the issuance of New PLAYSTUDIOS common stock to certain investors (collectively, the "PIPE Investors"), for a total aggregate purchase price of up to $250.0 million (the "PIPE Investment"), which is referred to herein as the "PIPE Issuance Proposal," (5) a proposal to approve and adopt the New PLAYSTUDIOS 2021 Equity Incentive Plan (the "Incentive Plan"), which is referred to as the "Incentive Plan Proposal," (6) a proposal to approve and adopt the New PLAYSTUDIOS 2021 Employee Stock Purchase Plan, which is referred to as the "ESPP Proposal," (7) a proposal to approve the appointment by the audit committee of Marcum LLP as the independent registered public accountants of Acies to audit and report on Acies' consolidated financial statements for the year ending December 31, 2021, which is referred to herein as the "Auditor Ratification Proposal," and (8) a proposal to approve the adjournment of the Extraordinary General Meeting to a later date or dates, if necessary, to permit further solicitation and vote of proxies in the event that there are insufficient votes for the approval of one or more proposals at the Extraordinary General Meeting, which is referred to herein as the "Adjournment Proposal." The Business Combination will be consummated only if the Business Combination Proposal, the Domestication Proposal, the Organizational Documents Proposals, the Director Election Proposal, the Merger Issuance Proposal, the PIPE Issuance Proposal, the Incentive Plan Proposal, and the ESPP Proposal (collectively, the "Condition Precedent Proposals") are approved at the Extraordinary General Meeting. Each of the Condition Precedent Proposals is cross-conditioned on the approval of each other. The Auditor Ratification Proposal and the Adjournment Proposal are not conditioned upon the approval of any other proposal. Each of these proposals is more fully described in the accompanying proxy statement/prospectus, which each shareholder is encouraged to read carefully and in its entirety.

At the closing (the "Closing") of the Business Combination, all outstanding shares of PLAYSTUDIOS capital stock as of immediately prior to the Closing will be cancelled and, except for any dissenting shares, be exchanged for the right to receive the merger consideration described below. The merger consideration payable by Acies to PLAYSTUDIOS stockholders and holders of vested options to purchase shares of PLAYSTUDIOS common stock under the Merger Agreement will be:

- at the Closing, $1,041,000,000 in the form of shares of New PLAYSTUDIOS common stock with the ability for each stockholder to elect up to 15% of their shares of New PLAYSTUDIOS common stock to be paid in cash (with an assumed value of $10.00 per share of New PLAYSTUDIOS common stock), subject to proration if there is insufficient available cash (holders of vested but unexercised options to purchase shares of PLAYSTUDIOS common stock

and (iv) the Registration Rights Agreement. For additional information, see "*Business Combination Proposal —Related Agreements*" in the accompanying proxy statement/prospectus.

Pursuant to the Cayman Constitutional Documents, a holder (a "public shareholder") of public shares, which excludes shares held by the Sponsor, may request that Acies redeem all or a portion of such shareholder's public shares for cash if the Business Combination is consummated. **Public shareholders may elect to redeem their public shares even if they vote "for" the Business Combination Proposal or any other Condition Precedent Proposal.** If the Business Combination is not consummated, the public shares will be returned to the respective holder, broker or bank. If the Business Combination is consummated, and if a public shareholder properly exercises its right to redeem all or a portion of the public shares that it holds and timely delivers its shares to Continental, Acies' transfer agent, New PLAYSTUDIOS will redeem such public shares for a per-share price, payable in cash, equal to the pro rata portion of the trust account established at the consummation of Acies' initial public offering into which substantially all of the proceeds from Acies' initial public offering has been deposited for the benefit of Acies, its public shareholders and the underwriters of Acies' initial public offering (the "Trust Account"), calculated as of two business days prior to the consummation of the Business Combination. For illustrative purposes, as of November 9, 2020, this would have amounted to approximately $10.00 per issued and outstanding public share. If a public shareholder exercises its redemption rights in full, then it will be electing to exchange its public shares for cash and will no longer own public shares. The redemption takes place following the Domestication, and, accordingly, it is shares of New PLAYSTUDIOS Class A common stock that will be redeemed immediately after consummation of the Business Combination. See "*Extraordinary General Meeting of Acies—Redemption Rights*" in the accompanying proxy statement/prospectus for a detailed description of the procedures to be followed if you wish to redeem your public shares for cash. Acies' public shareholders may exercise their redemption rights with respect to their public shares without affecting their ability to hold and exercise any public warrants.

Notwithstanding the foregoing, a public shareholder, together with any affiliate of such public shareholder or any other person with whom such public shareholder is acting in concert or as a "group" (as defined in Section 13(d)(3) of the Securities Exchange Act of 1934, as amended ("Exchange Act")), will be restricted from redeeming its public shares with respect to more than an aggregate of 15% of the public shares. Accordingly, if a public shareholder, alone or acting in concert or as a group, seeks to redeem more than 15% of the public shares, then any such shares in excess of that 15% limit would not be redeemed for cash.

The Sponsor and each officer and director of Acies have agreed to, among other things, vote in favor of the Merger Agreement and the transactions contemplated thereby, and to waive their redemption rights in connection with the consummation of the Business Combination with respect to any ordinary shares held by them, in each case, subject to the terms and conditions contemplated by the Sponsor Support Agreement, dated as of February 1, 2021, a copy of which is attached as Annex B to this proxy statement/prospectus (the "Sponsor Support Agreement"). The ordinary shares held by the Sponsor will be excluded from the pro rata calculation used to determine the per-share redemption price. As of the date of the accompanying proxy statement/prospectus, the Sponsor owns approximately 20% of the issued and outstanding ordinary shares.

The Merger Agreement provides that the obligations of PLAYSTUDIOS to consummate the Mergers are conditioned on, among other things, that as of the Closing, (i) the Domestication has been completed, (ii) the amount of cash available in (x) the Trust Account, after deducting the amount required to satisfy Acies' obligations to its shareholders (if any) that exercise their rights to redeem their Acies Class A ordinary shares pursuant to the Cayman Constitutional Documents (but prior to the payment of (a) deferred underwriting commissions being held in the Trust Account and (b) any transaction expenses of Acies or its affiliates) plus (y) the PIPE Investment Amount (as defined herein), is at least equal to $200.0 million minus qualified expenses related to the cost of filing fees and seeking governmental approval of the Mergers (the "Minimum Available Cash Amount") (such condition, the "Minimum Cash Condition"). If such condition is not met, and such condition is not waived by PLAYSTUDIOS under the terms of the Merger Agreement, then the Merger Agreement could terminate and the proposed Business Combination may not be consummated. In addition, pursuant to the Cayman Constitutional Documents, in no event will Acies redeem public shares in an amount that would cause Acies' net tangible assets (as determined in accordance with Rule 3a51-1(g)(1) of the Exchange Act) to be less than $5,000,001.

006

The Merger Agreement is also subject to the satisfaction or waiver of certain other closing conditions as described in the accompanying proxy statement/prospectus. There can be no assurance that the parties to the Merger Agreement would waive any such provision of the Merger Agreement.

Acies is providing the accompanying proxy statement/prospectus and accompanying proxy card to Acies' shareholders in connection with the solicitation of proxies to be voted at the Extraordinary General Meeting and at any adjournments of the Extraordinary General Meeting. Information about the Extraordinary General Meeting, the Business Combination and other related business to be considered by Acies' shareholders at the Extraordinary General Meeting is included in the accompanying proxy statement/prospectus. **Whether or not you plan to attend the Extraordinary General Meeting, all of Acies' shareholders are urged to read the accompanying proxy statement/prospectus, including the Annexes and other documents referred to therein, carefully and in their entirety. You should also carefully consider the risk factors described in "*Risk Factors*" beginning on page 30 of the accompanying proxy statement/prospectus.**

**After careful consideration, the board of directors of Acies has unanimously approved the Business Combination and unanimously recommends that shareholders vote "FOR" adoption of the Merger Agreement, and approval of the transactions contemplated thereby, including the Business Combination, and "FOR" all other proposals presented to Acies' shareholders in the accompanying proxy statement/prospectus. When you consider the recommendation of these proposals by the board of directors of Acies, you should keep in mind that Acies' directors and officers have interests in the Business Combination that may conflict with your interests as a shareholder. See the section titled "*Business Combination Proposal—Interests of Acies' Directors and Executive Officers in the Business Combination*" in the accompanying proxy statement/prospectus for a further discussion of these considerations.**

The approval of each of the Domestication Proposal and Organizational Documents Proposal D requires the affirmative vote of holders of at least two-thirds of the ordinary shares represented in person or by proxy and entitled to vote thereon and who vote at the Extraordinary General Meeting. The Business Combination Proposal, the Organizational Document Proposals (excluding Organizational Document Proposal D), the Merger Issuance Proposal, the PIPE Issuance Proposal, the Incentive Plan Proposal, the ESPP Proposal, the Auditor Ratification Proposal, and the Adjournment Proposal require the affirmative vote of a majority of the ordinary shares represented in person or by proxy and entitled to vote thereon and who vote at the Extraordinary General Meeting. The Director Election Proposal requires the affirmative vote of the majority of the holders of Acies Class B ordinary shares.

*Your vote is very important.* **Whether or not you plan to attend the Extraordinary General Meeting, please vote as soon as possible by following the instructions in the accompanying proxy statement/prospectus to make sure that your shares are represented at the Extraordinary General Meeting. If you hold your shares in "street name" through a bank, broker or other nominee, you will need to follow the instructions provided to you by your bank, broker or other nominee to ensure that your shares are represented and voted at the Extraordinary General Meeting. The transactions contemplated by the Merger Agreement will be consummated only if the Condition Precedent Proposals are approved at the Extraordinary General Meeting. Each of the Condition Precedent Proposals is cross-conditioned on the approval of each other. The Auditor Ratification Proposal and the Adjournment Proposal are not conditioned upon the approval of any other proposal set forth in the accompanying proxy statement/prospectus.**

If you sign, date and return your proxy card without indicating how you wish to vote, your proxy will be voted FOR each of the proposals presented at the Extraordinary General Meeting. If you fail to return your proxy card or fail to instruct your bank, broker or other nominee how to vote, and do not attend the Extraordinary General Meeting in person, the effect will be, among other things, that your shares will not be counted for purposes of determining whether a quorum is present at the Extraordinary General Meeting and will not be voted. An abstention or broker non-vote will be counted towards the quorum requirement but will not count as a vote cast at the Extraordinary General Meeting. If you are a shareholder of record and you attend the Extraordinary General Meeting and wish to vote in person, you may withdraw your proxy and vote in person.

TO EXERCISE YOUR REDEMPTION RIGHTS, YOU MUST DEMAND IN WRITING THAT YOUR PUBLIC SHARES ARE REDEEMED FOR A PRO RATA PORTION OF THE FUNDS HELD IN THE TRUST ACCOUNT AND TENDER YOUR SHARES TO ACIES' TRANSFER AGENT AT

**ACIES ACQUISITION CORP.**

**A Cayman Islands Exempted Company**
**(Company Number 365197)**
**1219 Morningside Drive, Suite 110**
**Manhattan Beach, CA 90266**

**NOTICE OF EXTRAORDINARY GENERAL MEETING**
**TO BE HELD ON JUNE 17, 2021**

TO THE SHAREHOLDERS OF ACIES ACQUISITION CORP.:

NOTICE IS HEREBY GIVEN that an Extraordinary General Meeting (the "Extraordinary General Meeting") of Acies Acquisition Corp., a Cayman Islands exempted company ("Acies" and, after the Domestication, as described below, "New PLAYSTUDIOS"), at 7:00 a.m., Pacific Time on June 17, 2021 at the offices of Latham & Watkins LLP located at 10250 Constellation Blvd., Suite 1100, Los Angeles, CA 90067, and also virtually via live webcast at: https://www.cstproxy.com/aciesacq/sm2021 or at such other time, on such other date and at such other place to which the meeting may be adjourned. You are cordially invited to attend the Extraordinary General Meeting, which will be held for the following purposes:

- **Proposal No. 1—The Business Combination Proposal—**to consider and vote upon a proposal to approve by ordinary resolution and adopt the Merger Agreement, dated as of February 1, 2021 (the "Merger Agreement"), by and among Acies, Catalyst Merger Sub I, Inc., a wholly owned subsidiary of Acies ("First Merger Sub"), Catalyst Merger Sub II, LLC, a wholly owned subsidiary of Acies ("Second Merger Sub"), and PlayStudios, Inc. ("PLAYSTUDIOS"), a copy of which is attached to this proxy statement/prospectus statement as Annex A. The Merger Agreement provides for, among other things, following the Domestication of Acies to Delaware as described below, the merger of First Merger Sub with and into PLAYSTUDIOS (the "First Merger") with PLAYSTUDIOS surviving the merger as a wholly owned subsidiary of Acies (PLAYSTUDIOS, in its capacity as the surviving corporation of the First Merger, is referred to as the "Surviving Corporation"), and immediately following the First Merger, and as part of an integrated transaction with the First Merger, the Surviving Corporation will merge with and into Second Merger Sub (the "Second Merger" and, together with the First Merger, the "Mergers"), with Second Merger Sub being the surviving entity of the Second Merger (Second Merger Sub, in its capacity as the surviving entity of the Second Merger, the "Surviving Entity"), in accordance with the terms and subject to the conditions of the Merger Agreement as more fully described elsewhere in this proxy statement/prospectus (we refer to this proposal as the "Business Combination Proposal");

- **Proposal No. 2—The Domestication Proposal—**to consider and vote upon a proposal to approve by special resolution, assuming the Business Combination Proposal is approved and adopted, the change of Acies' jurisdiction of incorporation by deregistering as an exempted company in the Cayman Islands and continuing and domesticating as a corporation incorporated under the laws of the State of Delaware (the "Domestication" and, together with the Merger Agreement and the other transactions contemplated by the Merger Agreement and documents related thereto, the "Business Combination") (this proposal is referred to herein as the "Domestication Proposal");

- **Proposal No. 3—Organizational Documents Proposals—**to consider and vote upon the following four separate proposals (collectively, the "Organizational Documents Proposals") to approve by ordinary resolutions, save for the Organizational Documents Proposal D which requires a special resolution, assuming the Business Combination Proposal and the Domestication Proposal are approved and adopted, the following material differences between Acies' Amended and Restated Memorandum and Articles of Association (as may be amended from time to time, the "Cayman Constitutional Documents") and the proposed new certificate of incorporation ("Proposed Certificate of Incorporation") and the proposed new bylaws ("Proposed Bylaws") of Acies Acquisition Corp. (a corporation incorporated in the State of Delaware, and upon the filing with and acceptance by the Secretary of State of Delaware of the certificate of domestication in accordance with Section 388 of the Delaware General Corporation Law (the "DGCL")), which will be renamed "PLAYSTUDIOS, Inc."

TABLE OF CONTENTS

in connection with the Business Combination (Acies after the Domestication, including after such change of name, is referred to herein as "New PLAYSTUDIOS"):

- **Organizational Documents Proposal A**—to authorize by ordinary resolution the change in the authorized share capital of Acies from 500,000,000 Acies Class A ordinary shares and 50,000,000 Acies Class B ordinary shares to 2,000,000,000 shares of New PLAYSTUDIOS Class A common stock, 25,000,000 shares of New PLAYSTUDIOS Class B common stock and 100,000,000 shares of New PLAYSTUDIOS preferred stock (this proposal is referred to herein as "Organizational Documents Proposal A");

- **Organizational Documents Proposal B**—to authorize the board of directors of New PLAYSTUDIOS (the "New PLAYSTUDIOS Board of Directors") to issue any or all shares of New PLAYSTUDIOS preferred stock (the "New PLAYSTUDIOS preferred stock") in one or more classes or series, with such terms and conditions as may be expressly determined by New PLAYSTUDIOS Board of Directors and as may be permitted by the DGCL (this proposal is referred to herein as "Organizational Documents Proposal B");

- **Organizational Documents Proposal C**—to provide that the New PLAYSTUDIOS Board of Directors be declassified with all directors being elected each year for one-year terms (this proposal is referred to herein as "Organizational Documents Proposal C"); and

- **Organizational Documents Proposal D**—to authorize, by way of special resolution, all other changes in connection with the amendment, restatement and replacement of the Cayman Constitutional Documents with the Proposed Certificate of Incorporation and Proposed Bylaws as part of the Domestication (copies of which are attached to this proxy statement/prospectus as Annex I and Annex J, respectively), including, among other things, (1) changing the corporate name from "Acies Acquisition Corp." to "PLAYSTUDIOS, Inc.," (2) making New PLAYSTUDIOS' corporate existence perpetual, (3) adopting Delaware as the exclusive forum for certain stockholder litigation and the federal district courts of the United States of America the exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act, and (4) removing certain provisions related to Acies' status as a blank check company that will no longer be applicable upon consummation of the Business Combination, all of which Acies Board of Directors believes is necessary to adequately address the needs of New PLAYSTUDIOS after the Business Combination (this proposal is referred to herein as "Organizational Documents Proposal D");

- **Proposal No. 4—Director Election Proposal**—to consider and vote upon a proposal to approve by ordinary resolution, to elect six directors who, upon consummation of the Business Combination, will be the directors of New PLAYSTUDIOS (this proposal is referred to herein as the "Director Election Proposal");

- **Proposal No. 5—Merger Issuance Proposal**—to consider and vote upon a proposal to approve by ordinary resolution, for the purposes of complying with the applicable provisions of Nasdaq Listing Rule 5635, the issuance of shares of New PLAYSTUDIOS common stock to the PLAYSTUDIOS stockholders pursuant to the terms of the Merger Agreement (this proposal is referred to herein as the "Merger Issuance Proposal");

- **Proposal No. 6—PIPE Issuance Proposal**—to consider and vote upon a proposal to approve by ordinary resolution, for the purposes of complying with the applicable provisions of Nasdaq Listing Rule 5635, the issuance of shares of New PLAYSTUDIOS common stock to certain investors (the "PIPE Investors") in connection with the PIPE Investment (this proposal is referred to herein as the "PIPE Issuance Proposal");

- **Proposal No. 7—The Incentive Plan Proposal**—to consider and vote upon a proposal to approve by ordinary resolution, the New PLAYSTUDIOS 2021 Equity Incentive Plan (the "Incentive Plan"), a copy of which is attached to this proxy statement/prospectus as Annex F, including the authorization of the initial share reserve under the Incentive Plan (this proposal is referred to herein as the "Incentive Plan Proposal");

- **Proposal No. 8—The ESPP Proposal**—to consider and vote upon a proposal to approve by ordinary resolution, the New PLAYSTUDIOS Employee Stock Purchase Plan (the "ESPP"), a copy of

TABLE OF CONTENTS

which is attached to this proxy statement/prospectus as Annex G, including the authorization of the initial share reserve under the ESPP (this proposal is referred to herein as the "ESPP Proposal" and, collectively with the Business Combination Proposal, the Domestication Proposal, the Organizational Documents Proposals, the Merger Issuance Proposal, the PIPE Issuance Proposal and the Incentive Plan Proposal, the "Condition Precedent Proposals");

• **Proposal No. 9—Auditor Ratification Proposal—**to consider and vote upon a proposal to approve by ordinary resolution, the ratification of the appointment of Marcum LLP as the independent registered public accountants of Acies to audit and report upon Acies' consolidated financial statements for the fiscal year ending December 31, 2021 (this proposal is referred to herein as the "Auditor Ratification Proposal").

• **Proposal No. 10—The Adjournment Proposal—**to consider and vote upon a proposal to approve the adjournment of the Extraordinary General Meeting by ordinary resolution to a later date or dates, if necessary, to permit further solicitation and vote of proxies in the event that there are insufficient votes for the approval of one or more proposals at the Extraordinary General Meeting (this proposal is referred to herein as the "Adjournment Proposal").

Each of the Condition Precedent Proposals is cross-conditioned on the approval of each other. The Auditor Ratification Proposal and the Adjournment Proposal are not conditioned upon the approval of any other proposal set forth in this proxy statement/prospectus.

These items of business are described in this proxy statement/prospectus, which we encourage you to read carefully and in its entirety before voting.

Only holders of record of ordinary shares at the close of business on May 14, 2021 are entitled to notice of and to vote and have their votes counted at the Extraordinary General Meeting and any adjournment of the Extraordinary General Meeting. The Extraordinary General Meeting will be held at 7:00 a.m., Pacific Time on June 17, 2021 at the offices of Latham & Watkins LLP located at 10250 Constellation Blvd., Suite 1100, Los Angeles, CA 90067, and also virtually via live webcast at: https://www.cstproxy.com/aciesacq/sm2021.

This proxy statement/prospectus and accompanying proxy card are being provided to Acies' shareholders in connection with the solicitation of proxies to be voted at the Extraordinary General Meeting and at any adjournment of the Extraordinary General Meeting. **Whether or not you plan to attend the Extraordinary General Meeting, all of Acies' shareholders are urged to read this proxy statement/prospectus, including the Annexes and the documents referred to herein, carefully and in their entirety. You should also carefully consider the risk factors described in "***Risk Factors***" beginning on page 30 of this proxy statement/prospectus.**

**After careful consideration, the board of directors of Acies has unanimously approved the Business Combination and unanimously recommends that shareholders vote "FOR" adoption of the Merger Agreement, and approval of the transactions contemplated thereby, including the Business Combination, and "FOR" all other proposals presented to Acies' shareholders in this proxy statement/prospectus. When you consider the recommendation of these proposals by the board of directors of Acies, you should keep in mind that Acies' directors and officers have interests in the Business Combination that may conflict with your interests as a shareholder. See the section titled "***Business Combination Proposal—Interests of Acies' Directors and Executive Officers in the Business Combination***" in this proxy statement/prospectus for a further discussion of these considerations.**

Pursuant to the Cayman Constitutional Documents, a holder of public shares (a "public shareholder") may request of Acies that New PLAYSTUDIOS redeem all or a portion of its public shares for cash if the Business Combination is consummated. As a holder of public shares, you will be entitled to receive cash for any public shares to be redeemed only if you:

(i)  (a) hold public shares, or (b) if you hold public shares through units, you elect to separate your units into the underlying public shares and public warrants prior to exercising your redemption rights with respect to the public shares;

010

TABLE OF CONTENTS

(ii)   submit a written request to Continental, Acies' transfer agent, that New PLAYSTUDIOS redeem all or a portion of your public shares for cash; and

(iii)   deliver your public shares to Continental, Acies' transfer agent, physically or electronically through The Depository Trust Company ("DTC").

**Holders must complete the procedures for electing to redeem their public shares in the manner described above prior to 2:00 p.m., Pacific Time, on June 15, 2021 (two business days before the Extraordinary General Meeting) in order for their shares to be redeemed.**

**Holders of units must elect to separate the units into the underlying public shares and warrants prior to exercising redemption rights with respect to the public shares. If holders hold their units in an account at a brokerage firm or bank, holders must notify their broker or bank that they elect to separate the units into the underlying public shares and warrants, or if a holder holds units registered in its own name, the holder must contact Continental, Acies' transfer agent, directly and instruct them to do so. Public shareholders may elect to redeem public shares regardless of if or how they vote in respect of the Business Combination Proposal. If the Business Combination is not consummated, the public shares will be returned to the respective holder, broker or bank.**

If the Business Combination is consummated, and if a public shareholder properly exercises its right to redeem all or a portion of the public shares that it holds and timely delivers its shares to Continental, Acies' transfer agent, New PLAYSTUDIOS will redeem such public shares for a per-share price, payable in cash, equal to the pro rata portion of the trust account established at the consummation of our initial public offering into which substantially all of the proceeds from Acies' initial public offering has been deposited for the benefit of Acies, certain of its public shareholders and the underwriters of Acies' initial public offering (the "Trust Account"), calculated as of two business days prior to the consummation of the Business Combination. For illustrative purposes, as of November 9, 2020, this would have amounted to approximately $10.00 per issued and outstanding public share. If a public shareholder exercises its redemption rights in full, then it will be electing to exchange its public shares for cash and will no longer own public shares. The redemption takes place following the Domestication and, accordingly, it is shares of New PLAYSTUDIOS common stock that will be redeemed promptly after consummation of the Business Combination. See "*Extraordinary General Meeting of Acies— Redemption Rights*" in this proxy statement/prospectus for a detailed description of the procedures to be followed if you wish to redeem your public shares for cash. Acies' public shareholders may exercise their redemption rights with respect to their public shares without affecting their ability to hold and exercise any public warrants.

Notwithstanding the foregoing, a public shareholder, together with any affiliate of such public shareholder or any other person with whom such public shareholder is acting in concert or as a "group" (as defined in Section 13(d)(3) of the Securities Exchange Act of 1934, as amended ("Exchange Act")), will be restricted from redeeming its public shares with respect to more than an aggregate of 15% of the public shares. Accordingly, if a public shareholder, alone or acting in concert or as a group, seeks to redeem more than 15% of the public shares, then any such shares in excess of that 15% limit would not be redeemed for cash.

Acies Acquisition LLC, a Delaware limited liability company and shareholder of Acies (the "Sponsor"), and each officer and director of Acies have agreed to, among other things, vote in favor of the Merger Agreement and the transactions contemplated thereby, and to waive their redemption rights in connection with the consummation of the Business Combination with respect to any ordinary shares held by them, in each case, subject to the terms and conditions contemplated by the Sponsor Support Agreement, dated as of February 1, 2021, a copy of which is attached to this proxy statement/prospectus statement as Annex B (the "Sponsor Support Agreement"). The ordinary shares held by the Sponsor will be excluded from the pro rata calculation used to determine the per-share redemption price. As of the date of this proxy statement/prospectus, the Sponsor owns 20% of the issued and outstanding ordinary shares.

The Merger Agreement provides that the obligations of PLAYSTUDIOS to consummate the Mergers are conditioned on, among other things, that as of the Closing, (i) the Domestication has been completed, (ii) the amount of cash available in (x) Trust Account, after deducting the amount required to satisfy Acies' obligations to its shareholders (if any) that exercise their rights to redeem their Acies Class A ordinary shares pursuant to the Cayman Constitutional Documents (but prior to the payment of (a) deferred

011

underwriting commissions being held in the Trust Account and (b) any transaction expenses of Acies or its affiliates) plus (y) the PIPE Investment Amount (as defined herein), is at least equal to $200.0 million minus qualified expenses related to the cost of filing fees and seeking governmental approval of the Mergers (the "Minimum Available Cash Amount") (such condition, the "Minimum Cash Condition"). If such condition is not met, and such condition is not waived by PLAYSTUDIOS under the terms of the Merger Agreement, then the Merger Agreement could terminate and the proposed Business Combination may not be consummated. In addition, pursuant to the Cayman Constitutional Documents, in no event will Acies redeem public shares in an amount that would cause Acies' net tangible assets (as determined in accordance with Rule 3a51-1(g)(1) of the Exchange Act) to be less than $5,000,001.

The Merger Agreement is also subject to the satisfaction or waiver of certain other closing conditions as described in this proxy statement/prospectus. There can be no assurance that the parties to the Merger Agreement would waive any such provision of the Merger Agreement.

The approval of each of the Domestication Proposal and Organizational Documents Proposal D requires the affirmative vote of holders of at least two-thirds of the ordinary shares represented in person or by proxy and entitled to vote thereon and who vote at the Extraordinary General Meeting. The Business Combination Proposal, the Organizational Document Proposals (excluding Organizational Document Proposal D), the Merger Issuance Proposal, the PIPE Issuance Proposal, the Incentive Plan Proposal, the ESPP Proposal, the Auditor Ratification Proposal, and the Adjournment Proposal require the affirmative vote of a majority of the ordinary shares represented in person or by proxy and entitled to vote thereon and who vote at the Extraordinary General Meeting. The Director Election Proposal requires the affirmative vote of the majority of the holders of Acies Class B ordinary shares.

*Your vote is very important.* **Whether or not you plan to attend the Extraordinary General Meeting, please vote as soon as possible by following the instructions in this proxy statement/prospectus to make sure that your shares are represented at the Extraordinary General Meeting. If you hold your shares in "street name" through a bank, broker or other nominee, you will need to follow the instructions provided to you by your bank, broker or other nominee to ensure that your shares are represented and voted at the Extraordinary General Meeting. The transactions contemplated by the Merger Agreement will be consummated only if the Condition Precedent Proposals are approved at the Extraordinary General Meeting. Each of the Condition Precedent Proposals is cross-conditioned on the approval of each other. The Auditor Ratification Proposal and the Adjournment Proposal are not conditioned upon the approval of any other proposal set forth in this proxy statement/prospectus.**

If you sign, date and return your proxy card without indicating how you wish to vote, your proxy will be voted **FOR** each of the proposals presented at the Extraordinary General Meeting. If you fail to return your proxy card or fail to instruct your bank, broker or other nominee how to vote, and do not attend the Extraordinary General Meeting in person, the effect will be, among other things, that your shares will not be counted for purposes of determining whether a quorum is present at the Extraordinary General Meeting and will not be voted. An abstention or broker non-vote will be counted towards the quorum requirement but will not count as a vote cast at the Extraordinary General Meeting. If you are a shareholder of record and you attend the Extraordinary General Meeting and wish to vote in person, you may withdraw your proxy and vote in person.

Your attention is directed to the remainder of the proxy statement/prospectus following this notice (including the Annexes and other documents referred to herein) for a more complete description of the proposed Business Combination and related transactions and each of the proposals. You are encouraged to read this proxy statement/prospectus carefully and in its entirety, including the Annexes and other documents referred to herein. If you have any questions or need assistance voting your ordinary shares, please contact Morrow Sodali LLC ("Morrow Sodali"), our proxy solicitor, by calling 800-662-5200; banks and brokers can call collect at (203) 658-9400, or by emailing ACAC.info@investor.morrowsodali.com.

Thank you for your participation. We look forward to your continued support.

By Order of the Board of Directors of Acies Acquisition Corp.,

May 25, 2021

| Daniel Fetters | Edward King |
|---|---|
| Daniel Fetters | Edward King |
| Co-Chief Executive Officer | Co-Chief Executive Officer |

TO EXERCISE YOUR REDEMPTION RIGHTS, YOU MUST DEMAND IN WRITING THAT YOUR PUBLIC SHARES ARE REDEEMED FOR A PRO RATA PORTION OF THE FUNDS HELD IN THE TRUST ACCOUNT AND TENDER YOUR SHARES TO ACIES' TRANSFER AGENT AT LEAST TWO BUSINESS DAYS PRIOR TO THE VOTE AT THE EXTRAORDINARY GENERAL MEETING. YOU MAY TENDER YOUR SHARES BY EITHER DELIVERING YOUR SHARE CERTIFICATE TO THE TRANSFER AGENT OR BY DELIVERING YOUR SHARES ELECTRONICALLY USING THE DEPOSITORY TRUST COMPANY'S DWAC (DEPOSIT WITHDRAWAL AT CUSTODIAN) SYSTEM. IF THE BUSINESS COMBINATION IS NOT COMPLETED, THEN THESE SHARES WILL BE RETURNED TO YOU OR YOUR ACCOUNT. IF YOU HOLD THE SHARES IN STREET NAME, YOU WILL NEED TO INSTRUCT THE ACCOUNT EXECUTIVE AT YOUR BANK OR BROKER TO WITHDRAW THE SHARES FROM YOUR ACCOUNT IN ORDER TO EXERCISE YOUR REDEMPTION RIGHTS.

**CONTENTS**

| Clause | Page |
|---|---|
| ADDITIONAL INFORMATION | iii |
| TRADEMARKS | iv |
| SELECTED DEFINITIONS | v |
| CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS | xi |
| QUESTIONS AND ANSWERS FOR SHAREHOLDERS OF ACIES | xiii |
| SUMMARY OF THE PROXY STATEMENT/PROSPECTUS | 1 |
| SUMMARY UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL INFORMATION | 26 |
| MARKET PRICE AND DIVIDEND INFORMATION | 29 |
| RISK FACTORS | 30 |
| EXTRAORDINARY GENERAL MEETING OF ACIES | 82 |
| BUSINESS COMBINATION PROPOSAL | 91 |
| DOMESTICATION PROPOSAL | 140 |
| ORGANIZATIONAL DOCUMENTS PROPOSALS | 143 |
| DIRECTOR ELECTION PROPOSAL | 155 |
| MERGER ISSUANCE PROPOSAL | 157 |
| PIPE ISSUANCE PROPOSAL | 159 |
| INCENTIVE PLAN PROPOSAL | 161 |
| ESPP PROPOSAL | 167 |
| AUDITOR RATIFICATION PROPOSAL | 170 |
| ADJOURNMENT PROPOSAL | 172 |
| U.S. FEDERAL INCOME TAX CONSEQUENCES FOR HOLDERS OF ACIES SECURITIES | 173 |
| U.S. FEDERAL INCOME TAX CONSEQUENCES FOR HOLDERS OF PLAYSTUDIOS CAPITAL STOCK | 187 |
| UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL INFORMATION | 193 |
| NOTES TO UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL INFORMATION | 204 |
| COMPARATIVE SHARE INFORMATION | 210 |
| INFORMATION ABOUT ACIES | 213 |
| ACIES' MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 221 |
| INFORMATION ABOUT PLAYSTUDIOS | 228 |
| PLAYSTUDIOS MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 246 |
| MANAGEMENT OF NEW PLAYSTUDIOS FOLLOWING THE BUSINESS COMBINATION | 269 |
| EXECUTIVE COMPENSATION | 276 |
| DIRECTOR COMPENSATION | 283 |
| BENEFICIAL OWNERSHIP OF SECURITIES | 284 |
| CERTAIN RELATIONSHIPS AND RELATED PERSON TRANSACTIONS | 289 |
| COMPARISON OF CORPORATE GOVERNANCE AND SHAREHOLDER RIGHTS | 294 |
| DESCRIPTION OF NEW PLAYSTUDIOS SECURITIES | 299 |

014

| Clause | Page |
|---|---|
| **SECURITIES ACT RESTRICTIONS ON RESALE OF NEW PLAYSTUDIOS SECURITIES** | 307 |
| **STOCKHOLDER PROPOSALS AND NOMINATIONS** | 308 |
| **SHAREHOLDER COMMUNICATIONS** | 309 |
| **LEGAL MATTERS** | 310 |
| **EXPERTS** | 311 |
| **DELIVERY OF DOCUMENTS TO SHAREHOLDERS** | 312 |
| **ENFORCEABILITY OF CIVIL LIABILITY** | 313 |
| **WHERE YOU CAN FIND MORE INFORMATION** | 314 |
| **ACIES ACQUISITION CORP. INDEX TO FINANCIAL STATEMENTS** | F-1 |
| **PLAYSTUDIOS, INC. INDEX TO FINANCIAL STATEMENTS** | F-1 |

**ANNEXES**

| Annex A: | Merger Agreement | A-1 |
|---|---|---|
| Annex B: | Sponsor Support Agreement | B-1 |
| Annex C: | Form of PLAYSTUDIOS Holders Support Agreement | C-1 |
| Annex D: | Form of Subscription Agreement | D-1 |
| Annex E: | Form of Registration Rights Agreement | E-1 |
| Annex F: | Form of New PLAYSTUDIOS 2021 Equity Incentive Plan | F-1 |
| Annex G: | Form of New PLAYSTUDIOS 2021 Employee Stock Purchase Plan | G-1 |
| Annex H: | Cayman Constitutional Documents of Acies | H-1 |
| Annex I: | Form of Proposed Certificate of Incorporation | I-1 |
| Annex J: | Form of Proposed Bylaws | J-1 |
| Annex K: | Opinion of Houlihan Lokey Capital, Inc., dated January 31, 2021 | K-1 |

ii

015

### QUESTIONS AND ANSWERS FOR SHAREHOLDERS OF ACIES

*The questions and answers below highlight only selected information from this document and only briefly address some commonly asked questions about the proposals to be presented at the Extraordinary General Meeting, including with respect to the proposed Business Combination. The following questions and answers do not include all the information that is important to Acies' shareholders. Acies urges shareholders to read this proxy statement/prospectus, including the Annexes and the other documents referred to herein, carefully and in their entirety to fully understand the proposed Business Combination and the voting procedures for the Extraordinary General Meeting, which will be held at 7:00 a.m., Pacific Time on June 17, 2021 at the offices of Latham & Watkins LLP located at 10250 Constellation Blvd., Suite 1100, Los Angeles, California 90067, and also virtually via live webcast at: https://www.cstproxy.com/aciesacq/sm2021.*

**Q:  Why am I receiving this proxy statement/prospectus?**

A:  Acies is proposing to consummate the Business Combination with PLAYSTUDIOS. Acies, First Merger Sub, Second Merger Sub and PLAYSTUDIOS have entered into the Merger Agreement, the terms of which are described in this proxy statement/prospectus.

A copy of the Merger Agreement is attached to this proxy statement/prospectus as Annex A and you are encouraged to read it in its entirety.

The Merger Agreement must be adopted by the Acies shareholders in accordance with the Cayman Islands Companies Act, the DGCL and the Cayman Constitutional Documents. Acies is holding an extraordinary general meeting to obtain that approval. Acies shareholders will also be asked to vote on certain other matters described in this proxy statement/prospectus at the Extraordinary General Meeting and to approve the adjournment of the Extraordinary General Meeting, if necessary or appropriate, to solicit additional proxies in the event there are not sufficient votes at the time of the Extraordinary General Meeting to adopt the Merger Agreement and thereby approve the Business Combination.

**THE VOTE OF SHAREHOLDERS IS IMPORTANT. SHAREHOLDERS ARE ENCOURAGED TO VOTE AS SOON AS POSSIBLE AFTER CAREFULLY REVIEWING THIS PROXY STATEMENT/PROSPECTUS.**

**Q:  What proposals are shareholders of Acies being asked to vote upon?**

A:  At the Extraordinary General Meeting, Acies is asking holders of ordinary shares to consider and vote upon:

- the Business Combination Proposal;
- the Domestication Proposal;
- the Organizational Documents Proposals;
- the Director Election Proposal;
- the Merger Issuance Proposal;
- the PIPE Issuance Proposal;
- the Incentive Plan Proposal;
- the ESPP Proposal;
- the Auditor Ratification Proposal; and
- the Adjournment Proposal.

**Q:  Why is Acies proposing the Business Combination?**

A:  Acies was organized for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization or similar business combination, with one or more businesses or entities.

xiii

016

Based on its due diligence investigations of PLAYSTUDIOS and the industry in which it operates, including the financial and other information provided by PLAYSTUDIOS in the course of Acies' due diligence investigations, the Acies Board of Directors believes that the Business Combination with PLAYSTUDIOS is in the best interests of Acies and its shareholders and presents an opportunity to increase shareholder value. However, there can be no assurances of this.

Although the Acies Board of Directors believes that the Business Combination with PLAYSTUDIOS presents a unique business combination opportunity and is in the best interests of Acies and its shareholders, the Acies Board of Directors did consider certain potentially material negative factors in arriving at that conclusion. These factors are discussed in greater detail in the section titled "*Business Combination Proposal—Acies Board of Directors' Reasons for the Business Combination*," as well as in the sections entitled "*Risk Factors—Risks Related to PLAYSTUDIOS' Business*."

**Q:   Is the Business Combination an affiliated transaction?**

A:   Yes.   Andrew Pascal, the current Chief Executive Officer of PLAYSTUDIOS, holds a direct economic interest in Acies Class B ordinary shares and Acies private placement warrants through his ownership in interests of the Sponsor, which interests Mr. Pascal has agreed to forfeit as described herein. In connection with Acies' initial public offering and the partial exercise of the overallotment option, Mr. Pascal became the beneficial holder of 522,843 Acies Class B ordinary shares and 449,129 Acies private placement warrants. In connection with the Business Combination, Mr. Pascal has agreed to forfeit his interests in the Sponsor and all of the associated Acies Class B ordinary shares and Acies private placement warrants, contingent on the Closing. Mr. Pascal is also a co-founder of Acies and an advisor to the Acies Board of Directors. Mr. Pascal did not participate in any meetings of the Acies Board of Directors in which the Business Combination or any other potential business combination of Acies was discussed, including the meeting in which the Merger Agreement was approved.

The Founder Group (which includes Mr. Pascal and his affiliated entities) holds 20.2% of the capital stock and voting power of PLAYSTUDIOS as of March 31, 2021. Shares of New PLAYSTUDIOS Class B common stock will be entitled to twenty (20) votes per share, while shares of New PLAYSTUDIOS Class A common stock will be entitled to one (1) vote per share. Upon the consummation of the Business Combination, Mr. Pascal and his affiliated entities included in the Founder Group will hold all of the issued and outstanding shares of New PLAYSTUDIOS Class B common stock. Accordingly, upon the consummation of the Business Combination, the Founder Group (including Mr. Pascal) will control at least 12.3% of the outstanding New PLAYSTUDIOS common stock and at least 73.7% of the combined voting power of New PLAYSTUDIOS common stock and will be able to control matters submitted to the New PLAYSTUDIOS stockholders for approval, including the election of directors, amendments to the New PLAYSTUDIOS organizational documents and any merger, consolidation, sale of all or substantially all of the New PLAYSTUDIOS' assets or other major corporate transactions. Mr. Pascal may have interests that differ from yours and may vote in a way with which you disagree and which may be adverse to your interests. This concentrated control may have the effect of delaying, preventing or deterring a change in control of New PLAYSTUDIOS, could deprive New PLAYSTUDIOS stockholders of an opportunity to receive a premium for their capital stock as part of a sale of New PLAYSTUDIOS, and may ultimately affect the market price of shares of New PLAYSTUDIOS Class A common stock.

As a result of the Founder Group controlling at least 73.7% of the combined voting power of New PLAYSTUDIOS, New PLAYSTUDIOS will be a "controlled company" within the meaning of the Nasdaq corporate governance standards and will not be subject to the requirements that would otherwise require New PLAYSTUDIOS to have: (i) a board of directors with a majority of independent directors; (ii) a nominating committee comprised solely of independent directors; (iii) compensation of the New PLAYSTUDIOS executive officers determined by a majority of the independent directors or a compensation committee comprised solely of independent directors; and (iv) director nominees selected, or recommended for the New PLAYSTUDIOS Board of Directors' selection, either by a majority of the independent directors or a nominating committee comprised solely of independent directors.

In addition, the Merger Agreement provides for a $5.0 million cash incentive pool in which certain PLAYSTUDIOS employees may participate (such individuals and the allocation to be determined by

017

Mr. Pascal at his sole discretion and in his capacity as chief executive officer of PLAYSTUDIOS). PLAYSTUDIOS intends for its board of directors to approve the allocation of the cash incentive pool and Mr. Pascal could receive a portion of the cash incentive pool in an amount up to $2.5 million. Mr. Pascal will not receive a bonus in connection with the Business Combination other than from the $5.0 million cash incentive pool.

**Q:   Is my vote important?**

A:   Yes.   The Business Combination cannot be completed unless the Merger Agreement is adopted by the Acies shareholders holding a majority of the votes cast on such proposal and the other Condition Precedent Proposals achieve the necessary votes outlined below. Only Acies shareholders as of the close of business on May 14, 2021, the record date for the Extraordinary General Meeting, are entitled to vote at the Extraordinary General Meeting. The Acies Board of Directors unanimously recommends that such Acies shareholders vote "**FOR**" the Business Combination Proposal, "**FOR**" the Domestication Proposal, "**FOR**" each of the separate Organizational Documents Proposals, "**FOR**" the Director Election Proposal, "**FOR**" the Merger Issuance Proposal, "**FOR**" the PIPE Issuance Proposal, "**FOR**" the Incentive Plan Proposal, "**FOR**" the ESPP Proposal, "**FOR**" the Auditor Ratification Proposal and '**FOR**" the Adjournment Proposal.

**Q:   What will PLAYSTUDIOS stockholders receive in return for Acies' acquisition of all of the issued and outstanding equity interests of PLAYSTUDIOS?**

A:   As a result of and upon the Closing, among other things, all outstanding shares PLAYSTUDIOS capital stock will be cancelled in exchange for the right to receive cash or shares of New PLAYSTUDIOS common stock, at the election of each holder of PLAYSTUDIOS capital stock, and the applicable pro rata portion of Earnout Shares, in the amount of the Aggregate Merger Consideration (as defined herein). The Aggregate Merger Consideration does not take into account certain additional issuances and payments which may be made under the terms of the Merger Agreement, as contemplated thereunder, including, if applicable, to the PIPE Investors pursuant to the PIPE Investment which may be made under the terms of the respective Subscription Agreements. For further details, see "*Business Combination Proposal—The Merger Agreement—Effects of the Merger Agreement—Aggregate Merger Consideration*."

**Q:   What equity stake will current Acies shareholders and PLAYSTUDIOS stockholders hold in New PLAYSTUDIOS immediately after the consummation of the Business Combination?**

A:   As of the close of business on May 14, 2021, the record date for the Extraordinary General Meeting, there are (i) 21,525,000 Acies Class A ordinary shares issued and outstanding (including as part of the issued and outstanding Acies units) and (ii) 5,381,250 Acies Class B ordinary shares issued and outstanding. In addition, as of the record date, there is an aggregate of 7,174,970 public warrants and 4,536,667 private placement warrants of Acies, in each case, issued and outstanding. Each whole warrant entitles the holder thereof to purchase one Acies Class A ordinary share and, following the Domestication, will entitle the holder thereof to purchase one share of New PLAYSTUDIOS Class A common stock. Therefore, as of the date of this proxy statement/prospectus (without giving effect to the Business Combination), the Acies fully diluted share capital would be 38,617,887.

It is anticipated that, following the Business Combination (assuming consummation of the transactions contemplated by the Merger Agreement), (1) Acies' public shareholders will own approximately 16.2% of the outstanding New PLAYSTUDIOS common stock, (2) PLAYSTUDIOS stockholders (without taking into account any public shares held by PLAYSTUDIOS stockholders prior to the consummation of the Business Combination) will own approximately 49.3% of the outstanding New PLAYSTUDIOS Class A common stock and 100.0% of the outstanding New PLAYSTUDIOS Class B common stock, representing 12.3% of the outstanding New PLAYSTUDIOS common stock, and (3) the Sponsor will own approximately 3.4% of the outstanding New PLAYSTUDIOS common stock. Members of the Founder Group will be the only holders of shares of New PLAYSTUDIOS Class B common stock, with each share entitled to twenty (20) votes. As a result, it is expected that the Founder Group will hold over 70% of the outstanding voting power of New PLAYSTUDIOS immediately following the closing of the Business Combination. These percentages assume (i) that no public

xv

018

such that all directors will be elected annually; (4) changing the corporate name from "Acies Acquisition Corp." to "PLAYSTUDIOS, Inc.,"; (5) making New PLAYSTUDIOS' corporate existence perpetual; (6) adopting Delaware as the exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act, and (7) removing certain provisions related to Acies' status as a blank check company that will no longer be applicable upon consummation of the Business Combination. Pursuant to Cayman Islands law, Delaware law and Acies' Cayman Constitutional Documents, Acies is required to submit the Organizational Documents Proposals to Acies' shareholders for approval. For additional information, see the section titled "*Organizational Documents Proposals.*"

**Q:**  **How will the Domestication affect my ordinary shares, warrants and units?**

A:  As a result of and upon the effective time of the Domestication, (1) each of the then issued and outstanding Acies Class A ordinary shares, will convert automatically, on a one-for-one basis, into a share of New PLAYSTUDIOS Class A common stock, (2) each of the then issued and outstanding Acies Class B ordinary shares, will convert automatically, on a one-for-one basis, into a share of New PLAYSTUDIOS Class A common stock, after giving effect to the forfeiture of certain Acies Class B ordinary shares held by the Sponsor pursuant to the Sponsor Support Agreement; (3) each then issued and outstanding Acies warrant will convert automatically, on a one-for-one basis, into a New PLAYSTUDIOS warrant, on substantially the same terms and conditions as specified in the Warrant Agreement, after giving effect to the forfeiture of certain warrants held by the Sponsor pursuant to the Sponsor Support Agreement; and (4) each of the then issued and outstanding units of Acies that have not been previously separated into the underlying Acies Class A ordinary shares and one-third of an Acies warrant upon the request of the holder thereof will be cancelled and will entitle the holder thereof to one share of New PLAYSTUDIOS Class A common stock and one-third of a New PLAYSTUDIOS warrant, provided that no fractional New PLAYSTUDIOS warrants will be issued upon separation of the Acies units. See "*Domestication Proposal*" for additional information. Acies Units will separate automatically into their individual components at the consummation of the Business Combination and will no longer be traded.

**Q:**  **Will the Domestication be a taxable transaction for U.S. Holders of Acies Class A ordinary shares or warrants for U.S. federal income tax purposes?**

U.S. Holders of Acies Class A ordinary shares or warrants may be subject to U.S. federal income tax as a result of the Domestication. The extent (if any) to which such U.S. Holders will be subject to U.S. federal income tax under Section 367 of the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code") will depend on facts and circumstances that are particular to each holder. It is expected that (subject to the passive foreign investment company ("PFIC") rules discussed below in the section titled "*U.S. Federal Income Tax Consequences for Holders of Acies Securities*"):

(i)  U.S. Holders whose Acies Class A ordinary shares have a fair market value of less than $50,000 on the date of the Domestication will not recognize gain or loss and will not be required to include any part of Acies' earnings in income in connection with the Domestication;

(ii)  a U.S. Holder whose Acies Class A ordinary shares have a fair market value of $50,000 or more and who, on the date of the Domestication, owns (actually or constructively) less than 10% of the total combined voting power of all classes of Acies ordinary shares entitled to vote and less than 10% of the total value of all classes of Acies ordinary shares will generally recognize gain (but not loss) on the exchange of Acies Class A ordinary shares for New PLAYSTUDIOS common stock pursuant to the Domestication (however, as an alternative to recognizing gain, such a U.S. Holder may file an election to include in income as a deemed dividend deemed paid by Acies the "all earnings and profits amount" (as defined in the Treasury Regulations under Section 367 of the Internal Revenue Code) attributable to its Acies Class A ordinary shares, subject to certain other requirements); and

(iii)  a U.S. Holder who, on the date of the Domestication, owns (actually or constructively) 10% or more of the total combined voting power of all classes of Acies ordinary shares entitled to vote or 10% or more of the total value of all classes of Acies ordinary shares will generally be required to include in income as a deemed dividend deemed paid by Acies the "all earnings and profits amount" attributable to its Acies Class A ordinary shares as a result of the Domestication.

xviii

voting as a separate class and (ii) a majority of the outstanding voting power of PLAYSTUDIOS common stock and PLAYSTUDIOS preferred stock (on an as converted basis), voting together as a single class, which are the only votes of PLAYSTUDIOS stockholders required to approve and adopt the Merger Agreement and the other transactions contemplated thereby, including the Business Combination. For a more complete description of the PLAYSTUDIOS Holders Support Agreements, see "*Business Combination Proposal—Related Agreements—PLAYSTUDIOS Holders Support Agreements.*"

### *Registration Rights Agreement*

The Merger Agreement contemplates that, at the Closing, New PLAYSTUDIOS, Sponsor, certain stockholders of PLAYSTUDIOS will enter into the Registration Rights Agreement pursuant to which New PLAYSTUDIOS will agree to register for resale, pursuant to Rule 415 under the Securities Act, certain shares of New PLAYSTUDIOS common stock and other equity securities of New PLAYSTUDIOS that are held by the parties thereto from time to time. For additional information, see "*Business Combination Proposal—Related Agreements—Registration Rights Agreement*."

### *The PIPE Subscription Agreements*

In connection with the execution of the Merger Agreement, Acies entered into Subscription Agreements with the PIPE Investors pursuant to, and on the terms and subject to the conditions of which, the PIPE Investors have collectively subscribed for 25,000,000 shares of New PLAYSTUDIOS Class A Common Stock for an aggregate purchase price equal to $250 million.

The Subscription Agreements for the PIPE Investors provide for certain registration rights. In particular, New PLAYSTUDIOS will be required to, as soon as practicable but no later than 30 calendar days following the Closing, submit to or file with the SEC a registration statement registering the resale of such shares to be issued to any such third-party investor. Additionally, New PLAYSTUDIOS will be required to use its commercially reasonable efforts to have such registration statement declared effective as soon as practicable after the filing thereof, but no later than the earliest of (i) the 60th calendar day following the filing date thereof, (ii) the 90th calendar day following the filing date thereof if the SEC notifies New PLAYSTUDIOS that it will "review" the registration statement, and (iii) the 10th business day after the date New PLAYSTUDIOS is notified in writing by the SEC that the registration statement will not be "reviewed" or will not be subject to further review. New PLAYSTUDIOS must use reasonable best efforts to keep the registration statement effective until the earliest of: (i) the date on which all of the shares covered by the registration statement have been sold, (ii) with respect to shares held by a particular subscriber, the date all shares held by such subscriber may be sold without restriction under Rule 144, and (iii) three years from the date of effectiveness of the registration statement. For more information, see "*Business Combination Proposal—Related Agreements—The PIPE Subscription Agreements.*"

### Acies Board of Directors' Reasons for the Business Combination

Acies was organized for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization or similar business combination with one or more businesses.

In evaluating the Business Combination, the Acies Board of Directors consulted with Acies' senior management and considered a number of factors. This explanation of Acies' reasons for the Acies Board of Directors' approval of the Business Combination, and all other information presented in this section, is forward-looking in nature and, therefore, should be read in light of the factors discussed under "*Cautionary Statement Regarding Forward-Looking Statements*." The Acies Board of Directors considered the following factors related to PLAYSTUDIOS and the Business Combination:

- *High-Growth Industry.* The global games market is substantial and growing rapidly. According to Newzoo, the global games market is estimated to grow to $217.9 billion by 2023, up from $138.8 billion in 2018, representing a 9% CAGR from 2018 to 2023. While the global games market as a whole is growing rapidly, the mobile gaming market has outpaced the broader industry's growth. According to Newzoo, mobile games was an $86.3 billion market in 2020 and represented the largest and fastest-growing segment of the global games market, growing at 26% in 2020. The proliferation of smartphones has been a key driver of this growth. According to Newzoo, in 2020 there were an

10

020

estimated 3.6 billion smartphone users globally, growing at a rate of 8% compared to the prior year, creating an increasingly large market for game developers to target.

- *Unique and defensible business model.* PLAYSTUDIOS was named a top 30 U.S.-headquartered mobile app publisher for 2021 and a top 30 Americas-headquartered mobile app publisher for 2020, in each case, measured by worldwide combined revenue through the Apple App Store and Google Play platforms for 2020 and 2019, as estimated by App Annie, a mobile data and analytics provider. Furthermore, PLAYSTUDIOS offers a one-of-a-kind loyalty platform that lets players earn real-world rewards from a curated collection of over 80 awards partners representing more than 275 brands. As of December 31, 2020, the PLAYSTUDIOS community has exchanged in-game loyalty points for over 10 million rewards with a retail value of nearly $500 million. The loyalty platform drives growth in PLAYSTUDIOS' existing portfolio of games, reduces the risk for new game launches, and supports acquisitions of other games.

- *Extraordinary User Engagement.* PLAYSTUDIOS has developed a product offering to players that has proven engaging. Their games have been downloaded over 100 million times and were played by 4.3 million monthly active users for the year ended December 31, 2020.

- *Significant Revenue and Earnings Growth Potential.* PLAYSTUDIOS' platform has enabled it to achieve an attractive financial profile, characterized by strong existing growth. From 2019 to 2020, PLAYSTUDIOS achieved revenue growth of 12.7%, from $239.4 million for the year ended December 31, 2019 to $269.9 million for the year ended December 31, 2020, compared to revenue growth of 22.5% from $195.5 million to $239.4 million for the years ended December 31, 2018 and 2019. Acies believes that PLAYSTUDIOS is well positioned to continue its dynamic growth trajectory.

- *Experienced and Motivated Management Team.* PLAYSTUDIOS is a founder-driven business led by its chief executive officer, Andrew Pascal. Mr. Pascal's vision for the company and the competitive gaming industry at large is unique and difficult to duplicate given PLAYSTUDIOS' proprietary technology and unique positioning. Mr. Pascal has further surrounded himself with a leadership team of entrepreneurs, product leaders, technologists, game designers, data scientists, and loyalty marketers who bring decades of experience, and a shared commitment to assembling teams and building quality products that are enduring.

For a more complete description of the Acies Board of Directors' reasons for approving the Business Combination, including other factors and risks considered by the Acies Board of Directors, see the section titled "*Business Combination Proposal—Acies Board of Directors' Reasons for the Business Combination*"

### Opinion of the Financial Advisor to Acies

On January 31, 2021, Houlihan Lokey Capital, Inc., which we refer to as Houlihan Lokey, orally rendered its opinion to the Acies Board of Directors (which was subsequently confirmed in writing by delivery of Houlihan Lokey's written opinion addressed to the Acies Board of Directors dated January 31, 2021), as to the fairness, from a financial point of view, to Acies of the Aggregate Merger Consideration, excluding the Earnout Shares, (the "Aggregate Closing Merger Consideration") to be issued and paid by Acies in the First Merger pursuant to the Merger Agreement.

**Houlihan Lokey's opinion was directed to the Acies Board of Directors (in its capacity as such) and only addressed the fairness, from a financial point of view, to Acies of the Aggregate Closing Merger Consideration to be issued and paid by Acies in the First Merger pursuant to the Merger Agreement and did not address any other aspect or implication of the Business Combination and related transactions or any other agreement, arrangement or understanding. The summary of Houlihan Lokey's opinion in this proxy statement/prospectus is qualified in its entirety by reference to the full text of its written opinion, which is attached as Annex K to this proxy statement/prospectus and describes the procedures followed, assumptions made, qualifications and limitations on the review undertaken and other matters considered by Houlihan Lokey in connection with the preparation of its opinion. However, neither Houlihan Lokey's opinion nor the summary of its opinion and the related analyses set forth in this proxy statement/prospectus are intended to be, and do not constitute, advice or a recommendation to the Acies Board of Directors, any shareholder or any other person as to how to act or vote or make any election with respect to any matter relating to Business Combination and related transactions or otherwise, including, without limitation, whether holders of Acies Class A ordinary shares should redeem**

11

021

- In the event that Acies fails to consummate a business combination within the prescribed time frame (pursuant to the Cayman Constitutional Documents), or upon the exercise of a redemption right in connection with the Business Combination, Acies will be required to provide for payment of claims of creditors that were not waived that may be brought against Acies within the 10 years following such redemption. In order to protect the amounts held in Acies' trust account, the Sponsor has agreed that it will be liable to Acies if and to the extent any claims by a third-party (other than Acies' independent auditors) for services rendered or products sold to Acies, or a prospective target business with which Acies has discussed entering into a transaction agreement, reduce the amount of funds in the trust account to below (i) $10.00 per public share or (ii) such lesser amount per public share held in the trust account as of the date of the liquidation of the trust account, due to reductions in value of the trust assets, in each case, net of the amount of interest which may be withdrawn to pay taxes, except as to any claims by a third-party that executed a waiver of any and all rights to seek access to the trust account and except as to any claims under the indemnity of the underwriters of Acies' initial public offering against certain liabilities, including liabilities under the Securities Act.

- Following consummation of the Business Combination, the Sponsor, Acies' officers and directors and their respective affiliates would be entitled to reimbursement for certain out-of-pocket expenses related to identifying, investigating and consummating an initial business combination or repayment of loans, if any, and on such terms as to be determined by Acies from time to time, made by the Sponsor or any of Acies' officers or directors to finance transaction costs in connection with an intended initial business combination. However, if Acies fails to consummate a business combination within the required period, the Sponsor and Acies' officers and directors and their respective affiliates will not have any claim against the trust account for reimbursement.

- In order to finance transaction costs in connection with Acies' initial business combination (including any amounts which are currently outstanding), the Sponsor or an affiliate of the Sponsor, or certain of Acies' officers and directors, may, but are not obligated to, loan funds to Acies as may be required ("Working Capital Loans"). Such Working Capital Loans would be evidenced by promissory notes that would each become due and payable in full, without interest, upon completion of Acies' initial business combination. In the event that Acies does not complete its initial business combination within the prescribed time frame, Acies may use a portion of its working capital held outside of its trust account to repay any Working Capital Loans made to Acies, but no proceeds held in the trust account would be used to repay such Working Capital Loans, and the applicable related party lender or lenders may not be able to recover the value it or they have loaned to Acies pursuant to such Working Capital Loans.

- Pursuant to the Registration Rights Agreement, the Sponsor will have customary registration rights, including demand and piggy-back rights, subject to cooperation and cut-back provisions with respect to the shares of New PLAYSTUDIOS Class A common stock and New PLAYSTUDIOS warrants held by such parties following the consummation of the Business Combination.

- In addition, Andrew Pascal, the current Chief Executive Officer of PLAYSTUDIOS, holds a direct economic interest in Acies Class B ordinary shares and Acies private placement warrants through his ownership of interests in the Sponsor. In connection with Acies' initial public offering and the partial exercise of the over-allotment option, Mr. Pascal became the beneficial holder of 522,843 Acies Class B ordinary shares and 449,129 Acies private placement warrants. Mr. Pascal has agreed to forfeit his interests in the Sponsor and all of the associated Acies Class B ordinary shares and Acies private placement warrants, contingent on the Closing. Mr. Pascal is also a co-founder of Acies and an advisor to the Acies Board of Directors. Mr. Pascal did not participate in any meetings of the Acies Board of Directors in which the Business Combination or any other potential business combination of Acies was discussed, including the meeting in which the Merger Agreement was approved.

The Sponsor has agreed to vote in favor of the Business Combination, regardless of how our public shareholders vote. Unlike some other blank check companies in which the initial shareholders agree to vote their shares in accordance with the majority of the votes cast by the public shareholders in connection with an initial business combination, the Sponsor and each officer and director of Acies have agreed to, among other things, vote in favor of the Merger Agreement and the transactions contemplated thereby, in each case, subject to the terms and conditions contemplated by the Sponsor Support Agreement. As of the

18

022

**RISK FACTORS**

*Acies shareholders should carefully consider the following risk factors together with all of the other information included in this proxy statement/prospectus before they decide whether to vote or instruct their vote to be cast to approve the relevant proposals described in this proxy statement/prospectus, including the section titled "PLAYSTUDIOS' Management's Discussion and Analysis of Financial Condition and Results of Operations" and the consolidated financial statements and notes thereto included herein.*

*The risks described below are not the only risks Acies and PLAYSTUDIOS face. Additional risks not presently known to Acies or PLAYSTUDIOS or that Acies or PLAYSTUDIOS currently believe are not material may also significantly affect New PLAYSTUDIOS' business, financial condition, results of operations or reputation. New PLAYSTUDIOS' business could be harmed by any of these risks. In that event, the trading price of Acies' securities and shares of New PLAYSTUDIOS Class A common stock could decline and you could lose all or part of your investment.*

**Risks Related to PLAYSTUDIOS' Business and Industry**

*The following risk factors will apply to the business and operations of New PLAYSTUDIOS following the closing of the business combination. Unless the context otherwise requires, references in this subsection "Risks Related to PLAYSTUDIOS' Business and Industry" to "we," "us," "our," and "the Company" generally refer to PLAYSTUDIOS in the present tense or New PLAYSTUDIOS from and after the Business Combination.*

***Our business will suffer if we are unable to entertain our players, develop new games and improve the experience of our existing games.***

Our business depends on developing, publishing and continuing to service casual, "free-to-play" games that consumers will download and spend time and money playing. We are currently focused on social casino mobile gaming, offering our social casino games on mobile devices, including smartphones and tablets on Apple's iOS and Google's Android operating systems, and on social networking platforms such as Facebook. We have devoted and we expect to continue to devote substantial resources to the research, development, analytics and marketing of our games. Our development and marketing efforts are focused on both improving the experience of our existing games (frequently through new content and feature releases for our live services) and developing new games. We generate revenue primarily through the sale of in-game virtual currency. For games distributed through third-party platforms, we are required to share a portion of our revenue from in-game sales with the platform providers. Due to our focus on mobile gaming, these costs are expected to remain a significant operating expense. See "—*We rely on third-party platforms such as the Apple App Store, the Google Play Store, the Amazon Appstore and Facebook to distribute our games and collect revenues generated on such platforms and rely on third-party payment service providers to collect revenues generated on our own platforms*." In order to remain profitable, we need to generate sufficient revenue from our existing and new game offerings to offset our ongoing development, marketing and operating costs.

Successfully monetizing "free-to-play" games is difficult, and requires that we deliver engaging and entertaining player experiences that a sufficient number of players will pay for or we are able to otherwise sufficiently monetize our games. The success of our games depends, in part, on unpredictable and volatile factors beyond our control including consumer preferences and spending habits, competing games and the availability of other entertainment experiences. If our games do not meet consumer expectations, or if new games are not brought to market in a timely and effective manner, our ability to grow revenue and our financial performance will be negatively affected.

Our ability to successfully develop games for mobile and web platforms and their ability to achieve commercial success will depend on our ability to:

- effectively market our games to existing and new players;
- achieve benefits from our player acquisition costs;
- achieve organic growth and gain customer interest in our games through free or more efficient channels;
- adapt to changing player preferences and spending habits;

30

- negotiate with third parties to provide our players with a diverse inventory of real-world loyalty rewards;

- increase customer engagement within our games;

- adapt to new technologies and feature sets for mobile and other devices;

- expand and enhance games after their initial release;

- attract, retain and motivate talented and experienced game designers, product managers and engineers;

- negotiate with third-party platforms;

- continue to adapt game feature sets for an increasingly diverse set of mobile devices, including various operating systems and specifications, limited bandwidth and varying processing power and screen sizes;

- efficiently manage the development of new games and features to increase the cadence of introductions without incurring excessive costs;

- achieve and maintain successful customer engagement and effectively monetize our games;

- maintain a quality gaming experience and retain our players;

- compete successfully against a large and growing number of existing market participants;

- accurately forecast the timing and expense of our operations, including game and feature development, marketing and customer acquisition, customer adoption and revenue growth;

- minimize and quickly resolve bugs or outages; and

- acquire and successfully integrate high quality mobile game assets, personnel or companies.

These and other uncertainties make it difficult to know whether we will succeed in continuing to develop successful games, live operations services and launch new games and features in accordance with our operating plan. If we do not succeed in doing so, our business, financial condition, results of operations or reputation will suffer.

*If we are able to develop new games and features that achieve success, it is possible that these new games and features could divert players of our other existing games without growing our overall player base, which could harm operating results.*

Although it is important to our future success that we develop new games and features that are popular with players, it is possible that new games and features may reduce the amount of time players spend with our other games. In particular, we plan to continue leveraging our existing games to cross-promote new games and features, which may encourage players of existing games to divert some of their playing time and discretionary spending away from our existing games. If new games and game features do not grow our player base, increase the overall amount of time our players spend with our games or generate sufficient new revenue to offset any declines from our other games, our revenue could be adversely affected.

*We believe that our players' level of engagement with our games is partly based on playAWARDS, our real-world rewards loyalty program. If we fail to expand and diversify our playAWARDS program, in particular given the current restrictions imposed by the COVID-19 pandemic, our business may suffer.*

Players accumulate loyalty points by engaging with our games, and players can exchange their loyalty points for real-world rewards through our playAWARDS program. We believe that our players' level of engagement with our games is partly based on the perceived value of earning loyalty points and exchanging those loyalty points for real-world rewards that they can redeem at our awards partners' establishments. We currently offer real-world rewards relating to, among other things, dining, live entertainment shows and hotel rooms. For example, through an agreement with MGM Resorts International, or MGM Resorts, our players are able to exchange loyalty points for, among other things, free hotel rooms, meals and show tickets for various Las Vegas properties, including ARIA, Bellagio and MGM Grand. We have observed a

31

024

TABLE OF CONTENTS

government intervention remains uncertain. A weakened global economy may impact our players' purchasing decisions within our games, in particular given the limitations of redeeming real-world rewards due to government mandated or other restrictions on travel and other activities and limitations on our players' discretionary spending, consumer activity during the pandemic and its impact on advertising investments, and the ability of our business partners, including our awards partners that provide the real-world rewards available in our games, to navigate this complex social health and economic environment, any of which could result in disruption to our business and results of our operations.

The duration and extent of the impact from the COVID-19 pandemic depends on future developments that cannot be accurately predicted at this time, such as the severity and transmission rate of the virus, the existence of any additional waves of the COVID-19 pandemic, the extent and effectiveness of containment actions, progress towards widespread rapid testing, effective treatment alternatives and a vaccine, and the impact of these and other factors on our employees, players and business partners. If we are not able to respond to and manage the impact of such events effectively, our business may be harmed. To the extent the COVID-19 pandemic adversely affects our business and financial results, it may also have the effect of heightening many of the other risks described in this "*Risk Factors—Risks Related to PLAYSTUDIOS' Business and Industry*" section.

***Our industry is very competitive. If consumers prefer our competitors' games over our own, our operating results could suffer.***

Competition in the gaming industry, especially the mobile gaming segment, is intense and subject to rapid changes, including changes from evolving consumer preferences and emerging technologies. Many new games are introduced in each major industry segment (mobile, web, PC, and console) each year, but only a relatively small number of titles account for a significant portion of total revenue in each segment. While we intend to diversify our product offering, we currently compete primarily in the social casino gaming category and our competitors that develop mobile and web games in the social casino gaming category vary in size and offerings and include companies such as Aristocrat, DoubleU, Huuuge Games, Playtika, SciPlay, Zynga and others. In addition, there are competitors that develop mobile and web games that are not currently focused on the social casino gaming category but may move into that space and that may also impede our diversification efforts, including companies such as Activision Blizzard (the parent company of King Digital), Electronic Arts (EA Mobile), Epic Games, Glu Mobile, Jam City, Machine Zone, Netmarble (the parent company of Kabam), NetEase (NetEase Games), Niantic, Peak Games, Supercell, Take-Two Interactive Software, Vivendi (the parent company of Gameloft) and others. In addition, online game developers and distributors that are primarily focused on specific international markets, such as Giant Interactive and Tencent in Asia, and high-profile companies with significant online presences that to date have not actively focused on social games, such as Facebook, Apple, Google, Amazon and Microsoft, may decide to develop social games including social casino games which may compete with our games. Some of these current and potential competitors have significant resources for developing or acquiring additional games, may be able to incorporate their own strong brands and assets into their games, have a more diversified set of revenue sources than we do and may be less severely affected by changes in consumer preferences, regulations or other developments that may impact our industry.

There are relatively low barriers to entry to develop a mobile or online game and we expect new game competitors to enter the market and existing competitors to allocate more resources to develop and market competing games and applications. We also compete or will likely compete with a vast number of small companies and individuals who are able to create and launch games and other content for devices and platforms using relatively limited resources and with relatively limited start-up time or expertise. The proliferation of titles in these open developer channels makes it difficult for us to compete for players without substantially increasing our marketing expenses. We also face competition for the leisure time, attention and discretionary spending of our players from other non-gaming activities, such as social media and messaging applications, personal computer and console games, video streaming services, television, movies, sports and the Internet. Increasing competition could result in loss of players, increasing player acquisition and retention costs, and loss of talent, all of which could harm our business, financial condition or results of operations.

33

025

TABLE OF CONTENTS

with an update that allowed users to make purchases directly through Epic Games in their game, Fortnite. Apple and Google promptly removed Fortnite from their respective app stores, and Apple filed a lawsuit seeking injunctive relief to block the use of Epic Games' payment system and seeking monetary damages to recover funds made while the updated version of Fortnite was active.

If any such events described above occur on a short-term or long-term basis, or if these third-party platforms and online payment service providers otherwise experience issues that impact the ability of players to download or access our games, access social features, or make in-game purchases, it could materially and adversely affect our brands and reputation, as well as our business, financial condition and results of operations.

***We rely on third-party hosting and cloud computing providers to operate certain aspects of our business. In particular, a significant portion of our game traffic is hosted by Amazon Web Services, or AWS, and any failure, disruption or significant interruption in our network or hosting and cloud services could adversely impact our operations and harm our business.***

Our technology infrastructure is critical to the performance of our games, the satisfaction of our players and our corporate functions. Our games and company systems run on a complex distributed system, or what is commonly known as cloud computing. We own, operate and maintain elements of this system, but significant elements of this system are operated by third parties that we do not control and which would require significant time and expense to replace. We expect this dependence on third parties to continue. We have experienced, and may in the future experience, disruptions, outages and other performance problems due to a variety of factors, including infrastructure changes, human or software errors and capacity constraints. If any such interruption is significant or prolonged, if a particular game is unavailable when players attempt to access it or navigation through a game is slower than they expect, players may stop playing the game and may be less likely to return to the game as often, if at all.

In addition, any changes in these third parties' service levels may adversely affect our ability to meet the requirements of our customers. As our platform's continuing and uninterrupted performance is critical to our success, sustained or repeated system failures would reduce the attractiveness of our offerings. It may become increasingly difficult to maintain and improve our performance, especially during peak usage times, as we expand and the usage of our offerings increases. Any negative publicity arising from these interruptions, delays, outages or other performance problems could adversely affect our business, financial condition, results of operations or reputation. Furthermore, in the event that any of our agreements with these third-party providers are terminated, we may experience significant costs or downtime in connection with the transfer to, or the addition of, new hosting or cloud computing providers. Although alternative providers could host our platform on a substantially similar basis, such transition could potentially be disruptive and we could incur significant costs in connection with such transition.

In particular, a significant portion of our game traffic, data storage, data processing and other computing services and systems is hosted by AWS. AWS provides us with computing and storage capacity pursuant to an agreement that continues until terminated by either party. The agreement requires AWS to provide us their standard computing and storage capacity and related support in exchange for timely payment by us. Any disruptions, delays, outages and other performance problems caused by AWS could significantly impact our business due to our many services and systems relying on the AWS services.

***We have engaged third-party game development companies to develop and operate new mobile games and if they fail to perform as expected, our business may suffer.***

We currently, have in the past and expect in the future to, engage third-party game development companies to develop and operate new mobile games on our behalf. In each instance, we have been and in the future intend to be the publisher of these third-party developed games when they are available for distribution through platforms such as the Apple App Store, Google Play Store and Amazon Appstore, but much of the responsibility to operate the games after commercial launch will be undertaken by the development company. Typically when we engage a third-party game development company, we will enter into a contract with them that defines their and our duties and responsibilities, but we have limited control over the work performed by the development company and are therefore subject to additional risks than if our own employees were developing the games, such as that completion of the games and their publication

36

026

TABLE OF CONTENTS

could be delayed due to the development company's failure to adhere to our milestones and roadmaps. For example, one of our third-party game development companies has in the past, and may in the future, fail to complete development milestones in accordance with our game development roadmap. If our third-party game development companies do not perform in accordance with our agreements with them, it could adversely affect the development of the games that are the subject of that agreement, including delaying their availability for launch and their performance once launched, which could materially and adversely impact our ability to meet our forecasts.

Once a co-developed game is launched, we will be reliant on the development company's ability to maintain adequate knowledgeable and experienced personnel to operate and maintain the games successfully and to develop and implement future game updates, patches and bug fixes, as well as provide ongoing support services. If the development company fails to operate and maintain the games, it could adversely affect the game's performance and player satisfaction and our business may suffer as a result.

We do not own or have direct control of the source code of the third-party developed games, but we endeavor to have source code escrow agreements in place under which the source code and operation documentation of such games will be held in escrow. If the source code escrow release conditions are triggered under the applicable source code escrow agreement, while we may be able to obtain access to and use the source code and operation documentation to operate the relevant game, it would take significant time for our employees to learn how to manage the operation of the game or develop future game updates, patches or bug fixes for the game, which could adversely affect the game's performance and player satisfaction, and our business may suffer as a result.

In addition, a co-developed game may incorporate intellectual property owned by the applicable development company. In such cases, we have or will obtain licenses to use the intellectual property as integrated with and into the games, but we will not own such intellectual property. If the third-party game developer challenged our right to use its intellectual property or the manner in which we use such intellectual property, it could materially and adversely affect our ability to continue to publish the codeveloped games.

***If we do not successfully invest in, establish and maintain awareness of our brands and games, if we incur excessive expenses promoting and maintaining our brands or our games or if our games contain defects, our business, financial condition, results of operations or reputation could be harmed.***

We believe that establishing and maintaining our brands is critical to maintaining and creating favorable relationships with players, awards partners, content licensors and advertisers, as well as competing for key talent. Increasing awareness of our brands and recognition of our games is particularly important in connection with our strategic focus on developing games based on our own intellectual property and successfully cross-promoting our games. In addition, globalizing and extending our brands and recognition of our games requires significant investment and extensive management time to execute successfully. Although we make significant sales and marketing expenditures in connection with the launch of our games, these efforts may not succeed in increasing awareness of our brands or the new games. If we fail to increase and maintain brand awareness and consumer recognition of our games, our potential revenue could be limited, our costs could increase and our business, financial condition, results of operations or reputation could suffer.

In addition, our games may contain errors, bugs, flaws, corrupted data, defects and other vulnerabilities, some of which may only become apparent after their launch, particularly as we launch new games and rapidly release new features to existing games under tight time constraints. Furthermore, our development and testing processes may not detect errors and vulnerabilities in our games prior to their release. Any such errors, flaws, defects and vulnerabilities may disrupt our operations, violate applicable security standards, adversely affect the game experience of our players, harm our reputation, cause our players to stop playing our games, divert our resources and delay market acceptance of our games, any of which could result in harm to our business, financial condition or results of operations.

We strive to establish and maintain our brands by obtaining trademark rights, including for our games. However, if our trademarks and trade names are not adequately protected, we may not be able to build name recognition in our markets of interest and our competitive position, business, financial condition or results of operations may be harmed.

027

jurisdiction could also create additional administrative burdens for us, put us at a competitive disadvantage if they do not impose similar obligations on our competitors or decrease our future sales, which may materially and adversely affect our business and results of operations.

*We may have exposure to greater than anticipated tax liabilities.*

Our income tax obligations are based in part on our corporate operating structure and intercompany arrangements. The tax laws applicable to our business, including the laws of the U.S. and other jurisdictions, are subject to interpretation, and certain jurisdictions are aggressively interpreting their laws in new ways in an effort to raise additional tax revenue. Our existing corporate structure and intercompany arrangements have been implemented in a manner we believe is in compliance with current prevailing tax laws. However, the taxing authorities of the jurisdictions in which we operate may challenge our methodologies for intercompany arrangements, which could impact our worldwide effective tax rate and harm our financial position and results of operations. We are currently under a transfer pricing examination by the Israel Tax Authority for fiscal years 2016 through 2018. While we expect to prevail, it is possible that a negative outcome in this examination would have a material impact on our consolidated results of operations and financial position. In addition, changes to our corporate structure and intercompany agreements, including through acquisitions, could impact our worldwide effective tax rate and harm our financial position and results of operation.

*Our ability to utilize our research credit carryforwards and certain other tax attributes may have been limited by "ownership changes" and may be further limited.*

Our ability to utilize our research credit carryforwards, which were an aggregate of $3.4 million between state and federal research credit carryforwards at December 31, 2020, to offset potential future income taxes that would otherwise be due is dependent upon our generation of future income taxes before the expiration dates of the research credit carryforwards, and we cannot predict with certainty when, or whether, we will generate sufficient income taxes to use all of our research credit carryforwards.

Under Section 383 of the Internal Revenue Code of 1986, as amended, and corresponding provisions of state law, if a corporation undergoes an "ownership change" (generally defined as a greater than 50 percentage point change (by value) in its equity ownership over a rolling three-year period), the corporation's ability to use its research credit carryforwards and other pre-change tax attributes to offset its post-change income taxes may be limited. We may have experienced, and we may in the future experience, ownership changes, either as a result of the Business Combination or other changes in our stock ownership (some of which are not in our control). As a result, if we incur income tax liability, our ability to use our pre-change research credit carryforwards to offset U.S. federal income taxes may be subject to limitations under Section 383, which could potentially result in increased future tax liability to us. In addition, at the state level, there may be periods during which the use of research credit carryforwards is suspended or otherwise limited, which could accelerate or permanently increase state taxes owed.

## General Risk Factors

*The financial projections relating to New PLAYSTUDIOS after the Business Combination are subject to significant risks, assumptions, estimates and uncertainties, and may not be achieved.*

In connection with the Business Combination, we prepared and considered, among other things, internal financial forecasts and analyses for the performance and operating results of New PLAYSTUDIOS after the Business Combination. These financial projections include assumptions regarding, among other things, the number of players of our games and the percentage of such players that pay for virtual currency, future operating costs and other assumptions regarding future performance. These financial projections are subject to significant economic, competitive, industry and regulatory risks and uncertainties and may not be achieved in full, within the projected timeframes or at all. Operating results are difficult to forecast because they generally depend on our assessment of the timing and likelihood of future events which are uncertain, including levels of player engagement and the continued acceptance of our games. Furthermore, if we invest in games that do not achieve significant commercial success, whether because of competition or

51

028

TABLE OF CONTENTS

otherwise, we may not recover the often substantial upfront costs of such games, or recover the opportunity cost of diverting management and financial resources away from other games.

In particular, it is difficult to predict if, when or how quickly our revenue may begin to decline. This difficulty may be exacerbated in the short to intermediate term by recent fluctuations in the levels of player engagement during the COVID-19 pandemic. The increased levels of player activity in the second calendar quarter of 2020 was not sustained through the third calendar quarter of 2020. There is no assurance that player behavior will not decrease, including below historic levels, as the full impacts of the COVID-19 pandemic on society and the global economy become more clear.

Due to a variety of factors, including following the announcement of the Business Combination, changes in market conditions and the effects of COVID-19, our actual results of operations may differ materially from those contained in the financial projections prepared in connection with the Business Combination. The failure of New PLAYSTUDIOS to achieve the results contained in the financial projections could materially and adversely affect the trading price of shares of New PLAYSTUDIOS Class A common stock.

*Economic downturns and political and market conditions beyond our control could adversely affect our business, financial condition and results of operations.*

Our financial performance is subject to U.S. economic conditions and their impact on levels of spending by players, our awards partners and our advertisers. Economic recessions have had, and may continue to have, far-reaching adverse consequences across many industries, including the gaming industries, which may adversely affect our business and financial condition. In the past decade, the U.S. economy experienced tepid growth following the financial crisis in 2008 and 2009 and experienced a recession in 2020 due to the impact of the COVID-19 pandemic as well as international trade and monetary policy and other changes. If the U.S. economy experiences a continued recession or any of the relevant regional or local economies suffers a prolonged downturn, our business, financial condition, results of operations or prospects may be adversely affected.

In addition, changes in general market, economic and political conditions in domestic and foreign economies or financial markets, including fluctuation in stock markets resulting from, among other things, trends in the economy as a whole may reduce our players' disposable income and our awards partners' budgets resulting in fewer or less desirable rewards to be offered to our players. Any one of these changes could materially and adversely affect our business, financial condition, results of operations or prospects.

*Our results of operations may fluctuate due to various factors and, therefore, our periodic operating results will not be guarantees of future performance.*

Our financial results and operating metrics have fluctuated in the past and we expect such results to fluctuate in the future. These fluctuations may be due to a variety of factors, some of which are outside of our control and may not fully reflect the underlying performance of our business.

Our financial results and operations in any given period may be influenced by numerous factors, many of which we are unable to predict or are outside of our control. Consumer engagement with our games may decline or fluctuate as a result of a number of factors, including the popularity of the underlying games, the player's level of satisfaction with our games, our ability to improve and innovate games and to attract new awards partners, outages and disruptions of online services, the services offered by our competitors, our marketing and advertising efforts or declines in consumer activity generally as a result of economic downturns, among others. Any decline or fluctuation in the recurring portion of our business may have a negative impact on our business, financial condition, results of operations or prospects.

*Our reported financial results may be affected by changes in accounting principles generally accepted in the U.S.*

Generally accepted accounting principles, or GAAP, in the U.S. are subject to interpretation by the Financial Accounting Standards Board, or FASB, the SEC and various bodies formed to promulgate and interpret appropriate accounting principles. A change in these principles or interpretations could have a

029

TABLE OF CONTENTS

significant effect on our reported financial results, and could affect the reporting of transactions completed before the announcement of a change. Any difficulties in implementing any future changes to accounting principles could cause us to fail to meet our financial reporting obligations, which could result in regulatory discipline and harm investors' confidence in us.

***Our core values of focusing on our players and their experience within our games and acting for the long-term may conflict with the short-term expectations of analysts.***

We believe that providing quality and highly engaging content to our players is essential to our success and serves the best, long-term interests of our company and our stockholders. Therefore, we have made in the past and we may make in the future, significant investments or changes in strategy that we think will benefit us in the long-term, even if our decision has the potential to negatively impact our operating results in the short term. In addition, our decisions may not result in the long-term benefits that we expect, in which case the success of our games, business, financial condition or results of operations could be harmed.

***Securities analysts may not publish favorable research or reports about our business or may publish no information at all, which could cause our stock price or trading volume to decline.***

Our stock price and trading volume may be heavily influenced by the way analysts and investors interpret our financial information and other disclosures. If securities or industry analysts do not publish research or reports about our business, delay publishing reports about our business, or publish negative reports about our business, regardless of accuracy, the trading price of shares of New PLAYSTUDIOS Class A common stock could decline.

If a trading market for shares of New PLAYSTUDIOS Class A common stock develops, the trading market will be influenced to some extent by the research and reports that industry or financial analysts publish about us and our business. We do not control these analysts. As a newly public company, we may be slow to attract research coverage and the analysts who publish information about New PLAYSTUDIOS will have had relatively little experience with us, which could affect their ability to accurately forecast our results and could make it more likely that we fail to meet their estimates. In the event we obtain securities or industry analyst coverage, if any of the analysts who cover us provide inaccurate or unfavorable research or issue an adverse opinion regarding our stock price, the trading price of New PLAYSTUDIOS Class A common stock could decline. If one or more of these analysts cease coverage of us or fail to publish reports covering us regularly, we could lose visibility in the market, which in turn could cause our stock price or trading volume to decline.

Even if New PLAYSTUDIOS is actively covered by analysts, we do not have any control over the analysts or the measures that analysts or investors may rely upon to forecast our future results. Overreliance by analysts or investors on any particular metric to forecast our future results may lead to forecasts that differ significantly from our own.

***We may require additional capital to support our growth plans, and such capital may not be available on terms acceptable to us, if at all. This could hamper our growth and adversely affect our business.***

We intend to continue to make significant investments to support our business growth and may require additional funds to respond to business challenges, including the need to develop new games and features or enhance our existing games, improve our operating infrastructure or acquire complementary businesses, personnel and technologies. Accordingly, we may need to engage in equity or debt financings to secure additional funds. If we raise additional funds through future issuances of equity or convertible debt securities, our existing stockholders could suffer significant dilution, and any new equity securities we issue could have rights, preferences and privileges superior to those of holders of our Class A common stock. In March 2020, we entered into a loan and security agreement with Silicon Valley Bank, pursuant to which we can borrow up to $35.0 million under a revolving credit facility, which subjects us to certain operational and financial covenants.

Any additional debt financing that we secure in the future could involve offering additional security interests and undertaking restrictive covenants relating to our capital raising activities and other financial and operational matters, which may make it more difficult for us to obtain additional capital and to pursue

53

TABLE OF CONTENTS

- publication of research reports by securities analysts about New PLAYSTUDIOS or its competitors or its industry;

- the public's reaction to New PLAYSTUDIOS' press releases, its other public announcements and its filings with the SEC;

- actions by stockholders, including the sale by the PIPE Investors of any of their shares of New PLAYSTUDIOS Class A common stock;

- additions and departures of key personnel;

- commencement of, or involvement in, litigation involving the combined company;

- changes in its capital structure, such as future issuances of securities or the incurrence of additional debt;

- the volume of shares of New PLAYSTUDIOS Class A common stock available for public sale; and

- general economic and political conditions, such as the effects of the COVID-19 outbreak, recessions, interest rates, local and national elections, fuel prices, international currency fluctuations, corruption, political instability and acts of war or terrorism.

These market and industry factors may materially reduce the market price of New PLAYSTUDIOS Class A common stock, and warrants regardless of the operating performance of New PLAYSTUDIOS.

In addition, following the Business Combination, fluctuations in the price of New PLAYSTUDIOS' securities could contribute to the loss of all or part of your investment. Prior to the Business Combination, there has not been a public market for the stock of New PLAYSTUDIOS and trading in the shares of Acies' Class A ordinary shares has not been active. Accordingly, the valuation ascribed to New PLAYSTUDIOS in the Business Combination may not be indicative of the price that will prevail in the trading market following the Business Combination. If an active market for our securities develops and continues, the trading price of New PLAYSTUDIOS securities following the Business Combination could be volatile and subject to wide fluctuations in response to various factors, some of which are beyond our control. Any of the factors listed above could have a material adverse effect on your investment in our securities, and New PLAYSTUDIOS securities may trade at prices significantly below the price you paid for them. In such circumstances, the trading price of our securities may not recover and may experience a further decline.

***New PLAYSTUDIOS does not intend to pay cash dividends for the foreseeable future.***

Following the Business Combination, New PLAYSTUDIOS currently intends to retain its future earnings, if any, to finance the further development and expansion of its business and does not intend to pay cash dividends in the foreseeable future. Any future determination to pay dividends will be at the discretion of the New PLAYSTUDIOS Board of Directors and will depend on its financial condition, results of operations, capital requirements, restrictions contained in future agreements and financing instruments, business prospects and such other factors as its board of directors deems relevant.

***New PLAYSTUDIOS may be subject to securities litigation, which is expensive and could divert management attention.***

The market price of New PLAYSTUDIOS Class A common stock may be volatile and, in the past, companies that have experienced volatility in the market price of their stock have been subject to securities class action litigation. New PLAYSTUDIOS may be the target of this type of litigation in the future. Securities litigation against New PLAYSTUDIOS could result in substantial costs and divert management's attention from other business concerns, which could seriously harm its business.

***Future resales of common stock after the consummation of the Business Combination may cause the market price of New PLAYSTUDIOS' securities to drop significantly, even if New PLAYSTUDIOS' business is doing well.***

Pursuant to the Sponsor Support Agreement and the Proposed Bylaws, after the consummation of the Business Combination and subject to certain exceptions, the holders of: (i) shares of common stock of New

74

*Fees and Expenses*

If the Closing does not occur, each party to the Merger Agreement will be responsible for and pay its own expenses incurred in connection with the Merger Agreement and the transactions contemplated thereby, including all fees of its legal counsel, financial advisers and accountants, subject to certain exceptions as described in the Merger Agreement. If the Closing occurs, New PLAYSTUDIOS will pay or cause to be paid all accrued and unpaid transaction expenses of PLAYSTUDIOS, and pay or cause to be paid all accrued transaction expenses of Acies or its affiliates (including the Sponsor). Acies and PLAYSTUDIOS will exchange written statements listing all accrued and unpaid transaction expenses not less than three business days prior to the Closing Date.

**Related Agreements**

*This section describes certain additional agreements entered into or to be entered into pursuant to the Merger Agreement, but does not purport to describe all of the terms thereof. The following summary is qualified in its entirety by reference to the complete text of each of the agreements. The full text of the Related Agreements, or forms thereof, are filed as annexes to this proxy statement/prospectus or as exhibits to the registration statement of which this proxy statement/prospectus forms a part, and the following descriptions are qualified in their entirety by the full text of such annexes and exhibits. Shareholders and other interested parties are urged to read such Related Agreements in their entirety prior to voting on the proposals presented at the Extraordinary General Meeting.*

*Sponsor Support Agreement*

In connection with the execution of the Merger Agreement, Acies entered into the Sponsor Support Agreement with the Sponsor, and PLAYSTUDIOS, a copy of which is attached to this proxy statement/prospectus as Annex B. Pursuant to the Sponsor Support Agreement, Acies and the Sponsor agreed, among other things, (i) to vote in favor of the Merger Agreement and the transactions contemplated thereby, (ii) that 900,000 Acies Class B ordinary shares held by the Sponsor shall become unvested and subject to forfeiture if certain earnout conditions are not satisfied, (iii) to forfeit, for no consideration, 850,000 Acies Class B ordinary shares held by the Sponsor and 715,000 Acies private placement warrants, (iv) to forfeit additional Acies Class B ordinary shares conditioned on certain redemptions of Acies Class A ordinary shares and (v) not to transfer any Sponsor Lock-Up Securities until the date that is 12 months after the Closing, except that beginning on the date that is 180 days after the Closing, an amount of Sponsor Lock-Up Securities equal to the lesser of (A) 5% of the Sponsor Lock-Up Securities held by each holder of Sponsor Lock-Up Securities and (B) 50,000 Sponsor Lock-Up Securities held by each holder of Sponsor Lock-Up Securities, will no longer be subject to the transfer restrictions (the "Lock-Up Period"), subject to the terms and conditions contemplated by the Sponsor Support Agreement.

The Sponsor Support Agreement will terminate in its entirety, and be of no further force or effect, upon the earliest to occur of (i) the Effective Time (as defined in the Sponsor Support Agreement), (ii) the termination of the Merger Agreement in accordance with its terms, or (iii) the mutual written agreement of PLAYSTUDIOS and the Sponsor, provided the following provisions in certain sections of the Sponsor Support Agreement shall survive termination: (i) the provisions set forth in Section 6(b) related to the provision of tax-related information if the agreement is terminated prior to the Effective Time (as defined in the Sponsor Support Agreement), (ii) the provisions set forth in Sections 8 through 20 and Section 22, (iii) the provisions set forth in Section 4(f) until the latest to occur of (A) the termination of that certain Letter Agreement, dated as of October 22, 2020, by and among the Sponsor and Acies, and (B) the end of the Lock-Up Period and (iv) the provisions set forth in Section 5 until the later to occur of (A) the achievement of the $15.00 Share Price Milestone (as defined in the Sponsor Support Agreement) or (B) the Earnout Expiration Date (as defined in the Sponsor Support Agreement) upon which, in the case of clause (B), any Unvested Shares (as defined in the Sponsor Support Agreement) will be forfeited for no consideration. The Sponsor Support Agreement provides that there is no relief from any liability resulting from a Willful Breach (as defined in the Merger Agreement).

*PLAYSTUDIOS Holders Support Agreement*

On February 2, 2021, Acies also entered into the PLAYSTUDIOS Holders Support Agreement. The Key Stockholders include Mr. Pascal and the Founder Group, PLAYSTUDIOS' Executive Vice President

111

**Background to the Business Combination**

**Acies Initial Public Offering**

Acies is a blank check company incorporated on August 14, 2020 as a Cayman Islands exempted company formed for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization or similar business combination with one or more businesses. The Business Combination was the result of an extensive search for a potential transaction using the network, investing and operating experience of our management team, including our board of directors. The terms of the Merger Agreement were the result of extensive negotiations between Acies and PLAYSTUDIOS (and their respective affiliates). The following is a brief description of the background of these negotiations, the Business Combination and related transactions.

On October 27, 2020, Acies completed its initial public offering of 20,000,000 units, including up to an additional 3,000,000 units subject to the underwriters' over-allotment option, at a price of $10.00 per unit, generating gross proceeds of $200,000,000 before transaction costs (including deferred underwriting expenses to be paid upon the completion of Acies' initial business combination). Each Acies unit consisted of one Acies Class A ordinary share and one-third of one public warrant. Each public warrant entitles the holder thereof to purchase one Acies Class A ordinary share at a price of $11.50 per share, subject to certain adjustments. Simultaneously with the closing of its initial public offering, Acies completed the private sale of an aggregate of 4,333,333 private placement warrants, at a price of $1.50 per private placement warrant, to the Sponsor, generating gross proceeds of $6,500,000. The private placement warrants entitle the Sponsor to purchase one Acies Class A ordinary share at a price of $11.50 per share, subject to certain adjustments.

In connection with Acies' initial public offering, Morgan Stanley & Co. LLC ("Morgan Stanley"), J.P. Morgan Securities LLC ("J.P. Morgan") and Oppenheimer & Co. Inc. ("Oppenheimer") acted as underwriters.

Prior to the consummation of its initial public offering, neither Acies, nor anyone on its behalf, engaged in any substantive discussions, directly or indirectly, with any business combination target with respect to an initial business combination with Acies.

**Initial Outreach and Assessment of Potential Targets**

After the closing of Acies' initial public offering, and alongside the outreach and pre-letter of intent discussions with PLAYSTUDIOS, Acies assessed and analyzed multiple prospective business combination targets and opportunities, based on strength of business model, defensive characteristics, size, management team and growth prospects, among other factors. Representatives of Acies were contacted by or initiated contact with multiple companies, both directly and through investment banks and other advisors, across the broad technology, entertainment and gaming industries. Between October 27, 2020 and December 21, 2020, Acies management evaluated over 40 potential business combination targets and had discussions with 17 of such potential business combination targets. Discussions with these potential targets involved direct engagement with senior management teams, shareholders or the target's advisors across either formal strategic sell-side processes or opportunities believed to be proprietary to Acies that could lead to a bilateral transaction. Discussions involved actionability, timing and competitive landscape considerations applicable to the potential targets. For these potential targets Acies assessed preliminary valuations and Acies' ability to enhance the potential target's growth prospects as a public company. These discussions did not result in a letter of intent with any other party. After reviewing and considering these opportunities, Acies' management determined that PLAYSTUDIOS offered the most compelling business combination opportunity and ceased further discussions with other potential targets on December 21, 2020 after the Acies Board approved, and Acies entered into, the LOI (as defined below) with PLAYSTUDIOS, as per the below chronology.

**Measures in Response to PLAYSTUDIOS as an Affiliated Transaction**

Andrew Pascal, the current Chief Executive Officer of PLAYSTUDIOS, holds a direct economic interest in Acies Class B ordinary shares and Acies private placement warrants through his ownership in interests in the Sponsor. Mr. Pascal is also a co-founder of Acies and an advisor to the Acies Board of

114

TABLE OF CONTENTS

Directors. Because of these relationships and ownership interests, Acies management and the Acies Board of Directors understood that a potential business combination with PLAYSTUDIOS would be an affiliated transaction and communicated to Mr. Pascal that he would be recused from any internal discussions among Acies management or the Acies Board of Directors related to a potential business combination with PLAYSTUDIOS or, prior to entering into the LOI, any other potential business combination of Acies while discussions with PLAYSTUDIOS were taking place. At no point prior to October 27, 2020 or thereafter did Mr. Pascal attend or participate in any calls or meetings with Acies management or the Acies Board of Directors at which such affiliated transaction as considered. As a condition to entering into any transaction with PLAYSTUDIOS, Mr. Pascal also agreed to forfeit all of his interests in the Sponsor, Acies Class B ordinary shares and Acies private placement warrants, contingent upon the consummation of the business combination with PLAYSTUDIOS.

### Discussions with PLAYSTUDIOS

On October 27, 2020, J.P. Morgan's M&A financial advisory group and LionTree Advisors ("LionTree"), financial advisors to PLAYSTUDIOS, reached out to Acies regarding a business combination process that J.P. Morgan's M&A financial advisory group and LionTree were involved in on behalf of PLAYSTUDIOS. J.P. Morgan's M&A financial advisory group and LionTree made Acies' management team aware that PLAYSTUDIOS was in the advanced stages of this process and indicated that if Acies wanted to be among the alternatives to be considered by PLAYSTUDIOS, it would need to act quickly. Later, on October 27, 2020, Acies and PLAYSTUDIOS entered into a mutual nondisclosure agreement. After that, on October 27, 2020, certain members of Acies' management team had a virtual meeting with certain members of PLAYSTUDIOS' management team, including Mr. Pascal, during which PLAYSTUDIOS' management team gave a presentation concerning its business to Acies and certain diligence questions were discussed. Certain advisors from J.P. Morgan's M&A financial advisory group and LionTree were also present at such virtual meeting. Later that day, PLAYSTUDIOS granted Acies access to a virtual data room and sent Acies a draft of a non-binding letter of intent, which included a term sheet to provide the framework for a potential business combination. This term sheet was not a complete document but was intended for initial discussion of terms and structural details.

On October 28, 2020, Acies and J.P. Morgan's M&A financial advisory group and LionTree acting on behalf of PLAYSTUDIOS discussed the key terms in the letter of intent. Over the course of the following week, PLAYSTUDIOS communicated the initial proposed terms of the potential transaction to Acies, including, among other things, (i) a proposed enterprise valuation of PLAYSTUDIOS of approximately $1.15 billion, (ii) a closing condition that at least $200 to $250 million of cash be available for use as cash consideration and primary capital, (iii) a dual class common stock structure that would result in Mr. Pascal having approximately 90% of the voting power of the combined company and (iv) a 12-month lock-up restriction on the Sponsor's equity and a 6-month lock-up on the shares to be issued to equityholders of PLAYSTUDIOS. Additionally, the financial advisors to PLAYSTUDIOS sought a proposal from Acies as to the number of (a) the Sponsor's shares and private placement warrants to be forfeited or transferred to PLAYSTUDIOS' equityholders or PIPE investors in connection with the proposed business combination and (b) the Sponsor's shares that would be subject to a vesting schedule. Prior to engaging in discussions with Acies, PLAYSTUDIOS had entered into discussions with several other special purpose acquisition companies and exchanged drafts of letters of intent with some of them, including with respect to giving Mr. Pascal super-voting shares of the combined company and the forfeiture of a portion of such other SPACs' sponsors' equity and warrants.

On October 30, 2020, Acies held a diligence call with certain members of PLAYSTUDIOS' management team. Acies and J.P. Morgan's M&A financial advisory group and LionTree acting on behalf of PLAYSTUDIOS further discussed key terms in the letter of intent. Later that day, Acies had a meeting with a third-party industry expert to discuss the social casino industry.

On November 2, 2020, Acies continued its discussions with J.P. Morgan's M&A financial advisory group and LionTree, acting on behalf of PLAYSTUDIOS regarding the valuation of PLAYSTUDIOS and other terms of the proposed combination. Later, on November 2, 2020, the Acies Board of Directors held a virtual meeting to review Acies' completion of its initial public offering and to discuss PLAYSTUDIOS.

On November 3, 2020, Acies continued discussions with J.P. Morgan's M&A financial advisory group and LionTree acting on behalf of PLAYSTUDIOS regarding the valuation of PLAYSTUDIOS and other

115

034

terms of the proposed combination. Later, on November 3, 2020, Acies had a discussion with Morgan Stanley regarding the possible business combination transaction with PLAYSTUDIOS and the possibility of raising capital through a private investment in public equity ("PIPE Investment").

On November 4, 2020, Acies held a diligence call with Mr. Pascal and certain other members of PLAYSTUDIOS' management team. Later, on November 4, 2020, Acies had a discussion with Morgan Stanley regarding the social casino industry, the valuation of PLAYSTUDIOS and the PIPE Investment.

On November 5, 2020, the Acies Board of Directors had a virtual meeting to discuss PLAYSTUDIOS and the terms of Acies' potential letter of intent submission to PLAYSTUDIOS. The Acies Board of Directors also confirmed that a potential business combination with PLAYSTUDIOS would constitute an affiliated transaction and agreed that Mr. Pascal be recused from any internal discussions with Acies management and the Acies Board of Directors in connection with the potential business combination with PLAYSTUDIOS or, prior to entering into the LOI, any other potential business combination of Acies while discussions with PLAYSTUDIOS were taking place. After such meeting, on November 5, 2020, Acies submitted its letter of intent to PLAYSTUDIOS' advisors that included, among other things, (i) a proposed enterprise valuation of PLAYSTUDIOS of approximately $1 billion, with an additional portion of the consideration payable to PLAYSTUDIOS' equityholders based on an earnout, (ii) a closing condition that at least $150 million of cash be available for use as cash consideration and primary capital and (iii) a dual class common stock structure that would entitle each share of the high vote stock to be held by Mr. Pascal and his affiliates to 10 votes per share.

Over the next several weeks, the parties continued to discuss the terms of the proposed transaction and exchanged multiple drafts of the letter of intent. The principal terms being negotiated were the valuation of PLAYSTUDIOS, the voting power of the shares of the combined company, the cash proceeds to be made available to PLAYSTUDIOS' equityholders and to the combined company following the closing of the transaction, the restructuring of the Sponsor's Class B ordinary shares and the Sponsor's private placement warrants, the forfeiture of the Sponsor's Class B ordinary shares and the Sponsor's private placement warrants, the general lock-up terms for the Sponsor and PLAYSTUDIOS' equityholders, the cash on the balance sheet of the combined company and mutual exclusivity. Over the course of such negotiations, the parties reached a preliminary agreement on certain terms, including, among other things, (i) the proposed form and amount of consideration payable to equityholders of PLAYSTUDIOS, (ii) a closing condition that at least $200 million of cash be available for use as cash consideration and primary capital, (iii) a dual class common stock structure that would entitle each share of the high vote stock to be held by Mr. Pascal and his affiliates to 20 votes per share and (iv) a 12-month lock-up restriction on the Sponsor's equity and the shares to be issued to equityholders of PLAYSTUDIOS, in each case, subject to customary exceptions.

On November 9, 2020, in connection with the underwriters' election to partially exercise their over-allotment option, Acies consummated the sale of an additional 1,525,000 Acies units, at $10.00 per unit, generating gross proceeds of $15,250,000. Simultaneously with the partial exercise of the over-allotment option, Acies consummated the sale of an additional 203,334 private placement warrants, at $1.50 per private placement warrant, generating gross proceeds of $305,000.

Over the next several weeks, Acies continued to perform diligence on a potential business combination with PLAYSTUDIOS. Acies and its representatives held numerous virtual meetings, phone calls and working sessions with PLAYSTUDIOS and its representatives concerning the letter of intent, diligence, and other commercial and legal matters. The parties continued the negotiation of, among other things, the restructuring of the Sponsor's equity interest in Acies, and the forfeiture of Mr. Pascal's interest in the Sponsor, including his interest in related Acies Class B ordinary shares and Acies private placement warrants.

On November 25, 2020, Acies' senior management updated the Acies Board of Directors on the status of the negotiation of the letter of intent with PLAYSTUDIOS, including an update on certain key terms, such as the super-voting shares of the combined company to be given to Mr. Pascal and the forfeiture of the Sponsor's Acies Class B ordinary shares and private placement warrants.

On December 16, 2020, PLAYSTUDIOS stated to Acies that its board of directors approved PLAYSTUDIOS entering into a letter of intent with Acies with respect to a potential business combination. On December 17, 2020, Acies and PLAYSTUDIOS discussed the timing of the approval of such letter of intent by the Acies Board of Directors and also began discussions regarding timeline and strategy for the PIPE Investment.

116

035

his interest in related Acies Class B ordinary shares and Acies private placement warrants, for no consideration, contingent upon the closing of the proposed business combination.

On January 30, 2021 and January 31, 2021, members of Acies' senior management met with one of the members of the Acies Board of Directors to discuss the proposed transaction. The entire Acies Board of Directors then met on January 31, 2021 to further consider the proposed transaction. At the invitation of the Acies Board of Directors, members of Acies' senior management and representatives of Acies' legal and financial advisors also attended the meeting. Latham & Watkins reviewed with the Acies Board of Directors their fiduciary duties in the context of the proposed transaction. Latham & Watkins then summarized the material terms of the proposed form of the Merger Agreement, including, among other things the Aggregate Merger Consideration. Mr. Pascal did not attend or otherwise participate in any of these meetings.

In making a determination to support providing Mr. Pascal (and certain related persons and vehicles) with high vote stock entitling him to 20 votes per share, compared to one vote per share for the listed shares of the combined company's common stock, the Acies Board of Directors considered that: (i) the right to 20 votes per share converts to a right to one vote per share upon a transfer of shares to an unaffiliated third party and (ii) all of Mr. Pascal's super-voting rights will expire following Mr. Pascal's death or disability (subject to certain extensions approved by the combined company's board of directors) or if Mr. Pascal, collectively with certain other permitted holders of the combined company's Class B common stock, collectively cease to beneficially own at least twenty percent (20%) of the number of shares of collectively held by Mr. Pascal and certain other permitted holders as of the effective date of the proposed business combination. Mr. Pascal held approximately 20.3% of PLAYSTUDIOS' capital stock and voting power as of December 31, 2020. After giving effect to the Business Combination and the issuance of the high vote stock, Mr. Pascal would own approximately 12.3% and 73.7% of New PLAYSTUDIOS' common stock and voting power in the "No Redemption" scenario and 15.5% and 78.6% of New PLAYSTUDIOS' common stock and voting power in the "Maximum Redemption" scenario as of December 31, 2020. The Acies Board of Directors considered the importance to the success of the combined company of the high vote stock, which would support Mr. Pascal's ability to lead the combined company in the pursuit of its long-term vision and strategy, and that this would benefit the interests of the Acies shareholders and New PLAYSTUDIOS stockholders after the closing of the transaction.

Later that day on January 31, 2021, the Acies Board of Directors held another special board meeting via video conference to discuss the proposed business combination with PLAYSTUDIOS, commitments and support from existing and prospective stockholders and the terms of the definitive agreements. At the request of the Acies Board of Directors, Houlihan Lokey then reviewed and discussed its financial analyses with respect to PLAYSTUDIOS and the proposed business combination. Thereafter, at the request of the Acies Board of Directors, Houlihan Lokey orally rendered its opinion to the Acies Board of Directors (which was subsequently confirmed in writing by delivery of Houlihan Lokey's written opinion addressed to the Acies Board of Directors dated January 31, 2021), as to the fairness, from a financial point of view, to Acies of the Aggregate Closing Merger Consideration to be issued and paid by Acies in connection with the proposed business combination. Following the discussions, the Acies Board of Directors unanimously voted in favor of proceeding with the proposed business combination with PLAYSTUDIOS, as well as the PIPE Investment and approved the Merger Agreement, the Subscription Agreements and the other agreements and transactions contemplated as part of the proposed business combination. In approving the transactions, the Acies Board of Directors, among other things, determined that the aggregate fair market value of the proposed business combination was at least 80% of the assets held in the trust account. Mr. Pascal did not attend or otherwise participate in this meeting.

On February 1, 2021, the parties entered into the Merger Agreement and Acies entered into the Subscription Agreements for the PIPE Investment. Substantially concurrently, Acies, the Sponsor and PLAYSTUDIOS also entered into the Sponsor Agreement and Mr. Pascal and the Sponsor entered into the Forfeiture Agreement. On February 1, 2021, Acies and PLAYSTUDIOS issued a press release announcing the Business Combination. On February 2, 2021, Acies, PLAYSTUDIOS and certain equityholders of PLAYSTUDIOS entered into the PLAYSTUDIOS Holders Support Agreements.

**Acies Board of Directors' Reasons for the Business Combination**

Acies was organized for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization or similar business combination with one or more businesses.

120

036

TABLE OF CONTENTS

In evaluating the Business Combination, the Acies Board of Directors consulted with Acies' management, Latham & Watkins LLP as legal advisors and Houlihan Lokey as financial advisors, and considered the general criteria and guidelines that Acies believed would be important in evaluating prospective target businesses as described in the prospectus for Acies' initial public offering. The Acies Board of Directors also considered that they could enter into a business combination with a target business that does not meet those criteria and guidelines. In the prospectus for its initial public offering, Acies stated that it intended to focus primarily on acquiring a company or companies with the following criteria and guidelines including but not limited to:

- **Highly defensible business models with a sustainable competitive advantage.**  A tailored, highly differentiated or unique consumer experience that builds on a sense of wonder, community and shared values engenders enduring consumer loyalty and repeat customer demand. It is our belief these attributes create the most defensible business models, sustain a competitive advantage and market position, create attractive growth and cash flow profiles, and so generate shareholder value;

- **Disruptive business models with strong secular growth.**  Many categories (in particular, mobile entertainment) are experiencing unprecedented growth due to strong underlying consumer demand and liberalizing regulations. These companies' rapid growth, and prospective scale, lead them to be natural public entities, whereon new avenues of growth and capital will be opened to fund organic initiatives and pursue transformative or bolt-on acquisitions;

- **Dislocated valuations within fundamentally strong sectors and businesses.**  Live entertainment sectors have been temporarily disrupted due to COVID-19, but otherwise possess fundamentally sound long-term business plans. We believe there exists an opportunity to provide equity capital to privately owned companies, or public companies through the carve-out of a division, at attractive valuations;

- **Strong management that would benefit from Acies' extensive and diverse expertise.**  We believe our operating expertise and expansive network access has the potential to drive incremental value to even those currently strong management teams, resulting in improvements to operational and financial performance;

- **Founder-owner monetization, corporate carve-outs and private equity exits.**  Special purpose acquisition company transactions are a proven path for owners to monetize their holdings through an upfront liquidity event with ongoing participation, and present many compelling features not otherwise replicable in an IPO or sale;

In considering the Business Combination, the Acies Board of Directors determined that the Business Combination was an attractive business opportunity that met the vast majority of the criteria and guidelines above, although not weighted or in any order of significance. On January 31, 2021, the Acies Board of Directors (i) approved the Merger Agreement and related transaction agreements and the transactions contemplated thereby, (ii) determined that the Business Combination is in the best interests of Acies and its shareholders, and (iii) recommended that Acies' shareholders approve and adopt the Business Combination. In evaluating the Business Combination and making these determinations and this recommendation, the Acies Board of Directors consulted with Acies' senior management and considered a number of factors. This explanation of Acies' reasons for the Acies Board of Directors' approval of the Business Combination, and all other information presented in this section, is forward-looking in nature and, therefore, should be read in light of the factors discussed under "*Cautionary Statement Regarding Forward-Looking Statements.*" In particular, the Acies Board of Directors considered, among other things, the following factors, although not weighted or in any order of significance:

- **PLAYSTUDIOS and the Business Combination.**  The Acies Board of Directors considered the following factors related to PLAYSTUDIOS and the Business Combination:

  - *High-Growth Industry.*  The global games market is substantial and growing rapidly. According to Newzoo, the global games market is estimated to grow to $217.9 billion by 2023, up from $138.8 billion in 2018, representing a 9% CAGR from 2018 to 2023. While the global games market as a whole is growing rapidly, the mobile gaming market has outpaced the broader industry's growth. According to Newzoo, mobile games was a $86.3 billion market in 2020 and represented the largest and fastest-growing segment of the global games market, growing at 26% in 2020. The proliferation of smartphones has been a key driver of this growth. According

121

037

to Newzoo, in 2020 there were an estimated 3.6 billion smartphone users globally, growing at a rate of 8% compared to the prior year, creating an increasingly large market for game developers to target.

- *Unique and defensible business model.* PLAYSTUDIOS was named a top 30 U.S.-headquartered mobile app publisher for 2021 and a top 30 Americas-headquartered mobile app publisher for 2020, in each case, measured by worldwide combined revenue through the Apple App Store and Google Play platforms for 2020 and 2019, as estimated by App Annie, a mobile data and analytics provider. Furthermore, PLAYSTUDIOS offers a one-of-a-kind loyalty platform that lets players earn real-world rewards from a curated collection of over 80 awards partners representing more than 275 brands. As of December 31, 2020, the PLAYSTUDIOS community has exchanged in-game loyalty points for over 10 million rewards with a retail value of nearly $500 million. The loyalty platform drives growth in PLAYSTUDIOS' existing portfolio of games, reduces the risk for new game launches, and supports acquisitions of other games.

- *Extraordinary User Engagement.* PLAYSTUDIOS has developed a product offering to players that has proven engaging. Their games have been downloaded over 100 million times and were played by 4.3 million monthly active users for the year ended December 31, 2020.

- *Significant Revenue and Earnings Growth Potential.* PLAYSTUDIOS' platform has enabled it to achieve an attractive financial profile, characterized by strong existing growth. From 2019 to 2020, PLAYSTUDIOS achieved revenue growth of 12.7%, from $239.4 million for the year ended December 31, 2019 to $269.9 million for the year ended December 31, 2020, compared to revenue growth of 22.5% from $195.5 million to $239.4 million for the years ended December 31, 2018 and 2019. Acies believes that PLAYSTUDIOS is well positioned to continue its dynamic growth trajectory.

- *Experienced and Motivated Management Team.* PLAYSTUDIOS is a founder-driven business led by its chief executive officer, Andrew Pascal. Mr. Pascal's vision for the company and the competitive gaming industry at large is unique and difficult to duplicate given PLAYSTUDIOS' proprietary technology and unique positioning. Mr. Pascal has further surrounded himself with a leadership team of entrepreneurs, product leaders, technologists, game designers, data scientists, and loyalty marketers who bring decades of experience, and a shared commitment to assembling teams and building quality products.

- **Best Available Opportunity**. The Acies Board of Directors determined, after a thorough review of other business combination opportunities reasonably available to Acies, that the proposed Business Combination, notwithstanding its status as an affiliated transaction, represents the best potential business combination for Acies based upon the process utilized to evaluate and assess other potential acquisition targets, and the Acies Board of Directors belief that such processes had not presented a better alternative. In particular, the Acies Board of Directors considered the following factors in its determination:

- **Continued Ownership By Sellers.** The Acies Board of Directors considered that PLAYSTUDIOS' existing equityholders would be receiving a significant amount of New PLAYSTUDIOS' common stock as its consideration and that 100% of the existing equityholders of PLAYSTUDIOS are "rolling over" all or a substantial portion of their existing equity interests into equity interests in New PLAYSTUDIOS which would represent approximately 61.6% of the pro forma ownership of the combined company after Closing, assuming none of Acies' current public shareholders exercise their redemption rights in connection with the Business Combination.

  Further, all of the proceeds to be delivered to the combined company in connection with the Business Combination (including from Acies' Trust Account and from the PIPE Investment), are expected to remain on the balance sheet of the combined company after Closing in order to fund PLAYSTUDIOS' existing operations and support new and existing growth initiatives, and are not anticipated to be used to effect any additional repurchase, redemption or other acquisition of outstanding shares of Acies' common stock for at least the first six months after Closing. The Acies Board of Directors considered this as a strong sign of confidence in New PLAYSTUDIOS following the Business Combination and the benefits to be realized as a result of the Business Combination.

122

- **Investment by Third Parties.** The Acies Board of Directors considered that third parties, including top-tier institutional investors, are investing $250 million in the combined company, in each case, pursuant to their participation in the PIPE Investment. The Acies Board of Directors considered this another strong sign of confidence in New PLAYSTUDIOS following the Business Combination and the benefits to be realized as a result of the Business Combination.

- **Results of Due Diligence.** The Acies Board of Directors considered the scope of the due diligence investigation conducted by Acies' senior management and outside advisors, and evaluated the results thereof and information available to it related to PLAYSTUDIOS, including:

  - extensive virtual meetings and calls with PLAYSTUDIOS' management team regarding its operations, projections and the proposed transaction; and review of materials related to PLAYSTUDIOS and its business, made available by PLAYSTUDIOS, including financial statements, material contracts, key metrics and performance indicators, benefit plans, employee compensation and labor matters, intellectual property matters, real property matters, information technology, privacy and personal data, litigation information, environmental matters and other regulatory and compliance matters, and other legal and business diligence.

  - the financial analysis reviewed by Houlihan Lokey with the Acies Board of Directors as well as the oral opinion of Houlihan Lokey rendered to the Acies Board of Directors on January 31, 2021 (which was subsequently confirmed in writing by delivery of Houlihan Lokey's written opinion addressed to the Acies Board of Directors dated January 31, 2021), as to the fairness, from a financial point of view, to Acies of the Aggregate Closing Merger Consideration to be issued and paid by Acies in the First Merger pursuant to the Agreement

- **Terms of the Merger Agreement.** The Acies Board of Directors reviewed and considered the terms of the Merger Agreement and the related agreements including the parties' conditions to their respective obligations to complete the transactions contemplated therein and their ability to terminate such agreements. See "*Business Combination Proposal*" for detailed discussions of the terms and conditions of these agreements.

- **The Role of the Independent Directors.** In connection with the Business Combination, Acies' independent directors, Zach Leonsis, Brisa Carleton, Andrew Zobler and Sam Kennedy, evaluated the proposed terms of the Business Combination, including the Merger Agreement and the related agreements, and unanimously approved, as members of the Acies Board of Directors, the Merger Agreement and the related agreements and the transactions contemplated thereby, including the Business Combination.

The Acies Board of Directors also identified and considered the following factors and risks weighing negatively against pursuing the Business Combination, although not weighted or in any order of significance:

- **Potential Inability to Complete the Mergers.** The Acies Board of Directors considered the possibility that the Business Combination may not be completed and the potential adverse consequences to Acies if the Business Combination is not completed, in particular the expenditure of time and resources in pursuit of the Business Combination and the loss of the opportunity to participate in the transaction. They considered the uncertainty related to the Closing, including due to closing conditions primarily outside of the control of the parties to the transaction (such as the need for stockholder and antitrust approval). The Merger Agreement and the Sponsor Support Agreement each also include exclusivity provisions that prohibit Acies, the Sponsor and certain of their respective affiliates from soliciting other initial business combination proposals on behalf of Acies, which restricts Acies' ability to consider other potential initial business combinations until the earlier of the termination of the Merger Agreement or the consummation of the Business Combination.

  In addition, the Acies Board of Directors considered the risk that the current public shareholders of Acies would redeem their public shares for cash in connection with consummation of the Business Combination, thereby reducing the amount of cash available to New PLAYSTUDIOS following the consummation of the Business Combination. Although the consummation of the Mergers is conditioned upon satisfaction of the Minimum Cash Condition, which is for the sole benefit of PLAYSTUDIOS, this condition will be satisfied at Closing regardless of any exercise by Acies' current public shareholders of their redemption rights, due to the size of the PIPE Investment. Further, the

123

039

TABLE OF CONTENTS

Acies Board of Directors considered the risk that current public shareholders would exercise their redemption rights is mitigated because PLAYSTUDIOS will be acquired at an attractive aggregate purchase price.

- **PLAYSTUDIOS' Business Risks**.   The Acies Board of Directors considered that Acies shareholders would be subject to the execution risks associated with New PLAYSTUDIOS if they retained their public shares following the Closing, which were different from the risks related to holding public shares of Acies prior to the Closing. In this regard, the Acies Board of Directors considered that there were risks associated with successful implementation of New PLAYSTUDIOS' long-term business plan and strategy and New PLAYSTUDIOS realizing the anticipated benefits of the Business Combination on the timeline expected or at all, including due to factors outside of the parties' control such as the potential negative impact, including the potential impact of the COVID-19 pandemic and related macroeconomic uncertainty. The Acies Board of Directors considered that the failure of any of these activities to be completed successfully may decrease the actual benefits of the Business Combination and that Acies shareholders may not fully realize these benefits to the extent they expected to retain the public shares following the completion of the Business Combination. For additional description of these risks, please see "*Risk Factors*."

- **Post-Business Combination Corporate Governance**.   The Acies Board of Directors considered the corporate governance provisions of the Merger Agreement and the Proposed Organizational Documents, and the effect of those provisions on the governance of the Company following the Closing. In particular, they considered the effect of the voting right of the different classes of stock and that the parties have not entered into any agreement in respect of the composition of the New PLAYSTUDIOS Board of Directors after the Closing, except for the parties' respective rights to designate the initial director nominees. See "*Business Combination Proposal—Merger Agreement*" for detailed discussions of the terms and conditions of the Merger Agreement.

  Given that the existing equityholders of PLAYSTUDIOS will collectively control shares representing a majority of New PLAYSTUDIOS' total outstanding shares of common stock upon completion of the Business Combination, and that the New PLAYSTUDIOS Board of Directors will be declassified following the Closing pursuant to the terms of the Proposed Organizational Documents, the existing equityholders of PLAYSTUDIOS may be able to elect future directors and make other decisions (including approving certain transactions involving New PLAYSTUDIOS and other corporate actions) without the consent or approval of any of Acies' current shareholders, directors or management team. See "*Organizational Documents Proposals*" for detailed discussions of the terms and conditions of the Proposed Organizational Documents.

- **Limitations of Review**.   The Acies senior management and Acies' outside counsel reviewed only certain materials in connection with their due diligence review of PLAYSTUDIOS. Accordingly, the Acies Board of Directors considered that Acies may not have properly valued such business.

- **No Survival of Remedies for Breach of Representations, Warranties or Covenants of PLAYSTUDIOS**.   The Acies Board of Directors considered that the terms of the Merger Agreement provide that Acies will not have any surviving remedies against PLAYSTUDIOS or its equityholders after the Closing to recover for losses as a result of any inaccuracies or breaches of the PLAYSTUDIOS representations, warranties or covenants set forth in the Merger Agreement. As a result, Acies, shareholders could be adversely affected by, among other things, a decrease in the financial performance or worsening of financial condition of PLAYSTUDIOS prior to the Closing, whether determined before or after the Closing, without any ability to reduce the number of shares to be issued in the Business Combination or recover for the amount of any damages. The Acies Board of Directors determined that this structure was appropriate and customary in light of the fact that several similar transactions include similar terms and the current equityholders of PLAYSTUDIOS will be, collectively, the majority equityholders in New PLAYSTUDIOS.

- **Litigation**.   The Acies Board of Directors considered the possibility of litigation challenging the Business Combination or that an adverse judgment granting permanent injunctive relief could enjoin consummation of the Business Combination.

- **Fees and Expenses**.   The Acies Board of Directors considered the fees and expenses associated with completing the Business Combination.

124

040

- **Diversion of Management**.  The Acies Board of Directors considered the potential for diversion of management and employee attention during the period prior to the completion of the Business Combination, and the potential negative effects on PLAYSTUDIOS' business.

In addition to considering the factors described above, the Acies Board of Directors also considered that:

- **Interests of Acies' Directors and Executive Officers**.  Acies' directors and executive officers may have interests in the Business Combination as individuals that are in addition to, and may be different from, the interests of Acies' shareholders, as described in the section entitled "*Business Combination Proposal— Interests of Acies' Directors and Executive Officers in the Business Combination*." However, Acies Board of Directors concluded that the potentially disparate interests would be mitigated because (i) these interests were disclosed in the prospectus for Acies' initial public offering and are included in this proxy statement/prospectus, (ii) most of these disparate interests would exist with respect to a business combination by Acies with any other target business or businesses, and (iii) Acies' directors and executive officers hold equity interests in Acies with value that, after the Closing, will be based on the future performance of New PLAYSTUDIOS' common stock. In addition, Acies' independent directors reviewed and considered these interests and the interests that Mr. Pascal had and would forfeit in the Sponsor during their evaluation of the Business Combination and in unanimously approving, as members of the Acies Board of Directors, the Merger Agreement and the related agreements and the transactions contemplated thereby, including the Business Combination.

Based on its review of the forgoing considerations, the Acies Board of Directors concluded that the potentially negative factors associated with the Business Combination were outweighed by the potential benefits that it expects Acies shareholders will receive as a result of the Business Combination. The Acies Board of Directors realized that there can be no assurance about future results, including results considered or expected as disclosed in the foregoing reasons.

The preceding discussion of the information and factors considered by the Acies Board of Directors is not intended to be exhaustive, but includes the material factors considered by the Acies Board of Directors. In view of the complexity and wide variety of factors considered by the Acies Board of Directors in connection with its evaluation of the Business Combination, the Acies Board of Directors did not consider it practical, nor did it attempt, to quantify, rank or otherwise assign relative weights to the different factors that it considered in reaching its decision. In addition, in considering the factors described above, individual members of the Acies Board of Directors may have given different weight to different factors. The Acies Board of Directors considered this information as a whole and overall considered the information and factors to be favorable to, and in support of, its determinations and recommendations.

This explanation of the Acies Board of Directors' reasons for its approval of the Business Combination, and all other information presented in this section, is forward-looking in nature and, therefore, should be read in light of the factors discussed under "*Cautionary Statement Regarding Forward-Looking Statements.*"

### Opinion of the Financial Advisor to Acies

On January 31, 2021, Houlihan Lokey Capital orally rendered its opinion to the Acies Board of Directors (which was subsequently confirmed in writing by delivery of Houlihan Lokey's written opinion addressed to the Acies Board of Directors dated January 31, 2021), as to the fairness, from a financial point of view, to Acies of the Aggregate Closing Merger Consideration to be issued and paid by Acies in the First Merger pursuant to the Merger Agreement.

**Houlihan Lokey's opinion was directed to the Acies Board of Directors (in its capacity as such) and only addressed the fairness, from a financial point of view, to Acies of the Aggregate Closing Merger Consideration to be issued and paid by Acies in the First Merger pursuant to the Merger Agreement and did not address any other aspect or implication of the transaction contemplated thereby or any other agreement, arrangement or understanding. The summary of Houlihan Lokey's opinion in this proxy statement/prospectus is qualified in its entirety by reference to the full text of its written opinion, which is attached as Annex K to this proxy statement/prospectus and describes the procedures followed, assumptions made, qualifications and limitations on the review undertaken and other matters considered by Houlihan Lokey in connection with the preparation of its opinion. However, neither Houlihan Lokey's opinion nor the summary of its opinion and the related analyses set forth in this proxy statement/prospectus are intended to be, and do not constitute, advice or a recommendation**

125

041

TABLE OF CONTENTS

**to the Acies Board of Directors, any security holder or any other person as to how to act or vote or make any election with respect to any matter relating to the Business Combination and the related transactions, including, without limitation, whether holders of Acies Class A ordinary shares should redeem their shares or whether any party should participate in the PIPE Investment.**

In connection with its opinion, Houlihan Lokey made such reviews, analyses and inquiries as it deemed necessary and appropriate under the circumstances. Among other things, Houlihan Lokey:

- reviewed a draft, dated January 26, 2021, of the Merger Agreement;

- reviewed certain publicly available business and financial information relating to Acies and PLAYSTUDIOS that Houlihan Lokey deemed to be relevant;

- reviewed certain information relating to the historical, current and future operations, financial condition and prospects of PLAYSTUDIOS made available to Houlihan Lokey by PLAYSTUDIOS and Acies, including financial projections prepared by the management of PLAYSTUDIOS relating to PLAYSTUDIOS (the "Projections");

- spoke with certain members of the managements of Acies and PLAYSTUDIOS and certain of their respective representatives and advisors regarding the business, operations, financial condition and prospects of PLAYSTUDIOS, the Transactions and related matters;

- compared the financial and operating performance of PLAYSTUDIOS with that of companies with publicly traded equity securities that Houlihan Lokey deemed to be relevant;

- considered the publicly available financial terms of certain transactions that Houlihan Lokey deemed to be relevant; and

- conducted such other financial studies, analyses and inquiries and considered such other information and factors as Houlihan Lokey deemed appropriate.

Houlihan Lokey relied upon and assumed, without independent verification, the accuracy and completeness of all data, material and other information furnished, or otherwise made available, to it, discussed with or reviewed by it, or publicly available, and did not assume any responsibility with respect to such data, material and other information. In addition, at Acies' direction, Houlihan Lokey assumed that the Projections were reasonably prepared in good faith on bases reflecting the best currently available estimates and judgments of the management of PLAYSTUDIOS as to the future financial results and condition of PLAYSTUDIOS. At Acies' direction, Houlihan Lokey assumed that the Projections provided a reasonable basis on which to evaluate PLAYSTUDIOS and the Transactions and Houlihan Lokey, at Acies' direction, used and relied upon the Projections for purposes of its analyses and opinion. In reaching its conclusions, Houlihan Lokey did not rely upon a discounted cash flow analysis of PLAYSTUDIOS, because as Acies advised Houlihan Lokey, long-term forecasts with respect to the future financial performance of PLAYSTUDIOS reflecting the best currently available estimates and judgments of the management of PLAYSTUDIOS were available only for the years ending December 31, 2021 and 2022. Houlihan Lokey expressed no view or opinion with respect to the Projections or the assumptions on which they were based. For purposes of its financial analyses and opinion, with Acies' consent, Houlihan Lokey (i) did not perform any financial analyses to evaluate the value of Acies or to derive valuation references ranges for any shares of Acies for purposes of comparison with the Aggregate Closing Merger Consideration or otherwise, and (ii) assumed that the value of each share of New PLAYSTUDIOS common stock (including, without limitation, each share of New PLAYSTUDIOS Class A common stock and each share of New PLAYSTUDIOS Class B common stock was equal to the original issue price per Acies Class A ordinary share (which Acies advised Houlihan Lokey was $10.00 per share), notwithstanding the different voting rights and other non-financial terms of such shares that could impact their value. Houlihan Lokey relied upon and assumed, without independent verification, that there had been no change in the business, assets, liabilities, financial condition, results of operations, cash flows or prospects of PLAYSTUDIOS or Acies since the respective dates of the most recent financial statements and other information, financial or otherwise, provided to Houlihan Lokey that would be material to its analyses or opinion, and that there was no information or any facts that would make any of the information reviewed by Houlihan Lokey incomplete or misleading. In addition, at Acies' direction Houlihan Lokey assumed that, based on the stated value per share of Acies ordinary shares of $10.00 set forth in the Merger Agreement, the aggregate value of the Aggregate Closing Merger Consideration was equal to $1,041,000,000, less (i) the aggregate amount payable

126

TABLE OF CONTENTS

in the First Merger in respect of options to purchase PLAYSTUDIOS common stock, and (ii) the aggregate implied value of the warrants to purchase shares of New PLAYSTUDIOS common stock issued in the First Merger in exchange for warrants to purchase shares of PLAYSTUDIOS capital stock.

Houlihan Lokey relied upon and assumed, without independent verification, that (a) the representations and warranties of all parties to the Merger Agreement and all other related documents and instruments referred to therein were true and correct, (b) each party to the Merger Agreement and such other related documents and instruments would fully and timely perform all of the covenants and agreements required to be performed by such party, (c) all conditions to the consummation of the Transactions would be satisfied without waiver thereof, and (d) Transactions would be consummated in a timely manner in accordance with the terms described in the Merger Agreement and such other related documents and instruments, without any amendments or modifications thereto. Houlihan Lokey also assumed, with Acies' consent, that the First Merger and the Second Merger, taken together, would qualify as a reorganization under the provisions of Section 368(a) of the Internal Revenue Code. Houlihan Lokey relied upon and assumed, without independent verification, that (i) the Transactions would be consummated in a manner that complies in all respects with all applicable foreign, federal, state and local statutes, rules and regulations, and (ii) all governmental, regulatory, and other consents and approvals necessary for the consummation of the Transactions would be obtained and that no delay, limitations, restrictions or conditions would be imposed or amendments, modifications or waivers made that would result in the disposition of any assets of PLAYSTUDIOS or Acies, or otherwise have an effect on the Transactions, PLAYSTUDIOS or Acies or any expected benefits of the Transactions that would be material to its analyses or opinion. In addition, Houlihan Lokey relied upon and assumed, without independent verification, that the final form of the Merger Agreement would not differ in any respect from the draft of the Merger Agreement identified above.

Furthermore, in connection with its opinion, Houlihan Lokey was not requested to, and did not, make any physical inspection or independent appraisal or evaluation of any of the assets, properties or liabilities (fixed, contingent, derivative, off-balance-sheet or otherwise) of Acies, PLAYSTUDIOS or any other party, nor was Houlihan Lokey provided with any such appraisal or evaluation. Houlihan Lokey did not estimate, and expressed no opinion regarding, the liquidation value of any entity or business. Houlihan Lokey did not undertake any independent analysis of any potential or actual litigation, regulatory action, possible unasserted claims or other contingent liabilities, to which Acies or PLAYSTUDIOS was or may have been a party or was or may have been subject, or of any governmental investigation of any possible unasserted claims or other contingent liabilities to which Acies or PLAYSTUDIOS was or may have been a party or was or may have been subject.

Houlihan Lokey's opinion was necessarily based on financial, economic, market and other conditions as in effect on, and the information made available to Houlihan Lokey as of, the date of the opinion. As Acies was aware, the credit, financial and stock markets had been experiencing unusual volatility and Houlihan Lokey expressed no opinion or view as to any potential effects of such volatility on the Transactions, and its opinion did not purport to address potential developments in any such markets. Furthermore, as Acies was aware, there was significant uncertainty as to the potential direct and indirect business, financial, economic and market implications and consequences of the spread of the coronavirus and associated illnesses and the actions and measures that countries, central banks, international financing and funding organizations, stock markets, businesses and individuals may take to address the spread of the coronavirus and associated illnesses including, without limitation, those actions and measures pertaining to fiscal or monetary policies, legal and regulatory matters and the credit, financial and stock markets (collectively, the "Pandemic Effects"), and the Pandemic Effects could have a material impact on Houlihan Lokey's analyses and opinion. Houlihan Lokey did not undertake, and is under no obligation, to update, revise, reaffirm or withdraw its opinion, or otherwise comment on or consider events occurring or coming to its attention after the date of the opinion.

Houlihan Lokey was not requested to, and did not, (a) initiate or participate in any discussions or negotiations with, or solicit any indications of interest from, third parties with respect to the Transactions, the securities, assets, businesses or operations of Acies, PLAYSTUDIOS or any other party, or any alternatives to the Transactions, (b) negotiate the terms of the Transactions, (c) advise the Acies Board of Directors, Acies or any other party with respect to alternatives to the Transactions, or (d) identify, introduce to the Acies Board of Directors, Acies or any other party, or screen for creditworthiness, any prospective investors, lenders or other participants in the Transaction. Houlihan Lokey did not express any opinion as to what the value of the New PLAYSTUDIOS Class A common stock or New PLAYSTUDIOS Class B common

127

TABLE OF CONTENTS

stock actually would be when issued in the Transactions pursuant to the Merger Agreement or the price or range of prices at which the ordinary shares or PLAYSTUDIOS capital stock may be purchased or sold, or otherwise be transferable, at any time.

Houlihan Lokey's opinion was furnished for the use of the Acies board in its capacity as such in connection with its evaluation of the Transactions and may not be used for any other purpose without Houlihan Lokey's prior written consent. Houlihan Lokey's opinion was not intended to be, and does not constitute, a recommendation to the Acies board, Acies, any security holder or any other party as to how to act or vote or make any election with respect to any matter relating to the Transactions or otherwise, including, without limitation, whether holders of Acies Class A ordinary shares should redeem their shares or whether any party should participate in the PIPE Investment.

Houlihan Lokey was not requested to opine as to, and its opinion did not express an opinion as to or otherwise address, among other things: (i) the underlying business decision of the Acies Board of Directors, Acies, its security holders or any other party to proceed with or effect Transactions, (ii) the terms of any arrangements, understandings, agreements or documents related to, or the form, structure or any other portion or aspect of, the Transactions or otherwise (other than the Aggregate Closing Merger Consideration to the extent expressly specified in the opinion), including, without limitation, the Earnout Shares, the Domestication, the PIPE Investment, the Second Merger, or the transactions contemplated by the Sponsor Support Agreement, (iii) the fairness of any portion or aspect of the Transactions to the holders of any class of securities, creditors or other constituencies of Acies, or to any other party, except if and only to the extent expressly set forth in the last sentence of the opinion, (iv) the relative merits of the Transactions as compared to any alternative business strategies or transactions that might have been available for Acies or any other party, (v) the fairness of any portion or aspect of the Transactions to any one class or group of Acies' or any other party's security holders or other constituents vis-à-vis any other class or group of Acies' or such other party's security holders or other constituents (including, without limitation, the allocation of any consideration amongst or within such classes or groups of security holders or other constituents), (vi) the appropriate capital structure of Acies, whether Acies should be issuing debt or equity securities or a combination of both in the Transaction, or the form, structure or any aspect or terms of any debt or equity financing for the Transaction (including, without limitation, the PIPE Investment) or the likelihood of obtaining such financing, (vii) the allocation of the Aggregate Closing Merger Consideration, (viii) the acquisition by the Founder Group, as a result of the receipt by the Founder Group of shares of Acies Class B ordinary shares in the Transactions, of a controlling interest in Acies, (ix) whether or not Acies, PLAYSTUDIOS, their respective security holders or any other party is receiving or paying reasonably equivalent value in the Transactions, (x) the solvency, creditworthiness or fair value of Acies, PLAYSTUDIOS or any other participant in the Transactions, or any of their respective assets, under any applicable laws relating to bankruptcy, insolvency, fraudulent conveyance or similar matters, or (xi) the fairness, financial or otherwise, of the amount, nature or any other aspect of any compensation to or consideration payable to or received by any officers, directors or employees of any party to the Transactions, any class of such persons or any other party, relative to the Aggregate Closing Merger Consideration or otherwise. Furthermore, Houlihan Lokey did not express any opinion, counsel or interpretation regarding matters that require legal, regulatory, environmental, accounting, insurance, tax or other similar professional advice. Houlihan Lokey assumed that such opinions, counsel or interpretations had been or would be obtained from the appropriate professional sources. Furthermore, Houlihan Lokey relied, with the consent of the Acies board, on the assessments by the Acies board, Acies, PLAYSTUDIOS and their respective advisors, as to all legal, regulatory, environmental, accounting, insurance, tax and other similar matters with respect to Acies, PLAYSTUDIOS and the Transactions or otherwise.

In performing its analyses, Houlihan Lokey considered general business, economic, industry and market conditions, financial and otherwise, and other matters as they existed on, and could be evaluated as of, the date of its opinion. No company, transaction or business used in Houlihan Lokey's analyses for comparative purposes is identical to PLAYSTUDIOS or the proposed Business Combination and an evaluation of the results of those analyses is not entirely mathematical. The estimates contained in the Projections and the implied reference range values indicated by Houlihan Lokey's analyses are not necessarily indicative of actual values or predictive of future results or values, which may be significantly more or less favorable than those suggested by the analyses. In addition, any analyses relating to the value of assets, businesses or securities do not purport to be appraisals or to reflect the prices at which businesses or securities actually may be sold, which may depend on a variety of factors, many of which are beyond the control of

128

044

Acies or PLAYSTUDIOS. Much of the information used in, and accordingly the results of, Houlihan Lokey's analyses are inherently subject to substantial uncertainty.

Houlihan Lokey's opinion was only one of many factors considered by the Acies Board of Directors in evaluating the proposed Business Combination. Neither Houlihan Lokey's opinion nor its analyses were determinative of the Aggregate Merger Consideration or of the views of the Acies Board of Directors or management with respect to the Transactions or the Merger Consideration. The type and amount of consideration payable in the Transactions were determined through negotiation between Acies and the PLAYSTUDIOS, and the decision to enter into the Merger Agreement was solely that of the Acies Board of Directors.

### *Financial Analyses*

In preparing its opinion to the Acies Board of Directors, Houlihan Lokey performed a variety of analyses, including those described below. The summary of Houlihan Lokey's analyses is not a complete description of the analyses underlying Houlihan Lokey's opinion. The preparation of such an opinion is a complex process involving various quantitative and qualitative judgments and determinations with respect to the financial, comparative and other analytical methods employed and the adaptation and application of these methods to the unique facts and circumstances presented. As a consequence, neither Houlihan Lokey's opinion nor its underlying analyses is readily susceptible to summary description. Houlihan Lokey arrived at its opinion based on the results of all analyses undertaken by it and assessed as a whole and did not draw, in isolation, conclusions from or with regard to any individual analysis, methodology or factor. While the results of each analysis were taken into account in reaching Houlihan Lokey's overall conclusion with respect to fairness, Houlihan Lokey did not make separate or quantifiable judgments regarding individual analyses. Accordingly, Houlihan Lokey believes that its analyses and the following summary must be considered as a whole and that selecting portions of its analyses, methodologies and factors, without considering all analyses, methodologies and factors, could create a misleading or incomplete view of the processes underlying Houlihan Lokey's analyses and opinion.

The following is a summary of the material financial analyses performed by Houlihan Lokey in connection with the preparation of its opinion and reviewed with the Acies Board of Directors on January 31, 2021. The order of the analyses does not represent relative importance or weight given to those analyses by Houlihan Lokey. The analyses summarized below include information presented in tabular format. The tables alone do not constitute a complete description of the analyses. Considering the data in the tables below without considering the full narrative description of the analyses, as well as the methodologies underlying, and the assumptions, qualifications and limitations affecting, each analysis, could create a misleading or incomplete view of Houlihan Lokey's analyses.

For purposes of its analyses, Houlihan Lokey reviewed a number of financial metrics, including:

- Enterprise Value—generally, the value as of a specified date of the relevant company's outstanding equity securities (taking into account outstanding options and other securities convertible, exercisable or exchangeable into or for equity securities of the company) plus the amount of its net debt (the amount of its outstanding indebtedness, non-convertible preferred stock, capital lease obligations and non-controlling interests less the amount of cash and cash equivalents on its balance sheet).

- Adjusted EBITDA—generally, the amount of the relevant company's earnings before interest, taxes, depreciation and amortization for a specified time period, adjusted for certain non-recurring items with stock-based compensation treated as a cash expense.

Unless the context indicates otherwise, enterprise values and equity values used in the selected companies analysis described below were calculated using the closing prices of the common stock of the selected companies listed below as of January 28, 2021, and transaction values for the selected transactions analysis described below were calculated on an enterprise value basis based on the value of the proposed consideration in the selected transactions. The estimates of the future financial performance of PLAYSTUDIOS relied upon for the financial analyses described below were based on the Projections, and estimates of the future financial performance of the selected companies listed below were based on publicly available research analyst estimates for those companies.

*Implied Transaction Equity Value.*   For purposes of its financial analyses, with Acies' consent, Houlihan Lokey assumed that the value of each share of New PLAYSTUDIOS common stock to be issued

129

045

TABLE OF CONTENTS

in the First Merger was equal to the original issue price of the Acies Class A ordinary shares, which Acies advised Houlihan Lokey was $10.00 per share. In addition, for purposes of its financial analyses, Houlihan Lokey evaluated the Aggregate Closing Merger Consideration based on the implied transaction equity value of $1,041 million as directed by Acies and provided by the Merger Agreement (and based on the assumed value per share of New PLAYSTUDIOS common stock being equal to the stated value per share of Acies ordinary shares of $10.00 set forth in the Merger Agreement). The implied transaction equity value is comprised of the aggregate implied value of the Aggregate Closing Merger Consideration, the aggregate amount payable at closing for options to purchase PLAYSTUDIOS Common Stock, and the aggregate implied value of the warrants to purchase shares of New PLAYSTUDIOS Class A common stock issued in the First Merger in exchange for warrants to purchase shares of New PLAYSTUDIOS capital stock. The implied transaction equity value excludes the value of any Earnout Shares, as to which Houlihan Lokey, with Acies' consent, expressed no view or opinion.

*Selected Companies Analysis.*  Houlihan Lokey reviewed certain financial data for selected companies with publicly traded equity securities, that Houlihan Lokey deemed relevant.

The financial data reviewed included:

- Enterprise value as a multiple of estimated fiscal year 2021, or "FY 2021E," revenue;

- Enterprise value as a multiple of estimated fiscal year 2022, or "FY 2022E," revenue; and

- Enterprise value as a multiple of estimated FY 2022E Adjusted EBITDA.

The selected companies and corresponding financial data included the following:

| Selected Company | Enterprise Value to Revenue | | Enterprise Value to Adj. EBITDA |
|---|---|---|---|
| | FY 2021E | FY 2022E | FY 2022E |
| Social Casino Companies | | | |
| Playtika Holding Corp.[1] | NA | NA | NA |
| SciPlay Corporation | 3.68x | 3.52x | 11.0x |
| Skillz Inc. | NMF | 22.03x | NMF |
| Casual Gaming Companies | | | |
| Glu Mobile Inc. | 2.19x | 1.95x | 11.1x |
| MAG Interactive AB | 2.88x | 2.60x | 12.7x |
| Rovio Entertainment Oyj | 1.39x | 1.35x | 8.9x |
| Stillfront Group AB | 5.33x | 4.76x | 11.3x |
| Team17 Group PLC | 11.57x | 10.57x | 27.9x |
| Zynga Inc. | 4.14x | 3.88x | 15.9x |

(1)  Applicable equity research and consensus estimates were not available for Playtika Holding Corp. as of the date of Houlihan Lokey's opinion. Playtika Holding Corp.'s enterprise value as a multiple of revenue and adjusted EBITDA for the last twelve months were 6.1x and 17.1x, respectively.

"NA" refers to data not available.

"NMF" refers to not meaningful figure.

Taking into account the results of the selected companies analysis, Houlihan Lokey applied selected multiple ranges of 3.00x to 3.50x estimated FY 2021E revenue, 2.25x to 3.00x estimated FY 2022E revenue and 11.5x to 13.5x estimated FY 2022E Adjusted EBITDA to corresponding financial data for PLAYSTUDIOS. The selected companies analysis indicated implied total equity value reference ranges for PLAYSTUDIOS of $994.4 million to $1,158.4 million based on estimated FY 2021E revenue, $989.7 million to $1,316.1 million based on estimated FY 2022E revenue, and $979.3 million to $1,147.7 million based on estimated FY 2022E Adjusted EBITDA, in each case as compared to the implied total equity value for the Transaction of $1,041.0 million, excluding the Earnout Shares.

*Selected Transactions Analysis.*  Houlihan Lokey considered certain financial terms of certain transactions involving target companies that Houlihan Lokey deemed relevant. The financial data reviewed included transaction value as a multiple of revenue for the last twelve months, or "LTM Revenue."

046

The selected transactions and corresponding financial data included the following:

| Announced | Target | Acquiror | Transaction Value / LTM Revenue |
|---|---|---|---|
| Social Casino Transactions | | | |
| 9/2020 | Skillz Inc | Flying Eagle Acquisition Corp. | 24.28x |
| 11/2017 | Big Fish Games, Inc. | Aristocrat Technologies, Inc | 2.16x |
| 8/2017 | Plarium Global Ltd. | Aristocrat Leisure Limited | 2.49x |
| 4/2017 | Double Down Interactive, LLC | DoubleUGames Co., Ltd | NA |
| 7/2016 | Playtika Ltd. | Investor Group | 6.07x |
| Casual Gaming Transactions | | | |
| 6/2020 | Peak Oyun Yazilim ve Pazarlama AS | Zynga Inc. | 3.08x |
| 1/2020 | Storm8, Inc. | Stillfront Group AB | 2.51x |
| 12/2018 | Small Giant Games Oy | Zynga Inc. | 9.28x |
| 12/2017 | Altigi GmbH | Stillfront Group AB | 2.86x |
| 2/2017 | Social Point S.L. | Take-Two Invest Espana, S.L. | 3.08x |
| 1/2017 | Outfit7 Investments Limited | Zhejiang Jinke Entertainment Culture Co., Ltd. (nka:Zhejiang Jinke Culture) | 9.23x |
| 7/2016 | TinyCo, Inc. | SGN Games, Inc. (nka:Jam City, Inc.) | NA |
| 6/2016 | Supercell Oy | Tencent Holdings Limited | 4.44x |
| 2//2016 | GameLoft SE | Vivendi SA | 2.66x |

"NA" refers to data not available.

Taking into account the results of the selected transactions analysis, Houlihan Lokey applied selected multiple ranges of 3.50x to 4.25x LTM revenue to PLAYSTUDIOS' estimated FY 2020E revenue. The selected transactions analysis indicated any implied total equity value reference range for PLAYSTUDIOS of $954.7 million to $1,157.0 million, as compared to the implied total equity value for the Transactions of $1,041.0 million, excluding the Earnout Shares.

*Other Matters*

Houlihan Lokey was engaged by Acies to provide an opinion to the Acies Board of Directors as to as to the fairness, from a financial point of view, to Acies of the Aggregate Closing Merger Consideration to be issued and paid by Acies in the First Merger pursuant to the Merger Agreement. Houlihan Lokey engaged Houlihan Lokey based on Houlihan Lokey's experience and reputation. Houlihan Lokey is regularly engaged to render financial opinions in connection with mergers, acquisitions, divestitures, leveraged buyouts, and for other purposes. Pursuant to its engagement by Acies, Houlihan Lokey will be entitled to an aggregate fee of $400,000 for its services, of which $150,000 became payable upon the delivery of Houlihan Lokey's opinion and the balance of which is contingent upon the completion of the First Merger. Acies has also agreed to reimburse Houlihan Lokey for certain expenses and to indemnify Houlihan Lokey, its affiliates and certain related parties against certain liabilities and expenses, including certain liabilities under the federal securities laws, arising out of or related to Houlihan Lokey's engagement.

In the ordinary course of business, certain of Houlihan Lokey's employees and affiliates, as well as investment funds in which they may have financial interests or with which they may co-invest, may acquire,

047

TABLE OF CONTENTS

hold or sell, long or short positions, or trade, in debt, equity, and other securities and financial instruments (including loans and other obligations) of, or investments in, Acies, PLAYSTUDIOS or any other party that may be involved in the Transactions and their respective affiliates or security holders or any currency or commodity that may be involved in the Transactions.

Houlihan Lokey and certain of its affiliates may provide investment banking, financial advisory and/or other financial or consulting services to Acies, the Sponsor, PLAYSTUDIOS, other participants in the Transactions, or certain of their respective affiliates or security holders in the future, for which Houlihan Lokey and such affiliates may receive compensation. Furthermore, in connection with bankruptcies, restructurings, distressed situations and similar matters, Houlihan Lokey and certain of its affiliates may have in the past acted, may currently be acting and may in the future act as financial advisor to debtors, creditors, equity holders, trustees, agents and other interested parties (including, without limitation, formal and informal committees or groups of creditors) that may have included or represented and may include or represent, directly or indirectly, or may be or have been adverse to, Acies, the Sponsor, PLAYSTUDIOS, other participants in the Transactions or certain of their respective affiliates or security holders, for which advice and services Houlihan Lokey and its affiliates have received and may receive compensation.

### Projected Financial Information

PLAYSTUDIOS provided Acies with certain financial projections for each of the years in the three-year period ending December 31, 2022. PLAYSTUDIOS does not, as a matter of general practice, publicly disclose long-term forecasts or internal projections of their future performance, revenue, financial condition or other results. The PLAYSTUDIOS forecasts were prepared solely for internal use by Acies and not with a view toward public disclosure, the published guidelines of the SEC regarding projections or the guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of prospective financial information. The financial projections were prepared in good faith by PLAYSTUDIOS management based on estimates and assumptions they believed were reasonable with respect to the expected future financial performance of PLAYSTUDIOS at the time the financial projections were prepared and the financial projections speak only as of that time.

The financial projections were developed by PLAYSTUDIOS' management and considered various material assumptions, including, but not limited to, the following:

- PLAYSTUDIOS' games will continue to be available on the current third-party platforms (Apple App Store, Google Play Store, Amazon Appstore and Facebook), and that current platform fees remain unchanged;

- no material acquisitions or divestures will occur;

- demand for social casino mobile games will continue to grow in line with recent years;

- revenue per game will grow based on historical performance and available information regarding market trends, including with respect to offerings by competitors;

- a new game, Kingdom Boss, which began development in 2020, will launch as expected in the second half of 2021;

- PLAYSTUDIOS Adjusted EBITDA is expected to be lower in 2021 due to the impact of significant development and user acquisition expenses related to the launch of new games; these significant expenses are not forecasted to continue into 2022 as the new games reach scale and achieve normalized performance levels, and no other games are expected to undergo comparable development expenses in 2022; and

- other general business and market assumptions, including the historical performance of PLAYSTUDIOS, economic and market growth consistent with recent years and other future prospects of PLAYSTUDIOS.

The inclusion of financial projections in this proxy statement/prospectus should not be regarded as an indication that Acies, our board of directors, or their respective affiliates, advisors or other representatives considered, or now considers, such financial projections necessarily to be predictive of actual future results or to support or fail to support your decision whether to vote for or against the Business Combination Proposal. The financial projections are not fact and should not be relied upon as being necessarily indicative

132

048

of future results, and readers of this proxy statement/prospectus, including investors or holders, are cautioned not to place undue reliance on this information. You are cautioned not to rely on the projections in making a decision regarding the transaction, as the projections may be materially different than actual results. New PLAYSTUDIOS will not refer back to the financial projections in its future periodic reports filed under the Exchange Act.

The financial projections should not be viewed as public guidance. Furthermore, the financial projections do not take into account any circumstances or events occurring after the date on which the financial projections were finalized, which was November 13, 2020. The financial projections reflect numerous estimates and assumptions with respect to general business, economic, regulatory, market and financial conditions and other future events, as well as matters specific to PLAYSTUDIOS' business, all of which are difficult to predict and many of which are beyond PLAYSTUDIOS' and Acies' control. The financial projections are forward-looking statements that are inherently subject to significant uncertainties and contingencies, many of which are beyond PLAYSTUDIOS' control. The various risks and uncertainties include those set forth in the "*Risk Factors*," "*PLAYSTUDIOS' Management's Discussion and Analysis of Financial Condition and Results of Operations*" and "*Cautionary Note Regarding Forward-Looking Statements*" sections of this proxy statement/prospectus, respectively. As a result, there can be no assurance that the projected results will be realized or that actual results will not be significantly higher or lower than projected. Since the financial projections cover multiple years, such information by its nature becomes less reliable with each successive year. These financial projections are subjective in many respects and, thus, are susceptible to multiple interpretations and periodic revisions based on actual experience and business developments.

The financial projections have not been audited. None of PLAYSTUDIOS' independent registered accounting firm, Acies' independent registered accounting firm or any other independent accountants, have compiled, examined or performed any procedures with respect to the financial projections included below, nor have they expressed any opinion or any other form of assurance on such information or their achievability, and they assume no responsibility for, and disclaim any association with, the financial projections. Nonetheless, a summary of the financial projections is provided in this proxy statement/prospectus because they were made available to Acies and our board of directors in connection with their review of the proposed transaction.

PLAYSTUDIOS has not warranted the accuracy, reliability, appropriateness or completeness of the financial projections to anyone, including Acies. Neither PLAYSTUDIOS nor any of its representatives has made or makes any representations to any person regarding the ultimate performance of PLAYSTUDIOS relative to the financial projections. The financial projections are not included in this proxy statement/prospectus in order to induce any Acies shareholders to vote in favor of any of the proposals at the Extraordinary General Meeting.

You are encouraged to review the financial statements of PLAYSTUDIOS included in this proxy statement/prospectus, as well as the financial information in the sections entitled "*PLAYSTUDIOS Management's Discussion and Analysis of Financial Condition and Results of Operations*" and "*Unaudited Pro Forma Condensed Combined Financial Information*" in this proxy statement/prospectus, and to not rely on any single financial measure.

The key elements of the projections provided by management of PLAYSTUDIOS to Acies are summarized in the table below:

| (US$ in millions) | 2020E[2] | 2021E[3] | 2022E[4] |
|---|---|---|---|
| Revenue | $269.8 | $328.0 | $435.2 |
| Cost of Sales | 91.2 | 102.2 | 128.4 |
| User Acquisition | 50.1 | 94.3 | 103.4 |
| All other expenses | 96.0 | 109.7 | 113.5 |
| Adjusted EBITDA[1] | 32.4 | 21.8 | 89.9 |

(1)    Adjusted EBITDA is defined as net income before interest, income taxes, depreciation and amortization, restructuring and related costs (consisting primarily of severance and other restructuring related costs), stock-based compensation expense, and other income and expense items (including special

133

TABLE OF CONTENTS

infrequent items, foreign currency gains and losses, and other non-cash items) and adjusting for the impact of costs capitalized for internal-use software projects.

(2)  2020E represents approximate estimated results for the 2020 fiscal year.

(3)  2021E represents approximate estimated results for the 2021 fiscal year.

(4)  2022E represents approximate estimated results for the 2022 fiscal year.

EXCEPT TO THE EXTENT REQUIRED BY APPLICABLE FEDERAL SECURITIES LAWS, BY INCLUDING IN THIS PROXY STATEMENT/PROSPECTUS A SUMMARY OF THE FINANCIAL PROJECTIONS FOR PLAYSTUDIOS, ACIES UNDERTAKES NO OBLIGATIONS AND EXPRESSLY DISCLAIMS ANY RESPONSIBILITY TO UPDATE OR REVISE, OR PUBLICLY DISCLOSE ANY UPDATE OR REVISION TO, THESE FINANCIAL PROJECTIONS TO REFLECT CIRCUMSTANCES OR EVENTS, INCLUDING UNANTICIPATED EVENTS, THAT MAY HAVE OCCURRED OR THAT MAY OCCUR AFTER THE PREPARATION OF THESE FINANCIAL PROJECTIONS, EVEN IN THE EVENT THAT ANY OR ALL OF THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS ARE SHOWN TO BE IN ERROR OR CHANGE.

**Satisfaction of 80% Test**

It is a requirement under the Nasdaq listing requirements that any business acquired by Acies have a fair market value equal to at least 80% of the balance of the funds in the Trust Account at the time of the execution of a definitive agreement for an initial business combination. Based on the financial analysis of PLAYSTUDIOS generally used to approve the transaction, the Acies Board of Directors determined that this requirement was met. The Acies Board of Directors determined that the consideration being paid in the Business Combination, which amount was negotiated at arms-length, were fair to and in the best interests of Acies and its shareholders and appropriately reflected PLAYSTUDIOS' value. In reaching this determination, Acies Board of Directors concluded that it was appropriate to base such valuation in part on qualitative factors, such as management strength and depth, competitive positioning, customer relationships, and technical skills, as well as quantitative factors, such as its potential for future growth in revenue and profits. Acies Board of Directors believes that the financial skills and background of its members qualify it to conclude that the acquisition of PLAYSTUDIOS met this requirement.

**Interests of Acies' Directors and Executive Officers in the Business Combination**

When you consider the recommendation of Acies Board of Directors in favor of approval of the Business Combination Proposal, you should keep in mind that the Sponsor and Acies' directors and executive officers have interests in such proposal that are different from, or in addition to, those of Acies shareholders and warrant holders generally. These interests include, among other things, the interests listed below:

• Prior to Acies' IPO, the Sponsor purchased 8,625,000 Acies Class B ordinary shares for an aggregate purchase price of $25,000, or approximately $0.003 per share, and subsequently the Sponsor cancelled an aggregate of 2,875,000 Sponsor Shares, thereby reducing the aggregate number of Sponsor Shares held by our sponsor to 5,750,000 for approximately $0.004 per share. As a result of the underwriters' election to partially exercise their over-allotment option on November 9, 2020, 368,750 Sponsor Shares were forfeited, resulting in an aggregate of 5,381,250 Sponsor Shares issued and outstanding. Simultaneously with the closing of the IPO, the Sponsor purchased 4,333,333 private placement warrants at a price of $1.50 per private placement warrant. Subsequently, on November 9, 2020, in connection with the underwriters' election to partially exercise their over-allotment option, the Company sold an additional 203,334 Private Placement Warrants to the Sponsor, at a price of $1.50 per Private Placement Warrant, resulting in an aggregate of 4,536,667 private placement warrants issued and outstanding. If Acies does not consummate a Business Combination by October 22, 2022, (or if such date is extended at a duly called extraordinary general meeting, such later date), it would cease all operations except for the purpose of winding up, redeeming all of the outstanding public shares for cash and, subject to the approval of its remaining shareholders and its Board, dissolving and liquidating, subject in each case to its obligations under the Cayman Islands Companies Act to provide for claims of creditors and the requirements of other applicable law. In such event, the 5,381,250 Acies Class B ordinary shares owned by the Sponsor would be worthless

134

**DIRECTOR ELECTION PROPOSAL**

**Overview**

**The Director Election Proposal**—Assuming the Business Combination Proposal, the Domestication Proposal and each of the Organizational Documents Proposals are approved, Acies' shareholders are also being asked to approve by ordinary resolution the Director Election Proposal to consider and vote upon a proposal to approve by ordinary resolution, to elect six directors who, upon consummation of the Business Combination, will be the directors of New PLAYSTUDIOS.

**Nominees**

As contemplated by the Merger Agreement, the New PLAYSTUDIOS Board of Directors following consummation of the transaction will consist of six directors:

1.  Andrew Pascal, the Chief Executive Officer of PLAYSTUDIOS;

2.  James Murren, a director designated by Acies, who qualifies as "independent" under applicable SEC and Exchange rules and who has been accepted by PLAYSTUDIOS; and

3.  Four directors designated by PLAYSTUDIOS who will initially be William (Bill) J. Hornbuckle, Joe Horowitz, Jason Krikorian and Judy K. Mencher, and will thereafter be designated, nominated and elected as contemplated by the Proposed Organizational Documents.

Accordingly, our board of directors has nominated each of Mr. Pascal, Mr. Murren, Mr. Hornbuckle, Mr. Horowitz, Mr. Krikorian and Ms. Mencher to serve as our directors upon the consummation of the Business Combination, with Mr. Pascal to serve as the Chairperson of the board of directors, in each case, in accordance with the terms and subject to the conditions of the Proposed Organizational Documents. For more information on the experience of each of these director nominees, please see the section titled "*Management of New PLAYSTUDIOS Following the Business Combination*" of this proxy statement/prospectus.

**Vote Required for Approval**

The approval of the Director Election Proposal requires an ordinary resolution under the Cayman Islands Companies Act, being the affirmative vote of a majority of the holders of the Acies Class B ordinary shares, which under the terms of the Cayman Constitutional Documents and being the only ones entitled to vote on the election of directors to our board of directors. Abstentions and broker non-votes, while considered present for the purposes of establishing a quorum, will not count as votes cast at the Extraordinary General Meeting.

The Director Election Proposal is conditioned on the approval of each of the Condition Precedent Proposals. Therefore, if each of the Condition Precedent Approvals is not obtained, the Director Election Proposal will have no effect, even if approved by holders of ordinary shares.

**Resolution**

The full text of the resolution to be passed is as follows:

"**RESOLVED,** as an ordinary resolution, that the persons named below be elected to serve on the New PLAYSTUDIOS Board of Directors upon the consummation of the Business Combination."

| Name of Director |
| --- |
| Andrew Pascal |
| William (Bill) J. Hornbuckle |
| Joe Horowitz |
| Jason Krikorian |
| Judy K. Mencher |
| James Murren |

051

**Directors and Executive Officers**

Acies' current directors and officers are as follows:

| Name | Age | Position |
| --- | --- | --- |
| James J. Murren | 59 | Chairman |
| Daniel Fetters | 42 | Co-Chief Executive Officer |
| Edward King | 46 | Co-Chief Executive Officer |
| Christopher Grove | 44 | Executive Vice President of Acquisitions |
| Zach Leonsis | 32 | Director |
| Brisa Carleton | 41 | Director |
| Andrew Zobler | 59 | Director |
| Sam Kennedy | 47 | Director |

**James Murren** has served as Chairman of our board of directors since August 2020. Mr. Murren is also the Chair of the Nevada COVID-19 Response, Relief and Recovery Task Force. He was the chair of the Leadership Board of the University of Southern California's Keck School of Medicine and has been a member of the Board of Trustees for Howard University since 2016. Mr. Murren first joined MGM Resorts International in 1998 as the Chief Financial Officer and served as the Chairman and CEO of MGM Resorts International from December 2008 to February 2020. He also served as Chairman of the American Gaming Association from 2014 to 2017, was on the Board of Trustees of the Brookings Institution from 2011 to 2018, served on the National Infrastructure Advisory Council from December 2013 to 2020, and served as a director of Delta Petroleum Corporation from February 2008 to November 2011. Mr. Murren co-founded the Nevada Cancer Institute, which was the official cancer institute for the state of Nevada until 2013, and served as a director from 2002 to 2012. Mr. Murren is also a founding contributor to Nevada's first Fisher House, which provides housing for military and Veterans' families, which was founded in February 2016. He also served as a member of the Business Roundtable, an association of CEOs of leading U.S. companies. Mr. Murren received his Bachelor of Arts from Trinity College. He is a CFA® charterholder. We believe Mr. Murren's significant leadership experience makes him well qualified to serve as Chairman of our board of directors.

**Daniel Fetters** has served as our Co-Chief Executive Officer since August 2020. Previously, Mr. Fetters spent 20 years at Morgan Stanley from July 2000 to September 2020. Mr. Fetters served as a Managing Director in Morgan Stanley's Mergers and Acquisition Group and became the Head of Western Region M&A in 2017, a position he held until his retirement in September 2020. Prior to his move to Los Angeles in 2005, Mr. Fetters spent five years with Morgan Stanley in New York focused on the Media & Communications sectors in both a financing and M&A capacity. Mr. Fetters received a B.S. in Business Administration from the Haas School of Business at the University of California, Berkeley.

**Edward King** has served as our Co-Chief Executive Officer since August 2020. Previously, Mr. King spent 20 years at Morgan Stanley, from March 2000 to September 2020, where, since January 2010, he served as Managing Director and Global Head of Gaming Investment Banking. In this capacity, Mr. King provided strategic and financial advice to clients on M&A and helped clients raise debt and equity capital in the public and private markets. Between July 1996 and February 2000, Mr. King was an investment banker at Lehman Brothers, working during this period in their London, Los Angeles and New York offices. Mr. King was a Board Member of the American Gaming Association from January 2014 to December 2015 and from January 2018 to December 2019. Mr. King has been a speaker at G2E, G2E Asia, International Association of Gaming Regulators, International Masters of Gaming Law, and International Association of Gaming Advisors conferences. Mr. King holds M.Phil, MA and BA degrees in economics from Cambridge University, England.

**Chris Grove** has served as our Executive Vice President of Acquisitions since August 2020. Mr. Grove has been a partner at Eilers & Krejcik Gaming since March 2017 and first joined them in December 2014, and is also on the board of FansUnite (FANS.CN). Mr. Grove also co-founded PlayUSA Media in January 2013, which was acquired by Catena Media in 2017. Following the acquisition, he also served as the

218

Acting Director for Catena Media's U.S. division through the completion of the transaction in October 2019. Mr. Grove received his Bachelor of Science and Master of Science degrees from the Illinois State University.

**Zach Leonsis** joined our board upon the effectiveness of the registration statement for Acies' initial public offering in October 2020. Mr. Leonsis has been the senior vice president of strategic initiatives for Monumental Sports & Entertainment since June 2017 and general manager of Monumental Sports Network since February 2016. Mr. Leonsis received his Bachelor of Arts from the University of Pennsylvania and his M.B.A. from Georgetown University. We believe Mr. Leonsis' background makes him well qualified to serve as a director.

**Brisa Carleton** joined our board upon the effectiveness of the registration statement for Acies' initial public offering in October 2020. Ms. Carleton is currently the Chief Executive Officer of Princess Grace Foundation-USA & Grace de Monaco LLC since April 2019 and also serves as a trustee of the Denver Center for the Performing Arts since July 2019 and as an advisor for the American Theater Wing since July 2020 and Selladoor Worldwide since July 2017. Previously, Ms. Carleton served as the Director of Innovation at the John Gore Organization from September 2017 to March 2019 and as the Founder and Chief Executive Officer of ShooWin from September 2015 to December 2017. Ms. Carleton received her Bachelor of Arts from Portland State University and her M.B.A. from the University of Portland. We believe Ms. Carleton's background makes her well qualified to serve as a director.

**Andrew Zobler** joined our board upon the effectiveness of the registration statement for Acies' initial public offering in October 2020. Mr. Zobler has been the Founder & CEO of the Sydell Group, a hospitality company, since October 2005. Prior to founding Sydell Group, Mr. Zobler served as Partner and Chief Investment Officer of André Balazs Properties from January 2003 to October 2005, and as a Principal in the Managing Member of the real estate fund Lazard Freres Real Estate Investors, LLC from May 2000 to January 2003. He joined Lazard from Starwood Hotels & Resorts in 2000, where he served as the Senior Vice President of Acquisitions and Development from April 1998 to May 2000. Before joining Starwood, Mr. Zobler was a partner in the real estate group at the law firm of Greenberg Traurig, LLP in their New York office from January 1997 to April 1998 specializing in hotel transactions. Mr. Zobler received his Bachelor of Arts from SUNY Binghamton and his Juris Doctor degree from Brooklyn Law School. We believe Mr. Zobler's background makes him well qualified to serve as a director.

**Sam Kennedy** joined our board upon the effectiveness of the registration statement for Acies' initial public offering in October 2020. Mr. Kennedy has been the President and Chief Executive Officer of the Boston Red Sox since August 2015 and has been a member of the baseball club's upper management hierarchy since March 2002. He also serves as the Chief Executive Officer of Fenway Sports Management, a sports marketing and sales agency that is a sister company to the Boston Red Sox under the Fenway Sports Group family. Mr. Kennedy also serves on the Beth Israel Deaconess Medical Center Trustee/Advisory Board since October 2016 and the Marketing Committee since September 2016, the Winsor School Board of Trustees since the 2018 academic year, the Dana-Farber's Visiting Committee for Institute Initiatives since February 2016, the BASE's Advisory Committee since October 2017, and the Camp Harbor View Board of Directors since July 2016. Mr. Kennedy received his Bachelor of Arts from Trinity College. We believe Mr. Kennedy's background makes him well qualified to serve as a director.

### Number, Terms of Office and Appointment of Directors and Officers

Acies Board of Directors consists of five members. Prior to our initial business combination, holders of Acies' Sponsor Shares have the right to appoint all of our directors and remove members of the board of directors for any reason, and holders of Acies' public shares do not have the right to vote on the appointment of directors during such time. These provisions of our Cayman Constitutional Documents may only be amended by a special resolution passed by a majority of at least two-thirds of our ordinary shares attending and voting in a general meeting. Each of Acies' directors hold office for a three-year term. Subject to any other special rights applicable to the shareholders, any vacancies on Acies' Board may be filled by the affirmative vote of a majority of the directors present and voting at the meeting of Acies Board of Directors or by a majority of the holders of Acies' ordinary shares (or, prior to Acies' initial business combination, holders of Acies' Sponsor Shares).

219

053

Case 2:22-cv-01159-RFB-NJK    Document 93-1    Filed 12/21/22    Page 55 of 86

**INFORMATION ABOUT PLAYSTUDIOS**

*Unless the context otherwise requires, all references in this section to the "Company," "we," "us," or "our" refer to the business of PLAYSTUDIOS, Inc. and its subsidiaries prior to the consummation of the Business Combination.*

**Business Description**

*For purposes of this section only, "PLAYSTUDIOS," "the Company," "we," "us," and "our" refer to PLAYSTUDIOS, Inc. and its subsidiaries, unless the context otherwise requires.*

**THE POWER OF PLAY**

We are PLAYSTUDIOS and we build award-winning casual games that are among the most popular games available on iTunes and Google Play. Our games, which include myVEGAS Slots, myVEGAS Blackjack, my KONAMI Slots, POP! Slots, myVEGAS Bingo and the soon to be released Kingdom Boss, have been downloaded over 100 million times and were played by 3.7 million monthly active users for the three months ended March 31, 2021. From social slots to casual and role-playing games (RPGs), each game has been thoughtfully crafted for the people who play it. As a result, we've been able to build a loyal and engaged community of players by virtue of our direct development efforts.

But we are not just a game company, because at the heart of every game we create is a powerful, one-of-a-kind loyalty program we call playAWARDS. It sets us apart from other leading game developers and it's our key to building deep and lasting connections with millions of players. Every time players engage with one of our games, they begin earning valuable loyalty points and elevating their playAWARDS status. Once they have accumulated loyalty points, they can unlock a collection of real-world rewards and other benefits, that include, but are not limited to, vacations, invitations to special events, and access to our VIP services. Through our loyalty program, with a few swipes and a tap, players can be on their way to a complimentary meal, a show, or a weekend getaway, along with a chance to connect with other players who share their passion for our games.

Our curated collection of over 80 awards partners who represent more than 275 unique brands (as of March 31, 2021) includes MGM Resorts International, Wolfgang Puck, Royal Caribbean Cruise Lines, Cirque du Soleil, and House of Blues. The appeal of our loyalty program speaks for itself. Players have exchanged their loyalty points for over 11 million rewards with a retail value of nearly $500 million as of March 31, 2021.

Managing a loyalty program like playAWARDS requires a robust technology platform. That's why we've created an intuitive collection of tools and services that allows our expansive network of global awards partners to make the most of their in-game promotional presence. With our platform, our awards partners can launch new rewards directly into our games and make changes to their existing ones. Then, in real time, they can see how players are responding to and engaging with their brands within our games.

Our awards partners recognize the value of showcasing their products and services within our games. The benefits, however, extend well beyond simple brand impressions, because each reward that a player acquires in our games translates to a potential customer for our awards partners. Extending these rewards to our players helps keep our awards partners top-of-mind in a way that's entertaining and engaging, rather than transactional.

Our valuable loyalty program provides our players a whole new dimension to their gameplay experiences. We often hear player stories of unforgettable memories and personal connections that our players have made through our real-world rewards. And that is what makes PLAYSTUDIOS so much more than a game company.

From our portfolio of games, to our loyalty program, to our growing network of awards partners, we continue to demonstrate the true power of play, achieving an annual consolidated revenue growth rate of 22.5%, from $195.5 million for the year ended December 31, 2018 to $239.4 million for the year ended December 31, 2019. For the same periods, our net income increased from $2.8 million to $13.6 million and our Adjusted EBITDA increased from $37.3 million to $49.5 million.

228

054

For the three months ended March 31, 2021, we generated consolidated revenue of $74.1 million compared to $58.3 million for the three months ended March 31, 2020, reflecting year-to-year growth of 27.1%, and, for the year ended December 31, 2020, we generated consolidated revenue of $269.9 million compared to $239.4 million for the year ended December 31, 2019, reflecting year-to-year growth of 12.7%. For the three months ended March 31, 2021, our net income increased to $5.9 million from $5.5 million year-over-year, and our Adjusted EDITDA increased to $14.5 million from $13.5 million in the same period in 2020. For the year ended December 31, 2020, our net income decreased to $12.8 million from $13.6 million in 2019, and our Adjusted EBITDA increased to $58.0 million from $49.5 million in the prior year.

***The Loyalty Lift***

Successful games, just like most forms of creative content, move through a predictable lifecycle—from development and launch to maturity and late-stage contraction. At each stage, they are met with unique challenges, from driving discovery and amassing a community of engaged players, to retaining their players and converting non-paying players to payers. Our games are free-to-play, and we have primarily generated our revenue from the sale of virtual currency, which players can choose to purchase at any time to enhance their playing experience.

The key to any game's success is the ability to hold onto its players long enough to realize their economic value. And therein lies the true benefit of our playAWARDS program. By incorporating loyalty mechanics into each of our games, we believe we have changed the profile of the typical game life cycle—scaling quickly, driving deeper engagement, and realizing greater life-time value from our players.



From the players' perspective, our in-game rewards enrich their game play experience, offering them something very real in exchange for their engagement with our games. This engenders an important sense of reciprocity, which is a key element in designing captivating digital experiences.

From our perspective as a game developer, our loyalty program has a proven positive impact on our ability to engage, retain, and monetize our players. During the year ended December 31, 2019, for players who redeemed rewards versus players who never viewed our rewards store, month-over-month retention was approximately ten times greater, minutes per day played was three times greater, and monetization was four times greater.

229

055

***Company and Product Awards***

Our games have received broad recognition from a number of industry publications and analysts. These accolades include:

- App Annie Top 30 Publishers, 2020 and 2021
- "Best Marketing Campaign" award at the EGR North America Awards 2019
- "Most Innovative Social Slot Game" 2019 EKG Slot Awards in Las Vegas (my KONAMI Slots)
- "Best New Game" at the EGR Awards 2017 (POP! Slots)
- Highly Commended in the Social Operator category "Best Social Gaming Operator" at the iGaming North America Awards 2017
- "Best Social Slots Operator for 2016" eGaming Review
- "Best Social Gaming Operator of 2016" iGaming
- "Best of 2016" by two leading gaming industry groups, iGaming and eGaming Review



## OUR LOYALTY PROGRAM

Our playAWARDS program is grounded in a proven model that provides our players with a rewarding entertainment experience and our awards partners with promotional access to a large and valuable audience. From our perspective as a game developer, our playAWARDS program affords us a key competitive advantage in our strategy to retain, engage, and ultimately monetize our players. The platform's rules engine allows us to align our reward offerings with players' preferences based upon certain qualifying criteria. For example, our upcoming RPG game will feature benefits that include sporting events, concerts, amusement parks, and other forms of live entertainment. We believe our differentiated playAWARDS program benefits our players, awards partners, and business for a number of reasons as described below.

***We believe our unique playAWARDS program provides our players with a compelling and differentiated value proposition: "Play Free Games. Earn Real Rewards."***

Each of our games incorporate loyalty points that are earned by players as they engage with our games. Like miles in a frequent-flyer program, our players accumulate more loyalty points as they

230

056

demonstrate their ongoing commitment to our games. These loyalty points can then be exchanged for a vast library of real-world rewards. Each of our games features an integrated rewards lobby, enabling our players to easily browse and acquire benefits from a curated collection of rewards. Loyalty points are aggregated across all of our games, allowing our players to accumulate loyalty points more rapidly by engaging with more of our games. This drives traffic across our entire portfolio of games.

It is our view that the playAWARDS program enriches the overall value proposition of our games. By complementing inherently great games with a compelling collection of rewards, we've been able to distinguish ourselves from our competition and drive market-leading metrics.

And it's these results that have enabled us to expand our portfolio to over 80 awards partners who represent more than 275 brands as of March 31, 2021 across the United States, Canada, the UK, Europe, Australia, and Asia.

*Our awards partners are able to reach new audiences and optimize marketing dollars through playAWARDS.*

The playAWARDS program allows our awards partners to connect directly with a valuable mobile audience in a way that is engaging, entertaining, and cost effective. By integrating branded content and promotional offerings into our games, playAWARDS converts entertaining digital impressions into real world brand engagement. In the process of earning loyalty points and redeeming rewards, players make the journey from our world into the world of our awards partners. This activity helps them acquire new customers and reactivate ones that have lapsed. In addition, by extending restricted offers, our awards partners are able to shift customer demand from peak to off-peak periods, allowing them to optimize the utilization of their inventory.

*Our awards partners are equipped with a robust toolkit to manage, monitor, and measure the performance of their rewards.*

The playAWARDS platform provides a comprehensive suite of tools that enables participants in our loyalty program to optimize their participation. Our platform includes operating tools tailored to the needs of our game makers, customer service features for our support and VIP teams, and a dedicated console for our awards partners. All of these stakeholders are empowered to manage their activities in real time, drawing on player insights to optimize the impact and value they derive from the playAWARDS program.

*We have amassed a global network of awards partners*

As we have amassed a diverse collection of awards partners, the scale of our network has become a competitive edge that delivers benefits to both our players and awards partners. As of March 31, 2021, our catalogue of rewards includes offerings from over 80 partners who represent more than 275 entertainment, retail, travel, leisure, and gaming brands across 17 countries and four continents, and our players have used their loyalty points to acquire over 11 million rewards with a retail value of nearly $500 million as of March 31, 2021.

*Our loyalty program extends the engagement and retention of our players and mitigates the impact of the "Creator's Dilemma."*

The "Creator's Dilemma" speaks to the unique challenges a game must overcome in each phase of its lifecycle. This dilemma highlights the complexities of standing out among hundreds of thousands of competing games, as well as the importance of driving deeper engagement and its relationship to monetization. We believe our playAWARDS program enhances the value of our games, and thereby lifts these key performance metrics. Whether it be early adoption, mid-term engagement, or long-term payer conversion, we believe our loyalty program enhances the trajectory and life cycle of our games.

We believe that the benefits of our loyalty program are best illustrated by our retention, engagement, and monetization metrics. In each of these key measures of performance, we see meaningful increases as players become aware of, and ultimately take advantage of the loyalty program. During the year ended December 31, 2019, for players who redeemed rewards versus those players who never viewed our rewards

231

057

store, month over month retention was approximately ten times greater, minutes per day played was three times greater, and monetization was four times greater.



*We grow our network of players and awards partners through a "Virtuous Cycle."*

By leveraging our unique loyalty proposition, we grow our vibrant community of players. As our players engage with our games, they accumulate loyalty points that enrich their experience in the real world. As they consume their real-world rewards, they drive incremental business value for our awards partners, who more fully engage with our program and actively promote our games as a means of keeping their brands top-of-mind with target consumers. This drives players back to our games, where they can engage more deeply, accumulate more loyalty points, and repeat the cycle. The more players we drive to our awards partners, the more awards partners and rewards inventory we can attract. The more rewards we attract, the more we can offer to our players, making our loyalty proposition more compelling to an even broader audience.

**OUR CORE STRENGTHS**

*We build engaging and beautifully executed games.*

We are dedicated to building fun and beautiful games that feature a captivating complement of graphics, sounds, and visual effects. We undertake an extensive internal creative review process and comprehensive quality assurance testing before publishing any new game. We constantly monitor the performance of our games to improve the overall gameplay experience.

*We have a proprietary loyalty platform with a global network of awards partners.*

We have developed and scaled our proprietary loyalty platform to over 80 partners who represent more than 275 brands across 17 countries and four continents. We have amassed a global, diverse collection of awards partners across entertainment, retail, technology, travel, leisure, and gaming. Our scaled loyalty platform allows us to provide an engaging enhancement to the primary gaming experience of our 3.7 million monthly active users for the three months ended March 31, 2021.

We believe the combination of our ten years of development investments, operational experience, integration of our loyalty platform within our awards partners' marketing and operating practices, and the breadth of our corporate relationships are significant competitive advantages, and to replicate our systems would require competitors to invest substantial time and incur significant expense.

232

*We are experts in live operations.*

We have established "live operations" as a core competency throughout the company and have dedicated live operations teams within each of our game studios. Crafting great content is a necessary, but not sufficient requirement when it comes to building an enduring franchise. Games, and the teams that build and operate them, must cultivate the capacity to understand, anticipate and respond to player behaviors. This ability is often enabled by sophisticated tools and a disciplined process. When done well, the overall experience, level of difficulty, rate of progress, and breadth of features, can be fine-tuned to the expectations and desires of individual player cohorts. By delivering content, offers, and features to our players at the optimal times during their gameplay, we can drive paying player conversion, continued monetization, and long-term paying player retention.

*We are committed to adding value to our player experience through rewards, service, and community.*

We believe that focusing on the player experience is the key to driving player retention and opportunities for conversion to paying players. We have built a player management infrastructure that includes customer support, social media community engagement, VIP hosting for premium players, and real-world meetups and social events with our awards partners.

*We focus on transparency and accountability, empowering our employees and management to drive the efficient use of capital.*

We believe that achieving our potential is rooted in the alignment of our teams around our vision, product plans, organization design, and expected results. To achieve this goal, we've implemented a company architecture that promotes transparency, engagement, critical thinking, and shared learning. Fundamental to this structure is our studio model and rigorous planning exercise. Teams evaluate their market opportunities, assess what's unique about their position, craft or refine their strategies, and translate them into plans that are actionable and measurable.

We have built an operating framework that consists of the tools, information systems, communication practices, and disciplines that enables each of our studios to function independently and optimize its performance. While this model encourages creativity, dynamism, and independence, it also ensures that our values as a company are deeply ingrained in all that we do. This model fosters our commitment to our employees and their growth, our uncompromising attention to innovation and the creative execution of our games, and our relentless focus on creating value for our stakeholders.

We have adopted certain organizational conventions to drive collaboration and shared learning. Our Council Framework consists of a collection of forums, each comprised of experts across our studios, that self-organize, meet, and advance an agenda that serves the interests of the broader business. Today we have over 10 active councils focused on areas such as Monetization, Data Science, Technology, Product Execution, User Acquisition, and the playMAKER Experience. These forums are designed to drive deeper connections among our key leaders and provide opportunities for emerging talent within our organizations to make a broader impact on our business.

*Our founder-led management team includes industry-leading talent in the casino, leisure and entertainment industries as well as seasoned game developers and operators.*

Our leadership team is a diverse collection of entrepreneurs, product leaders, technologists, game designers, data scientists, and loyalty marketers. In each case, they bring decades of experience, and a shared commitment to assembling teams and building products that are enduring. As a group, they've drawn upon their vast experience to design our operating framework, implement the tools to develop our talent, clarify our strategies, measure our performance, and optimize our decision making.

*We rely on data-driven performance marketing capabilities to drive return on our ad spend.*

There are certain functions or areas of responsibility that we've elected to centralize for every studio's benefit. In the case of player acquisition, we leverage a centralized marketing team to achieve efficiencies across our portfolio of games. Our performance marketing capabilities focus on cost-effectively acquiring

233

059

TABLE OF CONTENTS

players. Our player acquisition strategy is centered on a payback period methodology, and we strategically balance spend between the acquisition of new players and the reactivation of lapsed players.

***We demonstrate our culture of innovation through the work of playLABS.***

playLABS is an internal group of game designers, engineers, and artists dedicated to the creation of cutting-edge games, features, and content. This group is also tasked with monitoring the competitive landscape for current and emerging trends, within our current category as well as adjacent genres that might hold crossover appeal or from which new features and functionality could be cross-appropriated.

**OUR GROWTH OPPORTUNITIES**

We have a collection of growth opportunities that fall into four distinct categories—Optimize, Expand, Acquire and Diversify. We will continue to optimize the performance of our existing portfolio of games, attracting, engaging, and monetizing more players. We also expect to expand our portfolio as we enter the RPG category with our Kingdom Boss product in 2021. In addition, we intend to broaden our focus and act on acquisition opportunities that will allow us to complement our existing franchises by integrating new products and players into our playAWARDS program. In parallel, we expect to diversify our business model as we introduce and scale advertising within each of our games. We also plan to introduce new playAWARDS features that will enable our players to transact directly with us, which we expect will improve our gross margins. Lastly, we'll continue to evolve our playAWARDS platform and tools such that we can make them available to strategic partners and third parties under a SaaS model, or in our case, Loyalty-as-a-Service.

***New Game Launches, Including myVEGAS Bingo and Kingdom Boss***

Our strategy to date has been to expand our portfolio of games and game studios through in-house development, leveraging the talent and culture of our teams to develop innovative and award-winning games. We launched our myVEGAS Bingo game in March 2021 and intend to complete the development and launch of Kingdom Boss, our Idle RPG game, in the second half of 2021. These games represent an extension of our addressable market and growth opportunity.

We believe that the prospective audience for myVEGAS Bingo will overlap considerably with our existing player network. According to Sensor Tower Game Intelligence, the mobile Bingo category had revenues of $601 million, grew by nearly 54% year-over-year and had 53 million downloads for 2020.

With respect to the market opportunity for Kingdom Boss, the Squad RPG genre is among the fastest-growing gaming segments, with over 296 million downloads in 2020. According to Sensor Tower Game Intelligence, the total Squad RPG market size was $5.9 billion and it grew at a rate of 50% year-over-year. We intend to leverage our entry into this new category to attract both new awards partners and RPG players, expanding our reward offerings across sports, live entertainment, concerts, amusement and theme parks and other attractions. We believe this will further differentiate our game and enable us to attract, retain and monetize our players.

As we expand into these new genres, we expect to leverage loyalty mechanics and our player network to seed, and then grow, each new product. Historically, when we launched new games, we generally achieved over 150,000 retained daily active users within three weeks by cross-promoting to our existing player network.

234





***Targeted Strategic Acquisitions***

    To date, while we have generally grown our business organically by assembling every team, building every product and acquiring every player ourselves, we continually seek, evaluate and pursue strategic transactions which we believe will enhance our business as further described below. Our intention is to apply the resources obtained from becoming a public company and accelerate our growth through strategic acquisitions. We believe prospective game companies will find us to be a more attractive acquiror, given the uniqueness of our playAWARDS program and our overall operating framework. Whether it be a young company with untapped potential or a mature business with an established portfolio of existing games, we intend to apply our experience, resources and proprietary assets to helping them achieve their full potential.

235

We believe our model, operating approach, team and scale will enable us to compete for the best of these acquisition opportunities.

Our prior, current and future acquisition strategy is to expand into new genres, acquire proven games and brands with franchise value, assimilate talented teams, scale our audience, leverage our playAWARDS platform to create value and improve operating performance. The genres and related games we are currently focused on are casual (match, bubble, word, card), niche (racing, sport), midcore (Idle RPG, card battler) and casino (poker, bingo).

Consistent with our past practice of seeking, evaluating and pursuing strategic acquisitions, we are currently in various stages of discussions with several potential acquisition targets. The types of acquisition opportunities we are currently evaluating and pursuing fall into categories that we internally define based on the state of product maturity, audience size and related key performance indicators, access to resources, growth potential, revenues, margins and other factors. The acquisition targets we are currently evaluating and pursuing range in size from development stage to more than $300 million in revenue with DAUs of less than 50,000 to more than 5,000,000. We expect that we would issue a combination of our cash and stock to such acquisition targets or their respective equity holders in connection such acquisitions.

None of our current discussions with acquisition targets have advanced to binding definitive agreements and we cannot make any assurances that any such discussions will advance to binding definitive agreements. In addition, even if we enter into binding definitive agreements with acquisition targets, one or more of such acquisitions may not close, and even if one or more of such acquisitions close, we may not achieve the benefits we expect to achieve.

### Ad Monetization

Nearly all of our revenue is derived from in-game purchases. We have recently introduced ad monetization mechanics as a limited pilot program within two of our games. We intend to qualify the potential of in-game advertising as a new source of revenue and expect to exploit the opportunity further later in the year. We believe there is untapped revenue potential, through ads, from players that are deeply engaged in our loyalty program but who have not made in-game purchases.

### Direct Purchase

In 2020, we developed and trialed a new collection of web-based VIP features. The service was extended to select players, who were invited to engage with us through a customized player portal. Each portal is tailored to the player, with a curated collection of unique benefits, rewards, and real-world events. The player is also able to review his or her status and currency balances across all playAWARDS-enabled games, and should the player choose, the player can purchase virtual items from within the portal. It's important to highlight that these players are given preferential access to unique rewards, along with virtual currency packages that are not available within the game. The VIP Player Portal remains available to a limited group of players as we continue to test its use and acceptance before making it available to a larger number of players.

### Continued Conversion of Non-Paying Players into Paying Players

We believe we can generate revenue growth by converting more non-paying players into payers. We have increased the average daily conversion rate of non-payers to payers from 2.0% for the three months ended March 31, 2020 to 2.9% for the three months ended March 31, 2021, and, we have increased the average daily conversion rate of non-payers to payers from 2.0% for the year ended December 31, 2019 to 2.3% for the year ended December 31, 2020. We continually assess the data about our players to develop insights that we can use to improve conversion. We also engage regularly with our players at community events and other occasions associated with their reward redemptions. These opportunities enable us to glean additional insights from our players that inform our ongoing product refinements. We intend to continue to explore new strategies to improve our conversion of non-paying players into paying players, including continued game enhancements, player outreach, live operations offerings, and data-driven player management strategies.

236

*Increasing the Monetization of Our Paying Players*

We believe we can generate revenue through increasing the monetization of our paying players. Each of our products has a rich roadmap of live events and new features focused on deepening the engagement among our existing paying players. From exclusive in-game VIP events and bespoke hosting services, to tailored pricing on store bundles and premium real-world rewards, we continue to expand the value we deliver to our players, which we believe will translate to increased levels of purchases by our players.

*Growing Our Player Base*

During the three months ended March 31, 2021, we averaged 1,259,000 daily active users, a decrease of 22% from the same period in the prior year, and, during the year ended December 31, 2020, we averaged 1,459,000 daily active users, a decrease of 10.8% from the same period in the prior year. We believe this decrease is a result of COVID-19 and its impact on our rewards offering. As hotels, cruise-lines, restaurants, and concerts were closed or canceled, we saw erosion in the level of engagement of our players. We believe this illustrates the power of our playAWARDS program, in that the absence of it resulted in a decline in our active players—the first in nearly five years. We believe that as we move past COVID-19 and restore the value of our rewards offerings, our player network will increase. In addition, it is our view that our awards partners will leverage our program and player network to reinvigorate their businesses as they emerge from COVID-19. To accomplish this, we believe our awards partners will expand the variety and amount of rewards inventory, making the value proposition of our program more compelling for existing and new players.

Given the dynamics described above, the upcoming launch of our new games, and the anticipated acquisition of existing products, we believe we can grow our player base. And as we do, we intend to fully leverage the mechanics of our loyalty program to drive the cross-promotion and adoption of other games in our portfolio.

*Loyalty-as-a-Service*

Our playAWARDS program provides value to our awards partners while increasing player engagement and retention within our games. As we introduce new games and explore potential acquisition opportunities, we will integrate our loyalty program in order to drive value and benefit from our increased scale. We will continue to enhance our playAWARDS program by updating the platform and tools, optimizing the redemption funnel and growing our collection of awards partners. Our robust platform and knowledge can be leveraged and applied to other products and services as well. We also plan to explore additional opportunities for monetizing our technology, tools, and operating expertise by offering to other game publishers a tightly integrated, full-featured, loyalty-as-a-service solution.

## PLAYSTUDIOS OVERVIEW

### A Journey of a Thousand Smiles

At a San Francisco game conference in 2011, a chance encounter between a pair of accomplished entrepreneurs, Andrew Pascal and Paul Mathews, and a resourceful gaming veteran, Monty Kerr, led to the shared recognition of a unique opportunity. Facebook's emerging social games space was heating up, offering both the promise of rapid growth and the challenge of stiff competition. Inspired by the opportunity, Andrew, Paul, and Monty believed that they had discovered a novel point of entry. They would leverage a powerful customer engagement practice common to many other industries but not yet applied to consumer gaming—a loyalty program. Thus, our founding team—rounded out by additional members Katie Bolich, Chad Hansing, and Nicholas Koenig—entered the social gaming market with exclusive licenses to a collection of iconic casino resort brands and a company-defining value proposition: play free games, get real rewards.

In July 2011, having formalized our relationship with MGM Resorts and closed our initial round of funding, we opened our first offices in Las Vegas, Nevada, Burlingame, California, and Austin, Texas. Our presence in each of these markets allowed us to quickly assemble our core team and begin the work of developing our first Facebook game, myVEGAS.

237

In 2012, shortly after the successful launch of myVEGAS, we observed early signals that the center of gravity for casual gaming was about to shift to mobile platforms. We quickly broadened our focus and in November 2013 we launched myVEGAS Slots for iOS and Android.

In May 2015 we expanded our global reach, opening a new office in Hong Kong—PLAYSTUDIOS ASIA—helmed by John Lin, currently our Chief Operating Officer.

In August 2016, we acquired Scene 53, an Israel-based technology company led by Yonatan Maor and a tight-knit group of innovative co-founders. They were developing immersive, multi-user, virtual environments and we leveraged their real-time social engine as the foundation for our next game, a communal casino experience called POP! Slots that featured player-to-player interactions and shared game outcomes.

Between July 2012 and August 2016, we had launched five games: myVEGAS on Facebook, myVEGAS Mobile Slots, myVEGAS Blackjack, my KONAMI Slots, and POP! Slots.

As we added titles to our game portfolio and grew our network of players, we continued to improve upon our playAWARDS program, introducing new awards partners and extending our footprint to more destinations in the U.S., Canada, UK, Europe, Australia, and Asia.

We continued to make significant investments in our playAWARDS program, including a major update to its underlying technology, released in October 2019. We believe our loyalty program will become an increasingly valuable tool for current and future awards partners seeking creative ways to engage with their target audience.

**Our Company Values**

Values are not what you say. Values are who you are. At best, they are the product of self-discovery, not belabored wordsmithing. At PLAYSTUDIOS, the essence of who we are is expressed in three simple truths: PLAY better together, PLAY to win, and the game is for the PLAYer.

The founders of our company and the principals of our Tel Aviv and Hong Kong game studios have long histories together, and the importance of those relationships sets the tone for a company that places its highest premium on trust, mutual respect, and genuine regard for one another—even when we disagree. While clichés about close-knit cultures abound, we believe that in our case the metaphor of a company as family truly does apply. We recognize that building and growing a successful business requires a tremendous commitment of time and energy. Taking that journey with people you care about makes it all the better, whether shouldering a setback or sharing a success.

This leads us to our second value, PLAY to win. We all want an opportunity to do great work and to see the direct impact we have on the success of our company. And while there are many ways to measure success, for us, it's all about the quality of what we create—about thoughtful design and attentive execution. To this end, we spend a good deal of time working through details that most people will never notice, but that do make a difference. The result is that our games have become known for their innovative features, distinctive look and feel, and level of quality that has become a hallmark of PLAYSTUDIOS.

The closeness of our teams and the quality of our content come together in our conviction that everything we create is for our players. Unlike a retail or a hospitality business, most game companies don't have the luxury of daily encounters with their player base. While it is standard practice to continually evolve games based on a rich set of performance analytics, the importance of face-to-face player feedback cannot be overstated. Thanks to our real-world rewards and loyalty program, and an active calendar of community events, we have regular opportunities to socialize with our players in ways that other game companies cannot. Here again, our playAWARDS program affords us a distinct competitive advantage.

**OUR GAMES**

*myVEGAS Facebook*

In July 2012, we launched myVEGAS on Facebook. With the exclusive digital rights to many of the iconic casino resorts on Las Vegas Boulevard, our game provided players with the opportunity to build

238

TABLE OF CONTENTS

their own virtual Las Vegas Strip while enjoying free-to-play slots and table games inspired by their favorite desert destinations. Incorporating well established Las Vegas brands into our first title provided an air of authenticity to our games, our storylines, and even our social mechanics. We also debuted our one-of-a-kind loyalty program that allowed players to earn free meals, show tickets, hotel rooms, and more from a curated collection of awards partners, including: ARIA, Bellagio, MGM Grand, Mandalay Bay, The Mirage, Monte Carlo (now Park MGM), New York-New York, Luxor, and Excalibur.

### myVEGAS Slots

As myVEGAS was being favorably received on Facebook, the market was shifting from desktop to mobile. We followed suit and quickly went to work on our first mobile game, leveraging our existing content and lessons we learned on the social platform. In November 2013, myVEGAS Slots was launched on iTunes and Google Play. Similar to its predecessor, myVEGAS Slots also featured an extensive collection of real-world rewards—a first for the mobile platforms. Within weeks of its launch, myVEGAS, had attracted more than 250,000 players, validating our compelling proposition. It was clear that playing for fun while earning real-world benefits was resonating with out target audience.



### myVEGAS Blackjack

Having established the myVEGAS brand and proven the value of real-world rewards, we elected to leverage both in a new, albeit adjacent category. In November 2014, we released myVEGAS Blackjack for iOS and Android devices. The game offers players traditional Blackjack rules and game mechanics with a host of social gaming features such as collectables, challenges, and leaderboards, along with distinct "rooms" that provide the look and feel of familiar Las Vegas casinos. Central to the game experience is our loyalty program, which shares a common, linked currency across all of the other myVEGAS games. Blackjack quickly became a favorite among our network of players, amassing over 200,000 daily active users within weeks of its launch.



### my KONAMI Slots

Recognizing the growing popularity of real-world casino content in free-to-play mobile gaming, we entered into a strategic partnership with KONAMI Gaming. The relationship gave us access to the vast collection of casino-proven slot content. In January 2016, we introduced my KONAMI Slots, coupled with our unique loyalty program. The game quickly scaled to over 150,000 daily active players. Today, its audience has more than doubled as it continues to showcase KONAMI's newest and hottest slot machines like China Mystery, Lotus Land, Lion Festival, Masked Ball Nights, and more.



239

TABLE OF CONTENTS

*POP! Slots*

With our position established as a leading developer of casual slot games, we set out to create a product that would more fully exploit the inherently social aspects of mobile gaming. POP! Slots was released in August 2016 and introduced players to an entirely new, immersive world in which they roamed a virtual strip, entered their favorite casinos, then spun the reels alongside others with whom they were teamed-up, or pitted against. With real-time audio chat and emojis, players could connect with one another as they conquered the Wall of Kahn, broke the bank at Bellagio, or topped the chart in Win Zone. The games proved to be highly engaging, and the communal nature of the experience set it apart from everything else in its genre. Similar to the rest of the PLAYSTUDIOS portfolio, POP! Slots incorporated our loyalty points and real-world rewards into the game, and extended our loyalty program to an even broader audience of players and awards partners.



*myVEGAS Bingo*

While continuing to nurture and grow our core game franchises, we elected to enter the dynamic and rapidly growing casual bingo category. According to Sensor Tower Game Intelligence, the mobile Bingo category had revenues of $601 million, grew by nearly 54% year-over-year and had 53 million downloads for 2020. As we enter into the bingo genre, we are applying our proven approach—carefully crafting a game that's intuitive to play, feature rich, and beautifully executed. We believe players will respond to the integration of real casino brands, innovative power-ups, group social features, collectables, and leaderboards. Similar to all of the other PLAYSTUDIOS games, myVEGAS Bingo will offer its players the opportunity to earn real-world rewards. We launched myVEGAS Bingo in March 2021.



*Kingdom Boss (Coming Soon)*

We expect to launch our first idle RPG game, Kingdom Boss, in the second half of 2021, moving beyond casino-style content and into another rapidly expanding game category. With respect to the market opportunity for Kingdom Boss, according to Sensor Tower Game Intelligence, the Squad RPG genre is among the fastest-growing gaming segments, with over 296 million downloads in 2020, a market size of $5.9 billion and year-over-year market growth of 50%. Players of Kingdom Boss will be immersed in an epic role-playing game as they build their empire, forge alliances, command an army of epic heroes, and rescue their subjects from the shadowlands of exiled kingdoms. While we firmly believe in the strong appeal of the core game experience, Kingdom Boss will enjoy additional lift from our loyalty program and a new collection of real-world benefits that will be carefully tailored to this new audience.



*Integration of Loyalty Program and cross promotion into myVEGAS Bingo and Kingdom Boss*

In the decade since launching our first game with integrated loyalty mechanics, we've worked to abstract the technologies, tools, and operating practices that were central to this unique value proposition. Our aim was to transform our loyalty construct into a free-standing and full-featured program that could be

240

more efficiently integrated into future game releases. Our playAWARDS initiative, and the dedicated team that leads it, is focused on further establishing it as the gaming industry's gold standard. As we now look to accelerate our growth through new product introductions and strategic acquisitions, playAWARDS will serve as a catalyst, driving deeper engagement among newly acquired audiences.

As highlighted above, playAWARDS will feature prominently in our upcoming game launches. In the case of myVEGAS Bingo, we integrated the program under the consumer-facing myVIP brand and actively promote it to our existing network of players. We believe this will attract a sizable collection of qualified and highly valued players for this game, as was the case in our past game launches. In each prior case, these early adopters have proven to be the 'golden' cohorts of players, driving sustained levels of performance and growth.

We expect to turn our attention to the massive RPG market in 2021, as we launch Kingdom Boss with the category's only real-world loyalty program. Soon players of the fastest growing game genre will be able to play for free and earn for real.

**THE MARKET**

We are focused on serving players within the global gaming market, which grew 19.6% in 2020 to $174.9 billion, compared to 2019, and encompassed 2.8 billion players across the globe, according to Newzoo. Additionally, within the global gaming market, Smartphone Games represented a $74.9 billion market growing at 29% year-over-year growth rate in 2020, according to Newzoo. 2020 was another landmark year for the industry, adding approximately 140 million players, according to Newzoo, as people worldwide increasingly looked to games as a form of entertainment, continuing the strong growth trajectory of the industry. We are fortunate to operate in the high growth mobile arena, and believe that there is meaningful room for expansion, especially as mobile and 5G penetration increases globally, and existing players continue to deepen their relationship with mobile content.

We believe that our prior learnings within the social casino genre will prove advantageous as we extend into the adjacent categories of casual and mid-core games. Our proven ability to frequently refresh in-game content, overcome repetitive game mechanics with nuanced design, and craft compelling features that convert players to payers address a key set of challenges that are common to much of the gaming landscape.

We now see tremendous growth opportunities as we apply our game-making, operational, and monetization sensibilities to new genres. We believe this can significantly broaden our prospective audience and afford us new opportunities to grow our overall network of players.



241

067

**PLAYSTUDIOS MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*The following discussion and analysis provide information that PLAYSTUDIOS believes is relevant to an assessment and understanding of PLAYSTUDIOS' consolidated results of operations and financial condition. The discussion should be read together with "Selected Historical Consolidated Financial and Operating Data of PLAYSTUDIOS," "Unaudited Pro Forma Condensed Consolidated Financial Information," and the historical audited and unaudited consolidated financial statements and the related respective notes thereto, included elsewhere in this proxy statement/prospectus. This discussion contains forward-looking statements reflecting current expectations that involve risks and uncertainties. PLAYSTUDIOS' actual results may differ materially from those anticipated in these forward-looking statements due to various factors, including those set forth under "Risk Factors" and elsewhere in this proxy statement/prospectus. Unless the context otherwise requires, references in this "PLAYSTUDIOS Management's Discussion and Analysis of Financial Condition and Results of Operations" section to "we," "us," "our," "PLAYSTUDIOS" and "the Company" refer to the business and operations of PLAYSTUDIOS, Inc. and its consolidated subsidiaries prior to the Business Combination and to New PLAYSTUDIOS and its consolidated subsidiaries, following the consummation of the Business Combination.*

**Overview**

We are a developer and publisher of free-to-play casual games for mobile and social platforms that are powered by differentiated *playAWARDS* and myVIP loyalty platforms. We have developed some of the most innovative and successful free-to-play social casino games in the world, including the award-winning *POP! Slots*, *myVEGAS Slots*, *my KONAMI Slots* and *myVEGAS Blackjack*. Our games are based on original content, real-world slot game content, as well as third-party licensed brands and are downloadable and playable for free on multiple social and mobile-based platforms, including the Apple App Store, Google Play Store, Amazon Appstore and Facebook.

Each of our games is powered by our proprietary *playAWARDS* program and incorporates loyalty points that are earned by players as they engage with our games. These loyalty points can be exchanged for real-world rewards from over 80 awards partners representing more than 275 hospitality, entertainment, and leisure brands across 17 countries and four continents. The rewards are provided by our collection of awards partners, all of whom provide their rewards from their collection of consumer brands at no cost to us as part of their overall marketing. We have developed a robust suite of tools for our *playAWARDS* platform that enable our awards partners to manage their rewards in real time, measure the value of our players' engagement, and gain insight into the effectiveness and return on investment through the *playAWARDS* program. Through our self-service platform, awards partners can launch new offers, make changes to existing offers, and in real time see how players are engaging with their brands. The platform tools also provide awards partners the ability to measure the retail value of the rewards being redeemed by our players and estimate the additional benefits they are receiving from the patronage of our players at their establishments.

Supplemental to PLAYSTUDIOS' playAWARDS program is its myVIP program. The myVIP program is a player development and hosting program that ranks and assigns tiers to players based on the number of tier points earned by engaging with our games. The tier points earned in the myVIP program are separate from and are not interchangeable with the loyalty points earned in the playAWARDS program. Qualified players are provided access to enhanced customer benefits that increase with each tier. Higher tiers provide access to a VIP player portal whereby players can view and purchase special chip bundles, redeem loyalty points for a curated set of rewards, and communicate directly with a dedicated live host. The VIP player portal and concierge/ host program enhance the in-game and reward redemption experience with both in-game and in-person, invitation-only special events. We believe that the myVIP program drives increased player engagement and retention, and therefore extends each game's life-cycle and monetization opportunity.

We have primarily generated our revenue from the sale of virtual currency, which players can choose to purchase at any time to enhance their playing experience. Once purchased, our virtual currency cannot be withdrawn from the game, transferred from one game to another or from one player to another, or be redeemed for monetary value. Players who install our games receive free virtual currency upon the initial launch of the game, and they may also collect virtual currency free of charge at periodic intervals or through targeted

246

068

TABLE OF CONTENTS

marketing promotions. Players may exhaust the free virtual currency and may choose to purchase additional virtual currency. Additionally, players can send free "gifts" of virtual currency to their friends on Facebook. Our revenue from virtual currency has been generated worldwide, but is largely concentrated in North America, with $64.1 million, or 86.5%, and $4.1 million, or 5.6% of total net revenues for the three months ended March 31, 2021 being generated from the U.S. and Canada, respectively, compared with $49.2 million and $3.5 million, or 84.4%, and 6.0% of total net revenues for the three months ended March 31, 2020 from the U.S. and Canada, respectively. For the year ended December 31, 2020 we generated $228.6 million, or 84.7%, and $17.3 million, or 6.4% of total revenue from the U.S. and Canada, respectively, compared with $193.1 million and $160.8 million, or 80.7% and 82.3%, and $14.3 million and $12.1 million, or 6.0% and 6.2%, of total revenue for the years ended December 31, 2019 and 2018 from the U.S. and Canada, respectively.

We also generate revenue from in-game advertising. Advertisements can be in the form of an impression, click-throughs, banner ads or offers, where players are rewarded with virtual currency or loyalty points for watching a short video. For the three months ended March 31, 2021, 1.2% of our total net revenues was generated from advertising, compared with 0.2% for the three months ended March 31, 2020.

**History and Key Milestones**

Since our founding in 2011, we have developed fun, high-quality, free-to-play mobile games, all supported by *playAWARDS*, our proprietary loyalty program, and the myVIP program that provides enhanced customer benefits for qualified players such as concierge/host programs and special events as described further below.

Our first game, *myVEGAS Slots*, was launched on Facebook in 2012 along with the *playAWARDS* platform. In 2013, we expanded *myVEGAS Slots* to iOS and Android platforms, and we launched *myVEGAS Blackjack* in 2014. We signed a license agreement with Konami Gaming, Inc. in 2014, in order to use certain of their intellectual property in our *myVEGAS Slots* games.

In 2015, we expanded internationally with the opening of our Hong Kong studio, and expanded our partnership with Konami Gaming, Inc. to build a new game, m*yKONAMI Slots*, that launched in early 2016. In 2016, we also acquired Scene53, an Israeli company that we had previously engaged to co-develop a new and innovative free-to-play social casino slot game. The game — the award-winning *POP! Slots* —launched shortly after the acquisition.

Each new game integrated our loyalty program at launch, and thereby expanded the suite of games that players could play to earn loyalty points and subsequent real-world rewards. We have grown our network of awards partners to over 80, representing more than 275 brands in 17 countries across four continents as of March 31, 2021. Our players' responses have been positive, as they have exchanged loyalty points for more than 10 million rewards since inception through March 31, 2021.

247

069

For a discussion of our key metrics "DAU" and "MAU," see "—*Key Performance Indicators and Non-GAAP Measures*," below.

In 2020, we entered into development agreements with Boss Fight Entertainment for two new games which we expect will diversify our portfolio beyond the social casino genre — *myVEGAS Bingo* (a more casual form of social casino game), and *Kingdom Boss*, an idle role-playing game ("RPG"). In March 2021, *myVEGAS Bingo* was released on the Apple App Store and Google Play Store.

Our combination of a high-quality, diverse game portfolio and robust *playAWARDS* loyalty program has created an engaged player base. It has been our goal, from the launch of our first game, to bridge the gap between the virtual world of mobile and desktop game play and the real world. In addition to allowing players to use earned loyalty points to purchase real-world rewards, our concierge/host program establishes direct communication between our live hosts and our players to enhance the in-game and reward redemption experience. We further bring fun into the real world by hosting in-person and invitation-only events where our players get to know their host and each other, as well as enjoy a variety of parties and activities. We believe that our concierge/host program and related special events create a personal touch that enables us to establish long lasting relationships with our players.

**Impact of COVID-19**

The ongoing COVID-19 pandemic and resulting social distancing, shelter-in-place, quarantine and similar governmental orders put in place around the world have caused widespread disruption in global economies, productivity and financial markets and have materially altered the way in which we conduct our day-to-day business. We have followed guidance by the U.S., Israel, Hong Kong and other applicable foreign and local governments to protect our employees and operations during the pandemic and have implemented a remote environment for our business. We cannot predict the potential impacts of the COVID-19 pandemic or the distribution of vaccines on our business or operations, but we will continue to actively monitor the related issues and may take further actions that alter our business operations, including as may be required by federal, state, local or foreign authorities or that we determine are in the best interests of our employees, players, partners and stockholders.

In addition to the potential direct impacts to our business, the global economy has been, and is likely to continue to be, significantly weakened as a result of the actions taken in response to COVID-19, and future government intervention remains uncertain. A weakened global economy may impact our players and their purchasing decisions within our games, in particular as a result of the limitations associated with redeeming real-world rewards due to government-mandated or other restrictions on travel and other activities

248

070

Note 4 — Related-Party Transactions and Note 11 — Revenue from Contracts with Customers to the consolidated annual financial statements included elsewhere in this proxy statement/prospectus for more information regarding the termination of this agreement.

### Operating Expenses

Operating expenses primarily consist of cost of revenue, research and development expenses, selling and marketing expenses, general and administrative expenses, and depreciation and amortization.

### Cost of revenue (excluding depreciation and amortization)

Cost of revenue consists primarily of payment processing fees paid to platform providers such as Apple, Google, Amazon and Facebook, which represented approximately 30% of net revenues for the three months ended March 31, 2021, royalties payable to third parties for licensed games, and hosting and data center costs related to operating our games. Cost of revenue represents the direct expenses incurred to generate revenue from our online and mobile social gaming applications and are recorded as incurred. We expect cost of revenue to increase in the foreseeable future as our revenue increases.

### Research and development

Research and development expenses consist of payroll and related personnel costs, stock-based compensation expense, consulting fees and related overhead incurred in relation to game development and live operations. We expect research and development expenses to continue to grow in absolute terms as we increase our headcount to improve the content, offers, and features in our existing games, the release of new games, and the features of the *playAWARDS* platform. In particular, we expect to incur significant development costs associated with the expected launch of *Kingdom Boss* in the second half of 2021.

### Selling and marketing

Selling and marketing expenses consist of player acquisition costs, advertising and marketing costs and related overhead, including salaries and wages, stock-based compensation expense, facilities and other expenses associated with our selling and marketing activities. In general, selling and marketing expenses fluctuate as a percentage of net revenues depending on the timing and effectiveness of our marketing efforts. However, we expect selling and marketing expenses to increase both in amount and percentage of net revenues for the foreseeable future as we incur additional expenses associated with promotion of *myVEGAS Bingo,* which launched in March 2021, and the expected launch of *Kingdom Boss* games in the second half of 2021.

### General and administrative

General and administrative expenses primarily consist of salaries, benefits and stock-based compensation expense to our executives, finance, information technology, human resources and other administrative employees. General and administrative expenses also include outside consulting, legal and accounting services, facilities and other costs not allocated to other departments. We expect general and administrative expenses to increase for the foreseeable future as we incur additional expenses associated with being a public company and continue to grow our business.

### Depreciation and amortization

Depreciation and amortization expenses are primarily comprised of the amortization of capitalized game development costs. We expect depreciation and amortization expense to increase with the launch of new games.

### Restructuring expense

Restructuring expenses primarily consist of severance-related costs incurred in connection with our restructuring efforts as well as costs incurred to terminate a contract that is not a capital lease. During the year ended December 31, 2020, restructuring expenses increased significantly as a result of the termination

253

071

Net revenues increased by $15.8 million, or 27.1%, during the three months ended March 31, 2021 compared to the three months ended March 31, 2020. The increase in net revenues was comprised of a $15.1 million increase in the sale of virtual currency and $0.7 million increase in advertising revenue.

The increase in sales of virtual currency was driven by both an increase in number of spenders as well as an increase in spending per player, resulting in a year-over-year increase in ARPDAU. The increase in player spending was partially offset by a decline in DAU and MAU during the three months ended March 31, 2021 compared to the three months ended March 31, 2020. The decrease in players reflects the impact of the COVID-19 pandemic on the travel and tourism industries and the reduced availability of rewards offered in our reward programs. This decrease has reinforced our belief that our players place a significant value on the real-world rewards made available through our *playAWARDS* and myVIP loyalty platforms. We believe that the attractiveness of our rewards program will improve as the impacts of COVID-19 decrease and tourism resumes.

While DAU and MAU indicate the overall size of our player base, our continued focus is on expanding and maintaining the population of DPU. Our daily conversion rate increased 0.9 percentage points to 2.9% during the three months ended March 31, 2021 from 2.0% during the three months ended March 31, 2020.

*Operating Expenses*

The following table summarizes our consolidated operating expenses for each applicable period:

| ($ in thousands) | Three Months Ended March 31, | | $ Change | % Change | % of Revenue | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2021 | 2020 | | | 2021 | 2020 |
| Operating expenses: | | | | | | |
| Cost of revenue | $24,488 | $19,734 | $ 4,754 | 24.1% | 33.0% | 33.8% |
| Selling and marketing | 17,000 | 11,926 | 5,074 | 42.5% | 22.9% | 20.5% |
| General and administrative | 4,279 | 5,710 | (1,431) | -25.1% | 5.8% | 9.8% |
| Research and development | 14,746 | 9,483 | 5,263 | 55.5% | 19.9% | 16.3% |
| Depreciation and amortization | 6,034 | 5,388 | 646 | 12.0% | 8.1% | 9.2% |
| Total operating expenses | $66,547 | $52,241 | $14,306 | 27.4% | 89.8% | 89.6% |

*Cost of Revenue*

Cost of revenue increased by $4.8 million, or 24.1%, from the three months ended March 31, 2020 to the three months ended March 31, 2021. The increase was due in part to a $4.3 million increase in payment processing fees, which represents a 24.4% increase year over year. The increase is consistent with the increase in revenue from the sale of virtual currency. The increase was also due to a $0.3 million increase in royalties expenses resulting from our royalty-based games. As a percentage of net revenues, cost of revenue decreased slightly from 33.8% for the three months ended March 31, 2020 to 33.0% for the three months ended March 31, 2021.

*Selling and Marketing*

Selling and marketing expenses increased by $5.1 million, or 42.5%, from the three months ended March 31, 2020 to the three months ended March 31, 2021. The overall increase was primarily due to a $4.6 million increase in total player acquisition spend. As a percentage of net revenues, selling and marketing expenses increased from 20.5% for the three months ended March 31, 2020 to 22.9% for the three months ended March 31, 2021. We expect selling and marketing expense to increase during the remainder of 2021 as we promote *myVEGAS Bingo* and *Kingdom Boss*. *myVEGAS Bingo* was launched in March 2021 and *Kingdom Boss* is currently under development and expected to launch in the second half of 2021.

*General and Administrative*

General and administrative expenses decreased by $1.4 million, or 25.1%, from the three months ended March 31, 2020 to the three months ended March 31, 2021. The overall decrease was due to a $1.4 million

255

072

TABLE OF CONTENTS

## MANAGEMENT OF NEW PLAYSTUDIOS FOLLOWING THE BUSINESS COMBINATION

The following sets forth certain information, as of January 31, 2021, concerning the persons who are expected to serve as directors and executive officers of New PLAYSTUDIOS following the consummation of the Business Combination and assuming the election of the nominees at the Extraordinary General Meeting as set forth in "*Director Election Proposal.*"

| Name | Age | Position |
|---|---|---|
| **Executive Officers** | | |
| Andrew Pascal | 55 | Co-Founder, Chairman and Chief Executive Officer |
| Paul Mathews | 56 | Co-Founder & Executive Vice President |
| Scott Peterson | 54 | Vice President, Chief Financial Officer |
| Joel Agena | 58 | Vice President, Legal Counsel |
| Katie Bolich | 52 | Co-Founder & Head of Product |
| **Non-Employee Directors** | | |
| William (Bill) J. Hornbuckle | 63 | Director |
| Joe Horowitz(2)(3) | 69 | Director |
| Jason Krikorian(1)(3) | 49 | Director |
| Judy K. Mencher(1)(2) | 64 | Director |
| James Murren(1) | 59 | Director |

(1) Member of the New PLAYSTUDIOS audit committee, effective upon the consummation of the Business Combination.

(2) Member of the New PLAYSTUDIOS compensation committee, effective upon the consummation of the Business Combination.

(3) Member of the New PLAYSTUDIOS nominating and corporate governance committee, effective upon the consummation of the Business Combination.

### Executive Officers

*Andrew Pascal.*   Upon consummation of the Business Combination, Mr. Pascal will serve as Chairman of the New PLAYSTUDIOS Board of Directors. Andrew Pascal serves as a Co-Founder, Chairman, and Chief Executive Officer of PLAYSTUDIOS, which he co-founded in 2011. Prior to co-founding PLAYSTUDIOS, Mr. Pascal served as Senior Vice President of Product Marketing and Development at Wynn Las Vegas, a luxury casino resort property owned by Wynn Resorts, Ltd., beginning in 2003 during the project's development phase, before ascending to the roles of President and Chief Operating Officer in 2005. Throughout Mr. Pascal's tenure, Wynn Las Vegas garnered multiple awards from the world's leading hospitality guides. In 2008, Mr. Pascal led the development and launch of Wynn Las Vegas' sister property, Encore Las Vegas. From 2001 to 2003, Mr. Pascal served as President and Chief Executive Officer of WagerWorks, Inc., a company he founded as a casino solutions and content supplier for many of the world's largest gaming and media brands. Following Mr. Pascal's departure, WagerWorks was acquired by International Game Technology. Mr. Pascal holds a Bachelor of Arts in Economics from the University of Colorado, Boulder. Mr. Pascal is qualified to serve on the New PLAYSTUDIOS Board of Directors based on his substantial business experience, leadership and management experience as the CEO of PLAYSTUDIOS and previously as a founder of, and executive director at, other software companies.

*Paul Mathews*.   Paul Mathews is a Co-Founder and Executive Vice President of PLAYSTUDIOS, and is responsible for PLAYSTUDIOS' government affairs, compliance, platform and business relations efforts. Mr. Mathews is a founder of the International Social Games Association and has served as its Chairman since its inception. Prior to co-founding PLAYSTUDIOS in 2011, Mr. Mathews served as an internet gaming consultant for Fertitta Interactive/Ultimate Fighting Championship and Wynn Las Vegas. Mr. Mathews was also a long-serving member of Nevada's Gaming Policy Committee. Appointed to the role by then-Governor Brian Sandoval in 2011, Mr. Mathews advised the governor's office on gaming policy

269

and the evolution of the industry in Nevada and beyond. A graduate of the University of Nevada, Reno, Mr. Mathews holds a Bachelor of Science in Business Administration.

*Scott Peterson.*   Scott Peterson has served as the Chief Financial Officer of PLAYSTUDIOS since June 2017. Mr. Peterson is a seasoned finance executive with expertise in accounting, financial management, and compliance, and brings more than 20 years of senior level financial leadership of public and private companies. In 2005, he was named Vice President and Chief Financial Officer for Wynn Macau, and returned to Las Vegas as the Senior Vice President and Chief Financial Officer of Wynn Las Vegas in 2009. Mr. Peterson's responsibilities encompassed all aspects of finance, accounting and both casino and hotel finance operations. He was also the principal finance and accounting officer responsible for casino and hotel compliance with Wynn's internal controls, as well as state and federal requirements under the Sarbanes-Oxley Act and the Nevada Gaming Control Board. Mr. Peterson holds a Bachelor of Science in Accounting from the University of Southern California.

*Joel Agena*.   Joel Agena serves as VP Legal Counsel of PLAYSTUDIOS and is responsible for overseeing all of PLAYSTUDIOS' legal affairs, including corporate governance, mergers and acquisitions, securities, finance and general business, and content licensing. Mr. Agena has more than 23 years of experience as a practicing attorney. He joined PLAYSTUDIOS in January 2019, after serving as PLAYSTUDIOS' outside counsel since its inception in 2011. In 2001 he founded The Phoenix Law Group where his practice was focused on acting as outside general counsel for emerging growth companies. Mr. Agena received a Juris Doctorate degree from the University of Nebraska, College of Law in 1997 where he was a Member of the Law Review, Order of the Coif, and an Arthur E. Perry Scholar.

*Katie Bolich*.   Katie Bolich is a Co-Founder and Head of Product for PLAYSTUDIOS. Ms. Bolich leads PLAYSTUDIOS' corporate product initiatives and team of game designers. A veteran gaming executive with more than 25 years of experience, Ms. Bolich has a passion for developing teams and partnerships that transform the industry. Prior to co-founding PLAYSTUDIOS in 2011, she served as Vice President of Licensing for online gaming company WagerWorks and successfully led the organization through its startup to its acquisition by International Game Technology in 2005. She remained with IGT for four years following the acquisition. Ms. Bolich is a graduate of Stanford University with a Bachelor of Arts in Anthropology. She has also served as a board member and Vice President of the Davis Art Center.

**Non-Employee Directors**

*William (Bill) J. Hornbuckle.*   Upon consummation of the Business Combination, Mr. Hornbuckle will serve as a member of the New PLAYSTUDIOS Board of Directors. Mr. Hornbuckle is currently the Chief Executive Officer and President of MGM Resorts International (NYSE: MGM), an S&P 500 global entertainment company featuring iconic hotels and casinos, meeting and conference spaces, live and theatrical entertainment experiences and an array of restaurant, nightlife and retail offerings across the globe. Mr. Hornbuckle served as President of MGM Resorts starting in 2012 and served as Chief Operating Officer from 2019 to December 2020. He led MGM Resorts' domestic and international expansion efforts, including the development of resorts in National Harbor, MD, and Macau and of T-Mobile Arena in Las Vegas. More recently, Mr. Hornbuckle oversaw MGM Resorts' expansion of entertainment and sports betting. Mr. Hornbuckle has been a member of MGM Resorts' Board of Directors since July 2020 and has served on the Board of Directors of MGM China Holdings, a majority-owned subsidiary of MGM that operates resorts in Macau, since 2009 and as Chairman of the Board of Directors since March 2020. He has served as Chairman of the Board of Directors for CityCenter Holdings, LLC (a joint venture with Dubai World) since December 2018. Mr. Hornbuckle is a board member of T-Mobile Arena (a joint venture with AEG) since 2013 and of the Las Vegas Stadium Authority since 2016. Mr. Hornbuckle also serves on the Board of Trustees for Three Square Food Bank, is a Founder and member of the Board of Directors of GBank Financial Holdings Inc., the parent company of Bank of George, a local banking and financial services institution, and is President of the Fulfillment Fund. Previously, Mr. Hornbuckle served on the Board of Directors of MGM Growth Properties LLC from 2016 to March 2020. Mr. Hornbuckle holds a Bachelor of Science degree in Hotel Administration from the University of Nevada, Las Vegas. We believe Mr. Hornbuckle is qualified to serve on the New PLAYSTUDIOS Board of Directors due to his extensive management experience as a CEO and senior executive of a public company and his understanding of the entertainment and gaming industry.

074

*Joe Horowitz.* Upon consummation of the Business Combination, Mr. Horowitz will serve as a member of the New PLAYSTUDIOS Board of Directors. Joe Horowitz has been the Managing General Partner of Icon Ventures, a leading Silicon Valley venture capital firm, since 2003. Mr. Horowitz was also a founder of Icon Ventures in 2003 and has overseen its growth from $100 million in assets under management to $1.1 billion. Joe's venture capital experience also includes a 10-year tenure at U.S. Venture Partners, where the first deal that he worked on was the seed financing of Sun Microsystems. He was also Chairman and CEO of Geocast Network Systems, a broadband infrastructure company backed by Mayfield, Kleiner Perkins and Institutional Venture Partners. Current Icon Ventures portfolio companies that Joe is on the Board of or actively involved with include Area 1 Security, Global Worldwide, Synack, TuneIn and Volansi. He has also served on the board of the National Venture Capital Association and was previously a board member of the Western Association of Venture Capitalists. Joe holds a Bachelor of Arts in economics from Columbia University and a Master of Business Administration from the Wharton Graduate School of Business. We believe Mr. Horowitz is qualified to serve on the New PLAYSTUDIOS Board of Directors due to his experience as an investor, board member or executive officer of multiple technology companies and his understanding of the technology industry.

*Jason Krikorian.* Upon consummation of the Business Combination, Mr. Krikorian will serve as a member of the New PLAYSTUDIOS Board of Directors. He has been a General Partner of DCM, an international venture capital firm, since 2010 as well as a member of the board of directors of Augmedix since June 2017 and Shift Technologies since September 2018. He also has experience as a board member of other private companies. Before joining DCM, Mr. Krikorian was a co-founder of Sling Media, Inc., a pioneering digital media company and creator of the Slingbox, where he led the establishment of partnerships with global MSOs and mobile operators, as well as the international expansion of the company. Prior to Sling Media, Mr. Krikorian was a Partner at id8 Group where he advised leading global brands on product and business strategy focusing on digital media and mobile device platforms. He also spent time at the Boston Consulting Group, where he advised Fortune 500 clients in the retail, automotive and utilities sectors. Mr. Krikorian holds a Bachelor of Arts in Psychology from the University of California, Berkeley and both a Master of Business Administration and Juris Doctorate from the University of Virginia. We believe Mr. Krikorian is qualified to serve on the New PLAYSTUDIOS Board of Directors due to his experience as an investor in the mobile device platforms space and his background and understanding of the Internet and digital media industries.

*Judy K. Mencher.* Upon consummation of the Business Combination, Ms. Mencher will serve as a member of the New PLAYSTUDIOS Board of Directors. Ms. Mencher currently serves as a member of the board of directors of New Millennium Homes, a California homebuilder, since 1997 and Spiral Water Technologies, a New Jersey manufacturer of advanced water filtration systems, since November, 2018. Ms. Mencher is also the founder and Chief Executive Officer of Race Point Investors, LLC, a consultancy firm that specializes in advising various private equity funds and hedge funds on distressed investments and other matters, since March, 2018. Prior to joining Race Point Investors, LLC, Ms. Mencher served as Principal of DDJ Capital Management, a firm that specializes in high yield and distressed investing, with assets under management during her tenure of $1 billion to $3 billion from 1996 to 2006. Ms. Mencher holds a Bachelor of Arts in Economics from Tufts University and both a Juris Doctorate and Master of Business Administration from Boston University. We believe that Ms. Mencher is well qualified to serve on the New PLAYSTUDIOS Board of Directors due to her experience as a board member and in evaluating investments as well as her background in finance.

*James Murren.* Upon consummation of the Business Combination, Mr. Murren will serve as a member of the New PLAYSTUDIOS Board of Directors. Mr. Murren has served as Chairman of the Acies board of directors since August 2020. Mr. Murren is also the Chair of the Nevada COVID-19 Response, Relief and Recovery Task Force. He was the chair of the Leadership Board of the University of Southern California's Keck School of Medicine and has been a member of the Board of Trustees for Howard University since 2016. Mr. Murren first joined MGM Resorts International in 1998 as the Chief Financial Officer and served as the Chairman and CEO of MGM Resorts International from December 2008 to February 2020. He also served as Chairman of the American Gaming Association from 2014 to 2017, was on the Board of Trustees of the Brookings Institution from 2011 to 2018, served on the National Infrastructure Advisory Council from December 2013 to 2020, and served as a director of Delta Petroleum Corporation from February 2008 to November 2011. Mr. Murren co-founded the Nevada Cancer Institute, which was the

075

TABLE OF CONTENTS

## BENEFICIAL OWNERSHIP OF SECURITIES

The following table sets forth information regarding (i) the beneficial ownership of Acies ordinary shares as of March 31, 2021, and (ii) the expected beneficial ownership of shares of New PLAYSTUDIOS common stock immediately following consummation of the Business Combination (assuming a "no redemption" scenario and assuming a "redemption" scenario as described below) by:

- each person who is known to be the beneficial owner of more than 5% of Acies ordinary shares;

- each person who is expected to be the beneficial owner of more than 5% of shares of New PLAYSTUDIOS common stock post-Business Combination;

- each of Acies' current executive officers and directors;

- each person who will become an executive officer or director of New PLAYSTUDIOS post-Business Combination; and

- all executive officers and directors of Acies as a group pre-Business Combination, and all executive officers and directors of New PLAYSTUDIOS post-Business Combination.

Beneficial ownership is determined according to the rules of the SEC, which generally provide that a person has beneficial ownership of a security if he, she or it possesses sole or shared voting or investment power over that security, including options and warrants that are currently exercisable or exercisable within 60 days.

The beneficial ownership of Acies ordinary shares pre-Business Combination is based on 26,906,250 Acies ordinary shares issued and outstanding as of March 31, 2021, which includes an aggregate of 5,381,250 Acies Class B ordinary shares outstanding as of such date. The beneficial ownership of PLAYSTUDIOS capital stock pre-Business Combination is based on 403,942,769 shares of PLAYSTUDIOS capital stock (on an as-converted basis) issued and outstanding as of March 31, 2021.

The expected beneficial ownership of shares of New PLAYSTUDIOS common stock post-Business Combination assumes two scenarios:

(a) a "no redemption" scenario where (i) no public shareholders of Acies exercise redemption rights with respect to their public shares for a pro rata share of the funds in the Trust Account, (ii) all PLAYSTUDIOS stockholders make an election to receive cash consideration for the full 15% of their shares of PLAYSTUDIOS capital stock, which would equal approximately $144.1 million, and (iii) New PLAYSTUDIOS issues 81,679,273 shares of New PLAYSTUDIOS common stock to PLAYSTUDIOS stockholders as stock consideration pursuant to the Merger Agreement; and

(b) a "maximum redemption" scenario where (i) shareholders holding 21,525,000 shares of Acies Class A ordinary shares exercise their redemption rights for their pro rata share of the funds in the Trust Account and (ii) New PLAYSTUDIOS issues 96,093,263 shares of New PLAYSTUDIOS common stock to stockholders as stock consideration pursuant to the Merger Agreement. Under this scenario, there is insufficient cash to pay any cash consideration to PLAYSTUDIOS stockholders. See "*Unaudited Pro Forma Condensed Combined Financial Information*."

The expected beneficial ownership of shares of New PLAYSTUDIOS common stock post-Business Combination also assumes (i) no issuance of any Earnout Securities; (ii) 25,000,000 shares of New PLAYSTUDIOS Class A common stock are issued in connection with the PIPE Financing immediately prior to the Closing and (iii) no record or beneficial ownership of any shares of New PLAYSTUDIOS common stock issuable upon exercise of public warrants or private placement warrants, as such securities are not exercisable or convertible within 60 days of March 31, 2021.

Based on the foregoing assumptions, we estimate that there would be 131,615,243 shares of New PLAYSTUDIOS common stock issued and outstanding immediately following the consummation of the Business Combination in the No Redemption Scenario consisting of 115,375,226 shares of New PLAYSTUDIOS Class A common stock and 16,240,017 shares of New PLAYSTUDIOS Class B common stock and 123,499,347 shares of New PLAYSTUDIOS common stock issued and outstanding immediately following the consummation of the Business Combination in the Maximum Redemption Scenario

284

076

consisting of 104,393,445 shares of New PLAYSTUDIOS Class A common stock and 19,105,902 shares of New PLAYSTUDIOS Class B common stock. If the actual facts are different from the foregoing assumptions, ownership figures in the combined company and the columns under Post-Business Combination in the table that follows will be different.

Unless otherwise indicated, Acies believes that all persons named in the table below have sole voting and investment power with respect to the voting securities beneficially owned by them.

285

077

| Name and Address of Beneficial Owner[1] | Pre-Business Combination | | | | Post-Business Combination | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Acies | | PLAYSTUDIOS | | Assuming No Redemption | | | | | Assuming Maximum Redemption | | | | |
| | Number of Ordinary Shares | % of Acies Ordinary Shares | Number of Shares of PLAY STUDIOS Capital Stock | % of PLAY STUDIOS Capital Stock | Number of Shares of New PLAY STUDIOS CLASS A Common Stock | % of New PLAY STUDIOS Class A Common Stock | Number of Shares of New PLAY STUDIOS CLASS B Common Stock | % of New PLAY STUDIOS Class B Common Stock | % of Total Voting Power | Number of Shares of New PLAY STUDIOS CLASS A Common Stock | % of New PLAY STUDIOS Class A Common Stock | Number of Shares of New PLAY STUDIOS CLASS B Common Stock | % of New PLAY STUDIOS Class B Common Stock | % of Total Voting Power |
| *5% Holders of Acies* | | | | | | | | | | | | | | |
| Acies Acquisition LLC[2] | 5,381,250 | 20.0% | — | — | 3,631,250[3] | 3.1% | — | — | * | 2,824,062[3][4] | 2.7% | — | — | * |
| Millennium Management LLC[5] | 1,800,000 | 6.7% | — | — | 1,800,000 | 1.6% | — | — | * | 1,800,000 | 1.7% | — | — | * |
| *5% Holders of New PLAYSTUDIOS* | | | | | | | | | | | | | | |
| Activision Publishing, Inc.[6] | — | — | 64,000,000 | 15.8% | 12,763,628 | 11.1% | — | — | 2.9% | 15,016,033 | 14.4% | — | — | 3.1% |
| MGM Resorts International[7] | — | — | 62,852,292 | 15.6% | 14,534,739[8] | 12.6% | — | — | 3.3% | 16,746,752[8] | 16.0% | — | — | 3.4% |
| *Directors and Executive Officers Pre-Business Combination* | | | | | | | | | | | | | | |
| James Murren | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Daniel Fetters[2] | 5,381,250 | 20.0% | — | — | 3,631,250[3] | 3.1% | — | — | * | 2,824,062[3][4] | 2.7% | — | — | * |
| Edward King[2] | 5,381,250 | 20.0% | — | — | 3,631,250[3] | 3.1% | — | — | * | 2,824,062[3][4] | 2.7% | — | — | * |
| Christopher Grove | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Zach Leonsis | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Brisa Carleton | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Andrew Zobler | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Sam Kennedy | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| All Acies directors and executive officers as a group (8 individuals) | 5,381,250 | 20.0% | — | — | 3,631,250[3] | 3.1% | — | — | * | 2,824,062[3][4] | 2.7% | — | — | * |
| *Directors and Executive Officers Post-Business Combination* | | | | | | | | | | | | | | |
| Andrew Pascal[9] | 522,843 | 1.0% | 90,836,672[10] | 22.0% | 18,446,717[11] | 13.8% | 18,466,717[12] | 100.0% | 76.2% | 21,312,602[11] | 17.0% | 21,312,602[13] | 100.0% | 80.3% |
| Scott Peterson | — | — | 1,891,666[14] | * | 390,455[15] | * | — | — | * | 442,832[16] | * | — | — | * |
| Joel Agena | — | — | 833,333[17] | * | 195,521[18] | * | — | — | * | 195,521[18] | * | — | — | * |
| James Murren | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Bill Hornbuckle[19] | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Joe Horowitz | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Jason Krikorian | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Judy Mencher | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| All New PLAYSTUDIOS directors and executive officers as a group (8 individuals) | 522,843 | 1.0% | 93,561,671[20] | 22.6% | 19,032,693[21] | 14.2% | 18,466,717[12] | 100.0% | 76.3% | 21,951,955[22] | 17.4% | 21,312,602[13] | 100.0% | 80.4% |

286

078

TABLE OF CONTENTS

* Less than one percent

(1) Unless otherwise noted, the business address of each of those listed in the table above pre-Business Combination is 1219 Morningside Drive, Suite 110, Manhattan Beach, CA 90266 and post-Business Combination is 10150 Covington Cross Drive, Las Vegas, NV 89144.

(2) The shares reported above are held in the name of Acies Acquisition LLC. Acies Acquisition LLC is controlled by Daniel Fetters and Edward King, as the managing members. The shares reported above consist solely of Acies Class B ordinary shares. Such shares will automatically convert into shares of New PLAYSTUDIOS Class A common stock at the time of the Domestication.

(3) In connection with the Business Combination, Acies Acquisition LLC will forfeit, for no consideration, 850,000 Acies Class B ordinary shares at the Domestication. The shares reported above also exclude 900,000 shares of New PLAYSTUDIOS Class A common stock that are subject to certain vesting conditions based on the trading price of New PLAYSTUDIOS Class A common stock. In the event such performance targets are not met before the fifth anniversary of the Closing, the shares will be forfeited. While the shares will be considered issued and outstanding as of the date of the Business Combination, the share are contingently returnable and Acies Acquisition LLC currently has neither voting nor dispositive power over such shares.

(4) Up to an additional 807,188 shares of Acies Class B ordinary shares will be forfeited at the time of the Domestication, for no consideration, conditioned on certain redemptions of Acies Class A ordinary shares.

(5) According to Schedule 13G/A, filed on January 15, 2021 by Integrated Core Strategies (US) LLC ("Integrated Core Strategies"), Riverview Group LLC ("Riverview Group"), ICS Opportunities, Ltd. ("ICS Opportunities"), Millennium International Management LP ("Millennium International Management"), Millennium Management LLC ("Millennium Management"), Millennium Group Management LLC ("Millennium Group Management"), and Israel A. Englander ("Mr. Englander"), the business address of such parties is 666 Fifth Avenue, New York, New York 10103. The shares reported above are held as follows: (i) Integrated Core Strategies beneficially owned 839,997 Class A ordinary shares and 225,003 Acies units; (ii) Riverview Group beneficially owned 600,000 Class A ordinary shares; and (iii) ICS Opportunities beneficially owned 135,000 Acies units. Millennium International Management LP, a Delaware limited partnership ("Millennium International Management"), is the investment manager to ICS Opportunities and may be deemed to have shared voting control and investment discretion over securities owned by ICS Opportunities. Millennium Management is the general partner of the managing member of Integrated Core Strategies and Riverview Group and may be deemed to have shared voting control and investment discretion over securities owned by Integrated Core Strategies and Riverview Group. Millennium Management is also the general partner of the 100% owner of ICS Opportunities and may also be deemed to have shared voting control and investment discretion over securities owned by ICS Opportunities. Millennium Group Management is the managing member of Millennium Management and may also be deemed to have shared voting control and investment discretion over securities owned by Integrated Core Strategies and Riverview Group. Millennium Group Management is also the general partner of Millennium International Management and may also be deemed to have shared voting control and investment discretion over securities owned by ICS Opportunities. The managing member of Millennium Group Management is a trust of which Mr. Englander currently serves as the sole voting trustee. Therefore, Mr. Englander may also be deemed to have shared voting control and investment discretion over securities owned by Integrated Core Strategies, Riverview Group and ICS Opportunities.

(6) The address of Activision Publishing, Inc. is 3100 Ocean Park Boulevard, Santa Monica, CA 90405.

(7) The address of MGM Resorts International is 3600 Las Vegas Boulevard South, Las Vegas, Nevada 89109.

(8) Includes 2,000,000 shares of New PLAYSTUDIOS Class A common stock expected to be issued to MGM Resorts International in connection with the PIPE Financing.

287

079

(9) In connection with the Business Combination, Mr. Pascal will forfeit, for no consideration, 522,843 Acies Class B ordinary shares and 449,129 Acies private placement warrants at the Closing.

(10) Consists of (i) 81,431,472 shares of PLAYSTUDIOS capital stock held of record by the Founder Trust and (ii) 9,405,200 shares underlying options exercisable within 60 days of March 31, 2021.

(11) Consists of shares of New PLAYSTUDIOS Class B common stock that may be converted into shares of New PLAYSTUDIOS Class A common stock at any time at the election of the holder thereof.

(12) Consists of (i) 16,240,017 shares of New PLAYSTUDIOS Class B common stock held of record by the Founder Trust and (ii) 2,206,700 shares underlying options exercisable within 60 days of March 31, 2021.

(13) Consists of (i) 19,105,902 shares of New PLAYSTUDIOS Class B common stock held of record by the Founder Trust and (ii) 2,206,700 shares underlying options exercisable within 60 days of March 31, 2021.

(14) Consists of (i) 1,516,666 shares of PLAYSTUDIOS capital stock held of record by the Scott E Peterson Trust and (ii) 375,000 shares underlying options exercisable within 60 days of March 31, 2021.

(15) Consists of (i) 302,471 shares of New PLAYSTUDIOS Class A common stock held of record by the Scott E Peterson Trust and (ii) 87,984 shares underlying options exercisable within 60 days of March 31, 2021.

(16) Consists of (i) 355,848 shares of New PLAYSTUDIOS Class A common stock held of record by the Scott E Peterson Trust and (ii) 87,984 shares underlying options exercisable within 60 days of March 31, 2021.

(17) Consists of 833,333 shares underlying options exercisable within 60 days of March 31, 2021.

(18) Consists of 195,521 shares underlying options exercisable within 60 days of March 31, 2021.

(19) Does not include any shares beneficially owned by MGM Resorts International, as to which Mr. Hornbuckle disclaims beneficial ownership.

(20) Consists of (i) 82,948,138 shares of PLAYSTUDIOS capital stock and (ii) 10,613,533 shares underlying options exercisable within 60 days of March 31, 2021.

(21) Consists of (i) 16,240,017 shares of New PLAYSTUDIOS Class B common stock that may be converted into shares of New PLAYSTUDIOS Class A common stock at any time at the election of the holder thereof, (ii) 302,471 shares of New PLAYSTUDIOS Class A common stock and (iii) 2,490,205 shares underlying options exercisable within 60 days of March 31, 2021.

(22) Consists of (i) 19,105,902 shares of New PLAYSTUDIOS Class B common stock that may be converted into shares of New PLAYSTUDIOS Class A common stock at any time at the election of the holder thereof, (ii) 355,848 shares of New PLAYSTUDIOS Class A common stock and (iii) 2,490,205 shares underlying options exercisable within 60 days of March 31, 2021.

## CERTAIN RELATIONSHIPS AND RELATED PERSON TRANSACTIONS

**Sponsor**

*Sponsor Shares*

On September 15, 2020, the Sponsor purchased 8,625,00 Sponsor Shares for an aggregate purchase price of $25,000, or approximately $0.003 per share. On October 20, 2020, the Sponsor cancelled an aggregate of 2,875,000 Sponsor Shares, and on November 9, 2020, forfeited an additional 368,750 Sponsor Shares as a result of the underwriters' election to partially exercise their over-allotment option in connection with Acies' IPO, such that an aggregate of 5,381,250 Sponsor Shares are currently issued and outstanding.

The Sponsor is controlled by Daniel Fetters and Edward King as managing members. Additionally, Andrew Pascal beneficially owns a 9.8% interest in the Sponsor. Mr. Pascal has agreed to forfeit his interests in the Sponsor and all of the associated Acies Class B ordinary shares and Acies Private placement warrants, contingent on the Closing.

These Sponsor Shares are identical to the Acies Class A ordinary shares included in the units sold in Acies' IPO, except that (i) only the holders of the Sponsor Shares have the right to vote on the election of directors prior to the initial business combination (as defined in the Cayman Constitutional Documents), (ii) the Sponsor Shares are subject to certain transfer restrictions, (iii) the holders of the Sponsor Shares have agreed pursuant to a letter agreement to waive (x) their redemption rights with respect to the Sponsor Shares and public shares held by them in connection with the completion of a business combination, (y) their redemption rights with respect to any Sponsor Shares and public shares held by them in connection with a shareholder vote to amend the Cayman Constitutional Documents (A) to modify the substance or timing of Acies' obligation to allow redemption in connection with its initial business combination or to redeem 100% of the public shares if Acies does not complete its initial business combination by October 22, 2022 or (B) with respect to any other provision relating to shareholders' rights or pre-initial business combination activity and (z) their rights to liquidating distributions from the Trust Account with respect to the Sponsor Shares if Acies fails to complete a business combination by October 22, 2022, (iv) the Sponsor Shares are automatically convertible into Acies Class A ordinary shares at the time of Acies' initial business combination and (v) the Sponsor Shares are entitled to registration rights.

In connection with the Business Combination, upon the Domestication, 850,000 Sponsor Shares will be forfeited for no consideration. In addition, up to an additional 807,188 Sponsor Shares will be forfeited conditioned on certain redemptions of Acies Class A ordinary shares. The remaining Sponsor Shares will convert automatically, on a one-for-one basis, into shares of New PLAYSTUDIOS Class A common stock. For additional information, see "*Domestication Proposal*."

*Private Placement Warrants*

Simultaneously with the consummation of the IPO of Acies, the Sponsor purchased 4,333,333 private placement warrants at a price of $1.50 per warrant, or $6,500,000 in the aggregate, in a private placement. Each private placement warrant entitles the holder to purchase one Acies Class A ordinary share for $11.50 per share. Additionally, on November 9, 2020, the Sponsor purchased an additional 203,334 private placement warrants, for total gross proceeds to Acies of $305,000. A portion of the proceeds from the sale of the private placement warrants was placed in the Trust Account. The private placement warrants may not be redeemed by Acies so long as they are held by the Sponsor or its permitted transferees. If the private placement warrants are held by holders other than the Sponsor or its permitted transferees, the private placement warrants will be redeemable by Acies and exercisable by the holders on the same basis as the warrants included in the units that were sold as part of the IPO of Acies. The Sponsor, or its permitted transferees, has the option to exercise the private placement warrants on a cashless basis.

The private placement warrants are identical to the warrants included in the units sold in the IPO of Acies except that the private placement warrants: (i) are not redeemable by Acies, (ii) may be exercised for cash or on a cashless basis so long as they are held by the Sponsor or any of its permitted transferees and (iii) are entitled to registration rights (including the Acies Class A ordinary shares issuable upon exercise of the private placement warrants). Additionally, the purchasers have agreed not to transfer, assign or sell any

289

of the private placement warrants, including the Acies Class A ordinary shares issuable upon exercise of the private placement warrants (except to certain permitted transferees), until 30 days after the completion of Acies' initial business combination.

In connection with the Business Combination, upon the Domestication, each of the private placement warrants will convert automatically into a warrant to acquire one share of New PLAYSTUDIOS Class A common stock pursuant to the Warrant Agreement. For additional information, see "*Domestication Proposal*."

In addition, in connection with Acies' initial public offering and the partial exercise of the over-allotment option, Mr. Pascal became the beneficial holder of 522,843 Acies Class B ordinary shares and 449,129 Acies private placement warrants through his ownership of interests in the Sponsor. Mr. Pascal has agreed to forfeit his interests in the Sponsor and all of the associated Acies Class B ordinary shares and Acies private placement warrants, contingent on the Closing.

### Registration Rights

The holders of the Sponsor Shares and private placement warrants (and any Acies Class A ordinary shares issuable upon conversion of the Sponsor Shares and upon the exercise of the private placement warrants) are entitled to registration rights pursuant to a registration rights agreement signed October 22, 2020, requiring Acies to register such securities for resale (in the case of the Sponsor Shares, only after conversion to Acies Class A ordinary shares). The holders of these securities are entitled to make up to three demands, excluding short form demands, that Acies register such securities. In addition, the holders have certain "piggy-back" registration rights with respect to registration statements filed subsequent to the completion of Acies' initial business combination and rights to require Acies to register for resale such securities pursuant to Rule 415 under the Securities Act. Acies will bear the expenses incurred in connection with the filing of any such registration statements.

In connection with the Business Combination, the registration rights agreement will be amended and restated. For additional information, see "*Business Combination Proposal—Related Agreements—Amended and Restated Registration Rights Agreement.*"

### MGM Investment

Concurrently with the execution of the Merger Agreement, Acies entered into a Subscription Agreement with MGM Resorts International ("MGM"), pursuant to which MGM subscribed for shares of New PLAYSTUDIOS Class A common stock in connection with the PIPE Investment. MGM is expected to fund $20,000,000 of the PIPE Investment, for which they will receive 2,000,000 shares of New PLAYSTUDIOS Class A common stock.

The MGM PIPE Investment will be consummated substantially concurrently with the closing of the Business Combination. For additional information, see "*Business Combination Proposal—Approval of the Business Combination—Related Agreements—Subscription Agreements*" and "*—MGM Marketing Agreement*" and "*—MGM Letter of Commitment,*" below.

### Related Party Note and Advances

On September 4, 2020, Acies issued an unsecured promissory note to the Sponsor, pursuant to which Acies borrowed up to an aggregate principal amount of $300,000. The note was non-interest bearing and payable on the earlier of (i) December 31, 2020 or (ii) the completion of Acies' IPO. The borrowings outstanding under the note in the amount of $278,631 were repaid subsequent to the closing of Acies' IPO on October 29, 2020.

Prior to Acies' initial business combination, Acies' audit committee will review on a quarterly basis all payments that were made to the Sponsor, officers, directors or Acies' or their affiliates and will determine which expenses and the amount of expenses that will be reimbursed. There is no cap or ceiling on the reimbursement of out-of-pocket expenses incurred by such persons in connection with activities on Acies' behalf, although no such reimbursements will be made from the proceeds of Acies' IPO held in the Trust Account prior to the completion of Acies' initial business combination.

TABLE OF CONTENTS

**WHERE YOU CAN FIND MORE INFORMATION**

Acies has filed a registration statement on Form S-4 to register the issuance of securities described elsewhere in this proxy statement/prospectus. This proxy statement/prospectus is a part of that registration statement. This proxy statement/ prospectus does not contain all of the information included in the registration statement. For further information pertaining to Acies and its securities, you should refer to the registration statement and to its exhibits.

Acies files reports, proxy statements and other information with the SEC as required by the Exchange Act. You may access information on Acies at the SEC website containing reports, proxy statements and other information at: http://www.sec.gov. Those filings are also available free of charge to the public on, or accessible through, Acies' corporate website under the heading "Documents," at http:// www.aciesacq.com. Acies' website and the information contained on, or that can be accessed through, the website is not deemed to be incorporated by reference in, and is not considered part of, this proxy statement/prospectus.

Whenever reference is made in this proxy statement/prospectus to any of Acies' or PLAYSTUDIOS' contracts, agreements or other documents, the references are not necessarily complete, and you should refer to the annexes to the proxy statement/prospectus and the exhibits filed with the registration statement for copies of the actual contract, agreement or other document.

All information contained in this proxy statement/prospectus relating to Acies has been supplied by Acies, and all such information relating to PLAYSTUDIOS has been supplied by PLAYSTUDIOS, respectively. Information provided by one or another does not constitute any representation, estimate or projection of the other.

If you would like additional copies of this proxy statement/prospectus or any document incorporated by reference in this proxy statement/prospectus, or if you have questions about the Business Combination, you should contact via phone or in writing:

Acies Acquisition Corp.
1219 Morningside Drive, Suite 110
Manhattan Beach, CA 90266
(310) 545-9265

You may also obtain these documents by requesting them in writing or by telephone from Acies' proxy solicitation agent at the following address and telephone number:

Morrow Sodali
Telephone: (800) 662-5200
banks and brokers can call collect at: (203) 658-9400
Email: ACAC.info@investor.morrowsodali.com

If you are a shareholder of Acies and would like to request documents, please do so by                    , 2021 to receive them before the Acies Extraordinary General Meeting. If you request any documents, they will be mailed to you by first class mail, or another equally prompt means.

Neither Acies nor PLAYSTUDIOS has authorized anyone to give any information or make any representation about the Business Combination or their companies that is different from, or in addition to, that contained in this proxy statement/prospectus. If you are in a jurisdiction where offers to exchange or sell, or solicitations of offers to exchange or purchase, the securities offered by this proxy statement/prospectus or the solicitation of proxies is unlawful, or if you are a person to whom it is unlawful to direct these types of activities, then the offer presented in this proxy statement/prospectus does not extend to you. The information contained in this proxy statement/prospectus speaks only as of the date of this proxy statement/prospectus unless the information specifically indicates that another date applies.

314

083

**ACIES ACQUISITION CORP.**
**INDEX TO FINANCIAL STATEMENTS**

| | Page |
|---|---|
| **Financial Statements (Audited) for the period from August 14, 2020 (inception) to December 31, 2020** | |
| Report of independent registered public accounting firm | F-2 |
| Balance Sheet | F-3 |
| Statement of Operations | F-4 |
| Statement of Changes in Shareholder's Equity | F-5 |
| Statement of Cash Flows | F-6 |
| Notes to Financial Statements | F-7 |
| **Financial Statements (Unaudited) for the quarter ended March 31, 2021** | |
| Condensed Consolidated Balance Sheets as of March 31, 2021 (Unaudited) and as of December 31, 2020 | F-26 |
| Condensed Consolidated Statement of Operations for the three months ended March 31, 2021 (Unaudited) | F-27 |
| Condensed Consolidated Statement of Changes in Shareholder's Equity for the three months ended March 31, 2021 (Unaudited) | F-28 |
| Condensed Consolidated Statement of Cash Flows for the three months ended March 31, 2021 (Unaudited) | F-29 |
| Notes to Condensed Consolidated Financial Statements (Unaudited) | F-30 |

**PLAYSTUDIOS, INC.**
**INDEX TO FINANCIAL STATEMENTS**

| | Page |
|---|---|
| **Audited Consolidated Financial Statements of PlayStudios, Inc.** | |
| Report of Independent Registered Public Accounting Firm | F-49 |
| Consolidated Balance Sheets as of December 31, 2020 and 2019 | F-50 |
| Consolidated Statements of Operations for the years ended December 31, 2020, 2019 and 2018 | F-51 |
| Consolidated Statements of Comprehensive Income for the years ended December 31, 2020, 2019 and 2018 | F-52 |
| Consolidated Statements of Stockholders' Equity for the years ended December 31, 2020, 2019 and 2018 | F-53 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2020, 2019 and 2018 | F-54 |
| Notes to Consolidated Financial Statements | F-55 |
| | |
| **Unaudited Consolidated Financial Statements of PlayStudios, Inc.** | |
| Consolidated Balance Sheets as of March 31, 2021 and as of December 31, 2021 (Unaudited) | F-81 |
| Consolidated Statements of Operations for the three months ended March 31, 2021 and 2020 (Unaudited) | F-82 |
| Consolidated Statements of Comprehensive Income for the three months ended March 31, 2021 and 2020 (Unaudited) | F-83 |
| Consolidated Statements of Stockholders' Equity for the three months ended March 31, 2021 and 2020 (Unaudited) | F-84 |
| Consolidated Statements of Cash Flows for the three months ended March 31, 2021 and 2020 (Unaudited) | F-85 |
| Notes to Consolidated Financial Statements (Unaudited) | F-86 |

084

Case 2:22-cv-01159-RFB-NJK    Document 93-1    Filed 12/21/22    Page 86 of 86

ANNEX A

**AGREEMENT AND PLAN OF MERGER**

**dated as of February 1, 2021**

**by and among**

**PLAYSTUDIOS, INC.,**

**ACIES ACQUISITION CORP.,**

**CATALYST MERGER SUB I, INC.,**

**and**

**CATALYST MERGER SUB II, LLC**