—————2:22-cv-01159-RFB-NJK———

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

CHRISTIAN A. FELIPE,                )
individually as                     )  Case No. 2:22-cv-01159-RFB-NJK
administrator of the                )
CHRISTIAN A. FELIPE                 )  Las Vegas, Nevada
CONTRIBUTORY IRA, and on            )  Friday, October 20, 2023
Behalf of Similarly                 )  12:59 p.m.
Situated Persons,                   )
                                    )  MOTION HEARING
            Plaintiffs,             )
                                    )  *C E R T I F I E D   C O P Y*
     vs.                            )

PLAYSTUDIOS, INC., et al.,

            Defendants.

REPORTER'S TRANSCRIPT OF PROCEEDINGS

THE HONORABLE RICHARD F. BOULWARE, II,
UNITED STATES DISTRICT JUDGE

APPEARANCES:        See next page

COURT REPORTER:     Patricia L. Ganci, RMR, CRR
                    United States District Court
                    333 Las Vegas Boulevard South, Room 1334
                    Las Vegas, Nevada  89101

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

2:22-cv-01159-RFB-NJK

APPEARANCES:

For the Plaintiffs:

**ANDREW R. MUEHLBAUER, ESQ.**
MUEHLBAUER LAW OFFICE, LTD.
7915 West Sahara Avenue, Suite 104
Las Vegas, Nevada 89117
(702) 330-4505

and

**OMAR JAFRI, ESQ.**
POMERANTZ, LLP
10 South LaSalle Street, Suite 3505
Chicago, Illinois 60603
(312) 377-1181

For the Defendants:

**BRADLEY T. AUSTIN, ESQ.**
SNELL & WILMER, LLP
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
(702) 784-5200

and

**JENNIFER C. BRETAN, ESQ.**
FENWICK & WEST, LLP
555 California Street, 12th Floor
San Francisco, California 94104
(415) 875-2412

LAS VEGAS, NEVADA; FRIDAY, OCTOBER 20, 2023; 12:59 P.M.

--oOo--

P R O C E E D I N G S

THE COURT:  Please be seated.

COURTROOM ADMINISTRATOR:  The matter now before the Court is Christian A. Felipe and the Phoenix Insurance Companies, et al., versus Playstudios, Inc., et al., Case Number 2:22-cv-1159-RFB-NJK.  Counsel, please make your appearances beginning with the plaintiffs.

MR. MUEHLBAUER:  Good afternoon, Your Honor.  Andrew Muehlbauer for the plaintiffs.

MR. JAFRI:  Good afternoon, Your Honor.  Omar Jafri from the Pomerantz Firm for the lead plaintiffs.

MS. BRETAN:  Good afternoon, Your Honor.  Jennifer Bretan of Fenwick and West for Playstudios and the individual defendants.

MR. AUSTIN:  Good afternoon, Your Honor.  Brad Austin on behalf of the defendants as well from Snell & Wilmer.

THE COURT:  Good afternoon.

So who's going to be arguing this for the defendants in this case?

MS. BRETAN:  I will, Your Honor.

THE COURT:  Why don't you come up to the podium.

I'm sorry, Miss?

MS. BRETAN:  Bretan.

———————2:22-cv-01159-RFB-NJK———————

THE COURT:  Bretan?

MS. BRETAN:  Bretan.

THE COURT:  Bretan.

MS. BRETAN:  I know, it's a hard one.

THE COURT:  All right.  So, Ms. Bretan, let me start with this.  I'm not taking judicial notice of 250 pages.  I'm not sure why you all thought that that was something that I should do.  The proxy statement and registration statement, that could be relied upon, but you should start with that.  Because all of the arguments based upon the other, I mean, I don't know, 18 documents, I'm not even considering those documents at all.  So start with that in terms of your arguments.  That may change some of what you argue with me, but I don't find a basis to take judicial notice --

MS. BRETAN:  Okay.

THE COURT:  -- for any of those other documents, other than the proxy and registration statement so --

MS. BRETAN:  So are you saying none of the documents --

THE COURT:  Exhibits 1, I think, and 2.  Hold on.  I think those are the exhibit numbers.

MS. BRETAN:  1 and 2?  You're taking judicial notice of it or not taking judicial notice of?

THE COURT:  I am.

MS. BRETAN:  Okay.

THE COURT:  But not of anything else.

—————————2:22-cv-01159-RFB-NJK—————————

MS. BRETAN:  But not the rest of it.  Okay.  I got it. All right.

THE COURT:  So you may just want to, sort of, absorb that and think about that in the context of the arguments that you're going to be making to me.

So I want to start with this, Ms. Bretan.  Part of this, I mean, these securities laws are incredibly complex, but it comes down to some very basic things, which is did they or did they not communicate what was going wrong with this game. Because we have at least allegations -- again, we are at the motion to dismiss stage, right -- these allegations.  Now, we can talk about issues of standing and other issues, but it seems to me part of the issue, first, just starts with basics of did they misstate the problems, you know, and that folds into the issue of safe harbor.  Are these, sort of, forward-looking statements or are they, sort of, present statements about what's happening with the game or of course if there -- is this a blank check company so it doesn't matter anyway?

But I want to start with just this basic idea of the alleged misrepresentations themselves, right, and not just to get bogged down, yet, in, sort of, the different types of claims.  Because it seems to me I want to make sure that I'm understanding your best arguments as to the nature of these misrepresentations because that will drive a lot of the discussion today.

So tell me why I wouldn't at this stage find that they knew about the specific problems with the game and they didn't say specific problems with the game.  They gave this general boiler-plate language about, "We never know if games are going to be successful.  We don't know how the customer's going to react to games."  But we have at least allegedly, again we're at a motion to dismiss stage, specific statements about problems, alleged systemic problems, with the game.  Why isn't that enough?

MS. BRETAN:  Well, I'm glad to hear that's where Your Honor is focusing.  That's what -- primarily what I want to talk about today, Your Honor.  And I actually do get to the issue about request for judicial notice in the context of talking about those statements.

So just to begin with, Your Honor, Playstudios is in the entertainment business.  Like film studios and other -- other creative endeavors, there is no sure thing when it comes to making a hit game.  And you can pour millions of dollars into developing it, but it may not find its target audience.  And quite literally that is all that happened here.

The company spent time and resources on its first-ever role-playing game.  It hired a top outside studio, Boss Fight, which had a history of success making those games to develop it.  And at all times it -- it disclosed the risks related to new game development, about the ability to maintain the gaming

PATRICIA L. GANCI, RMR, CRR    (702) 385-0670

2:22-cv-01159-RFB-NJK

experience, that performance could suffer if games aren't coming to market timely, and that there's less control where -- and this is relevant here -- where you have a third-party studio developing the game, it increases the risk that launch timing may move.

And although it took longer to develop, Kingdom Boss took longer to develop than originally planned, those delays were timely disclosed.  And it did, in fact, launch in 2021.  Now --

THE COURT:  And I want to interrupt you just for a moment, though, to talk about that.  The launch date is actually not an agreed-upon fact here, right.  When the product actually launched, soft launched, hard launch, near launch, right, is actually not agreed upon between the parties, correct?

MS. BRETAN:  Plaintiff takes issue that the game didn't launch in December 2021, but it launched in December 2021.

THE COURT:  Right.  Okay.  But it's disputed.

MS. BRETAN:  It certainly launched -- it certainly launched in major markets in November of 2021.  They don't dispute that.  They recognize that.  And the company -- as the company disclosed, it launched in December 2021.

THE COURT:  Okay.  Because they're saying it launched in 2022, as you know.  And I'm saying that in part -- well, there are different types of launches.  And there's at least an allegation in terms of the extent, quote/unquote, of the launch

———————2:22-cv-01159-RFB-NJK———————

versus, you know, a, sort of, smaller launch or a full release. I want you to comment a little bit about that because that's a disputed fact here and, again, we're focussed on the allegations in the complaint. I don't know how I resolve that here at a motion to dismiss.

But that's actually a significant fact as it relates to how we look at the statements because when the statements are made is related to the timing of the, quote/unquote, launch or soft launch or no launch. And so I want you to address that briefly because obviously for it to be forward looking, right, it has to -- it depends upon the date when the game is coming out and being developed.

MS. BRETAN: I'm happy to do that, Your Honor.

I actually don't think they say it launched in 2022. I think what they say is they characterize it -- to Your Honor's point, they say it soft launched in 2021. But the Ninth Circuit has addressed that very type of argument. It came up in the *Wochos versus Tesla* case where they -- where they -- plaintiffs there quibbled with the term "production vehicle" and how it was produced as not being production and absolutely rejected a plaintiff's insertion of an inexpert view of what production meant or what launch meant.

And, here, that's exactly what they're doing. They're saying a soft launch isn't a launch. Mind you, there was a full launch, full commercial game was released, but they don't say

—————2:22-cv-01159-RFB-NJK—————

2022.  They do not say that, plaintiffs don't say that.

And -- and you can take a look, Your Honor, at the *Wochos* case.  It deals with this particular issue --

THE COURT:  What I'm focussed on is the complaint because, again, some of these cases that you all discuss occur after there's been a motion for summary judgment.  There is a difference, right, in terms of the Court's ability to inquire and resolve things at different stages.  And so partly I want to make sure at least I hear from you why you think I should disregard this soft versus hard launch language because whether or not it's soft or hard seems to me could really depend upon the context of a case.  That may have a different meaning.  It is not necessarily I think a legal term of art to the degree that the Court can take some sort of notice of that.

So, in other words, different entities can have different views of what a soft versus a hard launch is.  As I can't resolve that now, that seems to me to be an issue as it relates to the arguments that you raise because I don't know how just looking at the complaint I can make that determination.  So if you want to focus me on paragraphs in the complaint where you feel like there is, sort of, an undisputed allegation as it relates to when it's launched, that would be helpful.  Because in the back and forth in the briefs, there's a little bit of confusion, and then we're referencing these other documents, which I'm not actually taking notice of.  And so it would be

2:22-cv-01159-RFB-NJK

helpful for me if you can point to that if you have some reference to that.

MS. BRETAN:  I don't have the paragraph cite, but Confidential Witness 1, which is the one who comes up with the soft launch terminology, describes the game launching in 2021. And I don't have the specific paragraph cite.  I can look at it in the break, Your Honor.

But just to clarify, though, the *Wochos* case did deal with this particular issue on a motion to dismiss.  It wasn't at summary judgment.  It was on a motion to dismiss, and there they used a term of art about production vehicle.  Plaintiffs offered a term of art about what a production vehicle is, just like plaintiffs here offer a term of art to describe a soft launch as something other than a launch.  So it's exact -- it's really on point, Your Honor.

It was in the motion to dismiss context.  And the Court, the Ninth Circuit, said it was proper at this stage to look at what -- what defendants said, not what plaintiffs characterized they said -- not plaintiff's characterization of what was said.

THE COURT:  Right, but that's slightly different than the nature of what a launch is.  And so you're right.  If I can look at something that can tell me definitively one way or another a fact, then at the motion to dismiss stage I can do that.

But the nature of a soft versus a hard launch is not from my perspective a term of art such that I can say, that meant that 50 percent of the game was launched or in major markets or it meant that it was on a particular timeline so that it would be launched three months later.

MS. BRETAN:  Under --

THE COURT:  The difficulty for me is I don't know what that term actually means without context.  And if I can't look to aspects of the complaint or the documents I am going to take judicial notice of to make that determination, that's something that I at least have to consider in the arguments here today. But we don't have to go back and forth.  I've heard you.  I want you to get to the meat of what we're talking about.

MS. BRETAN:  Yeah, I appreciate that, Your Honor.  I don't think Your Honor has to get there and let me tell you why.

THE COURT:  Okay.

MS. BRETAN:  And this is the main point.  This is about the misstatements.

And this is enough to dispose of the entire case. Every statement challenged here, every statement, concerns a single subject, the development and future, and future, launch of Kingdom Boss in a specific time frame.  And statements like those, statements of projections, timelines, estimates are -- are unequivocally forward-looking statements, and that's especially true here.  When a game is still in development, it's

not a done game.  You don't have a finished product.  The game's still in development at the time of these statements.

And the Ninth Circuit law on this point is absolutely clear, unequivocal.  In *Wochos versus Tesla* the -- the allegation -- the company said it was on track, on track, to produce 5,000 vehicles per week by the end of the year.  And the Ninth Circuit held that was unquestionably, unquestionably, a forward-looking statement.  And when you have a forward-looking statement like these about being on track to develop a game and launch it, as long as they're accompanied by meaningful risk disclosures or made without actual knowledge of falsity, they're protected, they're protected.

And, here, the risks were meaningful, and they're the exact risks that plaintiffs talk about in this case.  And I have a few of them just in the demonstrative deck that I brought.

But the company -- these are not boiler plate.  They're very specific risks about how difficult it is to monetize free-to-play games like the games here if they're not brought to market timely and that it will depend on the company's ability to manage the development of new games to monetize those games to forecast the timing of the development and to minimize and resolve bugs.

The company -- oops, sorry.

THE COURT:  So, Ms. Bretan, I guess one of my questions is, would we even be here if they had simply said, "We have

─────────2:22-cv-01159-RFB-NJK─────────

identified some bugs from customers or users of the game.  We're in the process of resolving them and anticipate they will be resolved"?  Right.  That's part of the issue here revolves around the specificity of the disclosure itself.

There's no dispute about the fact that there's some statements that are made here, but the fact is -- and this goes also to the issue of, sort of, scienter, right, or knowledge or known falsity, which is they had been receiving some information, a fair amount at least allegedly, about the games.  But why wouldn't they be required to say, "We have identified, right, some glitches or bugs in the system from current users, but this is to be expected," or something like that, "But we anticipate being able to resolve that"?

Why aren't they required to say that when they allegedly have this information?

MS. BRETAN:  Your Honor, the -- these are statements about development and launch timing that -- those are the statements they're challenging.  And this is Tab 8 of -- Tab 8 of the demonstrative.  The company warned that games -- this is technology.  The company warned that games may contain bugs and flaws; some of which might not even be --

THE COURT:  But you're not actually answering my question.  My question is, why are they not required -- when they know, allegedly, of specific problems, why are they not required under the law to disclose that?  You're saying they're

not required.  Because I don't read the law to say that.  And so tell me specifically why they're not required to disclose what they allegedly knew -- again, I'm saying that because we're at the motion to dismiss stage -- allegedly knew about technical problems with the game that clearly could affect when it, quote/unquote, launched, whenever that date would be?  Why were they not required to say that specifically here?

MS. BRETAN:  Your Honor, the only -- the only party, the only party, that says that technical defects are what made the company ultimately suspend this game, sitting over here.  It's plaintiff.  That's never -- there's never been a revelation that technical defects doomed this game.  The only party, the only party, that says that is plaintiff.  And it does that based on a handful, inexpert lawyer say-so.  They looked at social -- social media, people playing the game a year before its release.

And that's just not enough and it's not enough under Ninth Circuit law.  That's the *Twitter* case:  Not disclosing bugs in software -- in software program is not misleading.  *Fitbit* case:  New program has kinks doesn't make a positive statement about the program false.  *Qualcomm*:  On track to release commercial devices in the new year, not actionable because despite technical issues where no -- nothing showed the goal of launching the product was unachievable.  And I could go on.  That's also in *Wochos*.

And in fact, here, it was achieved.  I know -- I'll

—————————2:22-cv-01159-RFB-NJK—————————

come up with the paragraph cite where a CW-1 says the game was launched.  Even CW-1 -- this is plaintiff's evidence, right.  Confidential Witness 1, who's at Boss Fight, he developed the game, developed game.  He doesn't say technical defects doomed this game.  He says Playstudios didn't market it enough.

Those are very different things, and it goes to the heart of the scienter question that Your Honor raised.  No one has said, no one has said, technical defects -- and that's why it's difficult to focus on this issue.  No one has ever said technical defects doomed this game.  These were statements about the timing launch.  I gave you the whole host of cases which hold over and over again this is technology.  Bugs are expected as you develop technology.  Happens all the time.  It doesn't mean that achieving the goal, achieving the goal, of launching the game at the end of the year after you've developed it is false.  It's just not false, Your Honor.

And that's what they needed to show --

THE COURT:  Well, what would they -- from your standpoint what would they have to have alleged in terms of having evidence of for that to be the case?  Give me an example of what you think if they were going to proceed with this claim that they should have alleged, but they haven't done here.

MS. BRETAN:  They might have come up with witnesses that said, "We told Mr. Pascal that not only are there -- not only are there defects, these are defects that are not curable.

2:22-cv-01159-RFB-NJK

They're bugs in game play that are not curable.  And we're never going to fix them and you're never going to release this game.  And people are never going to like it."

They don't have anything like that.  What they have are, like, lawyer say-so reaching back to November 2020, a year or more before the game is launched, complaining about laggy performance in the game or the platform won't load the game.  I mean, they're just -- you know, it's -- first of all, it's a handful of comments on social media when the game was in alpha or beta testing.  The beta version of this game wasn't even released until August 2021.  And the company said so.  The company advised that it was in alpha testing in August 2021, and it said that the launch of the game was moving out at least six months because of it.

Now, if Mr. Pascal knew that there were intractable technical defects that meant he was never going to launch the game, that would be one thing, but that's not what we have here.  The only party saying there are intractable defects that doomed this game from the start is over here.

THE COURT:  Yes, but they're allowed to make that allegation.  What you're saying to me is that the allegations in the complaint actually don't rise to that level.  That's them arguing that in the briefs.  Is that what I am understanding?

MS. BRETAN:  There's nothing that says that there was a statement where there was knowing falsity in the statement.

First of all --

THE COURT:  Well, they don't have to -- look, they can -- at the complaint stage they don't have to find an internal memo because they're never going to find one where someone says, "Oh, I know this game is not going to work and I've known this for two months."  I mean, that's never going to be the case in these types of cases.  Like, they're never going to have that.

So certainly the Court can look at what can be reasonably inferred from what's in the complaint.  And so I do think that you're not going to have that type of smoking gun.  I mean, you have it in very rare instances, but most of the time in these cases, as you know, the Court has to look at reasonable inference as to what they may or may not have known.

MS. BRETAN:  Right.  Right.

Your Honor, this is -- this is exactly the kind of case that the securities laws with their formidable pleading standards are designed to protect against.  You don't get to take an ordinary business development, an ordinary business setback, and turn it after the fact into fraud by hindsight.  And that's precisely what they're doing here.  You can't tell me -- you'd have to believe -- in order to believe that, you'd have to believe that Mr. Pascal and Playstudios poured millions of dollars into developing this game knowing it's a sure loser.

That makes no sense.  And he -- he's buying stock at

—————2:22-cv-01159-RFB-NJK—————

the same time.  He's not defrauding himself.  That just doesn't make any sense.

The statements were forward looking and they're protected.  And -- and once they're protected, Your Honor, that's a big problem.  This is important.  Once they're protected, it's important because what plaintiff does is they try to avoid that safe harbor.  And they change the statements, and they don't want Your Honor to look at the statements in context.  That's why they're objecting to judicial notice.  But that's not the law.

The law says plaintiff put these statements at issue, plaintiff put the statements at issue.  They're the basis for the amended complaint, and they're incorporated by reference into it as a result.  And that makes sense -- and this is the *Khoja* case, Your Honor -- because it prevents plaintiffs from selecting out portions of statements, portions of documents, that support the claims and omitting the portions of the statements that doom their claims.  And the Reform Act actually mandates, Your Honor, getting to the RJN, it mandates that the Courts shall look at the statements and the risk disclosures provided with them, which is why we put in all of those SEC filings, Your Honor, in assessing whether the safe harbor applies.

THE COURT:  Well, they're not just relying upon those statements, which is part of the difficulty for me.  It's not

2:22-cv-01159-RFB-NJK

always just the statements in the SEC filings, right.  There are other statements.  And so part of the problem and the challenge here relates to, I mean, you all are disagreeing about which statements actually should be used, period, which happens in these cases anyway, and which ones are acceptable as the basis for claims and which ones are not.  That's why I wanted to focus on the issue of which documents I'm going to take judicial notice of because I think that affects the decision here.

But I take your point about and I don't disagree with the fact the statements need to be taken in context.  But I wanted to focus, as I said, initially just on this issue of exactly what the nature of the misrepresentation was because I think that drives this case in particular.  It really drives the case as it relates to what they did or didn't know about the game.

And I want you to then to address the issue of safe harbor as it relates to you know there are exceptions to the safe harbor doctrine, right, obviously in terms of when it doesn't apply to, quote/unquote, blank check companies or known falsity.  I want you to address both of those here briefly because that also I think is a driver to this case.

I mean, if you can't tell, to me, the issue comes down to whether or not these are forward-looking statements, and there's cautionary language appropriate with each of the statements that's potentially the basis for the claim --

MS. BRETAN:  Thank you.

THE COURT:  -- and whether or not there's any exceptions to safe harbor because I'm not saying that these other arguments aren't legitimate arguments.  But that to me is the heart of this particular case, and so I want you to focus on that.

MS. BRETAN:  I agree, Your Honor.  The statements themselves are the heart of this case, and it's why we asked Your Honor to take notice of them because when the complaint -- when plaintiff tells you that Mr. Pascal, and this is Tab 1, said, "We're going to get it launched before the year's out," as if it's an affirmative promise, that's not what he said.  That's not what he said.  What he said was, "Kingdom Boss shifts out six months at least and hopefully, hopefully, we're going to get it launched before this year's out."

Those are very different things, Your Honor.  One is clearly forward-looking statement, and plaintiff portrays it as if it's something else.  And it goes on and on like this, Your Honor.  The statements are taken out of context.

Mr. Pascal on November 11th did not continue to misstate, misstate, that Kingdom Boss, quote, will be ready to launch by the end of the year.  What he said was, "There's still work to be done."  There's still work to be done, Your Honor.  "And our partners are hopeful" -- the ones developing the game are hopeful that the game will be ready to launch by the end of

2:22-cv-01159-RFB-NJK

the year.

Again, very different statements.  One is forward looking and one is portrayed, not forward looking.  But those are the actual statements, Your Honor.

And, again, here's another one on November 11th:  "The game from a future perspective is complete."  That doesn't even make sense, Your Honor.  What does that mean?  What the statement was:  The game from a feature perspective is complete.  The game's features are complete.  It's not complete complete.  It's not a finished product.  They're still working on it.  In November this is what they're saying.

And this one may be the most significant one in my opinion.  Plaintiff says the proxy prospectus, the main documents in this case, repeatedly claimed, repeatedly claimed, that Kingdom Boss, quote, will launch as expected in the second half of 2021.

Okay.  Putting aside that we have the dispute over it -- it did launch in 2021.  That was in a section on projected, projected, financial information and was clearly identified as a material assumption underlying the forward-looking projection.  Assumptions are warnings.  They're warnings, Your Honor, that this might not happen, that we might be delayed in the game.

So whether or not it launched in 2021 or early 2022, it doesn't matter.  They warned that the game could be delayed.  It

was a material assumption and a risk that was fully disclosed.

And though -- and this happens over and over again. And so when you have these what I view as clearly forward-looking statements, when you look at the full statements, and I urge Your Honor to look at the full statements that were made --

THE COURT:  Well, first of all, blow that up again.  I can't read what --

MS. BRETAN:  I am so -- can I zoom?

THE COURT:  You can zoom.  There's a zoom feature on there.  Again, so I can see this again.

MS. BRETAN:  See, here's the context.  It's projected financial information, projected financial information.  And those projections rely on assumptions, including that Kingdom Boss, which began development in 2020, will launch as expected. It's a risk.  It's a warning underlying a future projection. And assumptions underlying forward-looking projections are just as protectable under the securities laws as the projections themselves.

THE COURT:  Okay.  So this is actually one of the statements I wanted to ask you about.  Because this doesn't feel like an assumption to me.  This feels like an affirmative statement.  However you categorize it, I mean, you can put descriptions of phrases ahead of them, but if you say, right, "this will launch," that doesn't sound to me, Ms. Bretan, like

2:22-cv-01159-RFB-NJK

an assumption.

MS. BRETAN:  It's identified right here.

THE COURT:  No, no.

MS. BRETAN:  Yeah.

THE COURT:  I'm saying to you, you can't -- and this also comes up in securities law.  You can't just use language to protect and then make statements that are inconsistent.  So my question to you is, why wouldn't I look at this and say, look, the fact that you call it an assumption, right, to say something will launch, right, to me, right, in that sort of context, right, "will launch as expected," right --

MS. BRETAN:  It's an expectation, correct.  It's forward looking.

THE COURT:  Okay.

MS. BRETAN:  No, I hear Your Honor.  But, honestly, the section is called "projected financial information."  It's future looking.  It's identified as a material assumption.  We assume -- these -- these projected financials rely on us launching the game as expected.  It's an expectation.  This is -- this is unequivocal forward-looking statement.  It's the same as the *Tesla*, "We" -- you know, "We expect to produce 5,000 cars by the end of the year."  It's unquestionably forward looking.  The Ninth Circuit makes that absolutely clear.  The safe harbor identifies assumptions underlying projections as equally protected.

—————2:22-cv-01159-RFB-NJK—————

I hear Your Honor, but that -- I don't know what more -- I mean, I've never seen a document where -- where -- where it's identifying something as a forward-looking material assumption and it's not.  I mean, it just -- on its face.

THE COURT:  Okay.  Why don't you move onto the issue of blank check exceptions.

MS. BRETAN:  Yeah.  So, Your Honor, that's the *CarLotz* case.  And the same -- you know, plaintiff is trying to get around the fact that there's -- that the safe harbor shouldn't apply to the Section 11 claim because at one point Acies referred to itself as a blank check company, but it doesn't technically meet the definition of a blank check company.  And they point to these proposed rules -- proposed SEC rules --

THE COURT:  I'm not focussed on that.  I'm focussed on, again, part of the challenge for me in a case like this relates to some of the facts that are important for me to decide.  The legal issues are not agreed upon by the parties.  This is one of them as it relates to what is the status of this company in particular, whether or not -- first of all, these blank check companies themselves are somewhat amorphous entities, but whether or not it qualifies.

And so tell me why I shouldn't consider this company as a blank check company in this context.

MS. BRETAN:  It doesn't meet the statutory definition of a blank check company, Your Honor.  It doesn't -- and the

fact that this type of entity, this SPAC and de-SPAC transaction, doesn't fit within the exemptions to the safe harbor is addressed at length in the *CarLotz* case.  The same exact issue came up, Your Honor.  And definitively the Court said, no, the safe harbor applies in this context.  It was not a blank check company.  A blank -- this was -- this -- by the time that you're talking about the merger with Playstudios, it -- there's a known merger partner by the time that merger is announced.  It's not a blank check company that's open to anything at that point.

And if you wanted to have that argument about the Acies registration statement, which is not the registration statement at issue here, that would be one thing, but as to this registration statement it --

THE COURT:  So am I just to ignore their own reference of their own company as a blank check company?  I'm just saying, I mean --

MS. BRETAN:  Okay.

THE COURT:  -- they say it, right.  What --

MS. BRETAN:  It -- you know, at one point it was a blank check company because it didn't have an identified partner.  Okay.  But it -- it didn't meet the definition -- in the context of this case, where we are, it doesn't meet the definition of a blank check company.  Wasn't a blank check company.

But even if Your Honor wants to view it that way and says the safe harbor shouldn't apply -- and I disagree that it applies, and you can look at the *CarLotz* case. It's directly on point, Your Honor, addresses the same issue. But even if you wanted to say that, you still have a problem with the Section 11 claim that they're not going to be able to get around. And that's that there's no standing here, no standing here.

THE COURT: Okay. So we don't need to address -- I mean, I actually -- well, I don't have a question about that. I disagree with that. So I'm not going to argue with you about that. I just don't find that to be the case here because I actually think there's a Ninth Circuit case that I've looked at that wasn't cited by either party that relates to the issue of the choice. We're not arguing that, counsel.

MS. BRETAN: Okay.

THE COURT: So I want to focus on this particular -- the issue that I'm asking about because that's the issue that I have questions about in this case.

So the other question about safe harbor I wanted to ask you about was -- hold on.

I actually think you've answered it. So let me let the plaintiff's counsel come up and respond, and then I'll give you an opportunity to be able to come back up --

MS. BRETAN: Thank you, Your Honor.

THE COURT: -- and talk to me a little bit more. All

—————————2:22-cv-01159-RFB-NJK—————

right.  Thank you.

MR. JAFRI:  Your Honor, may I approach?

THE COURT:  Please.

MR. JAFRI:  Thank you, Your Honor.

I think that I will try to focus on the issues that you raised as opposed to just going through the claims.

THE COURT:  So why don't you -- I'm sorry.  It's Mister?

MR. JAFRI:  Jafri.

THE COURT:  Jafri.

I want you to point out to me -- I don't know if you have the complaint up here -- what you think are examples of the three or four -- again, I'm not taking judicial notice of these other documents as of now -- three or four clear, sort of, statements that are not forward looking and would not be covered by the safe harbor in any event.

MR. JAFRI:  Sure, Your Honor.

So I would begin with the slides that were presented as part of the offering documents.  This would be on Page -- on Paragraphs 73, 74.

THE COURT:  Hold on a second.  I want to pull this up. I want to look at it again.

Of the amended complaint?  Is that what you're looking at?  Which -- are you looking at the amended complaint?  Is that what you're looking at?

MR. JAFRI:  Yes, Your Honor, the most recent one that was filed.

THE COURT:  Yes.

MR. JAFRI:  So, Your Honor, if you look at, for instance --

THE COURT:  Hold on.  Hold on.  I'm not there yet. Give me a second.

I'm sorry.  Which paragraphs are you looking at?

MR. JAFRI:  Your Honor, 74, you'll see these two slides here that were presented along with the presentation when Mr. Pascal was speaking at a conference call in, I believe, February of 2021.

THE COURT:  Okay.

MR. JAFRI:  So, Your Honor, are you with me?  Can I continue?

THE COURT:  Yes, I see it now.

MR. JAFRI:  So, Your Honor, for instance -- and this is a statement that the defendants don't want to discuss because it's very difficult to say that it's forward looking.  It says right here on the first slide that there's a clear and actionable plan to achieve business results, meaning there is a plan now for us to reach the goal of these revenues that we claim we will generate in the next two years based on this game launching and us generating $60 million.  There's no credible basis to say that there's anything predictive about this

statement, Your Honor.

Now, the next one, in the next slide it's talking about their current performance, right. So the next slide says -- this is adjusted EBIDTA or earnings of the company. And it says: "Proven profitability with clear path to margin growth." Again, this is not a forward-looking statement. There is nothing predictive about this statement.

Next, Your Honor, if you look at the slides on Page -- sorry -- Paragraph 77, this would be on Page 27 of the complaint. It says here, again, "Clear path to margin growth." These slides were being presented while Mr. Pascal was speaking to investors about this de-SPAC transaction and this company going public.

Next, Your Honor, this is again on Paragraph 77, but it's on Page 28. It says: "Sustained and projected top and bottom line growth." Those were the representations that were made. In -- and these statements were made on Form 425, Your Honor. They claim that these are off limits, but if you look at what they said, what they -- and I know, Your Honor, you've said that you won't take any judicial notice of these and that's probably correct, of course, based on the fact that I don't think that they have explained to you what it is that they want to be judicially noticed. And they are really, you know, arguing about factual issues which you correctly pointed out are not something that we discuss right now at the pleadings stage.

2:22-cv-01159-RFB-NJK

However, based on what they said themselves about these forms, they said that these forms were filed pursuant to Rule 425 of the Securities Act and Rule 14a-12 of the Exchange Act. Your Honor, those rules say that if you file these documents pursuant to these specific rules, they are prospectuses and proxy statements. So that's what the rules say.

They said that they filed these pursuant to those rules when they were filed. Now, when the lawyers come in, they're saying, "Well, no, actually we don't, you know, think that we really meant what we said," right.

It's the same thing, Your Honor, with the blank check company. Like you correctly pointed out, should you disregard that they described themselves as a blank check company? Repeatedly on and on they said, "We're a blank check company." That case that we cited from -- the *AT&T* case from the District of New Jersey, it said, "Well, if you describe yourself as an IPO, then the Court is going to assume that you are an IPO and, therefore, the safe harbor won't apply."

Here, they described themselves as a blank check company, but now the lawyers come in and they say, "Well, not really. It's not a blank check company. You need to look at these regulations and so on and so forth." But that's not what they said in the registration statement. In the registration statement it's pretty clear.

But going back to your question, Your Honor, because a

lot of this is in the Form 425s.  And then the next one, this is -- this is one that, you know, again, the defendants don't want to discuss.  This is the one on Paragraph 81 on Page 30.  It says -- in Paragraph 81 there's a sentence that we said was misleading where they made the claim that the game, quote, remained on schedule to launch Kingdom Boss.  I'm sorry.  The company remained on schedule to launch Kingdom Boss.  Kingdom Boss is the game.

That is, again, not a predictive statement.  It cannot be because it's describing that they are currently at that moment when the statement is made on schedule.  So either it was on schedule or it wasn't.  They cannot have it both ways.

So these are all --

THE COURT:  Mr. Jafri, I want you to address, though, part of this relates to the question I asked Ms. Bretan before which related to what's misleading about the statements.  Is it that they were systemic technical difficulties that they were aware of that prevented it?  Because if they actually believed that these were the normal -- let's assume they thought these are normal bugs in the development of a game.  Would that make these statements misleading?

MR. JAFRI:  So, Your Honor, I don't think that this is based on what they actually believed.  Even in a fraud case their subjective belief is really irrelevant because it's --

THE COURT:  Well, in terms of the misstatement you have

2:22-cv-01159-RFB-NJK

to -- you're asking me to take some aspect to sort of -- into consideration as to what they understood and what they're misstating.  So it's not a question of -- I'm not focussed on the, quote/unquote, subjective aspect to it, but in order for it to be a misstatement, I have to be able to objectively look at something and say this is a misstatement of what was allegedly known, right.

And in the context of the development of a game, right, it does matter whether or not the misstatement objectively is a misstatement about what's happening in terms of the development versus a statement that is not a misstatement because it includes consideration of the fact that the development of games includes dealing with bugs that happen all the time, right.

So what makes this a misstatement?

MR. JAFRI:  So, Your Honor, the reason why this is more than just, you know, kinks and bugs that can be rectified, there's two bases really.  You know, the defendants said that there's nobody who says there are these intractable -- intractable defects other than the plaintiffs here.  But that's actually not true.  There were 150 players.  We went through all of the forums.  And this -- they started reporting on problems before the module, during the module, and shortly before the game was abandoned.  So this was not something that happened earlier only and you can dismiss, as you know, these people were just testing games -- earlier aspects of the game.  It was

constant.

And, Your Honor, the -- they weren't just complaining about bugs that they felt made the game less perfect.  They were saying it wasn't working.  Like, one guy, for instance, said, "It's heating up my phone and it crashes."  Another guy said that he lost all of the developments that he had made because it crashed and then he had to go back so there was no point in him playing it.  You know, there were other people who said, you know, "We don't even know how to assess this game because it keeps crashing."

So, Your Honor, this is -- this is well beyond this.  I mean, I don't mean to make -- epistolize this, but what I can tell you is I have a nine year old.  He plays role-playing games and, you know, I'm forced to play them with him.  If we had these issues where games were crashing, we would lose our minds.  So that's one basis for why the game has these --

THE COURT:  Well, if I understand it, one of the bases is, beyond your personal experience with your son, the idea that what's being described by the players of the games are themselves systemic problems, not small technical problems, but are problems that result in the game essentially not functioning, period.  Is that --

MR. JAFRI:  Correct, Your Honor.  Correct.  And then the second thing which I think corroborates this, right, because it's just not -- you cannot dismiss these people.  These people

PATRICIA L. GANCI, RMR, CRR    (702) 385-0670

are playing the game that they released in whatever form it was, but I think the other thing that corroborates it is Confidential Witness 2's account who was somebody who worked at this company and tested the game in November 2021, before this so-called launch took place.

We spoke to him. And that confidential witness said that the game was tested and it was not ready to launch because of the bugs and the glitches. So that's another person with personal knowledge whose job was to test the game. And he tested it a month before they claim to have launched it, and he said it wasn't ready because of the bugs.

So we have an inside source. Plus, we have people who are playing the game. So, Your Honor, I think that's sufficient to plead that there is a serious problem here.

THE COURT: Okay. Tell me a little bit -- since we talked about this whole issue about the launch, soft launch, hard launch, I want to address that -- I wanted to address that today. So tell me from your perspective what and how I should consider that in the context of the allegations in the amended complaint.

MR. JAFRI: Sure, Your Honor. Again, this is an interesting point because the only individuals who claim that this so-called global launch took place are the defendants. And they made this representation in that 10-K which we had requested you to disregard. And I believe it's out because

you've said you're not taking any judicial notice of anything other than the registration statement. And that -- they really overreach --

THE COURT: So when do you claim that this launch, whatever, the global launch of the game took place?

MR. JAFRI: So, Your Honor, I don't believe there was a global launch. In one of the press releases Mr. Pascal said that the launch was in North America. The witness -- the Confidential Witness 1 said that it was a soft launch. So it wasn't, you know, a full-blown launch. There was no commercialization of the game.

As far as Confidential Witness 1 is concerned, Your Honor, he was the chief creative officer of Boss Fight. You know, he wasn't some lower-level employee whose opinion can be disregarded. He was the chief content officer of the game developer, and he said they only had a soft launch.

At the pleadings stage they want the Court to disregard that and presume that their side of the story is true. I mean, this is again -- like you pointed out, it's a factual dispute. But I don't even think they have a good faith basis to say that there is some -- some reason to disregard that confidential witness's account. Because all they have said is, "In our 10-K we made a representation that there was a global launch." No evidence exists of this global launch.

And, Your Honor, again, you have to look at the

complaint from a commonsense perspective.  That's what the Ninth Circuit has said that the Court can use its common sense to make inferences.

And, here, if you look at the timeline, there's this alleged global launch, right, following all these delays that they have conceded occurred earlier in 2021.  Finally in December 2021 they claim there's a launch.  Within a few months they abandoned the game.  Meanwhile, the people who are playing the game are again complaining of constant crashes and they're -- and about an inability to play the game.

When they abandoned the game in February of 2022, they take a write-down of $8 million associated with the development of the game.  There's no dispute here that they did not make a cent from this game.

So, I mean, if you think about it, what do they mean by a launch?  I mean, are they saying that we just released this game, you know, in thin air and anyone could access it so, therefore, there's no fraud, there's no misrepresentation?  I mean, that just doesn't make a lot of sense in light of --

THE COURT:  What type of a launch is the amended complaint alleging?  So this is so we're clear, right, because I'm not trying to stray far from what I can look at in the amended complaint or I can reasonably infer from that.  And so I want to be clear about this.  The amended complaint seems to suggest that there was a soft launch that occurs some time in

2021, right?

MR. JAFRI:  Yes, Your Honor, that's correct.

THE COURT:  Okay.  And it doesn't say really anything else about, sort of, a hard launch or global launch after that, right?

MR. JAFRI:  No, Your Honor.  In fact, that's a disputed fact.

THE COURT:  Well, what's disputed?

MR. JAFRI:  Whether there was a global launch or whether there was a hard launch, which I would understand to mean commercialization of the game.

THE COURT:  So, okay.  All right.

MR. JAFRI:  Your Honor, unless you have other questions about the issues that we discussed, I just wanted to point out a few other things based on your questions for Ms. Bretan and her responses.

THE COURT:  Okay.

MR. JAFRI:  You know, the one thing is I really want to emphasize that I think that you're thinking about this correctly.  There -- given that it was a self-described blank check company, the safe harbor is out of the window.  It doesn't really matter.

But even if, you know, you were to consider whether some of these statements are predictive, I already pointed out the statements that -- well, statements of present fact, those

2:22-cv-01159-RFB-NJK

the safe harbor cannot be applied to.  But then, you know, even if you were to assume that you want to take a look at these risk factors, I think you're thinking about this correctly, which is it was so easy for these defendants to say, "There are these bugs and these glitches in Kingdom -- in Kingdom Boss.  You know, we have these problems, but our expectation and hope is that it will still launch despite these bugs."  They didn't say that.

You know, they knew this fact.  They were shifting the timeline in between drafts that were being juggled of this registration statement.  Why was it so difficult for them to say it?

And then I think your question, Your Honor, which again is correct is were they required to do so.  And of course they were.  You know, this is the elephant in the room that they again are running away from.  So Regulation S-K can serve as a predicate for a Section 11 claim.  If you violate Regulation S-K, you violate Section 11.

In the recent *Macquarie* decision from the Second Circuit which is now being appealed to the Supreme Court for other reasons, the Second Circuit had said that in order to comply with this regulation, you have to determine that the -- you know, that the uncertainty that or the risk factor -- or the risk will not occur if you want to omit a certain fact.  In other words, if they had decided, for instance, that there was

no risk of a delay at all, they could omit any risks, but they cannot do that given everything else that's conceded. So that is a clear violation of Regulation S-K.

Most of the decisions have said, you know, precisely this that even if a defendant cannot determine whether an uncertainty is likely to occur, disclosure is still required unless the defendant affirmatively determines that no effect whatsoever on the company is reasonably likely to occur.

Your Honor, they cannot meet the standard, which is why they have -- they have dodged it throughout this litigation. There's all these standards that the defendants discuss, but they don't address this requirement head on because there's no credible basis to say that they can meet the standard based on their own conduct. They shifted the timeline of the game. They ultimately in August started to say there's a delay. There's all these problems that we discussed. The game is ultimately abandoned.

And because of this fact, because of this clear violation of Reg S-K which they were required to disclose and didn't, the Section 11 claim is -- is essentially, you know, reasonably pled. And there's no way to -- there's no basis to dismiss it.

And you won't find anything in their briefs explaining anything in response to what I just stated. It just doesn't -- it isn't there because they cannot make an argument to dispute

it.

Your Honor, I also wanted to discuss something about the charts that Ms. Bretan had showed here. She was nice enough to show them to me before she got up here so I am prepared to address them.

You know, I think that this is again pretty ironic because the defendants say that we are not focusing on certain phrases and sentences that they like, but are focusing on others. And, therefore, you know, we're somehow not addressing these statements in context. But they are not addressing some of the other clear misrepresentations in these very paragraphs.

So Ms. Bretan had pointed I believe to Paragraph 98 of the complaint. That is where Ms. -- that there was a press release that was issued in which the statement was made that they had already advanced the development of the game, right. So this is in August of 2021 where they are now beginning to acknowledge there's a problem and a delay. Yet, they are still trying to dribble out these facts in a way where they are cushioned by these further misrepresentations. They're not coming clean. They're saying, "Oh, we've made some advancements, but, you know, there's been this delay and we still hope that everything will work out towards the end." Nothing can be forward looking about this representation and it is false in light of everything that we've discussed.

Next, Ms. Bretan had talked about certain statements

and phrases that the defendants wanted to discuss in Paragraph 10 or, sorry, in Paragraph 100 of the complaint. But there is a very key and very egregious misrepresentation that Mr. Pascal made that, again, is not discussed and the defendants don't want to address head on in their briefs.

There was an analyst question where the analyst said, "What exactly is the issue with the game? Is it a development problem or is it about, you know, perfecting it?" And Mr. -- Mr. Pascal at this point, this is in November of 2021, he responds and he says, "More the latter," meaning it's a perfection issue. It has nothing to do with the development of the game. This is clearly false, Your Honor, in light of everything that we've discussed and in light of everything that Mr. Pascal must have known by this point.

And then as far as this future perspective issue is concerned, Your Honor, the reason why we had had that phrase "future perspective" in the complaint is because we read a Bloomberg transcript. That's what Bloomberg reported. They have put in some other transcript I believe from Reuters. And, again, this is -- this goes back to the issue I think that you've -- that you've correctly identified which is, you know, they just want you to take these documents and assume their version of the events as true.

I mean, what reason is there to believe that Reuters got it right and Bloomberg didn't? That's the first point, but

2:22-cv-01159-RFB-NJK

the second is even if you assume, even if you assume for the sake of argument that the statement was that the game from a feature perspective is complete, that's still false.  I mean, it isn't.  If it's constantly crashing and people cannot play it and it's heating up phones, all the features are not complete. I mean, this is -- this, again, it's sort of like it doesn't really make a difference.

THE COURT:  So how are we to determine what makes a bug simply a bug that would be in the normal course of development versus a bug that would actually fundamentally impair the development?  Because what you're basically saying is that the Court should understand the confidential witness statements and some of these other player statements to reflect comments about fundamental issues with the game, not simply smaller insignificant problems with the game, right?

MR. JAFRI:  Well, Your Honor, with the caveat that this is again an issue of fact, right.  So we have our position. They have their position.  They can come up with a gaming expert, you know, to say that their position is right.  We'll have a gaming expert of our own if it comes to that and there's a trial.  So, first of all, Your Honor, I would say that this is not a pleading issue.  It's a factual dispute.

But going back to your question, Your Honor, these -- these issues that we described, you know, they are not minor.  I mean, we went through the forums.  150 players were complaining

PATRICIA L. GANCI, RMR, CRR    (702) 385-0670

about this game, and they were talking about how it just didn't simply function. So I think that to the extent your question is have you pled that these problems were significant, I believe we have. It's in the complaint, and it's based on people who have personal knowledge of the game. There's no reason to disregard what they've said on the pleadings.

So, yes, Your Honor, I would say that the issues already are serious enough where they should have disclosed that there was a problem. And then ultimately obviously the game was abandoned, right. I mean, it's not as if that didn't happen. They have never really explained why it wasn't [sic] abandoned. I mean, I believe Mr. Pascal said that it wasn't worth the money, you know, but he never really admitted to this fact.

But it doesn't matter. They don't have to make an admission in order to be liable. And we don't have to plead that they admitted to some sort of wrongdoing or that they committed fraud in order for us to move onto the next stage of the litigation, which is all that we're here to decide.

Finally, Your Honor, there's one thing that I really wanted to mention and discuss, which is that there's this -- again, I think the defendants have overreached with this Ninth Circuit decision that was favorable to their part, the *Tesla* case, right. And there's a statement in there -- it's an unadorned statement so, you know, where Musk had said, "Yeah, we're on track." But in context everything else that he said

was forward looking.  And the on-track statements, you know, they really are context dependent.  The statements about expectations are context dependent.  The Courts have continued to find such statements misleading and have upheld claims in spite of this decision.

So this will be -- on Page 14, Your Honor, we cited this case from the Northern District of California.  It's called *Zymergen*, Z-Y-M-E-R-G-E-N.  This was the misrepresentation that the Court said was false, and it was a Section 11 claim.  The statement was, quote, We expect to begin generating revenue in the second half of 2021.  This is what they said in their registration statement that, you know, "As expected," meaning that's their expectation now, "we will launch Kingdom Boss at the end of 2021."  *Tesla* did not deter this Court from finding this representation false.

So -- and the other thing is that the Ninth Circuit before *Tesla* had considered on-track representations and said that they can be false.  So, for instance, in *Rigel* the Court said that if they really weren't moving towards their goal, but had made a representation that it was on track, then that would be false.

And, Your Honor, you're aware the earlier cases control.  You know, some new panel cannot overrule prior decisions without en banc review.  So I think that this idea that on-track limits are now completely off limits is just

misguided.  It simply is not in line with how these rules are applied or how the law is interpreted.

The other thing that I wanted to mention about this case is that there's a straw man argument that's made that we didn't plead that it was impossible, that we didn't plead that it was unachievable.  Your Honor, we don't need to plead that.

THE COURT:  You don't need to address that, Mr. Jafri, because I agree with that.  So you don't need to address that.

Is there anything else?

MR. JAFRI:  No, Your Honor.  Unless you have further questions, I think I've made all of the points I wanted to.

THE COURT:  I do not.  Thank you, Mr. Jafri.

MR. JAFRI:  Thank you.

THE COURT:  Ms. Bretan, I assume you want to have a few --

MS. BRETAN:  Just a couple of things, Your Honor.

THE COURT:  -- in response.

MS. BRETAN:  Thank you.

So it's Paragraph 66 of the amended complaint, Your Honor, where Confidential Witness 1 says --

THE COURT:  Hold on, hold on.  Let me get there.

Okay.  I see.  Is that the reference to the soft launch part?

MS. BRETAN:  Yes, they -- they characterize it.  I don't know if that's CW-1's characterization or plaintiff's

characterization, but that's -- that's what it says.  It says it launched in 2021.  And notably -- December 2021.  Notably, none of these inexpert reviews of game play that plaintiff offers postdate that.  They don't postdate that.  They're all from way earlier at a time when the game was still in development, and they're irrelevant, Your Honor.

On August 11th, in August -- and just -- sorry.  To circle back --

THE COURT:  I'm sorry.  You're saying there's nothing that comes after December 2021 in terms of problems with the game?  Is that what you're saying?

MS. BRETAN:  Correct.  Nothing's offered in the complaint.

As for the soft launch point, I think we talked about this very briefly.  That's directly addressed in the *Tesla* case, Your Honor, where plaintiffs were claiming production car meant something different than the company meant by production.

THE COURT:  So I want to make sure I'm understanding you correctly.  Are you saying that the Court couldn't find this to be a present statement if I said or the company were to say, "Based upon our current state of affairs we are on track to produce that"?  Because if the fact is that you know that that's not true, that's not a future statement.  That's a -- that is a current lie that underlies a future projection.  I don't know that that would be covered.

So I want to be clear about that because I do think there's a distinction between saying there -- in terms of their theory.  Their theory is they knew at the time that these things were not working.  I'm not saying I agree with that.  That's not what the issue is.  And so when they're saying "we're on track," that's actually a lie at the time because they're not on track, right.  So that's not necessarily a future statement.  That is a misrepresentation about the current schedule for the development, which is slightly different than I think what they're talking about in *Tesla*.

So there are -- Mr. Jafri's right.  There are cases that the Ninth Circuit talks about exactly this situation.  You can't, sort of, lie in the present about a future schedule when you know that what you're saying in the present is actually incorrect.

MS. BRETAN:  So I hear what you're saying, Your Honor.  *Tesla* is exactly on point here, and that case said --

THE COURT:  So I want to make sure I am understanding.  Are you saying the law is that if I know that I'm not on schedule and I say, "I'm on schedule," but I know that that's actually not true, are you saying that *Tesla* says that's still a future statement that's covered by safe harbor?

MS. BRETAN:  If there are current facts, current facts, and representations related to the present time, the present time, that would take it out of future looking --

2:22-cv-01159-RFB-NJK

THE COURT:  Okay, but --

MS. BRETAN:  -- that can be actionable.  That's under *Quality Systems*.

THE COURT:  I want to change my specific question which is --

MS. BRETAN:  Okay.

THE COURT:  -- if I say in terms of a development of a product, "We are on schedule to launch this product in six months," and I know at the time that I say that that that's not true based upon the information that I have, are you saying because it references a future release of the product that that's still not actionable if the allegation is that you knew at the time that your projection was incorrect because you had information about the product?  Are you saying that *Tesla* says that that is still a future-looking statement that is still subject to the safe harbor protection?

MS. BRETAN:  Implicit in every future-looking goal -- implicit in every future-looking goal is that you're on track to reach that goal.  Okay.  And so *Tesla* -- that's what *Tesla* said, "On track to launch X during the second half" --

THE COURT:  Ms. Bretan, this is a yes or no.  So what you're saying is yes, you think that even if you know -- according to you, you're saying that what you think what *Tesla* says is that even if you were -- again, I'm not saying this happened here, but I'm saying even if you were allegedly aware

PATRICIA L. GANCI, RMR, CRR     (702) 385-0670

at the time you make a future statement that you are lying about the schedule, the fact that it references a future date in production, that that statement is still covered by safe harbor even if you are aware of the lie?  Because I don't think that *Tesla* --

          MS. BRETAN:  That would not be the case.  I'm not saying that, Your Honor.

          THE COURT:  Okay.  So --

          MS. BRETAN:  I hear you.  If there is -- if there is a current concrete fact that says there's no way you're on schedule, of course that's going to be a misrepresentation.  But that's not what we have here.  Nothing in February 2021 which plaintiff wants to talk about, very early on in the development of the game, said it wasn't on schedule to launch in the second half of 2021, nothing.  And on August 11th -- and plaintiff brought up this statement.  On August 11th, A, the company announced that it was delaying the schedule.  Said they're working on it.  That they had only released a beta version of the game at that time.  They were forthright about the schedule for launching the game, forthright about it.

          And on November -- and by the way, where are the facts that say they hadn't advanced the development of the game?  They were releasing a beta test of the game.  Sounds like advancing the development to me.  There are no facts that suggest otherwise.

—2:22-cv-01159-RFB-NJK—

And on November 11th, on November 11th, what Mr. Pascal said very specifically was, "We need to see this game once we release it to its target audience perform in the revenue-generating way that these free-to-play games need in order to invest millions more to market it."  That's what he said.  And guess what?  Didn't meet that criteria.

THE COURT:  So let me ask you this question because this I think also is a question that is at the heart of at least this particular motion, which is at this point in terms of where we are procedurally, why are you not in a situation where you're arguing facts to me?  And what I mean by this is it makes a difference in the context of your argument about whether or not these are systemic defects in the game such that they can't be remedied even with a delay.  Why isn't that -- Ms. Bretan, even if I agree with you, why isn't that a factual issue that the Court can't decide at this point in time?  Because some of what you're arguing to me relates to the extent of these, quote/unquote, problems and how they should be viewed as it relates to the development of the game.

Why isn't that a factual issue in which it would be more appropriate for me to consider the dispute between the parties about the severity of these defects in the context of a motion for summary judgment or something like that?

MS. BRETAN:  Again, Your Honor, we went through some of the case law on this exact issue in this exact context.  *Twitter*

PATRICIA L. GANCI, RMR, CRR    (702) 385-0670

case, nondisclosure of software bugs in a program, not misleading.  *Fitbit* --

THE COURT:  Okay.  But, Ms. Bretan, again what I want you to do is -- you keep citing these cases to me.  Each case is unique on its facts.  So, yes, they cite the general principles, but those cases don't stand for the general proposition that whenever you describe bugs, it's always going to be consistent with that decision.

I'm asking about in particular in this case, right.  I am aware of those cases.  But in this case, right, there is an issue about a dispute about the severity of the nature of these, quote/unquote, bugs as opposed to them being systemic versus being part of a normal development.

And my question to you is, why wouldn't I find that here?  I don't want you to cite to me these other cases because I'm focussed on what's in the amended complaint here and the documents that I'm taking judicial notice of.  Why is it in those documents you think that there is not this particular basis or there's not a basis for me to reasonably infer that in fact these are systemic defects rather than defects which could be remedied in the normal course of development?

MS. BRETAN:  Your Honor, this -- in these securities cases the pleadings standard is formidable.  The only one saying intractable defects doomed the game all along from the earliest days is plaintiff.  And it's based on the handful, a handful, of

2:22-cv-01159-RFB-NJK

accounts of people beta-testing the game.  And CW-2, this -- doesn't even get the game until November, and says -- and his job is to ferret -- ferret out bugs before launch.  And six -- Paragraph 66 says the game did launch in December 2021.

So you have to -- it's not just say-so.  It's not just say-so.  The company has never said intractable defects doomed this game.  It said it didn't warrant further investment. People weren't monetizing the game.  They weren't enjoying it enough to -- to buy things in in-app purchases and make it revenue generating.  And that's a business decision to cut your losses at a certain point.

I mean, again, there's no sure thing with developing a game.  And this is precisely the type of case, Your Honor, precisely the type of case, that uses hindsight to go back to the earliest days and say it was all false.  There's nothing that says it was all false.  It was a good faith -- the evidence that this was a good faith development effort, that the company fully intended to launch the game, that bugs are part of the normal development for technology, there's nothing that says that those were not overcome by the time of the December 2021 launch.  And plaintiff's say-so is just not enough.  There's a very high standard here, Your Honor.

And -- and just one final point, Your Honor.  There's an independent reason that this case can't go forward, and that's loss causation.  This is an independent basis for

2:22-cv-01159-RFB-NJK

dismissal because nothing revealed on February 24th, nothing said there were intractable defects that doomed this game.  The company said why it was suspending the game.  Those very things it talked about in November, optimizing the game play, making it revenue generating, that's why it suspended the game.  That's what it said.

And the idea that plaintiff -- that's all disclosed by February 24th.  The idea that plaintiff's reaching to May 5th when no -- no new information about -- it's already out of the financial statements, right.  No new information about Kingdom Boss comes out.  That's just using a negative earnings announcement to plead -- plead after the fact.  That doesn't suffice.  That's the *Rok v. Identiv* case.

And sorry, Your Honor.  One final point here on the Section 11 claim and the proxy claim.  A corrective disclosure which plaintiffs embraced, the August 2021 disclosure which plaintiffs embraced in vying for lead plaintiff and continue to assert in the temporal proximity arguments, if that was a corrective disclosure, Your Honor, then they passed the statute of limitations.  There's a one-year statute of limitations for the Section 11 and Section 14 claim.  And, here, they didn't bring a case until October 4th for all those 12 new defendants.

They're out of time with that, Your Honor, and there's no basis for sweeping all of those people into this case for an untimely assertion of claims.  And that's an independent reason

that all of those claims should be dismissed.

Unless Your Honor has anything else for me, which I'm happy to address, I think everything is covered in our papers. And I really would urge Your Honor to think about the request for judicial notice.  The PSLRA mandates that the statements are reviewed in context along with the risk disclosures that are provided by them, and that's why we put them in here.  And Court after Court looks at SEC filings to see what was said to the market.  It's the most important thing here.  And so I would urge you, Your Honor, to reconsider that view.

THE COURT:  Okay.  All right.  Thank you.

MS. BRETAN:  Thank you very much.

THE COURT:  All right.  Thank you, both of you.  I'm going to take the matter under advisement.  I appreciate your time.  We'll be adjourned.  I'm going to stay on the bench for a few minutes.  Thank you.

MR. JAFRI:  Thank you, Your Honor.

MR. MUEHLBAUER:  Thank you, Your Honor.

(Whereupon the proceedings concluded at 2:10 p.m.)

2:22-cv-01159-RFB-NJK

--oOo--

COURT REPORTER'S CERTIFICATE

I, PATRICIA L. GANCI, Official Court Reporter, United States District Court, District of Nevada, Las Vegas, Nevada, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Date:   December 18, 2023.

/s/ **Patricia L. Ganci**

Patricia L. Ganci, RMR, CRR

PATRICIA L. GANCI, RMR, CRR    (702) 385-0670