1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

CHRISTIAN A. FELIPE, individually as administrator of the CHRISTIAN A. FELIPE CONTRIBUTORY IRA, and on behalf of all those similarly situated,

Plaintiff,

v.

PLAYSTUDIOS INC., et al.,

Defendants.

Case No. 2:22-cv-01159-RFB-NJK

**ORDER**

## I.   INTRODUCTION

Before the Court in this securities class action are four motions: Defendants' Motion to Dismiss the Amended Complaint (ECF No. 91), Lead Plaintiff's Unopposed Motions to Take Notice of Supplemental Authorities (ECF Nos. 102, 130), and Defendants' Unopposed Motion to Take Notice of Supplemental Authority (ECF No. 107). Additionally, the Court considers Defendants' Request for Judicial Notice (ECF No. 94).

For the reasons stated below, Defendants' Motion to Dismiss (ECF No. 91) is granted in part and denied in part. Defendants' Request for Judicial Notice is granted in part and denied in part. The motions to take notice of supplemental authority are all granted.

## II.   PROCEDURAL BACKGROUND

Plaintiff Christian A. Felipe commenced this case by filing a complaint on April 5, 2022 in the U.S. District Court for the Northern District of California. ECF No. 1. The case was assigned to U.S. District Judge Vince Chhabria. On June 6, 2022, Phoenix Insurance Company Ltd. and the Phoenix Pension Fund Ltd. along with Felipe each filed competing motions seeking appointment

as Lead Plaintiff. Judge Chhabria appointed Phoenix as Lead Plaintiff and Phoenix's selection of Counsel, Pomerantz LLP, as Lead Counsel on July 12, 2022. On July 15, 2022, the parties stipulated to a transfer of venue, agreeing that the District of Nevada was the appropriate venue for this action because Playstudios is headquartered in Las Vegas and Defendant Andrew Pascal resides in Las Vegas. ECF No. 47. Judge Chhabria granted the stipulation on July 18, 2023. ECF No. 48.

On October 4, 2022, Lead Plaintiff filed an Amended Complaint. ECF No. 73. Defendants filed the instant motion to dismiss on December 21, 2022. ECF No. 91. The motion was fully briefed on April 7, 2023. Defendants filed a request for judicial notice and incorporation by reference of certain documents attached to their motion to dismiss on December 21, 2022, which was fully briefed on April 7, 2023. ECF No. 94. On April 5, 2023, Lead Plaintiff filed an unopposed motion to take notice of supplemental authorities. ECF No. 102. On June 1, 2023, Defendants filed an unopposed motion to take notice of supplemental authorities. ECF No. 107. On September 8, 2023, Lead Plaintiff filed a second unopposed motion to take notice of additional supplemental authorities. ECF No. 130. The Court heard oral argument on the pending motions on October 20, 2023. This Order follows.

### III.    FACTUAL ALLEGATIONS

The following factual allegations are drawn from the Amended Complaint ("AC"). Founded in 2011, Playstudios is a mobile gaming company that principally develops and markets free-to-play social casino games for mobile devices and personal computers, including slots, blackjack, and bingo. While Playstudios had no experience in the lucrative market of role-playing games ("RPGs"), it entered into an agreement with Boss Fight Entertainment, Inc. ("Boss Fight") to develop and commercialize a significant new RPG known as Kingdom Boss. RPGs are games in which players assume the roles of certain characters in a defined setting and act on those roles within the game's narrative. Smooth gameplay free of glitches and bugs is critical to keep users engaged and dedicated to an RPG. Kingdom Boss was an RPG that would allow players to build empires, forge alliances, command armies, and rescue subjects from exiled kingdoms.

On August 14, 2020, when Playstudios was still a privately held company ("Pre-Merger Playstudios")—Acies was incorporated as a Special Purpose Acquisition Company ("SPAC") for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization or similar business combination with one or more businesses or entities. From its earliest SEC filings, Acies described itself as a blank check company.

SPACs are shell companies with no operations; offering private companies an alternative pathway to "go public." SPACs generally proceed in two stages. At the first stage, the SPAC registers the offer and sale of securities for cash and places the proceeds in a trust for future acquisition of a private operating company. If the SPAC fails to find and acquire a target within two years, then the SPAC liquidates. In the second stage, SPACs complete a business combination transaction, in which the SPAC and the target (i.e. the private company to be acquired) issue equity to target owners. SPAC shareholders typically have a vote on this "de-SPAC" transaction. After the de-SPAC, the entity carries on its operations as a public company. Holders of SPAC shares are not required to exchange their pre-merger SPAC shares into shares of the merged company. Instead, such holders are afforded the opportunity to redeem their shares prior to exchange. The redemption of shares directly impacts the working capital of the merged company.

Acies went public in October 2020 and raised over $215 million from public investors and $250 million from Private Investments in Public Equities ("PIPE") to be held in trust until it could complete an acquisition. Meanwhile, in the summer of 2020, Playstudios' CEO Andrew Pascal, considered using a SPAC as a vehicle for Pre-Merger Playstudios to go public. Pre-Merger Playstudios and Acies executed a merger agreement on February 1, 2021. The merger was contingent upon approval by Acies shareholders and regardless of the vote, Acies shareholders would be permitted to redeem shares at $10 per share if they did not want to hold shares in Post-Merger Playstudios after the closing. If the Acies shareholder chose not to redeem their shares then their Acies shares were exchanged for Post-Merger Playstudios shares according to a pre-determined formula.

According to the proxy/registration statement, the Acies Directors (defined below)

concluded that merging with Playstudios at a $1.15 billion valuation for Playstudios was "in the best interests" of Acies shareholders and unanimously recommended that investors vote for the merger. The Acies Directors based this valuation on their purported due diligence. In particular, the Acies Directors stated that they met with representatives of Pre-Merger Playstudios on December 21, 2020 to perform diligence on Playstudios' new game launches.

Acies shareholders overwhelmingly voted to approve the merger on June 17, 2021; effecting Playstudios' initial public offering. Playstudios became a public entity (hereinafter "Post-Merger Playstudios" or "Company"), trading on the NASDAQ exchange under the symbol "MYPSW." Upon approval and closing of the merger, Acies ceased to exist and Post-Merger Playstudios became the sole surviving entity.

Acies' merger with Pre-Merger Playstudios was a foregone conclusion as soon as Acies went public. Plaintiff bases this belief upon the following facts: James Murren, a longtime friend and the former CEO and Chairman of MGM Resorts International, helped launch Pre-Merger Playstudios and MGM remains one of the Company's largest shareholders and rewards partner; Pascal co-founded Acies with Murren; and bankers from J.P. Morgan Chase & Company contacted managers at Acies to pitch them on merging with Playstudios within hours of Acies' IPO.

The launch of Kingdom Boss and expansion into the RPG category was a significant component of the Acies-Playstudios merger pitch. For example, the finalized proxy statement and prospectus, filed on May 20, 2021, repeatedly claimed that Kingdom Boss would contribute to an increase in revenue from $269.8 million in 2020 to $435.2 million in 2022. One of the material assumptions underlying this financial projection was that Kingdom Boss would launch in the second half of 2021 and generate $60 million in revenues for Post-Merger Playstudios by 2022.

However, users of Kingdom Boss (prior to its global launch) began reporting defects with the game beginning in November 2020. Lead Plaintiff reviewed nearly 150 negative comments or reviews detailing crashes, bugs, frequent lagging, and major stability problems that were constant between at least November 2020 and February 2022. Kingdom Boss acknowledged these issues on their Facebook page and released several software updates in an attempt to address the defects.

According to Plaintiffs, the negative comments and reviews corroborate each other and demonstrate severe functionality and performance problems existed before the proxy/registration statement was filed and continued throughout the Class Period despite Boss Fight's attempts to rectify the problems. The AC include a sample of at least eighteen of these comments, beginning in November 2020 and spanning through the end of December 2021.

Between the February 2021 announcement of the merger agreement and the June 2021 vote on the merger, Pascal and the signatories of the proxy/registration statement (Acies and Post-Merger Playstudios Directors) never disclosed any of these technical problems and their attendant risks, which had materialized as early as November 2020 and had become constant by mid-2021, within the proxy/registration statement itself, press releases, interviews, or conference calls. According to Plaintiffs, in the months following the merger, Post-Merger Playstudios and Pascal made a series of additional false or misleading statements through press releases and investor conference calls.

On February 24, 2022, Post-Merger Playstudios announced in a press release that its full fiscal year revenues for 2021 were $287.4 million, missing the low end of its previous estimates by millions of dollars and that its full year 2022 revenues were expected to be in the range of $305 million to $325 million, or $110 million below the figures published in the proxy/registration statement. On that same day, the Company held a conference call to announce the financial results for the fourth quarter of 2021. During this call, Pascal disclosed that they were suspending the development of Kingdom Boss all together and that Playstudios would be taking an $8 million write off associated with the game. Slide 17 of an investor presentation admitted that a dramatic decline in revenue in 2021 was "impacted by New Game Development." The August 11 announcement was based on full quarter financial results that were finalized no later than June 30, 2021—less than two weeks after the merger vote.

On this news, the price of Playstudios' common stock declined from its previous day closing price of $5.10 on February 24, 2022 to close at $4.86 per share on February 25, 2022. The common stock price declined again the next trading day on February 28, 2022 to close at $4.56

per share, and $3.90 on March 1, 2022. On April 7, 2022, Kingdom Boss's Facebook page posted an update announcing that the servers would be taken down and the game would not be playable beginning May 6, 2022.

The Phoenix Insurance Company Ltd. and The Phoenix Provident Pension Fund Ltd. (collectively "Lead Plaintiff") purchased shares of Acies before the merger but elected to exchange rather than redeem shares pursuant to the proxy/registration statement and/or purchased or otherwise acquired Playstudios' common stock during the 10(b) class period.

The Securities Act Class is defined as all persons who purchased or otherwise acquired shares in Playstudios (including by way of exchange of Acies shares) pursuant to the proxy/registration statement that was filed with the SEC on Form S-4 on February 16, 2021 and amended on Forms S-4/A on March 26, 2021, May 10, 2021, and May 20, 2021—the body of which was incorporated into the final prospectus on Form 424(b)(3) filed on May 25, 2021. The 14(a) Class consists of all persons who were solicited to approve the merger and who exchanged Acies shares for Playstudios Class A Ordinary Shares rather than redeeming the same pursuant to the proxy/registration statement. The 10(b) Class is all persons who purchased or otherwise acquired Playstudios Class A Ordinary Shares between August 11, 2021 and May 5, 2022, both dates inclusive.

Defendant Andrew Pascal ("Pascal") was a co-founder and shareholder of Acies, and is a co-founder, Chairman and CEO of Playstudios. Defendants King and Fetters were Co-CEOs of Acies, Defendant Murren was the Chairman of Acies' Board of Directors, and Defendants Leonsis, Carleton, Zobler, Kennedy, and Grove[1] were all Directors of Acies. These Defendants (collectively, "Acies Directors") all signed the proxy/registration statement. Defendants Hornbuckle, Horowitz, Krikorian, and Mencher were all, or are still presently, Directors of Post-Merger Playstudios. These Defendants (collectively, "Post-Merger Playstudios Directors")

---

[1] Defendants assert that Mr. Grove was not a director because his name is not listed as a signatory in the registration statement. However, Grove is listed as a Director of Acies in the proxy statement. In any case, this is a factual dispute which the Court cannot, and may not, resolve through an *excerpted* proxy and registration statement at the pleading stage.

consented to be listed in the proxy/registration statement as a Director of Post-Merger Playstudios.

## IV.   LEGAL STANDARD

### a.  Motion to Dismiss

An initial pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). The court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In ruling on a motion to dismiss, "[a]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." Faulkner v. ADT Sec. Services, Inc., 706 F.3d 1017, 1019 (9th Cir. 2013) (citations omitted).

To survive a motion to dismiss, a complaint need not contain "detailed factual allegations," but it must do more than assert "labels and conclusions" or "a formulaic recitation of the elements of a cause of action. . . ." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)). In other words, a claim will not be dismissed if it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," meaning that the court can reasonably infer "that the defendant is liable for the misconduct alleged." Id. at 678 (internal quotation and citation omitted). The Ninth Circuit, in elaborating on the pleading standard described in Twombly and Iqbal, has held that for a complaint to survive dismissal, the plaintiff must allege non-conclusory facts that, together with reasonable inferences from those facts, are "plausibly suggestive of a claim entitling the plaintiff to relief." Moss v. U.S. Secret Service, 572 F.3d 962, 969 (9th Cir. 2009).

"In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). To meet the particularity requirement of Rule 9(b), the complaint must identify the "who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." Salameh v. Tarsadia Hotel, 726 F.3d 1124, 1133 (9th Cir. 2013) (quoting Cafasso v. Gen. Dynamics C4 Sys., Inc., 637 F.3d 1047, 1055 (9th Cir. 2011)). In other words, the plaintiff must

set forth an explanation as to why the statement or omission complained of was false or misleading." In re Stac Elecs. Sec. Litig., 89 F.3d at 1404. In addition, "the pleading requirements imposed by the [Private Securities Litigation Reform Act ("PSLRA")] vary depending on the element of the claim at issue." Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc., 63 F.4th 747, 765 (9th Cir. 2023).

## V.   DISCUSSION

### A.  Judicial Notice and Incorporation by Reference

Defendants seek to have the Court incorporate by reference and/or take judicial notice of nineteen exhibits totaling 250 pages of documents from outside the AC.  Plaintiff opposes, arguing that Defendants "fail to identify the specific facts" to be judicially noticed and incorporated by reference and are abusing the judicial notice and incorporation by reference doctrines in order to impermissibly transform the motion to dismiss into a "trial by paper."

"Generally, district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6)." Lee v. City of Los Angeles, 250 F.3d 668, 689 (9th Cir. 2001)). "There are two exceptions to this rule: the incorporation by reference doctrine and judicial notice under Federal Rule of Evidence 201." Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 998 (9th Cir. 2018).

"Judicial notice under Rule 201 permits a court to notice an adjudicative fact if it is 'not subject to reasonable dispute.'" Fed. R. Evid. 201(b). A fact is 'not subject to reasonable dispute' if it is 'generally known,' or 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" Khoja, 899 F.3d at 999 (citing Fed. R. Evid. 201(b)(1)–(2)). Thus "[a] court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment." Id. (quoting Lee, 250 F.3d at 689. "But a court cannot take judicial notice of disputed facts contained in such public records." Id. This includes documents, such as investor call transcripts and regulatory reports, whose implications are "subject to varying interpretations." Id. Courts "must also consider—and identify—which fact or facts it is noticing" from judicially-noticed documents. Id.

Incorporation-by-reference is a "judicially created doctrine that treats certain documents as though they were part of the complaint itself." Id. "The doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." Id. Defendants may "seek to incorporate a document into the complaint 'if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim.'" Id. (quoting United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003). The "mere mention of the existence of a document is insufficient to incorporate the contents of a document." Id. (quoting Ritchie. Coto Settlement v. Eisenberg, 593 F.3d 1031, 1038 (9th Cir. 2010). To form the basis for a claim, the document must serve as the foundation for an element of the claim. "If the document merely creates a defense to the well-pled allegations in the complaint, then that document [does] not necessarily form the basis of the complaint." Id. at 1000.

In assessing securities fraud claims, "courts must consider the complaint in its entirety, as well as other sources [including] documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322, (2007). However, the Ninth Circuit noted "a concerning pattern in securities cases" with respect to the "overuse and improper application of judicial notice and the incorporation by reference doctrine." Khoja, 899 F.3d at 998. Specifically, "the unscrupulous use of extrinsic documents to resolve competing theories against the complaint risks premature dismissals of plausible claims that may turn out to be valid after discovery." Id. This "risk is especially significant in SEC fraud matters, where there is already a heightened pleading standard, and the defendants possess materials to which the plaintiffs do not yet have access." Id.

The Court now turns to the exhibits. The Court will incorporate by reference Acies Proxy and Registration Statement (Exhibits 1, 2); Playstudios' August 11, 2021 quarterly earnings release and conference call transcript (Exhibits 3, 4); Playstudios' November 11, 2021 conference call transcript (Exhibit 7); Playstudios' February 2, 2021 investor presentation and conference call transcript (Exhibit 13, 14); the Fantini Research interview with Andrew Pascal (Exhibit 15); and the May 11, 2021 quarterly earnings release (Exhibit 16). The Court finds that each of these

exhibits is quoted or relied on extensively within the AC or forms a necessary basis of the complaint. However, the Court will not consider the documents to resolve factual disputes against the well-pled allegations in the complaint.

The Court declines to incorporate by reference Exhibits 9, 10, or 12. Exhibits 9 and 10 are only referenced twice in the AC and not quoted at length. Exhibit 12 is only referenced once. The Court also declines to incorporate by reference Exhibits 5 (Playstudios Form 10-Q for the quarter ended June 30, 2021), 8 (Playstudios' Form 10-Q for the quarter ended September 30, 2021), or 11 (Playstudios' Form 10-K for the fiscal year ended December 31, 2021). These documents are never referenced to or quoted from in the AC. Defendants' reference to the Ninth Circuit's decision in Knievel v. ESPN is unavailing. As the Ninth Circuit explained, Knievel represents the "rare instanc[e]" where a document forms the basis of the claim even though the complaint does not mention it at all. The Court does not find that any of these exhibits "serve as the foundation for an element of the claim." The Court further finds that Exhibit 11, which refers to an alleged "global launch" of Kingdom Boss "merely creates a defense to the well-pled allegations" in the AC and is an impermissible attempt by Defendants to insert their "own version of events into the complaint." In re Lyft Inc. Sec. Litig., 484 F. Supp. 3d 758, 764 (N.D. Cal. 2020).

Defendants next request that the Court take judicial notice of Exhibits 1-3, 5, 6, 8, 9, 11-19. Exhibit 19 is a table that Defendants created, which purports to reflect the daily closing stock prices for Playstudios common stock from June 22, 2021 through May 5, 2022. The Court will not consider this exhibit. This is not a publicly filed document and given Plaintiff's objections, it "is subject to reasonable dispute." Weston v. DocuSign, Inc., No. 22-CV-00824-WHO, 2023 WL 3000583 (N.D. Cal. Apr. 18, 2023) (finding a party-created chart not judicially noticeable). As the Court has already incorporated Exhibit 1-3 and 13-16, this leaves the Form 10-Qs and 10-Ks (Exhibits 5, 8, 11); the year-end earnings release (Exhibits 6, 9, 12); Acies Form 8-K (Exhibit 17); and the Forms 4 (Exhibit 18). Although these exhibits are "matters of public record," Defendants do not identify which fact or facts they seek to have the Court notice. See Khoja 899 F.3d at 999 ("Just because the document itself is susceptible to judicial notice does not mean that every

assertion of fact within that document is judicially noticeable for its truth."). Therefore, the Court will not take judicial notice of these exhibits.

### B.  Count One - Section 11 of the Securities Act of 1933

Lead Plaintiff first alleges that Playstudios, the Acies Directors, the Post-Merger Playstudios Directors, and Pascal violated Section 11 of the Securities Act of 1933. Lead Plaintiff asserts that their Section 11 claim is based on negligence and strict liability and does not sound in fraud. The Section 11 violation stems from omissions and misstatements within the proxy/registration statement itself, the Form 425s incorporated by reference to the proxy/registration statement, as well as omissions of fact that are required under Regulation S-K. Defendants argue that Plaintiff's Section 11 claim is barred because Plaintiff lacks standing. Defendant also asserts that none of the alleged statements are misleading and even if they are, they are protected by safe harbor because they are forward-looking and were accompanied by the requisite cautionary language.

#### i.  Section 11 Standing

The Court first finds that Lead Plaintiff has standing to bring a claim under Section 11. To establish standing under Section 11, a plaintiff must allege that they purchased or acquired a security "in the offering made under the misleading registration statement" or that they "purchased shares in the aftermarket, provided they can trace their shares back to the relevant offering." In re Century Aluminum Co. Sec. Litig., 729 F.3d 1104, 1106 (9th Cir. 2013). It is not sufficient to allege that class members bought securities under the misleading registration statement. Lead Plaintiff must be able to show traceability. See id.

Lead Plaintiff asserts its shares are directly traceable to the proxy/registration statement because Acies stockholders who did not redeem their shares had their Acies shares cancelled in exchange for the right to receive Class A Ordinary Shares of Playstudios pursuant to a predetermined formula. Defendants argue that Lead Plaintiff had Acies' common stock and when the merger occurred, all the shares Lead Plaintiff had were automatically converted into Playstudios company stock, with no action on Plaintiff's part. Defendants contend that Plaintiff

did not "purchase" or pay anything under the de-SPAC proxy/registration statement; rather Plaintiff's shares are from Acies' IPO in 2020.

Although the Ninth Circuit has not expressly addressed the application of Section 11 to SPACs, it has previously found that stocks acquired through an exchange of shares because of a merger can confer Section 11 standing if the newly acquired securities are traceable to the defective registration. In Hildes v. Arthur Andersen LLP, 734 F.3d 854 (9th Cir. 2013), a plaintiff acquired shares for the purposes of Section 11 as a result of a merger agreement that resulted in the exchange of shares according to a pre-determined formula. These shares were acquired pursuant to a misleading registration statement because, if the registration statement had contained accurate information, the merger and exchange of shares would not have taken place.[2] Lead Plaintiff, an Acies shareholder, acquired its Acies stock pursuant to the initial Acies IPO. However, Acies public shareholders were provided the right to redeem their Acies shares for $10 per share pursuant to the proxy/registration statement if they preferred to receive their money back rather than receive the Post-Merger Playstudios' shares in the merger. Additionally, the registration/proxy statement called for Acies public shareholders to vote to approve or reject the merger between Acies and Playstudios.[3] As in Hildes, Lead Plaintiff alleges that had the registration/proxy statement contained accurate information, Lead Plaintiff would have either redeemed its Acies shares and/or declined to vote for the merger.[4]

_____

[2] Although the Hildes court was addressing whether plaintiff had alleged causation, the case presumes without deciding that this type of traceability to the registration statement was sufficient for Section 11 standing as well.

[3] This case is thus also distinguishable from the only other case to address Section 11 standing in the context of a SPAC, Mehedi v. View Inc., No. 21-cv-06374-BLF, 2023 WL 3592098, at *6 (N.D. Cal. May 22, 2023). In Mehdi, the plaintiffs "did not provide any specific allegations tracing its purchase of shares to the De-SPAC Registration Statement."

[4] The Hildes court found that the shares were traceable to the registration statement for the purposes of causation despite the fact that the plaintiff had already entered into an agreement to vote for the merger prior to the filing of the defective registration statement. The court reasoned that despite this agreement, the plaintiff did not irrevocably commit to exchange his shares. Here, Lead Plaintiff never agreed to vote for the merger prior to the release of the proxy/registration statement. Instead, Lead Plaintiff's decision on whether to redeem their Acies shares or vote for the merger, and thus receive Post-Merger Playstudios shares, was based on the information contained in the proxy/registration statement; making Lead Plaintiff's claims for traceability even stronger than the claim in Hildes.

1

2                                    ii.   Substantive Law re: Section 11 Liability

3          The Court now turns to whether Lead Plaintiff has adequately pled Section 11 liability

4   against Pascal, Playstudios, the Acies Director, and the Post-Merger Playstudios Directors. Section

5   11 of the Securities Act "creates a private remedy for purchasers of a security if any part of the

6   registration statement 'contained an untrue statement of a material fact or omitted to state a

7   material fact required to be stated therein or necessary to make the statements therein not

8   misleading.'" In re Rigel Pharms., Inc. Sec. Litig., 697 F.3d 869, 885 n.14 (9th Cir. 2012) (quoting

9   15 U.S.C. § 77k(a)). The plaintiff must allege: "(1) that the registration statement contained an

10  omission or misrepresentation, and (2) that the omission or misrepresentation was material, that

11  is, it would have misled a reasonable investor about the nature of his or her investment." In re Stac

12  Elecs. Sec. Litig., 89 F.3d 1399, 1403–04 (9th Cir. 1996). Section 11 imposes liability on "every

13  person who signed [a] registration statement" that contains "untrue statements of material fact or

14  [omissions of] a material fact required" to make the statements therein not misleading. 15 U.S.C.

15  § 77k(a).

16         A "statement is false or misleading if it directly contradict[s] what the defendant knew at

17  that time or omits material information." Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc., 63

18  F.4th 747, 764 (9th Cir. 2023). Courts "apply the objective standard of a 'reasonable investor' to

19  determine whether a statement is misleading." In re Alphabet, Inc. Sec. Litig., 1 F.4th 687, 699

20  (9th Cir. 2021). When defendants "tout positive information to the market," they must "do so in a

21  manner that wouldn't mislead investors, including disclosing adverse information that cuts against

22  the positive information." Id. "A misleading omission is material if 'there is 'a substantial

23  likelihood that [it] would have been viewed by the reasonable investor as having significantly

24  altered the "total mix" of information made available' for the purpose of decision-making by

25  stockholders concerning their investments.'" Id. at 699-700. However, assessments of materiality

26  are "fact-specific" and "peculiarly ones for the trier of fact." Id. (internal citations omitted).

27         "Transparently aspirational" statements and statements of "mere corporate puffery, vague

28  statements of optimism like 'good,' 'well-regarded,' or other feel good monikers," are generally

not actionable." Id. However, such statements are materially misleading if they provide "concrete description of the past and present" that affirmatively create a plausibly misleading impression of a "state of affairs that differed in a material way from the one that actually existed." In re Quality Sys., Inc. Sec. Litig., 865 F.3d 1130, 1144 (9th Cir. 2017) (cleaned up).

Unlike Section 10, "[n]o scienter is required for liability under § 11," In re Stac Elecs. Sec. Litig., 89 F.3d at 1404, and "allegations of non-fraudulent conduct need satisfy only the ordinary notice pleading standards of Rule 8(a)." Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1105 (9th Cir. 2003). Although the heightened PSLRA pleading requirements do not apply to Section 11 claims, "plaintiffs are required to allege their claims with increased particularity under Federal Rule of Civil Procedure 9(b) if their complaint sounds in fraud." Rubke v. Capitol Bancorp Ltd, 551 F.3d 1156, 1161 (9th Cir. 2009). In determining whether a complaint "sounds in fraud," the court assesses "whether the complaint 'allege[s] a unified course of fraudulent conduct' and 'rel[ies] entirely on that course of conduct as the basis of a claim.'" Id.; see In re Stac Elecs, 89 F.3d 1399 (finding specific disclaimer of fraud insufficient where "gravamen of the complaint is plainly fraud and no effort is made to show any other basis for the claims.").

The PSLRA safe harbor provisions for forward-looking statements are applicable to Section 11 actions and exempt from liability any false or misleading statement if it is forward-looking and either is accompanied by cautionary language or is made without actual knowledge that it is false or misleading. 15 U.S.C. § 78u-5(c)(1). "Some statements about the future may combine non-actionable forward-looking statements with separable—and actionable—non-forward-looking statements." Wochos v. Tesla, Inc., 985 F.3d 1180, 1190 (9th Cir. 2021) (citing Quality Systems, 865 F.3d at 1142). With "mixed" statements, "only the forward-looking aspects could be immunized from liability." The safe harbor is "not designed to protect [issuers] when they make a materially false or misleading statement about current or past facts, and combine that statement with a forward-looking statement." Id. at 1141–42.

iii.   Applicable Pleading Standard

The Court finds that Plaintiff's Section 11 claim does not sound in fraud as to Defendants

14

King, Fetters, Murren, Leonsis, Carleton, Zobler, Kennedy, Hornbuck, Krikorian, Mencher, and Grove. The AC does not rely *entirely* on the same course of conduct for each claim. Rather, Plaintiff "has made an effort to plead a non-fraudulent basis for liability." Knollenberg v. Harmonic, Inc., 152 F. App'x 674, 684 (9th Cir. 2005) (citing Stac Elecs., 89 F.3d at 1405 n.2). Specifically, Plaintiff alleges the Acies Directors and Post-Merger Playstudios Directors each breached their duty to exercise reasonable care with respect to the statements in the proxy/registration. Plaintiff also adds additional particularized allegations as to the Defendants who are implicated in the fraud, Pascal and Playstudios. Accordingly, Rule 8 ordinary notice pleading standard applies to these Director Defendants. See, e.g., In re Countrywide Fin. Corp. Sec. Litig., 588 F. Supp. 2d 1132, 1163 (C.D. Cal. 2008) ("it eviscerates § 11 to give all defendants Rule 9(b) protection" when "particularized facts raise a scienter inference as to [some] defendants, but not all.").

However, the Court finds that the Section 11 allegations as to Defendants Pascal and Playstudios sound in fraud. In looking at the AC as a whole, the Section 11 and Section 10(b) claims against Pascal and Playstudios rely on a course of *repeated* misrepresentations that allow for an inference of fraud. Id. ("At some point, repeated misrepresentations, as well as additional corroborating facts, may allow an inference of fraud as to some participants"). Furthermore, the Section 10(b) claim incorporates all the allegations from the Section 11 claim. See, e.g., Perrin v. Sw. Water Co., No. 208CV7844JHNAGRX, 2010 WL 11459200 (C.D. Cal. June 30, 2010) (finding Section 11 sounded in fraud where section 10(b) claim's added allegations asserted additional misstatement in filings actionable under section 10(b) but not section 11).

#### iv.   Some of the Statements were Misleading

The Court now turns to the alleged misleading statements and omissions. The AC alleges that the proxy/registration statement, which was finalized on May 25, 2021, contained the following misleading statements:

1) Referred to Kingdom Boss as the "soon to be released" RPG game

2) Under a sub-heading entitled "growth opportunities," the Company stated "we also expect to expand our portfolio as we enter the RPG category with our Kingdom Boss

15

product in 2021."

3) Under another sub-heading entitled "new game launches," it stated "we launched our myVEGAS Bingo game in March 2021 and intend to complete the development and launch of Kingdom Boss, our idle RPG game, in the second half of 2021."

4) "[W]e expect to turn our attention to the massive RPG market in 2021, as we launch Kingdom Boss with the category's only real-world loyalty program."

5) A claim that the Company would generate $435 million in revenues 2022 which was explicitly based on an unsubstantiated assumption that "a new game, Kingdom Boss, which began development in 2020, will launch as expected in the second half of 2021."

As to the Form 425s that were incorporated by reference, Plaintiff alleges that Pascal and the Company made the following misleading statements:[5]

1) February 2, 2021 conference call:[6]

a. "you can see the growth and the bridge that takes us from the $270 million that we did in 2020 and how it is that we're going to get to the forecast of $435 million in 2022. As we look to see how that plan translates into our financial performance . . . we expect to see the maturity of these new games along with our existing portfolio, drive our growth through 2021 into 2022."

b. "as we launch these new products, we're going to invest aggressively and in scaling and growing them, allowing them to achieve their scale and critical mass, which we expect will drive our performance as we roll into '22 and beyond . . ."

c. "we feel very confident in the plan that we have that gets us to our normalized margins . . ."

d. "we expect [our margin's] going to grow from $50 million to $94 million in 2021 as we launch these two new products."

---

[5] Generally, only statements contained in the registration statement are actionable under Section 11. A registration statement consists of the form filed with the SEC, the prospectus, any supplement, and all documents incorporated by reference. 15 U.S.C. § 77b(a)(8). To incorporate a document by reference, there must be "an express statement clearly describing the specific location of the information" that is being incorporated by reference. 17 C.F.R. § 240.12b-23. Plaintiff repeatedly alleges that these statements were filed as Form 425s with the SEC and were incorporated by reference into the proxy/registration statement. At this stage of the pleadings, the Court must accept these allegations as true. The Court notes that it did not locate any "incorporation by reference" language in the proxy and prospectus (Exhibit 1) or registration statement (Exhibit 2); however, this is not dispositive because both of these exhibits are "excerpts" and thus the Court does not have the ability to review the entire document. Therefore, the Court will consider statements made on the Form 425s.

[6] These statements were accompanied by investor presentation slides which contain graphs representing the Company's projected revenue growth.

16

2)  April 7, 2021 interview with Fantini Research, Pascal stated: "We fully expect that we'll be launching that product at some point later on this summer."

3)  May 11, 2021 press release:

    a.  Company stated it "remain[ed] on schedule to launch Kingdom Boss" "during the second half of 2021";

    b.  "Looking ahead, we expect the results for the rest of 2021 will reflect the combination of the current momentum in our existing portfolio with new game expansions into two of the fastest growing game categories—bingo and idle roleplaying games, or RPG";

    c.  "we are also on track to launch Kingdom Boss, our entry into the idle RPG category during the second half of 2021."

Confidential Witness 1 ("CW1") was the Chief Creative Officer ("COO") of Boss Fight from June 2016 through the spring of 2022. CW1 stated that Kingdom Boss went live as early as November 2020. Plaintiff references dozens of negative comments or reviews discussing crashes, bugs, frequent lagging, and major stability problems that remained constant between November 2020 and May 2021, when the final proxy/registration statement was filed, and June 2021, when Playstudios went public. The bugs made the game essentially inoperable for the users who submitted the reports.

Based on these alleged facts, the Court finds that the statements in the proxy/registration, which was finalized on May 25, 2021, as well as the April 7, 2021 interview, and May 11, 2021 press release were all misleading because they failed to disclose any of the risks associated with the severe playability issues that had materialized as early as November 2020.[7] Defendants had multiple opportunities to make such disclosures in order to avoid misleading investors. The proxy/registration statement was initially filed with the SEC on February 16, 2-21 and amended on March 26, 2021, May 10, 2021, and May 20, 2021. The final prospectus, which incorporated the body of the proxy/registration statement was filed on May 25, 2021. Moreover, Defendants could have made these disclosures in June prior to the merger vote.

---

[7] For this reason, the Court does not find the February 2, 2021 conference call statements are misleading. At that point in time, Kingdom Boss had been exhibiting technical problems for only three months. The Court finds that there would not have been enough data at this point to determine that the problems were chronic or that they would materially impact the development schedule.

The Court also finds the omission of these specific risks were material. The AC alleges that the $435 million revenue projection assumed that $60 million would be generated from Kingdom Boss sales and was a main justification for the $1.15 billion merger pitch between Acies and Playstudios. The $110 million reduction in 2022 revenue projections upon the announcement in February 2022 that the game would be abandoned as well as Pascal's acknowledgement on August 11, 2021 that a "substantial amount o[r] majority of the adjustment" 2021 revenues was caused by the delayed launch of Kingdom Boss all further support the materiality of these omissions.

v.   The Statements are Not Protected by Safe Harbor

Defendants contend that each of the identified statements are inactionable because they are forward-looking and protected by the safe harbor. The Court agrees that these statements are forward-looking but does not find that the forward-looking nature of the statements alone forecloses Section 11 liability.

The Court finds that most, if not all, the identified statements are forward-looking, therefore meeting the first prong of the safe harbor test. The only statements identified above that include non-forward-looking components, and which relate to Kingdom Boss, are Playstudios' assertion that it "remain[ed] on schedule to launch Kingdom Boss" "during the second half of 2021" and "we are also on track to launch Kingdom Boss by 2021." However, under Wochos v. Tesla, unadorned statements that a company is "on track" to achieve a goal are implicit assertions that the goal is achievable and therefore considered forward-looking. Likewise, the statement that the company "remained on schedule," without more, fails to "assert a specific concrete assertion concerning a specific current or past fact" or go "beyond the articulation of a predicate assumption" as required by Wochos.

These statements are nonetheless not protected by safe harbor.[8] First, none of these

_____

[8] Plaintiffs alternatively argue that none of the statements are subject to PSLRA safe harbor because they were made in conjunction with a blank check company and IPO. While a de-SPAC transition and IPO are functionally similar and the SEC has recently promulgated regulations that would take these statements out of safe harbor when made in conjunction with a de-SPAC transition, proposed regulations are not binding on this court. Additionally, although Acies described itself as a blank check company, the rule only takes statements that are made "in connection with an offering of securities *by a* blank check company" out of safe harbor. 15 U.S.C. § 78u-5(b)(1)(B). Here the statements were made in connection with an offering (or exchange) of securities by Post-Merger Playstudios, Acies.

statements were accompanied by meaningful cautionary language.[9] "[C]autionary language is not 'meaningful' if it discusses as a mere possibility a risk that has already materialized." Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc., 63 F.4th 747, 781 (9th Cir. 2023). The proxy/registration statement contains several risk factors applicable to game development broadly. For example, under "Risks Related to PLAYSTUDIOS' Business and Industry" the prospectus provides:

> "our games may contain errors, bugs, flaws, corrupted data, defects and other vulnerabilities, some of which may only become apparent after their launch, . . . our development and testing processes may not detect errors and vulnerabilities in our games prior to their release. Any such errors . . . may disrupt our operations, violate applicable security standards, adversely affect the game experience of our players, harm our reputation, cause our players to stop playing our games, divert our resources and delay market acceptance of our games . . . ."

ECF No. 93-1 (Exhibit 1) at 28; see also ECF No. 91 at 6 (Defendants' Motion to Dismiss at 6) (listing relevant risk disclosures).

This statement and the remaining "Risk Factors" never disclosed the *specific* risk associated with Kingdom Boss—the serious glitches and bugs that players were reporting. The Court also reviewed the February 2, 2021 Conference Call Transcript, April 7, 2021 Fantini Research Interview Transcript, and May 11, 2021 Press Release. The cautionary language in these documents simply refers readers back to the "Risk Factors" disclosed in the proxy/registration statement or amounts to boiler plate generic recitals. See id. (holding that a risk disclosure did not constitute meaningful cautionary language because the company "was aware of a significant likelihood that the risk would materialize and did not sufficiently apprise its investors of this development.").

The AC satisfies the second prong of the Safe Harbor test because it adequately pleads that Defendants knew these statements were misleading. Quality Systems, 865 F.3d at 1149. Plaintiff has proffered evidence that "the problem with [Kingdom Boss] was severe enough that Defendants must have been aware of it." No. 84 Emp-Teamster Joint Council Pension Tr. Fund v. Am. W.

---

[9] The Court also rejects Defendants argument that these statements were "mere corporate puffery." These statements went beyond "vague statements of optimism," providing concrete timelines and significant revenue generation associated with those timelines. See In re Alphabet, Inc. Sec. Litig., 1 F.4th 687, 699 (9th Cir. 2021)

_Holding Corp._, 320 F.3d 920, 942 (9th Cir. 2003). The game was experiencing glitches and bugs that impacted basic gameplay five months prior to the April interview and over six months prior to the May 11, 2021 statements and May 25, 2021 proxy/registration statement. The Kingdom Boss launch timeline was pushed back from mid-2021 to the second half of 2021 in the March 26, 2021 amendment to the proxy/registration statement, which suggests Defendants were aware of the bugs. The players described the issues with the game across multiple platforms including Boss Fight's own Facebook page. Boss Fight acknowledged the comments on its Facebook page. The illustrative comments contained in the AC described the game as being essentially unplayable. CW1, the Chief Operating Officer of Boss Fight, the third-party game developer, interacted and negotiated with Playstudios' senior management. Finally, the earnings miss announced in the August 11, 2021 press release was based on financial results that were finalized less than two weeks after the merger vote. At the time of this announcement, Pascal attributed the decreased revenue to a delay in game development. This suggests that Defendants were aware of the timing and financial risks associated with Kingdom Boss while the merger was being consummated.

These facts, taken together, plausibly allege that Defendants were on notice of the persistent glitches and bugs and therefore knew that the uniformly optimistic statements in the May 25, 2021 proxy/registration, without additional facts, were misleading. See _In re Stac Elecs. Sec. Litig._, 89 F.3d at 1406 (quoting _In re Convergent Technologies Sec. Litig._, 948 F.2d 507, 515 (9th Cir. 1991) ("There is a difference between knowing that any product-in-development may run into a few snags, and knowing that a particular product has already developed problems so significant as to require months of delay."). Defendants argue that they could not know the statements were false or misleading because Kingdom Boss did in fact launch at the end of 2021 as promised. However, the AC alleges through statements from the COO of Boss Fight (CW1) testimony that the game was "soft launched" at the end of 2021. According to the AC, there was no global launch. The Court will not consider Defendant's exhibits that merely seek to dispute this well-pled allegation. See _Khoja_, 899 F.3d at 1003.[10] Accordingly, the statements are not protected

---

[10] For these same reasons, the Court also finds that the bespeaks caution doctrine is inapplicable. See _In re Worlds of Wonder Sec. Litig._, 35 F.3d 1407, 1413 (9th Cir. 1994) (explaining the bespeaks caution doctrine as "a

1    by PLSRA's safe harbor provision.

2                          vi.   Regulation S-K

3         Plaintiff has also sufficiently stated a Section 11 claim based on the Defendants failure to

4    comply with Items 303 and Items 105 under Regulation S-K. Any omission of facts required to be

5    stated under Regulation S-K "produces liability under Section 11." Steckman v. Hart Brewing,

6    Inc., 143 F.3d 1293, 1296 (9th Cir. 1998); Sundaram v. Freshworks Inc., No. 22-CV-06750-CRB,

7    2023 WL 6390622 (N.D. Cal. Sept. 28, 2023) (observing that after Steckman, "courts treat a

8    violation of Items 303 and 105 as a violation of Section 11").

9         The Court finds Plaintiffs have alleged a failure to comply with Item 303. Item 303 requires

10   disclosure of "any unusual or infrequent events or transactions or any significant economic

11   changes" affecting reported income and "any known trends or uncertainties" that have had or are

12   likely to have a material impact on net sales or revenues or income. Id. § 229.303(b)(2)(i)–(ii). To

13   state a Section 11 claim based on Item 303, Plaintiffs must allege (1) the existence of a trend or

14   uncertainty; (2) known to management; and (3) that is reasonably likely to have a material effect

15   on the registrant's financial condition. Item 105 requires disclosure of "the material factors that

16   make an investment . . . speculative or risky," 17 C.F.R. § 229.105.

17        By the time the proxy/registration statement was finalized in May 2021, the AC plausibly

18   alleges that problems with Kingdom Boss had remained consistent for at least six months and had

19   thus become a trend. In re Restoration Robotics, Inc. Sec. Litig., 417 F. Supp. 3d 1242, 1263 (N.D.

20   Cal. 2019) ("A trend under Item 303 requires an 'observed pattern that accurately reflects

21   persistent conditions of the particular registrant's business environment.'"). For the reasons

22   described above, the AC also sufficiently alleges that Defendants had knowledge of this adverse

23   trend. Further, the abnormally large number of bugs and the severity of those bugs created a

24   reasonable likelihood of material effects on, and did in fact negatively affect, Post-Merger

25   Playstudios' financial condition as early as two weeks after the merger closed.

26        The Court also finds that Plaintiff has alleged a failure to comply with Item 105. Item 105

27   _____

28   mechanism by which a court can rule as a matter of law  that defendants' forward-looking representations contained
     enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud.") (internal
     quotations and citations omitted).

is generally satisfied "where a company's filings contain abundant and specific risk disclosures regarding the risks facing the company . . ." However, courts have held that a company's risk disclosures are misleading in violation of Item 105 where the "risk factors" reported in its Registration Statement had already materialized by the time of its IPO or where the company's financial affairs were materially different than what was represented in its registration statement. See Sundaram, 2023 WL 6390622, (citing Bos. Ret. Sys. v. Uber Techs., Inc., 2020 WL 4569846, at *6 (N.D. Cal. Aug. 7, 2020)). For example, in Uber Techs., the court found Item 105 liability because plaintiff plausibly alleged the company's financial affairs were materially different than what was represented in its Registration Statement and that the risk factors had "already come to fruition." Id. (finding liability where a company delayed inevitable layoffs and restructuring to mislead the markets prior to its IPO only to dissolve director-level positions weeks after the IPO).

As explained, the Company released its quarterly earnings on August 11, 2021, just weeks after the IPO in late June. The earnings missed the registration statement's revenue projections by millions of dollars. Pascal acknowledged at that time that "a substantial amount or majority of the adjustment" in revenues was *due to the delayed launch* of Kingdom Boss. The August announcement was based on financial quarter results that would have been finalized no later than June 30, 2021, less than two weeks after the Company went public. The AC therefore raises a plausible inference that Defendants were aware of the significant financial and timing risks associated with Kingdom Boss at around the same time as the merger vote. As in Uber Techs., the generic "Risk Factors" in the proxy/registration statements that the game *may* be delayed were not "mere possibilities" and instead, "many had already come to fruition" by the time of the merger. Therefore, the Court finds that the Plaintiff has stated a claim under Section 11 based on Items 303 and 105 as well.

vii.   Statute of Limitations

Finally, Defendants also argue that Section 11's one-year limitations period bars the adding of twelve new Defendants to the Amended Complaint. See 15 U.S.C. § 77m. Defendants argue

that the one-year period would have begun to run on August 11, 2021. The Court disagrees. On August 11, 2021, it was announced that revenue was down and Kingdom Boss's launch was delayed, but the Company and Pascal maintained that the game would "launch globally" before the end of 2021. Plaintiff alleges that the full extent of the misleading statements were not known until the game was abandoned in February 2022. The new Section 11 Defendants were added in October 2022, just eight months later; and six months after the complaint was filed in April 2022. The Court finds that the commencement of the limitations period in this particular case is a fact-intensive question that should not be addressed at the pleading stage. See, e.g., Supermail Cargo, Inc. v. United States, 68 F.3d 1204, 1207 (9th Cir. 1995) ("[A] complaint cannot be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the claim.").

For the foregoing reasons, the Court finds that Plaintiff has alleged Section 11 liability against Pascal, Playstudios, the Acies Directors, and the Post-Merger Playstudios Directors.

### C. Count IV - Section 10(b) and Rule 10b-5

The Court turns to Plaintiff's Section 10(b) and Rule 10b-5 claim against Pascal and Playstudios based on statements made after the merger. Section 10(b) of the Exchange Act prohibits using or employing, "in connection with the purchase or sale of any security ... [,] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." In re Alphabet, Inc. Sec. Litig., 1 F.4th 687 (9th Cir. 2021) (quoting 15 U.S.C. § 78j(b)).

"To state a claim under Section 10(b) of the Exchange Act and Rule 10b-5, the complaint must plausibly allege: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Weston Fam. P'ship LLLP v. Twitter, Inc., 29 F.4th 611, 619 (9th Cir. 2022) (internal quotations and citations omitted). In contrast to Section 11, Section 10(b) "covers statements made not only in the registration statement or prospectus but also in other documents and in oral

23

communications." In re Stac Elecs. Sec. Litig., 89 F.3d 1399, 1404 (9th Cir. 1996). In addition to meeting the Rule 9 pleading standards, Section 10(b) plaintiffs must also satisfy the heightened pleading standards imposed by the PLSRA. Defendants argue that Plaintiff has failed to state a claim based on the first, second, and sixth elements.

### i. Element One - Material Misleading Statements

As described more fully above with respect to Plaintiff's Section 11 claim, a statement is misleading if it contradicts what the defendant knew or omits material information. Glazer Cap., 63 F.4th at 764. Statements are judged by a reasonable investor standard and the materiality is examined through looking at the total mix of information available. In re Alphabet, 1 F.4th at 699. Additionally, although Section 10(b) and Rule 10b-5(b) "do not create an affirmative duty to disclose any and all material information," they do require disclosure "when necessary 'to make ... statements made, in light of the circumstances under which they were made, not misleading.'" Id. (quoting Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 44 (2011) (quoting 17 C.F.R. § 240.10b-5(b)). To satisfy the PSLRA on this element, "the complaint must specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." In re Alphabet, Inc. Sec. Litig., 1 F.4th 687, 701 (9th Cir. 2021).

### ii. Element Two - Scienter

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." In re Rigel Pharms., Inc. Sec. Litig., 697 F.3d 869, 882 (9th Cir. 2012) (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319, 127 (2007)).

To plead scienter adequately under the PSLRA, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Glazer Cap. Mgmt., 63 F.4th at 766 (quoting 15 U.S.C. § 78u-4(b)(2)(A)). A "strong inference" exists "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. (quoting Tellabs,

551 U.S. at 324). The court "conducts a dual inquiry when assessing whether the strong inference standard is met: first, it determines whether any one of the plaintiff's allegations is alone sufficient to give rise to a strong inference of scienter; second, if no individual allegations are sufficient, it conducts a 'holistic' review to determine whether the allegations combine to give rise to a strong inference of scienter." Id. (quoting Zucco, 552 F.3d at 992).

"[A] reckless omission of material facts" satisfies the element of scienter, provided that such recklessness "reflects some degree of intentional or conscious misconduct." In re Alphabet, 1 F.4th at 701. The Ninth Circuit defines this "deliberate recklessness" standard as "an extreme departure from the standards of ordinary care" which "presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." Id. However, because of the PLSRA's safe harbor, the required state of mind for any *forward-looking* statement, is "actual knowledge ... that the statement was false or misleading." 15 U.S.C. § 78u–5(c)(1). No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp., 320 F.3d 920, 931–32 (9th Cir. 2003).

### iii.   Loss Causation

The loss causation element of a § 10(b) claim "is simply a variant of proximate cause;" "the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." Wochos v. Tesla, Inc., 985 F.3d 1180, 1197 (9th Cir. 2021). The burden of pleading loss causation is typically satisfied by allegations that the defendant revealed the truth through "corrective disclosures" which "caused the company's stock price to drop and investors to lose money." Lloyd v. CVB Fin. Corp., 811 F.3d 1200, 1209 (9th Cir. 2016). "Loss causation thus focuses on whether a loss can be attributed to 'the very facts about which the defendant lied.'" Id. "Because the nature of a fraud is that it conceals "underlying facts . . . that affect the stock price, then if the stock price falls shortly after the disclosure of the true facts, that decline suggests that the fraud had artificially propped up the stock price." Id.

Loss causation must satisfy Rule 9(b) heightened pleading requirements, but as the Ninth Circuit observed in In re BofI, Rule 9(b)'s particularity requirement usually adds little to the

25

burden." In re BofI Holding, Inc. Sec. Litig., 977 F.3d 781, 794 (9th Cir. 2020). The plaintiff "must plausibly allege a causal connection between the defendant's misstatements and the plaintiff's economic loss, and to succeed in doing so the plaintiff will always need to provide enough factual content to give the defendant 'some indication of the loss and the causal connection that the plaintiff has in mind.'" Id. (quoting Dura Pharmaceuticals, 544 U.S. at 347). That effort "should not prove burdensome, for even under Rule 9(b) the plaintiff's allegations will suffice so long as they give the defendant notice of plaintiffs loss causation theory and provide the court some assurance that the theory has a basis in fact." In re BofI Holding, Inc. Sec. Litig., 977 F.3d 781, 794 (9th Cir. 2020) (internal quotations and citations omitted).

iv.   The Section 10(b) Statements were Misleading

The AC alleges Defendants Playstudios and Pascal made the following materially misleading statements on August 11, 2021 and November 11, 2021 with scienter.

1) August 11, 2021 press release announcing the financial results for the second quarter of 2021 in which Playstudios stated that it had "[a]dvanced the development of Kingdom Boss, the Company's entry into the fast-growing idle RPG category, which is expected to launch later this year."

2) August 11, 2021 conference call to discuss the financial results of the second quarter of 2021 where in Pascal stated:

   a. The Kingdom Boss release was delayed because of the time needed to "optimize the experience."

   b. Playstudios needs more time to assess "retention," "engagement," and "monetization" metrics to "optimize" and "adjust" the game to measure and see how it performs with new versions before investing tens of millions of dollars in "scaling" and "growing" the product.

   c. Stated "we plan to introduce the product globally later this year," "expect to soon launch Kingdom Boss," and "we're going to get it launched before the year[']s out."

3) November 11, 2021 conference call to discuss the financial result for the third quarter of 2021, wherein Pascal told investors that:

   a. The launch date for Kingdom Boss was shifted to the fourth quarter of 2021 "to allow for more refinement and performance optimizations" but the game "will

26

be ready to launch by the end of the year."

    b.  The following exchange between an analyst who asked Pascal about the specific cause of the delay:

        i.  Q:  I guess, just wondering kind of the reason for another slight delay their development kind of related, or just kind of perfecting it. Any color you can provide there?

        ii.  Pascal's Answer: "Sure. More the latter. The game from a future perspective is complete. We are constantly expanding and refining it and really this is about finding its market and optimizing the metrics to a degree that really warrants and justifies are (sic) transitioning into a more formal launch . . . So we'll continue to watch it very closely, and obviously provide more information as we further qualify what the potential is for that product. But to your point we as it hoped that it would launch earlier in this quarter we still expect that it's going to launch before the end of the year, that certainly every indication that we're getting from our partners, at Boss Fight and so we're looking forward to that."

      The Court finds that the AC adequately alleged that the August 11, 2021 statements omitted material facts to make the statements not misleading. The AC alleges throughout the summer of 2021 the bugs and crashes continued to persist despite numerous attempts by Boss Fight to remedy the problem by releasing software updates. The problems persisted into the fall of 2021 despite the software updates released by Boss Fight. The bugs that were being reported during this time period, and which had been plaguing the game since November 2020, remained so severe as to make the game impossible to play.[11]

      At the August 11, 2021 press release and conference call, Playstudios and Pascal stated "they had advanced" the development of the game, vaguely attributed the delay to the need for "optimization" of the user experience, and reiterated a "global" launch was set to occur within a matter of four months or less. These statements made no mention of the pervasive inoperability issues that the game had been exhibiting. While Pascal and Playstudios were not necessarily

---

[11] On July 31, 2021 a player described how after having played the game for many days and hours, the game ceased to run. After uninstalling and reinstalling and several restarts later, all that players' progress had been lost. On September 9, 2021, a user wrote "keeps crashing, can't progress past first stage." On September 13, 2021 another user wrote "game does not work; heats up phone and crashes within 40 seconds." On September 14, 2021, another user explained "all these bug fixes aren't working."

required to delineate each piece of material information, the Court finds that disclosure of Kingdom Boss's playability issues was necessary to make these singularly optimistic August 11, 2021 statements not misleading. See Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 44 (2011).

Additionally, the AC alleges that Confidential Witness 2 ("CW2"), a Quality Assurance lead at Playstudios from October 2016 through February 2022 spent four weeks play testing Kingdom Boss and was responsible for identifying issues that needed to be addressed before the game was marketed. CW2 states that Kingdom Boss was not ready to launch in November 2021 because of significant glitches and bugs. For this reason, the Court further finds that Pascal's response to the Analyst at the November 11, 2021, conference call was not only misleading, but was an affirmative misrepresentation. See 17 C.F.R. § 240.10b-5(b) (Securities plaintiffs may rely on either an affirmative misrepresentation theory or an omission theory). Furthermore, the November 2021 statements regarding "optimization," "retention," as well as Pascal's explanation that the delay was due to "perfecting it" all lent the impression that the game was nearly complete. Defendants therefore "tout[ed] positive information to the market" such that it "[became] bound to do so in a manner that wouldn't mislead investors." Khoja, 899 F.3d at 1009.[12]

For the reasons already discussed in reference to Plaintiff's Section 11 claim, the Court further finds that these omissions were material and therefore AC satisfies the first element of a Section 10(b) claim.

### v.   The Statements were Made with Scienter

The Court also finds Plaintiffs have adequately pled scienter with respect to these statements. The allegations taken as a whole, raise a strong inference that Pascal and Playstudios knew about the significant, fundamental problems with Kingdom Boss and intentionally did not

---

[12] Defendants' reliance on Weston Fam. P'ship LLLP v. Twitter, Inc., 29 F.4th 611 (9th Cir. 2022) is misplaced. Twitter's non-disclosure of the bugs were inactionable because Twitter's statements "suggest[ed] a vaguely optimistic assessment that [the program] like almost all product developments, has had its ups and downs, even as the company continues to make progress." Id. at 620. But this finding was based on the lack of a "specific deadline or revenue impact" for Twitter's software, thus the projections were "incapable of objective verification." Id. at 620-21. For example, Twitter made statements such as "[Software] work is ongoing." In contrast, the Defendants here continued to set specific timelines and revenue impacts that were directly tied to the development of Kingdom Boss.

disclose this information in the August 11, 2021 or November 11, 2021 statements. Although the AC does not directly allege that Pascal communicated with CW1 or CW2 about the issues with Kingdom Boss, courts "may consider a senior executive's role in a company to determine whether there is a cogent and compelling inference that the senior executive knew of the information at issue." <u>South Ferry</u>, 542 F.3d at 785. "This includes consideration of the executive's access to the information, and, whether, given the importance of the information, 'it would be 'absurd' to suggest that management was without knowledge of the matter.'" <u>Id.</u> at 786.

The Court finds sufficient facts to support a cogent and compelling inference that Pascal knew of the severe bugs and glitches. Boss Fight acknowledged the gameplay issues in a Facebook post on November 10, 2020 and released numerous software updates to remedy the defects. CW1, Boss Fight's COO, stated that he interacted and negotiated with "senior management" at Playstudios. <u>See</u> <u>In re Alphabet</u>, (inferring knowledge to the CEO based in part of management structure). On the same day that the August 11 statements were made, Pascal admitted that a majority of the adjustment in 2021 revenues was due to the delay in the Kingdom Boss launch. In November 2021, Pascal himself stated "*we'll continue* to watch it *very closely*," in reference to Kingdom Boss's developments. Additionally, as discussed, the success of Kingdom Boss was highly material to Playstudios' bottom line, representing $60 million of the projected revenue in 2022. Taken together, these allegations "go beyond a mere inference of management knowledge of all 'core operations,'" <u>South Ferry</u>, 542 F.3d at 786, or a singular reliance on temporal proximity, <u>Twitter</u>, 29 F.4th at 622.

vi.   The Statements Are Not Protected by Safe Harbor

Finally, the Court finds that these statements are not protected by safe harbor. None of the statements were entirely forward-looking, however, some statements contained a forward-looking component.[13] The Court does not delineate each forward-looking statement because as with the

---

[13] For example, although portions of Pascal's statement on November 11, 2021 were forward-looking, other portions were not. "More the latter," and "we are constantly refining and expanding it" were direct responses to an Analyst's question about the current reason for the delay in Kingdom Boss's launch and therefore not forward-looking. Additionally, "that's certainly every indication we are getting from our partner" was a statement describing current events.

Section 11 statements, they were not accompanied by meaningful cautionary language and the AC raises a strong inference that they were made with knowledge that they were misleading. The August 11, 2021 press release and conference call transcript refer readers to the same risk factors from the May 25, 2021 proxy registration, which had never been updated. The documents also did not disclose any new risks even though the risks associated with Kingdom Boss remained constant and the delay had already impacted revenue by millions of dollars. Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc., 63 F.4th 747 (9th Cir. 2023) (concluding that cautionary language is not "meaningful" when it "amounts to boilerplate listing of generic risks and does not mention the specific risk" to which the company has been alerted).

### vii.   The AC Sufficiently Pleads Loss Causation

The Court further concludes that the AC sufficiently pleads loss causation. On February 24, 2022, Playstudios announced that its fiscal year revenues for 2021 were $287.4 million, well below the low-end of its previous estimates. Playstudios also announced that it expected its revenues for 2022 to be in the range of $305 to $325 million, which was $110 million below the figures published in the proxy/registration statement. Playstudios stock price then proceeded to decline significantly for the next three trading days—from $5.10 to $4.86 to $3.90.

Defendants are correct to observe that the earnings miss announcement alone, would be insufficient to establish loss causation because Plaintiffs would not be able to plead that the market learned and reacted to the alleged fraudulent practices "as opposed to merely reports of the defendant's poor financial health generally." See Oracle 392. However, the AC also alleges that on the same day as this announcement, Playstudios held a conference call to announce the financial results of the fourth quarter of 2021. Pascal announced during this call that Playstudios was abandoning Kingdom Boss and acknowledged the decline in 2021 revenue "was impacted by New Game Development." These are both corrective disclosures related specifically to the game and not the Company's general financial health. See In re BofI Holding, Inc. Sec. Litig., 977 F.3d 781, 790 (9th Cir. 2020) ("loss causation does not require a showing 'that a misrepresentation was the sole reason for the investment's decline in value.'") (citing In re Daou Systems, Inc., 411 F.3d

1006, 1025 (9th Cir. 2005)).

Based on the foregoing, the Court finds that Plaintiff has stated a Section 10(b) claim against Pascal and the Company.

### D.  Count III - Section 14(a) of the Exchange Act

Plaintiff next brings a claim under Section 14(a) and Rule 14a-9 against Playstudios and the Acies Directors. Defendants raise many of the same arguments in support of dismissing the Section 14(a) claim and also assert that Plaintiff fails to allege that the proxy statement was an essential link in the transaction.

To state a claim under Section 14(a) and Rule 14a–9, "a plaintiff must establish that (1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." New York City Employees' Ret. Sys. v. Jobs, 593 F.3d 1018, 1022 (9th Cir. 2010), *overruled on other grounds by* Lacey v. Maricopa Cnty., 693 F.3d 896 (9th Cir. 2012).

Private Section 14(a) plaintiffs "must meet the heightened pleading standards of the PSLRA." Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, 552 U.S. 148, 165 (2008). Accordingly, a plaintiff must, with respect to each alleged act or omission, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind as well as loss causation. 15 U.S.C. § 78u–4(b)(2). The required state of mind for Section 14(a) claims is negligence unless the claim sounds in fraud. See Knollenberg, 152 Fed. Appx. at 682–83. To determine whether the complaint sounds in fraud, the court undertakes the same analysis as it does with Section 11 claims. Fraud-based allegations are subject to Rule 9(b) pleading requirements.

Rule 14a–9 requires a complainant to demonstrate why a challenged proxy statement was misleading "at the time ... made." Desaigoudar v. Meyercord, 223 F.3d 1020, 1023 (9th Cir. 2000) (citing 17 C.F.R. § 240.14a–9). "Failure to disclose information that does not yet exist cannot be the predicate for Rule 14a–9 liability." See 17 C.F.R. § 240.14a–9. "Section 14(a) and Rule 14a–9 do not obligate corporate officials to present, no matter how unlikely, every conceivable

argument against their own recommendations. They instead require that officials divulge all known material facts so that shareholders can make informed choices." <u>Desaigoudar v. Meyercord</u>, 223 F.3d 1020, 1024 (9th Cir. 2000) (citing <u>J.I. Case Co. v. Borak</u>, 377 U.S. 426, 431 (1964). An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. <u>Id.</u>

Section 14(a) plaintiffs must plead both economic loss and proximate causation. <u>Id.</u> (citing <u>Dura Pharm., Inc. v. Broudo</u>, 544 U.S. at 346). In well-pleaded § 14(a) claims, loss causation connects the proxy misstatements with an actual economic harm." <u>Id.</u> (citing <u>Grace</u>, 228 F.3d at 46); <u>see also</u> <u>Dura</u>, 544 U.S. at 347 (faulting plaintiffs for not providing defendants notice of the relevant economic loss and the causal connection between that loss and the misrepresentation).

The same statements, risk disclosures, and timeline, are at issue for the Section 14(a) claim and Section 11 claim. As an initial matter, the Court finds that the February 2, 2021 conference call, April 7, 2021 research interview, and May 11, 2021 press release and conference call were "all part of a continuous plan to encourage a favorable vote by shareholders" and therefore all constitute the proxy solicitation. <u>Desaigoudar v. Meyercord</u>, 223 F.3d 1020, 1022 (9th Cir. 2000) (citing 17 C.F.R. § 240.14a–1). For the same reasons explained in relation to the Section 11 claim, which the Court incorporates by reference here, the Court finds that the statement identified in the April 7, 2021 research call, the May 11, 2021 press release and conference call, as well the statements in the proxy/registration statement itself constituted material misrepresentations and omissions absent additional disclosures of facts.[14] These statements were not protected by safe harbor because they were not accompanied by meaningful cautionary language and the AC plausibly pleads that Defendants were on notice of the facts that made these statements misleading.

As with Plaintiff's Section 11 claim, the Court concludes that the Section 14(a) claim against the Acies Directors does not sound in fraud and Plaintiff raises a strong inference that the Section 14(a) Defendants acted negligently by failing to adhere to their duty of care. Specifically,

---

[14] The Court does not find the statements in the February 2, 2021 conference call actionable for the same reasons specified above in relation to the Section 11 claim.

Plaintiff alleges that the Section 14(a) Defendants acted negligently because they represented that they had conducted diligence on Pre-Merger Playstudios, including its new game launches, but the proxy nonetheless contained misleading statements.

Moreover, the proxy statement was the essential link in the accomplishment of the transaction because the vote on the proxy consummated the merger between Acies and Pre-Merger Playstudios, which converted the Acies shareholders stock into Post-Merger Playstudios common stock. Although Acies shareholders needed to go through a separate process to redeem their shares, the merger provided essential information to shareholders about the value of their shares and a vote on the proxy was the but-for cause of the exchange of stock.

The Court also finds that the AC adequately pleads loss causation at this stage of the litigation. Plaintiff alleges that the misstatements and omissions in the proxy deprived shareholders of information, which caused them to accept inadequate consideration for the merger at $10 per share. See Zhou v. Faraday Future Intelligent Elec. Inc., No. 221CV09914CASJCX, 2022 WL 13800633 (C.D. Cal. Oct. 20, 2022) (citing In re Hot Topic, Inc. Sec. Litig., No. CV 13-02939 SJO JCX, 2014 WL 7499375 (C.D. Cal. May 2, 2014) (causing shareholders to believe that $14/share was fair transaction sufficient to satisfy 14(a) loss causation requirement).

### E.  Count Two and Count Five - Section 15 and Section 20(a)

Finally, the Court finds that the Plaintiff adequately pleads a Section 15 of the Securities Act of 1933 (Count Two) and Section 20(a) of the Exchange Act (Count Five) "control person" claims against Pascal. The standard for establishing control liability under Section 15 and 20(a) is the same. Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1578 (9th Cir. 1990). "To establish 'controlling person' liability, the plaintiff must show that a primary violation was committed . . . ." Paracor Fin., Inc. v. Gen. Elec. Capital Corp., 96 F.3d 1151, 1161 (9th Cir. 1996). Once Plaintiffs have properly pled underlying violations under the Exchange and Securities Acts, the Court determines whether Plaintiffs have alleged claims against those with "control." Id. "In general, the determination of who is a controlling person ... is an intensely factual question." Arthur Children's Trust v. Keim, 994 F.2d 1390, 1396 (9th Cir. 1993).

The Court has already found that Plaintiff has adequately pled a Section 11 claim as to Pascal, the underlying violation for a Section 15 control person claim. The Court has also found that Plaintiff has adequately pled a Section 10(b) claim as to Pascal, which is the underlying violation for a Section 20(a) control person claim. Defendants do not dispute control. Several district courts have found that even directors who sign the statement are "control persons." In re Metro. Sec. Litig., 532 F. Supp. 2d 1260 (E.D. Wash. 2007) (collecting cases). Pascal is far more than a director; he is the co-founder of Acies and co-founder, Chairman, and CEO of Pre-Merger and now Post-Merger Playstudios. Therefore, Plaintiffs have adequately pled control.

## VI.     CONCLUSION

**IT IS ORDERED** that Defendants' Motion to Dismiss (ECF No. 91) is **GRANTED in part and DENIED in part**. All the statements identified within the Amended Complaint are actionable except for those made at the February 2, 2021 conference call.

**IT IS FURTHER ORDERED** that the unopposed motions to take notice of supplemental authority (ECF No. 102, 107, 130) are **GRANTED.**

**IT IS FURTHER ORDERED** that the Request for Judicial Notice and Incorporation by Reference is **GRANTED in part and DENIED in part**. The Court incorporates by reference Defendants' Exhibits 1, 2, 3, 4, 7, 13, 14, 15, and 16, only and declines to take judicial notice of any of the Exhibits.

The parties are to submit a proposed discovery plan and scheduling order consistent with this Court's order by **April 12, 2024.**

DATED: March 31, 2024.

_____

**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**

34