Steven J. Parsons
Nevada Bar No. 363
**LAW OFFICES OF STEVEN J. PARSONS**
10091 Park Run Dr., Ste. 200
Las Vegas, NV 89145-8868
(702) 384-9900
(702) 384-5900 -- fax
Steve@SJPlawyer.com

Kevin D. Gamarnik,
State Bar of California #274335
kgamarnik@foleybezek.com
**FOLEY BEZEK BEHLE & CURTIS, LLP**
15 West Carrillo Street
Santa Barbara CA 93101
Telephone: (805) 962-9495
Facsimile: (805) 962-0722

*Attorneys for Movant*
**FOLEY BEZEK BEHLE & CURTIS, LLP**

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| CHRISTIAN A. FELIPE;<br><br>Plaintiff,<br><br>vs.<br><br>PLAYSTUDIOS, INC., et al.<br><br>Defendants. | Case No: 2:22-CV-01159-RFB-(NJK)<br><br>**MOVANT FOLEY BEZEK BEHLE & CURTIS, LLP'S REPLY IN SUPPORT OF THEIR MOTION FOR ATTORNEYS' FEES, AND**<br><br>**OBJECTION TO REQUEST OF ATTORNEYS' FEES BY LEAD COUNSEL**<br><br>**HEARING REQUESTED** |

**Preliminary Statement**

The relevant inquiry in determining whether to compensate non-lead counsel is whether their efforts added value to the class, by, among other things, discovering the claims. Therefore, when a firm is the sole entity to analyze public information and construct a viable theory of fraud (that no other firm, especially lead counsel, contemplated) that results in a class settlement, doesn't that add value to the class that merits compensation?

1

## **Introduction**

The common fund in this class action exists for one reason: Foley Bezek Behle & Curtis, LLP ("FBBC") and its co-counsel conducted the foundational investigation that created it. While Lead Counsel ("LC") now claims in hindsight that the fraud was obvious, they cannot answer a simple question: if the claims were so apparent, why was FBBC (with its co-counsel) the only firm—out of all securities firms in the country, including LC—to investigate and file a complaint?

FBBC agrees with LC's characterization that FBBC has filed a "highly unusual motion". The reason for FBBC's motion is that LC is violating the good faith requirements set forth in *Cendant* that "In most cases … we expect that lead plaintiffs who make use of earlier attorneys' legal or investigative work will request compensation for such attorneys." *Cendant*, 404 F.3d at 197. Thus, we found ourselves in "the unlikely case that lead plaintiffs appropriate that work and attempt to deny compensation", which *Cendant* explains that in such situations "we expect that the court will nonetheless reward the earlier attorney's work on behalf of the class." *Id*. Notably, at least two of LC's authorities include situations where LC did (appropriately) seek fees on behalf of non-lead counsel, but the non-lead counsel was demanding far more compensation.[1]

Here, LC did not just borrow some of FBBC's ideas; the entire class settlement is derived from FBBC's Original Complaint.  This is not hyperbole: FBBC's Original Complaint is the very *complaint* that was used to inform all class members of the underlying facts of the case. Specifically, the Playstudios Settlement Website, which is "maintained by the Claims Administrator **under the supervision of LC**", refers all class members to FBBC's Original Complaint to view.  Supplemental Declaration of Kevin D. Gamarnik ("Supp. Gamarnik Decl."), ¶¶ 5-6, Exhs. D-E. Unable to contest this foundational contribution on the merits, LC is forced to

---

[1] Compensation to non-lead counsel is not a new concept to LC, and any suggestion otherwise is disingenuous. *See In re OCA, Inc. Sec. & Derivative Litig*., No. 05-2165, 2009 U.S. Dist. LEXIS 19210, at *74-77 (E.D. La. Mar. 2, 2009) (the Pomerantz firm seeking fees for time on drafting their original complaint.)  Notably—and even more reason why Pomerantz' fee request should be viewed skeptically—in that case, after being asked to submit detailed time sheets, the Pomerantz firm "submitted a declaration lowering the number of hours in its fee request from 235.3 to 54.8, which lowered its projected lodestar from $ 127,898.25 to $ 25,188.50." *Id.*

resort to procedural and personal attacks, all of which are baseless, as well as a misapplication of the governing law concerning compensation of non-lead counsel.

First, LC argues for a Fed. Rule Civ. Proc. § 60(b)(1) standard that the Ninth Circuit Court of Appeals has held results in an abuse of discretion. ***Even if*** *FBBC should have been monitoring the case docket* (and there are mitigating factors as to that factor), the lack of prejudice, the mere one-day delay, and the lack of evidence of bad faith, require that this Court grant 60(b)(1) relief. Indeed, it is LC's fees motion that is procedurally defective in failing to provide detailed billing statements (even after having the chance to correct that omission), violating L.R. 54-14(a)(1), which requires "[a] reasonable itemization and description of the work performed", which the Court can treat as "a consent to the denial of [their fees] motion." *Id.*; L.R. 54-14(c).

Second, they misapply the *Cendant* standard that this Circuit follows. LC argues for an impossible standard that would create a categorical rule where, irrespective of the circumstances, non-lead counsel can never be awarded attorneys' fees. They fault FBBC for not performing tasks only LC had the authority to do, such as issuing class-wide notice or satisfying a multi-factor test intended exclusively for appointed lead counsel. To require that FBBC have satisfied these requirements results in a rejection of *In re Cendant Corp. Sec. Litig.*, 404 F.3d 173 (3d Cir. 2005) ("*Cendant*"), which (as LC itself concedes) the Ninth Circuit follows. *See* Dkt. No. 181-2, page 2 of 11 ("it looks like the Ninth Circuit would indeed look to *Cendant* for guidance…").

Third, they treat this case as one that misconstrues the law as to this specific situation, treating this case as one that *Cendant* describes as being "the dominant paradigm in securities class actions [which] is probably not careful investigation to discover hidden abuses, but rapid filing in response to abuses publicized by regulators, the media, or the issuer itself." *Id.* at 194. Put differently, unlike here, the paradigmatic securities class action involves some report that alone simply identifies the ingredients needed for any securities lawyer to plead a securities fraud claim. In such a situation, it is appropriate to deny the firm that first filed a complaint to any compensation because the work is easy to duplicate—often evidenced by other complaints filed at or around the same time. However, it is appropriate to award non-lead counsel

their attorneys' fees, when, as here, "**attorneys who alone discover grounds for a suit, based on their own investigation rather than on public reports, legitimately create a benefit for the class.**" *Cendant*, 404 F.3d at 196-97. In fact, under LC's own definition of what constitutes a sufficient investigation—seeking input from experts in the industry, not just information publicly available—FBBC's investigation qualifies for compensation. LC attempts to mislead the Court by saying that the Original Complaint was "only one of such complaints spurred by Defendants' public announcement," deceptively conflating this unique case with all SPAC-related litigation generally. Opposition at 3:2-5.[2]

Lastly, although LC's ad hominem attacks volleyed at FBBC have no relevance here, LC's attacks are wholly unsupported and have already been raised and (appropriately) ignored by the Central District of California earlier in this case.

As discussed herein, it is appropriate to award FBBC for its fees sought.  Notably, LC does not dispute the FBBC's lodestar—either the hourly rate or the time expended. Thus, if the Court agrees that FBBC is entitled to any fees, then it should be awarded the full amount sought.  With the additional time having been spent on drafting this Reply, FBBC now seeks a total of **$132,549**.

### 1.     LC Mischaracterizes the Rule 60(b)(1) Standard

LC's Rule 60(b)(1) analysis fails because it misstates the controlling law and ignores the undisputed facts. To start, LC conflates two entirely separate procedural devices, wrongly suggesting FBBC should have sought to continue the due date rather, or in addition to, properly moving for the acceptance of a late-filed document under the excusable neglect standard. *See e.g., Ahanchian v. Xenon Pictures, Inc.*, 624 F.3d 1253, 1261-62 (9th Cir. 2010) (analyzing a post-deadline motion to accept a late filing as a distinct procedural device from seeking to extend the deadline itself).

The modern 60(b) excusable neglect standard in the Ninth Circuit is an elastic, multi-factor test, considering: "(1) the danger of prejudice to the opposing party; (2) the length of the delay and

---

[2] To accept the premise that all SPAC cases are the same, then that is even more reason to scrutinize LC's fee request as the amount billed may not be reasonable.

its potential impact on the proceedings; (3) the reason for the delay; and (4) whether the movant acted in good faith." *Lemoge v. United States*, 587 F.3d 1188, 1192 (9th Cir. 2009). The rule is "remedial in nature and . . . must be liberally applied." *TCI Group Life Ins. v. Knoebber*, 244 F.3d 691, 696 (9th Cir. 2001).

Here, three of the four factors weigh dispositively in FBBC's favor. The delay was a mere one day, it had no impact on the proceedings, and LC offers no evidence that FBBC acted in bad faith. Instead, their opposition rests entirely on the third factor, the reason for the delay.

However, LC's argument that FBBC's failure to monitor the docket is an automatic bar to relief is precisely the kind of rigid, *per se* rule the Ninth Circuit has rejected. In *Ahanchian*, the court found an abuse of discretion where the district court denied relief based solely on a "calendaring mistake," because such a ruling fails to properly weigh all the factors. 624 F.3d at 1261-62. As in *Ahanchian*, the only prejudice here is that the opposing party "lost a quick victory," the delay was minimal, and there is no evidence of bad faith. *Id.*; *see also Bateman v. United States Postal Serv.*, 231 F.3d 1220 (9th Cir. 2000) (finding abuse of discretion in denying 60(b)(1) relief even where counsel "showed a lack of regard for his client's interests and the court's docket…"); *Holt v. Staples the Office Superstore, LLC*, No. CV 19-1735-DMG (RAOx), 2019 U.S. Dist. LEXIS 227000, at *3-5 (C.D. Cal. May 10, 2019) (finding that although plaintiff's counsel's explanation that it did not obtain notice of a motion filing on the CM/ECF system "strained credulity", "equity demand[ed]" that the Court vacate a motion to dismiss order when there was no prejudice, the delay was minimal, and that there was no indication of bad faith). The mitigating circumstances here—including that FBBC had been removed from the CM/ECF service list and the professional expectations of fairness established in *Cendant*[3]—further weaken LC's position.

LC's supporting case law is equally unavailing. *Yeschick v. Mineta*, 675 F.3d 622, 629-30 (6th Cir. 2012) is a Sixth Circuit case that, unlike here, expressly found prejudice to the other party.

---

[3] While no formal requirement on LC's part, it doesn't take much to send a quick email to a party that it knows has a claim to a portion of the fees. Such notice is especially within the spirit of *Cendant*, which requires that LC act fairly towards other firms that benefitted the class. Per *Cendant*, LC should have been the one to offer to include FBBC as part of any fee request, and not to subversively seek such relief.

*Allmerica Fin. Life Ins. & Annuity Co. v. Llewellyn*, 139 F.3d 664, 666 (9th Cir. 1997) is irrelevant as it concerned relief sought after a final judgment had already been entered and did not apply the governing *Pioneer* factor test that the Ninth Circuit now follows.

LC's procedural attack rings hollow, as it is their own fee application that is procedurally deficient. Although having the opportunity to correct its error, LC refused to produce any detailed time sheets, in direct violation of L.R. 54-14(a)(1), requiring that a motion for attorneys' fees include "[a] reasonable itemization and description of the work performed." *Id.*  Failure to do so is "a consent to the denial of the motion." *Id.; see also* L.R. 54-14(c).

Without this information, a "court is placed in the position of simply guessing at the actual value of the attorney's services." *See Computer Econ., Inc. v. Gartner Grp., Inc.*, No. 98-CV-0312 TW (CGA), 1999 U.S. Dist. LEXIS 22204, 1999 WL 33178020, at *8 (S.D. Cal. Dec. 14, 1999) (citation omitted).  The Court has no way of determining if the claimed hours of work were "reasonably expended" or whether some of the hours are duplicative entries or were spent on tasks that should have been done by less experienced attorneys, paralegals, or secretaries. *See In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 941 (9th Cir. 2011) ("The lodestar figure is calculated by multiplying the number of hours the prevailing party ***reasonably expended* on** the litigation (**as *supported by adequate documentation***) by a reasonable hourly rate[.]") (emphasis added, parenthetical in original); *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210 (9th Cir. 1986) ("[H]ours may be reduced by the court where documentation of the hours is inadequate; if the case was overstaffed and hours are duplicated; if the hours expended are deemed excessive or otherwise unnecessary."); *Dardarian v. OfficeMax N. Am., Inc.*, No. 11-cv-00947-YGR, 2014 U.S. Dist. LEXIS 178463, at *12 n.8 (N.D. Cal. Dec. 30, 2014) ("While detailed timesheets are not a prerequisite to an award of attorneys' fees, the declarations of class counsel lend insufficient credence to the reasonableness of a claim for more than $200,000 in fees in light of the complexity of this case.")

Recently, the Pomerantz law firm was criticized for failing to provide detailed billing statements. *See, e.g.*, *Hardy v. Embark Tech., Inc.*, No. 3:22-cv-02090-JSC, 2024 U.S. Dist. LEXIS

6

58266, at *28 (N.D. Cal. Mar. 29, 2024) (despite court's request for "detailed billing records", Pomerantz submitted a chart, which was "inadequate to support the hours claimed").[4]

But the Court need not even address the 60(b)(1) standard because FBBC's motion is untimely under ¶ 25 of the Preliminary Settlement Order. LC misreads Paragraph 25, which plainly allows objections from any "Settlement Class Member or **other Person**." Their interpretation that this provision applies only to Settlement Class Members completely disregards the reference to "other Person". As the firm whose foundational work created the common fund, FBBC is an "other Person" with an established right to object to the allocation of fees. LC's argument as to FBBC's interpretation of ¶28 fails because there is, in fact, only one "Settlement" and one "Plan of Allocation." Under the legal canon *noscitur a sociis*, items in a list are read consistently. Since "the Settlement" and "the Plan of Allocation" are singular, "the Fee and Expense Application" should also refer to the singular, primary application from LC. This consistent reading supports FBBC's position, not the strained interpretation LC invents.  FBBC does not contend it could have filed its Motion and Objection whenever it wanted, it states it could file it 28 days before the hearing.

### 2.  <u>LC Mischaracterizes the Standard for Fees of Non-LC</u>

LC's argument that FBBC "vanished" only to reappear when there was money on the table and should be denied fees for failing to provide notice is illogical and contradicts the very paradigm the *Cendant* court described. The court explained that under the PSLRA, "the new paradigm of securities litigation **significantly restricts the ability of plaintiffs' attorneys to interpose themselves as representatives of a class** and expect compensation for their work". It is LC, chosen by the Lead Plaintiff, who becomes the "driving force behind the class's counsel decisions". It is absurd for LC to argue that FBBC, a firm with no authority or official role, should

---

[4] LC cites to a 2015 FBBC declaration filed in support of fees for the proposition that it did not include detailed time sheets.  However, the difference is that there was no local rule requiring it. And in any event, the declaration specifically stated that "Should the Court request further supporting documentation for these amounts, the firm is prepared to provide it." No such offer is made by LC here.  *See* Dkt. No. 181-4, ¶ 15.

have performed a function—issuing a formal, class-wide notice—that is now the exclusive responsibility of LC themselves. They cannot have it both ways: they cannot claim total control over the litigation and then fault a powerless, non-lead firm for not performing a duty that only they had the power to execute.

This contradiction exposes the true nature of their objection: it is not a good-faith procedural argument, but a self-serving attempt to retain the full benefit of FBBC's foundational work without providing compensation. LC's substantive arguments are equally flawed, resting on a misapplication of legal standards to the unique role of non-lead counsel. For example, their reliance on the Ninth Circuit's multi-factor test for reasonableness (risk, results, skill, etc.) is entirely misplaced. Those factors are designed to evaluate the overall management of a class action by lead counsel from start to finish. To apply them to FBBC's limited, pre-appointment investigative work creates an impossible Catch-22: non-lead counsel can never be compensated because they, by definition, did not shoulder the litigation risk or secure the final settlement— duties exclusively reserved for lead counsel under the PSLRA. The proper inquiry is not whether FBBC acted as lead counsel, but whether its foundational work provided the "independent benefit" that the *Cendant* standard requires.

Similarly, LC's attempt to diminish FBBC's contribution by highlighting its own later investigation with Confidential Witnesses creates a false choice. The two efforts are sequential and symbiotic, not mutually exclusive. FBBC's investigation created the blueprint by discovering and articulating a non-obvious theory of fraud when no other firm had. LC then built upon that blueprint, using its resources to prosecute the case. One does not exist without the other; LC's valuable work in prosecuting the case does not retroactively erase the value of FBBC's essential work in creating it.

The court is not required to follow LC's recommendation, particularly for pre-appointment work where its "involvement in the fee decision will be at its height". See *In re Cendant Corp. Sec. Litig.*, 404 F.3d at 195. Indeed, the court must be skeptical of such a recommendation precisely because LC has a "**direct financial interest in keeping down the fees of non-lead counsel**". *See*

8

*id*. at 198-99.   Recognizing this inherent conflict, the *Cendant* court established that it has an affirmative duty to intervene, stating its expectation that "**the court will nonetheless reward the earlier attorney's work on behalf of the class**".  *See id*. at 197.The court's duty to prevent this unjust outcome must override any procedural or substantive argument being used to facilitate it, especially when that argument faults a non-lead firm for failing to exercise a power it does not possess.

### 3.   <u>FBBC is Entitled to Fees Because of Their Substantial Contributions to the Class</u>

Whether by way of intentional misrepresentation or careless oversight, LC's opposition is built on the factually false premise that FBBC's work was limited to a review of public documents. LC attempts to distinguish *Pappas v. Naked Juice Co. of Glendora, Inc.* by arguing "FBBC conducted no such investigation" and did not speak with "industry participants". As support for its argument that in *Pappas*, counsel had spoken with industry participants, LC relies on billing statements submitted as evidence in that case. This is incorrect. LC conveniently omits reference to FBBC's own billing records, which show a "call with expert Marek" prior to filing the complaint. *See, e.g.*, Gamarnik Decl., Exh. 1, 04/05/2022. This expert was tasked with preparing a loss-causation event study (*see* Supp. Gamarnik Decl., Exh. F), a "statistical method of measuring the effect of a particular event such as a press release . . . on the price of a company's stock**.**" *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1269 (S.D. Cal. 2010).[5]

Even setting aside FBBC's independent investigation, LC misstates the controlling legal standard. The correct standard, established in *In re Cendant Corp. Sec. Litig.*, is not the *source* of the information, but the *value* of the work produced. The Ninth Circuit, quoting *Cendant*, confirms that "'[a]ttorneys whose complaints contain factual research or legal theories that lead counsel did not discover, and upon which lead counsel later rely, will have a claim on a share of the class's recovery.'" *Hill v. Volkswagen Grp. of Am., Inc. (In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Litig.)*, 914 F.3d 623, 642-43 (9th Cir. 2019). The critical distinction is

---

[5] FBBC did not simply see a correlation and run to file a complaint.

9

between a "public report"—like a press release announcing a scandal that triggers a race to the courthouse—and diligently analyzing publicly available data that no one else has pieced together. *Cendant* makes clear that "**attorneys who alone discover grounds for a suit, based on their own investigation rather than on public reports, legitimately create a benefit for the class.**" *Cendant*, 404 F.3d at 196-97. A novel claim can be constructed from public information, much like a trade secret where a "unique combination of the information, which adds value to the information, also may qualify as a trade secret**.**" *Allergan, Inc. v. Merz Pharms., Inc.*, No. SACV 11-446 AG (Ex), 2012 U.S. Dist. LEXIS 201389, at *29-30 (C.D. Cal. Feb. 1, 2012).

LC's cited authorities are irrelevant because they all concern "piggybacking" off an obvious public report—the exact situation *Cendant* distinguishes from this case. In *Beauregard v. Smart Online, Inc.*, the complaint was filed only *after* the SEC had already filed an action and defendants were arrested for securities fraud. The court found the firm failed to show it "'discover[ed] [the] wrongdoing'" *See Beauregard v. Smart Online, Inc.*, No. 1:07CV785, 2011 WL 13076742 (M.D.N.C. June 6, 2011). *In re ArthroCare* involved at least six different lawsuits filed across the country, indicating a "readily apparent" theory of liability. *See In re ArthroCare Corp. Sec. Litig.*, No. A-08-CA-574-SS, 2012 U.S. Dist. LEXIS 189843 (W.D. Tex. June 4, 2012).[6] And both *Victor v. Argent* (involving "over thirty putative class action complaints") and *In re Adelphia* (where another complaint was filed the very same day) concerned classic races to the courthouse. *In re Adelphia Communs. Corp. Sec. & Derivative Litig.*, 2008 U.S. Dis. LEXIS 67220, *18-19 (S.D.N.Y. 2008).

In stark contrast, FBBC (along with its co-counsel) was the **only** group to investigate and file a complaint based on this theory of fraud.

---

[6] LC's accusation of bad faith relies on a demonstrable clerical error, not a deliberate omission. The Gamarnik Declaration expressly states that the attached exhibit contains an email chain from "March 10 to April 4, 2025". However, the exhibit as submitted inadvertently cuts off on March 28, 2025, failing to include the final April 4th email. FBBC's Motion and Objection references LC's reliance of the *Volkswagen* case, an authority LC raised for the first time in their omitted April 4th email.

Finally, LC's position that FBBC's fee request is "highly unusual" is refuted by its own conduct and authorities. Both *Adelphia* and *Arthrocare* were cases where lead counsel *did* appropriately seek compensation for the non-lead firms, however, the non-lead counsel wanted greater compensation, including a multiplier on their lodestar. More pointedly, the Pomerantz law firm itself was awarded fees as non-lead counsel in *In re OCA, Inc. Sec. & Derivative Litig.* for including a specific group in its complaint that was later adopted—even though their complaint was not the first one filed. *In re OCA, Inc. Sec. & Derivative Litig.*, No. 05-2165, 2009 U.S. Dist. LEXIS 19210, at *74-77 (E.D. La. Mar. 2, 2009).

LC's focus on the motion to dismiss phase is a red herring. The common fund only exists because FBBC created the case's blueprint when no other firm did. While LC's later contributions were valuable, they do not erase the initial act of creation. Without FBBC's foundational work, there would be no case to litigate and no settlement fund from which to pay anyone.

**4. <u>LCs' Ad Hominem Attacks' Against FBBC are Unfounded</u>**

LC's strategy is to mischaracterize innocuous clerical errors and past legal arguments as evidence of bad faith. Each of these accusations is baseless. Regarding the PSLRA Notice Date, LC points to a miscalculated date in FBBC's initial PSLRA notice. This was a harmless error that caused no prejudice to any party. By the time the error was discovered, the Court had already mooted the issue by setting the lead plaintiff deadline to that exact same date, June 7, 2022, rendering all motions timely filed.

Regarding the investor group, LC recycles the same unfounded argument it made during the lead plaintiff stage. This claim is directly contradicted by the record; the investors themselves submitted sworn declarations explaining that they had a pre-existing relationship and had been in contact for months before retaining FBBC. ECF No. 31-2 at ¶6, 9.

Regarding the class definition, LC again mischaracterizes FBBC's legal strategy. FBBC raised a legitimate, forward-looking concern that including a specific group of investors created a significant risk that a court might deny certification for the entire class if the matter had to be fully litigated. That this potential issue was ultimately avoided by a negotiated settlement does not mean

the initial concern was invalid or raised in bad faith; it was a prudent strategic consideration intended to protect the viability of the case for the entire class.

**5.** **FBBC Has Incurred an Additional $17,810 in Attorneys' Fees.**

In having to work on this reply, FBBC spent an additional 27.4 hours, at a rate of $650, which is $17,810.  When combined with the amount originally sought as part of FBBC's Motion and Objection, FBBC requests a total of **$132,549**. Supp. Gamarnik Decl. ¶¶ 2-3; Gamarnik Decl., Exh. C. There is no reason FBBC should not be awarded for its time incurred on drafting the fees motion and reply.  LC does not dispute that it is seeking compensation for the time spent on its fees motion.  And, as discussed above, this Motion would not have been necessary had it not been for LC's failure to include FBBC as part of its original fee request.  LC's reliance on a "presumption of correctness" fails, as that presumption does not protect a decision that violates the good-faith requirements set forth in *Cendant*. By forcing this motion, LC created these fees, and should not be rewarded for its bad faith, otherwise, firms appointed as LC would be incentivized to refuse to compensate non-lead counsel for their class-benefitting work. They could act in bad faith, knowing they would, at worst, only be ordered to pay the amount they should have offered from the start. Such an outcome would encourage, rather than deter, this exact misconduct in future cases.

Dated: October 7, 2025.        LAW OFFICES OF STEVEN J. PARSONS

/s/ Steven J. Parsons
STEVEN J. PARSONS
Nevada Bar No. 363

*Attorneys for Movant*
**FOLEY BEZEK BEHLE & CURTIS, LLP**

**CERTIFICATE OF SERVICE**

I hereby certify that on October 7, 2025, I electronically filed the foregoing **FOLEY EZEK BEHLE & CURTIS, LLP'S REPLY** with the Clerk of Court using the CM/ECF system, which will send notification of such to all CM/ECF participants.

Dated: October 7, 2025.        /s/ Candice Ruiz
Employee of LAW OFFICES OF STEVEN J. PARSONS

12